1  D. EDWARD HAYS, #162507
   ehays@marshackhays.com
2  CHAD V. HAES, #267221
   chaes@marshackhays.com
3  MARSHACK HAYS LLP
   870 Roosevelt
4  Irvine, California 9262
   Telephone:  (949) 333-7777
5  Facsimile:  (949) 333-7778

6  Attorneys for Plaintiff,
   JAMES CLARK

7

8              UNITED STATES BANKRUPTCY COURT

9         CENTRAL DISTRICT OF CALIFORNIA - RIVERSIDE DIVISION

10 | In re                          | Case No. 6:11-bk-15412-SY
11 | LETICIA JOY ARCINIEGA,         | Chapter 7
12 |         Debtor.                | Adv. No.  6:11-ap-01735-SY
13 |                                | PLAINTIFF JAMES CLARK'S COMPENDIUM
   |                                | OF TRIAL EXHIBITS
14 | JAMES CLARK,                   |
15 |         Plaintiff,             | TRIAL
   |                                | Date:   March 17, 2014
16 | v.                             | Time:   9:30 a.m.
   |                                | Ctrm:   304
17 | LETICIA JOY ARCINIEGA,         |
18 |         Defendant.             |

19        Plaintiff James Clark respectfully submits the following Trial Exhibits:

20                        Compendium of Exhibits

21        1.      The September 3, 2008 Letter from the Department of Veteran's Affairs;

22        2.      The December 11, 2008 Letter from Springboard Nonprofit Consumer Credit

23 Management;

24        3.      The January 22, 2009 Letter from CitiMortgage's Loss Mitigation Department;

25        4.      The February 12, 2009 Letter from CitiMortgage's Loss Mitigation Department;

26        5.      The January 13, 2009 Letter from CitiMortgage's Loss Mitigation Department;

27        6.      The April 20, 2009 Letter from CitiMortgage;

28        7.      The 2009 Deed of Trust on the Verona Property in favor of David Christian;

                                      1
              PLAINTIFF JAMES CLARK'S COMPENDIUM OF TRIAL EXHIBITS
85337v1/1187-001

8.    The May 2, 2009 Letter from the Defendant to CitiMortgage;

9.    The March 19, 2010 Letter from the Defendant to CitiMortgage;

10.    The January 12, 2011 Letter from the Defendant to CitiMortgage;

11.    The Settlement Agreement between Defendant and Plaintiff executed by both parties in May 2009;

12.    Defendant's Schedules A-J;

13.    Defendant's Statement of Financial Affairs;

14.    Check number 1012, dated June 11, 2008, in the amount of $2,000;

15.    Check number 1017, dated June 18, 2008, in the amount of $2,060;

16.    Check number 1018, dated July 7, 2008, in the amount of $1,775;

17.    Check number 1020, dated August 5, 2008, in the amount of $1,800;

18.    Check number 1025, dated September 8, 2008, in the amount of $2,170;

19.    Check number 1026, dated September 12, 2008, in the amount of $2,390;

20.    Check number 1028, dated September 13, 2008, in the amount of $900;

21.    Check number 1030, dated October 2, 2008, in the amount of $1,000;

22.    Check number 1031, dated October 9, 2008, in the amount of $4,370;

23.    Check number 1075, dated January 3, 2009, in the amount of $750;

24.    Check number 1076, dated January 10, 2009, in the amount of $800;

25.    Check number 1098, dated February 11, 2009, in the amount of $100;

26.    Check number 1119, dated February 13, 2009, in the amount of $1,550;

27.    Check number 1120, dated February 18, 2009, in the amount of $250;

28.    Check number 1121, dated February 19, 2009, in the amount of $500;

29.    Check number 1139, dated April 6, 2009, in the amount of $500;

30.    Check number 1140, dated April 15, 2009, in the amount of $200;

31.    Check number 1154, dated May 1, 2009, in the amount of $500;

32.    Check number 1174, dated May 21, 2009, in the amount of $700;

33.    Check number 1175, dated May 26, 2009, in the amount of $200;

34.    Check number 1176, dated June, 2009, in the amount of $2,700;

2

PLAINTIFF JAMES CLARK'S COMPENDIUM OF TRIAL EXHIBITS

35. Check number 1179, dated June 17, 2009, in the amount of $600;

36. Check number 1181, dated June 30, 2009, in the amount of $5,000;

37. Check number 1183, dated July 13, 2009, in the amount of $2,000;

38. Check number 1192, dated September 2, 2009, in the amount of $2,700;

39. Check number 1193, dated September 14, 2009, in the amount of $2,063.84;

40. Check number 1195, dated October 2, 2009, in the amount of $2,000;

41. Check number 1196, dated October 15, 2009, in the amount of $100;

42. Check number 1197, dated October 19, 2009, in the amount of $2,063.84;

43. Check number 1203, dated January 6, 2010, in the amount of $2,700;

44. Check number 1204, dated January 30, 2010, in the amount of $2,700;

45. Check number 1205, dated March 1, 2010, in the amount of $2,700;

46. Check number 1208, dated March 15, 2010, in the amount of $700;

47. Check number 1209, dated March 15, 2010, in the amount of $1,000;

48. Check number 1210, dated April 16, 2010, in the amount of $3,500;

49. Check number 1211, dated May 6, 2010, in the amount of $2,700;

50. Check number 1213, dated June 11, 2010, in the amount of $2,000;

51. Check number 1225, dated November 8, 2010, in the amount of $1,500;

52. Check number 1226, dated November 12, 2010, in the amount of $300;

53. Check number 1227, dated December 1, 2010, in the amount of $300;

54. Check number 1228, dated December 2, 2010, in the amount of $2,700;

55. Check number 1229, dated December 21, 2010, in the amount of $500;

56. Check number 1230, dated January 8, 2011, in the amount of $2,700;

57. Check number 1231, dated January 11, 2011, in the amount of $200;

58. Check number 1232, dated January 13, 2011, in the amount of $50;

59. Check number 1233, dated January 14, 2011, in the amount of $25;

60. Check number 1234, dated January 26, 2011, in the amount of $300;

61. Check number 1236, dated February 6, 2011, in the amount of $400;

62. Check number 1239, dated February 25, 2011, in the amount of $2,700;

PLAINTIFF JAMES CLARK'S COMPENDIUM OF TRIAL EXHIBITS

63.    Check number 1240, dated March 18, 2011, in the amount of $200;

64.    Check number 1241, dated March 31, 2011, in the amount of $2,700;

65.    Check number 1242, dated April 25, 2011, in the amount of $200;

66.    Check number 1245, dated May 2, 2011, in the amount of $2,700;

67.    Check number 1246, dated May 12, 2011, in the amount of $300;

68.    Check number 1248, dated May 31, 2011, in the amount of $2,700;

69.    The $50,000 cashier's check dated April 30, 2009;

70.    The $120,000 note dated April 4, 2009, held by David Christian;

71.    The bank statement dated December 9, 2006 – January 9, 2007 for Wells Fargo account number 794365304;

72.    Deposition transcript regarding January 30, 2013, deposition of Defendant;

73.    Defendant's Verified Response to Plaintiffs First Set of Requests for Admission;

74.    Defendant's Verified Response to Plaintiff's First Set of Interrogatories;

75.    Defendant's Verified Response to Plaintiff's First Set of Requests for Production of Documents;

76.    Defendant's Amended Verified Responses to Plaintiff's First Set of Interrogatories;

77.    Defendant's Amended Verified Response to Plaintiff's First Set of Requests for Production of Documents;

78.    San Luis Obispo County secured tax bill for 2010-2011; and

A.    Full Deposition transcript regarding January 30, 2013, deposition of Defendant with Reporter's Certificate.


DATED:  February 17, 2015                    MARSHACK HAYS LLP

                                             By:  _/s/ Chad V. Haes_____
                                                  D. EDWARD HAYS
                                                  CHAD V. HAES
                                                  Attorneys for Plaintiff,  JAMES CLARK

PLAINTIFF JAMES CLARK'S COMPENDIUM OF TRIAL EXHIBITS

85337v1/1187-001



**DEPARTMENT OF VETERANS AFFAIRS**
Regional Loan Center
3333 North Central Avenue
Phoenix, AZ 85012
Website: http://www.vba.va.gov/ro/phoenixlgy/index.htm

September 3, 2008

In Reply Refer To:
345/261 ROL/SOE
VA# ████████1489

Leticia J. Arciniega
890 Verona Avenue
San Jacinto, CA 92583

Dear Ms. Arciniega:

Enclosed is the Release of Liability (ROL) package you requested. To
expedite the processing of your application, please submit all required
documents at one time.

## What Documents are Needed?

- VA Form 26-6381 and information sheet completed by the seller.
- VA Forms 26-6382 and 26-8807 completed by the assumer(s).
- Copies of assumer's past two years tax returns and W-2s.
- Copies of assumer's and spouse's (if applicable) current paystub(s).
- Copies of assumer's past two months bank statements.
- Copy of the warranty deed which transfers ownership to the assumer(s).
  This would not apply if the loan has not yet closed.
- VA Form 26-8106 completed by the assumer, and their Certificate of
  Eligibility (if applying for a Substitution of Entitlement)
- Copy of final divorce decree or legal separation (if applicable)

## What Should You Do Now?

Please insure that all forms are completed and that the VA loan number has
been included on each form and document. Submit the entire package to the
address at the top of this page. Once the package is received, we will
determine if you (the assumer) qualifies for the assumption of the loan and
will notify you in writing of our decision.

## What Else Should You Know?

You should be advised that if VA grants a release of liability, this will not
restore the veteran's Home Loan entitlement. The veteran will not be able

10/06/2008 14:41 FAX  7149371423          FARZADMAZAREI                    ☑003/012

to use his entitlement until you (the assumer) pays the loan in full. In
addition, if you (the assumer) defaults on the payments and the lender
forecloses on the loan, the veteran will lose his entitlement until you (the
assumer) repays VA for the loss suffered in the foreclosure

Should you have further questions, please call our toll-free number at 1-888-
869-0194.

Sincerely,

JEFFERY WILSON
Loan Production Officer

Enclosures



**Client Action Plan**



NON PROFIT CONSUMER CREDIT MANAGEMENT

12/11/2008

**Action Steps:**

Mrs. Arciniega, during our counseling session you indicated that your mortgage is current. You indicated your concern is your reduction of household income since divorce and reduction of income due to slow work production. Based on the current situation and review of your monthly budget your Total Household Income equals $1,000.00. Household Expenses equal: $4,820.00. Client(s) DEFICIT equals: $3,820.00. Your living expenses are: 207.10% of your net monthly income. Housing Costs are over recommended 45% percentile and your transportation expenses are 93.20% of your net monthly income, costs are over recommended 25% percentile. I recommend that you implement and maintain a monthly household budget keeping your mortgage the top priority before any other expenses. Eliminate all non essential spending from your budget like cable, internet and cell phones- these are luxuries you can do without until the mortgage issue is resolved, consider selling assets (unused car, motorcycle, jewelry). I also recommend you to reduce food budget from $400.00 to $275.00. I recommend seeking full-time and/or part-time employment and possibly renting a room to increase household income; Seek employment by utilizing websites, agencies etc for employment opportunities. Consider in home work at home opportunities (childcare, laundry/ironing service, etc), contact United Way at 211 for employment opportunities available. Remember that the lender may require you to show proof of income (Pay stubs, Tax Returns, Bank statements, etc.). I also recommend suspending/deferring unsecured debt until the mortgage issue is resolved, contact Wise Plan at 800-947-3752 for debt and credit consolidation. Contact tax collector regarding reassessing taxes since property value is less then mortgage loan amount. I recommend that you follow up with your lender to see what options are available, department of Loss Mitigation and speak to your negotiator and advise them you spoke to us, 995 HOPE. I will be sending copy of session notes and budget to your lender for a possible Hope 4 Homeowners Act of 2008 ones income is increased and expenses have decreased. Please remember lender has final decision and it's based on investor guidelines. If your income does not increase and should you feel you are no longer able to make the mortgage payments, list the property for sale to avoid foreclosure, in which a Short Sale would be needed and would be highly recommended or Deed in Lieu of Foreclosure. Please remember the foreclosure timeline in your state (8-9 months). You need to stay in contact with your lender. If anything changes give me a call at 888 669-2227 ext 7730, so we can re-evaluate the budget or answer any questions

- It is recommended that you take Springboards on-line course "The Power of Paycheck Planning". This is a valuable tool that will help guide you to financial success. Go to www.credit.org/resources_education.htm for this free material. You may also request this material be mailed to you by contacting Springboard's education department at 800-947-3752 ext 820

**Actions Taken:**
Assessed Problems and Solutions
Budget Development
Developed Action Steps

**Recommendations:**
Mortgage Service

| Session Fees | Adjusted Price |
|---|---|
| Counseling Fee | $0.00 |
| Total | $0.00 |



ACCREDITED
COA

*"The Power To Move Beyond"*
Normal client service hours are Monday through Friday 7:30 AM to 5:30 PM PST
Headquarters Office: 4351 Latham St., Riverside, CA 92501
Mailing Address: P.O.Box 5438, Riverside, CA 92517-5438
951.781.0114 fax: 951.781 8027
website: www.credit.org email: springboard@credit.org



**Client Action Plan**

 **PRINGBOARD** ®
NON PROFIT CONSUMER CREDIT MANAGEMENT

12/11/2008

**Client Housing Goals:**
1. Client would like to explore some options
2. Client would like some information on the FHA Secure program
3. Client would like to keep the home
Client is current on mortgage or rent payments and understands the importance of remaining current
To obtain information on loss mitigation options
To prevent foreclosure on their home
To obtain early delinquency intervention counseling

**Counselor/Agency Housing Goals:**
1. Educate borrower on the finances
2. Help borrower reduce the mortgage payment
3. Help borrower avoid Foreclosure
To provide the client with information on loss mitigation options
To provide early delinquency intervention
The importance of remaining current on mortgage or rent payments has been explained to the client
To provide information and certification for FHA/HUD requirements

**Housing Action Plan:**
Reviewed income & listed housing & transportation expenses, client has a DEFICIT of $3,820.00 after living expenses. Based on financials, compiled, reviewed and verified present Monthly Net Income is insufficient to maintain mortgage(s), essential living expenses, and transportation costs. Clients living expenses are 207.10% of net monthly income; the national average is 35-45%. Client's transportation expenses are 93.20% of the net monthly income, national average is 15-25%. I recommended client to maintain and implement a monthly household budget keeping the mortgage the top priority. Eliminate all non essential spending from clients' budget like cable, internet and cell phones, for these are luxuries you can do without until the mortgage issue is resolved, consider selling assets (unused car, motorcycle, jewelry). I also recommended reducing food budget from $400.00 to $275.00. I recommended for client to seek full-time and/or part-time employment also possibly rent out a room to in
To contact the lender to begin the loss mitigation process
To continue to keep housing as a financial priority
Increase Income
Budget Improvement Needed Prior To Loan Resolution
Listing Home/Selling Recommended
To attend the necessary training that will allow them to manage their finances with a greater amount of skill
Decrease Expenses

**Housing Notes:**


ACCREDITED
COA

*"The Power To Move Beyond"*
Normal client service hours are Monday through Friday 7:30 AM to 5:30 PM PST
Headquarters Office: 4351 Latham St., Riverside, CA 92501
Mailing Address: P.O.Box 5438, Riverside, CA 92517-5438
951.781.0114 fax: 951.781.8027
website: www.credit.org email: springboard@credit.org


MEMBER
CREDIT COUNSELING

**Exhibit "2"**
00004





January 22, 2009

JAMES CLARK
LETICIA ARCINIEGA
890 VERONA AVE
SAN JACINTO. CA 92583-2961

RE: Loan No.
█████ 9405

Dear JAMES CLARK:

Thank you for submitting your request for assistance on the above-referenced loan, which was received on January 22, 2009. Your file has now been forwarded to a Loss Mitigation Specialist for review.

The expected timeframe needed to complete the review process is 15 to 30 days from the date of this letter. During this time you will receive a call from your Specialist in an effort to obtain any additional information needed to complete their review.

Depending on the type of *Workable Solutions℠* option you have requested, you may also receive a call from a property appraiser and/or Realtor in order to make arrangements to gain access to your home to determine the value of the property.

Please be aware that we are unable to suspend collection or foreclosure activity until such a time that a *Workable Solution* has been approved or completed, depending on the type of solution offered.

If you have any questions, please feel free to contact your Loss Mitigation Specialist. Adela McAllister, toll free. at 866-272-4749, or directly at (301)696-4252 between the hours of 8:00 a.m. through 5:00 p.m. EST.

Sincerely,

CitiMortgage
Loss Mitigation
Department

In the event you are subject to an Automatic Stay issued by a United States Bankruptcy Court or the referenced debt has been discharged in Bankruptcy, this communication is not intended to collect a debt.

Exhibit "3"
00005

02/26/2009  10:05   9514872377            MAIN STREET                     PAGE   01

## citi

JAMES A CLARK
LETICIA J ARCINIEGA
890 VERONA AVE
SAN JACINTO CA, 92583-2961

February 12, 20...

Re:       Loan No: ▓▓▓▓▓405  *Jom*

Property Address:
890 VERONA AVENUE
SAN JACINTO CA, 92583

Dear Mortgagor:

CitiMortgage, Inc. (CMI) has reviewed your request for a forbearance plan. The enclosed contract sets forth the terms under which CMI will accept a schedule of payments during the time of plan.

Please read the contract thoroughly so you understand your responsibilities under this agreement, sign and return the agreement as follows:

1) Return original agreement to CitiMortgage, Inc., 5280 Corporate Drive, Department 0010, Frederick, MD 21703.

2) Fax a copy of the signed agreement to my attention at CitiMortgage, Inc., Department 0010, (301) 696-4473.

**All payments must be in certified funds while your account is delinquent.** You may remit your down payment, as well as future payments in the following manner:

1) Payments may be sent to: CitiMortgage, Inc., Attention Exception Payments 1156-7, Duane Heaberlin, 4740 121st Street, Urbandale, IA 50323-2402.

2) Via Western Union Quick Collect.
   a) Provide the operator with the Code City: CMI, Code State: MO, and your loan number.
   b) Obtain the Money Transfer Control Number (MTCN) as confirmation of the transaction. *Please include the MTCN reference      number on the fax cover sheet.*

3) Please contact me at 1-866-272-4749 or (301) 696-44252 if you need to make other arrangements for returning the agreement and the down payment.   4232

It is important that you return the signed contract and the down payment by **02/27/09**, or this agreement will be considered null and void and we will resume collection (and/or foreclosure activity, if applicable).

Sincerely,

Adela McAllister
Loss Mitigation

Enclosure
cc:     File

02/26/2009  12:58PM (GMT-05:00)

**Exhibit "4"**
00006

## STIPULATED SPECIAL FORBEARANCE PLAN AGREEMENT

THIS AGREEMENT made as of the 3 day of February, 2009, by and between CitiMortgage, Inc. ("CMI"), having a place of business at 5280 Corporate Drive, Frederick, Maryland 21703, and JAMES A CLARK, LETICIA J ARCINIEGA whose mailing address is 890 VERONA AVE SAN JACINTO CA, 92583-2961 collectively known to as "Borrower" (the "Agreement").

Recitals:

A.  CMI is the owner and holder or servicing agent of a certain Note and Deed of Trust/Mortgage made and executed or assumed by the Borrower.

B.  The Borrower has failed and omitted to make regular monthly payments in accordance with the terms of the Note and Deed of Trust/Mortgage, therefore, the loan is in default, and CMI has exercised its rights to institute collections (and/or foreclosure, if applicable).

C.  The Borrower has requested that CMI enter into this agreement to place its collections (and/or foreclosure on hold, if applicable). CMI wishes to assist Borrower, but does not wish to discontinue collections (and/or foreclosure, if applicable), until the loan is brought current.

Agreement:

1) The total amount needed to bring the loan current through and including the February payment is the following sum:

| | |
|---|---|
| 01 payments at $1,025.48 | **$1,025.48** |
| 02/01/09 thru 02/28/09 | |
| Late Charges Due: | $0.00 |
| Foreclosure Fees: | $0.00 |
| Other: | $0.00 |
| Other: | $0.00 |
| | |
| Total Arrears Due: | **$1,025.48** |

2) Borrower is relieved from making the regular monthly payment from 02/01/09 through 04/01/09, after the down payment, if applicable, is received, which must occur on or before 02/27/09. The regular monthly payments referred to in this paragraph are being deferred and must be repaid as set forth below. The said monthly payments are not forgiven.

3) Beginning on 05/01/09, Borrower shall resume making regularly scheduled monthly payments. In addition to their regularly scheduled monthly payments, Borrower shall pay the above arrears as follows:

$513.00 due 02/27/09 ($513.00 down payment along with signed agreement)
$513.00 due 03/20/09
$513.00 due 04/20/09

**BORROWER SHALL EITHER PAY THE LOAN IN FULL OR RESUBMIT UPDATED FINANCIAL INFORMATION TO BE REVIEWED FOR FURTHER LOSS MITIGATION OPTIONS BY 05/01/09.**

Exhibit "4"
00007

4)  By entering into this agreement, CMI is neither modifying, nor waiving any rights under the Note and Deed of Trust/Mortgage, which shall continue in full force and effect. CMI is only agreeing to forbear from further collection (and/or foreclosure, if applicable), action on the condition that Borrower makes all regularly scheduled payments due under the Note and Deed of Trust/Mortgage and arrears payments under this agreement, including the down payment. In the event Borrower does not make all payments under this agreement, CMI will proceed with collections (and/or foreclosure, if applicable), without further notice, except as required by applicable law.

5)  All money paid to CMI during the term of this agreement is due and not refundable.

6)  Special forbearance plans must lead to reinstatement of the loan, either by increasing monthly payments in an amount sufficient to repay the arrearage over time, or through resumption of normal payments for a period of time followed by a total reinstatement via a lump sum payment.

   a)  If after all of the above payments have been made, and the loan is still delinquent, the Borrower must make arrangements with CMI prior to the expiration of the terms as stated in paragraph 3 to cure the delinquency. In the event that the Borrower is unable or unwilling to utilize the reinstatement option noted above, the Borrower agrees to apply for the PFS (Pre Foreclosure Sale Program).

7)  In the event Borrower and CMI are unable to agree to a resolution for the remaining delinquency amount, CMI may proceed with collection (and/or foreclosure, if applicable), without further notice, except as required by applicable law.

8)  This payment agreement is subject to change if the regular payment amount changes. If you have questions regarding your new payment amount please contact the Loss Mitigation Department. The monthly payment provided for in this schedule may increase or decrease due to the following conditions:

      (1) Variable Interest Rate or Graduated Payment loans;
      (2)  Escrow impound changes or advances;
      (3)  Costs, fees and reimbursements provided for under the loan documents that may be assessed to the account.

9)  CMI will not discontinue the pending collection (and/or foreclosure, if applicable), until Borrower's account is current.

10)  If you file for bankruptcy at any time during term of this agreement, please notify CMI immediately as it may affect the terms of this stipulated agreement.

11)  All money paid to CMI during the term of this agreement must be in *certified funds*.

12)  All payments under this agreement are due on or before the due dates. There is no grace period under the plan for any payments.

13)  Funds applied during the course of this plan will be applied as most delinquent installments first, until the loan is contractually current, then fees and costs as broken down above.

Loan No: ██████9405
CitiMortgage, Inc.

_____          _____
Alex Harris                                              Date
Loss Mitigation Specialist

Exhibit "4"
00008

02/26/2009  10:05    9514872377    MAIN STREET    PAGE  04

*I/we agree to all terms as set forth in this agreement:*

Borrower:    JAMES A CLARK                          Date

Co-Borrower:    LETICIA J ARCINIEGA                 Date

cc:    File

02/26/2009  12:58PM (GMT-05:00)

**Exhibit "4"**
**00009**

CitiMortgage



www.citimortgage.com

04/13/09

77381 002781
JAMES A CLARK
LETICIA J ARCINIEGA
890 VERONA AVE
SAN JACINTO CA   92583-2961

RE:  CitiMortgage Loan #: ███████9405

Dear CitiMortgage Customer(s):

In response to your recent inquiry regarding assistance with your
mortgage, enclosed is a financial information form for you to complete
and return to us for review.  At CitiMortgage, Inc., we look at
mortgages as partnerships.  You, of course, are responsible for
payments.  But it is up to us to help you find the payment arrangement
that is right for you.  That is exactly what we would like to do at
this time.  While only available under certain circumstances, it may
be possible to avoid foreclosure through the use of a Workable
Solution alternative.  Here are a few of the possible ways we may be
able to help you keep your home:

* Repayment Plan/Special Forbearance - after a temporary suspension or
  reduction of your loan payments, you resume making your regular payment
  plus a portion of the past-due payments until you are caught up.
* Loan Modification - if you have the ability to make payments but need
  more assistance than a forbearance plan, we can alter one or more terms
  of your original loan to allow you to repay the past-due amount over the
  remaining life of your loan.
* Claim Advance/Partial Claim - if your loan is insured, you may qualify to
  receive an interest-free loan that will bring your mortgage current
  immediately.

If we are unable to find a solution to help you keep your home or you
do not wish to keep your home, we have additional alternatives to
foreclosure that may include monetary assistance to satisfy other lien
holders or help pay moving costs:

* Pre-Foreclosure Sale - we can allow you time to sell your home for its
  market value to a qualified purchaser and pay us the sale proceeds to
  satisfy the debt, even if the proceeds are less than the total amount
  owed.
* Deed-in-Lieu of Foreclosure - if you are unable to sell your home after
  a specified period of time, we may be able to accept the property itself
  as settlement of the account.

You can also find additional information regarding loss mitigation at
the following web site that is hosted by HUD but consists of combined
information from various industry partners: "Help for Homeowners
Facing the Loss of Their Home" at
http://www.hud.gov/offices/hsg/sfh/econ/econ.cfm.

©2008 CitiMortgage, Inc. CitiMortgage, Inc. does business as Citicorp Mortgage in NM. CitiMortgage, Inc. is an equal housing lender. Citi, Arc Design, and Citi and Arc Design are registered service
marks of Citigroup Inc. *Calls are randomly monitored and recorded for quality assurance. CitiMortgage is a debt collector and any information obtained will be used for that purpose.

Exhibit "5"
00010

CitiMortgage



www.citimortgage.com

Page Two
04/13/09
████9405

In order to open a file for review in loss mitigation, your request
must include financial information from all borrowers who signed the
original loan, a statement explaining what caused you to fall behind
in your payments, and proof of income; paystubs, unemployment or other
benefit statements, or bank statements showing direct deposits. Or,
if you are self-employed, please complete the Profit and Loss
Statement portion of the Financial Form or submit your own Y-T-D
Profit and Loss Statement. As part of the review process, additional
information may need to be requested to support a particular Workable
Solution.

Please return the completed package within 10 days of the date of this
letter to the following address:

Surface Mail:                      Overnight Mail
P.O. Box 9446                      5280 Corporate Drive
Gaithersburg, MD 20898-9446        Frederick, MD 21703

Or, you may fax the information to:        301-696-4473

Please be advised that by offering you these options, CitiMortgage
does not waive any of its legal rights under the Note and Mortgage. In
addition, we are unable to suspend collection or foreclosure activity
until such time that a loan workout has been completed. Absent a
written agreement between you and CitiMortgage, CitiMortgage is under
no obligation to agree to any options presented.

Once a decision is made, you will be notified of the terms,
conditions, and any related fees associated with the completion of
your workout request. These fees vary depending on the solution
requested and can include but are not limited to;

Credit Bureau Report
Title Search and/or Policy Update
Property Valuation (Broker's Price Opinion and/or Appraisal)
Flood Certification Fee
Document Preparation and/or Recording

Eligibility criteria for a Workable Solution may also be subject to
specific investor restrictions or approval outlined in their contract
with us. If Private Mortgage Insurance covers the loan, the insurer
may also require approval of our proposal prior to completion of any
workout.

671-3038-0209F

©2008 CitiMortgage, Inc. CitiMortgage, Inc. does business as Citicorp Mortgage in NM. CitiMortgage, Inc. is an equal housing lender. Citi, Arc Design, and Citi and Arc Design are registered service
marks of Citigroup Inc. *Calls are randomly monitored and recorded for quality assurance. CitiMortgage is a debt collector and any information obtained will be used for that purpose.

Exhibit "5"
00011

CitiMortgage



www.citimortgage.com

04/20/09

80288 013857
JAMES A CLARK
LETICIA J ARCINIEGA
890 VERONA AVE
SAN JACINTO CA    92583-2961

Dear CitiMortgage Customer(s):

We are concerned because your mortgage account is still delinquent.
Our agreement was that we would receive this payment no later than
04/20/09, however your account is still due for a total amount of
$2,182.38, including $0.00 in late charges, $30.00 in delinquency
expenses and $0.00 in other fees.

If you have made arrangements to pay the total amount, Thank You.  If
you have not made arrangements, we want to provide you with every
opportunity to correct this situation and we are asking that you
immediately send the total amount past due to the following address.
Also, you must include any additional payments and/or late charges,
which may come due.

CitiMortgage, Inc.
P.O. Box 6006
The Lakes, NV 88901-6006

To ensure your payment reaches us, you may want to use Phone Pay.
Phone Pay lets you make your mortgage payment by phone using funds
directly from your checking account. There is a fee for this service.
If you have been advised of a personal check restriction, Phone Pay is
not an available payment option.

If you are unable to mail the full amount due today, and have not made
other arrangements for payment, please call us toll-free at
1-800-723-7906* to discuss the possibility of alternative
arrangements.  When you call or write to us, refer to your loan number
2001719405.  Thank you.

Sincerely,

Collection Department
CitiMortgage, Inc.

*Calls are randomly monitored and recorded to ensure quality service.

This is an attempt to collect a debt, and any information obtained
will be used for that purpose.

In the event you are subject to an Automatic Stay issued by a United
States Bankruptcy Court or the referenced debt has been discharged in
Bankruptcy, this communication is not intended to be an attempt to
collect a debt.

090420B0007734

©2008 CitiMortgage, Inc. CitiMortgage, Inc. does business as Citicorp Mortgage in NM. CitiMortgage, Inc. is an equal housing lender. Citi, Arc Design, and Citi and Arc Design are registered service
marks of Citigroup Inc. *Calls are randomly monitored and recorded for quality assurance. CitiMortgage is a debt collector and any information obtained will be used for that purpose.

**Exhibit "6"**
00012

DOC # 2009-0207376
04/28/2009 08:00A Fee:27.00
Page 1 of 6
Recorded in Official Records
County of Riverside
Larry W. Ward
Assessor, County Clerk & Recorder



RECORD AND RETURN TO:
DAVID D. CHRISTIAN
890 Verona Ave
San Jacinto, CA 92583

| S | R | U | PAGE | SIZE | DA | MISC | LONG | RFD | COPY |
|---|---|---|------|------|-----|------|------|-----|------|
|   |   |   | 6    |      |     |      |      |     |      |
| M | A | L | 465  | 426  | PCOR | NCOR | SMF | NCHG | EXAM 706 |

C
706

[Space Above This Line For Recording Data]

# DEED OF TRUST

THIS DEED OF TRUST ("Security Instrument") is made on   12/07/2007                      . The trustor is

LETICIA JOY ARCINIEGA

("Borrower"). The trustee is  DAVID D. CHRISTIAN

("Trustee").

The beneficiary is DAVID D. CHRISTIAN

which is organized and existing under the laws of   CALIFORNIA                        , and whose
address is  890 Verona Ave, San Jacinto, CA 92583

("Lender"). Borrower owes Lender the principal sum of

ONE HUNDRED–TWENTY THOUSAND & 00/000          Dollars (U.S. $ 120,000.00        ).
This debt is evidenced by Borrower's note dated the same date as this Security Instrument ("Note"), which provides
for monthly payments, with the full debt, if not paid earlier, due and payable on   APRIL 24, 2010
This Security Instrument secures to Lender: (a) the repayment of the debt evidenced by the Note, with interest, and
all renewals, extensions and modifications of the Note; (b) the payment of all other sums, with interest, advanced
under paragraph 7 to protect the security of this Security Instrument; and (c) the performance of Borrower's
covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably
grants and conveys to Trustee, in trust , with power of sale, the following described property located in
RIVERSIDE          County, California:

LOT: 81 City: San Jacinto  TR#: 21900-1  Lot 81
MB 187/093  TR 21900-1   CITY/MUNI/TWP: SAN JACINTO

APN# 433-323-028

Which has the address of  890 Verona Ave, San Jacinto, CA 92583          [Street, City];
**California**                     ("Property Address");
[Zip Code]
CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    Page 1 of 6          Form 3005 9/90
GENESIS 2000, INC. * V9.3/W11.0 * (818) 223-3260                                    Amended 5/91
Initials:

Public Record

**Exhibit "7"**
00013

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:
**1. Payment of Principal and Interest; Prepayment and Late Charges.** Borrower shall promptly pay when due the principal of and interest on the debt evidenced by the Note and any prepayment and late charges due under the Note.

**2. Funds for Taxes and Insurance.** Subject to applicable law or to a written waiver by Lender, Borrower shall pay to Lender on the day monthly payments are due under the Note, until the Note is paid in full, a sum ("Funds") for: (a) yearly taxes and assessments which may attain priority over this Security Instrument as a lien on the Property; (b) yearly leasehold payments or ground rents on the Property, if any; (c) yearly hazard or property insurance premiums; (d) yearly flood insurance premiums, if any; (e) yearly mortgage insurance premiums, if any; and (f) any sums payable by Borrower to Lender, in accordance with the provisions of paragraph 8, in lieu of the payment of mortgage insurance premiums. These items are called "Escrow Items." Lender may, at any time, collect and hold Funds in an amount not to exceed the maximum amount a lender for a federally related mortgage loan may require for Borrower's escrow account under the federal Real Estate Settlement Procedures Act of 1974 as amended from time to time, 12 U.S.C. Section 2601 et seq. ("RESPA"), unless another law that applies to the Funds sets a lesser amount. If so, Lender may, at any time, collect and hold Funds in an amount not to exceed the lesser amount. Lender may estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with applicable law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is such an institution) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items. Lender may not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and applicable law permits Lender to make such a charge. However, Lender may require Borrower to pay a one-time charge for an independent real estate tax reporting service used by Lender in connection with this loan, unless applicable law provides otherwise. Unless an agreement is made or applicable law requires interest to be paid, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender may agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds, showing credits and debits to the Funds and the purpose for which each debit to the Funds was made. The Funds are pledged as additional security for all sums secured by this Security Instrument.

If the Funds held by Lender exceed the amounts permitted to be held by applicable law, Lender shall account to Borrower for the excess Funds in accordance with the requirements of applicable law. If the amount of the Funds held by Lender at any time is not sufficient to pay the Escrow Items when due, Lender may so notify Borrower in writing, and, in such case Borrower shall pay to Lender the amount necessary to make up the deficiency. Borrower shall make up the deficiency in no more than twelve monthly payments, at Lender's sole discretion.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender. If, under paragraph 21, Lender shall acquire or sell the Property, Lender, prior to the acquisition or sale of the Property, shall apply any Funds held by Lender at the time of acquisition or sale as a credit against the sums secured by this Security Instrument.

**3. Application of Payments.** Unless applicable law provides otherwise, all payments received by Lender under paragraphs 1 and 2 shall be applied: first, to any prepayment charges due under the Note; second, to amounts payable under paragraph 2; third, to interest due; fourth, to principal due; and last, to any late charges due under the Note.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines and impositions attributable to the Property which may attain priority over this Security Instrument, and leasehold payments or ground rents, if any. Borrower shall pay these obligations in the manner provided in paragraph 2, or if not paid in that manner, Borrower shall pay them on time directly to the person owed payment. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this paragraph. If Borrower makes these payments directly, Borrower shall promptly furnish to Lender receipts evidencing the payments.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender; (b) contests in good faith the lien by, or defends against enforcement of the lien in, legal proceedings which in the Lender's opinion operate to prevent the enforcement of the lien; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which may attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Borrower shall satisfy the lien or take one or more of the actions set forth above within 10 days of the giving of notice.

**CALIFORNIA**-Single Family-**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**      Page 2 of 6                                    Form 3005 9/90
                                                                                                                              Amended 5/91
GENESIS 2000, INC. * V9.3/W11.0 * (818) 223-3260

Initials:  _____ _____

2009-0207376
04/28/2009 08:00A
2 of 6

Public Record

Exhibit "7"
00014

**5. Hazard or Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage" and any other hazards, including floods or flooding, for which Lender requires insurance. This insurance shall be maintained in the amounts and for the periods that Lender requires. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's approval which shall not be unreasonably withheld. If Borrower fails to maintain coverage described above, Lender may, at Lender's option, obtain coverage to protect Lender's rights in the Property in accordance with paragraph 7.

All insurance policies and renewals shall be acceptable to Lender and shall include a standard mortgage clause. Lender shall have the right to hold the policies and renewals. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower.

Unless Lender and Borrower otherwise agree in writing, insurance proceeds shall be applied to restoration or repair of the Property damaged, if the restoration or repair is economically feasible and Lender's security is not lessened. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with any excess paid to Borrower. If Borrower abandons the Property, or does not answer within 30 days a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may collect the insurance proceeds. Lender may use the proceeds to repair or restore the Property or to pay sums secured by this Security Instrument, whether or not then due. The 30-day period will begin when the notice is given.

Unless Lender and Borrower otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments referred to in paragraphs 1 and 2 or change the amount of the payments. If under paragraph 21 the Property is acquired by Lender, Borrower's right to any insurance policies and proceeds resulting from damage to the Property prior to the acquisition shall pass to Lender to the extent of the sums secured by this Security Instrument immediately prior to the acquisition.

**6. Occupancy, Preservation, Maintenance and Protection of the Property; Borrower's Loan Application; Leaseholds.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within sixty days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate, or commit waste on the Property. Borrower shall be in default if any forfeiture action or proceeding, whether civil or criminal, is begun that in Lender's good faith judgment could result in forfeiture of the Property or otherwise materially impair the lien created by this Security Instrument or Lender's security interest. Borrower may cure such a default and reinstate, as provided in paragraph 18, by causing the action or proceeding to be dismissed with a ruling that, in Lender's good faith determination, precludes forfeiture of the Borrower's interest in the Property or other material impairment of the lien created by this Security Instrument or Lender's security interest. Borrower shall also be in default if Borrower, during the loan application process, gave materially false or inaccurate information or statements to Lender (or failed to provide Lender with any material information) in connection with the loan evidenced by the Note, including, but not limited to, representations concerning Borrower's occupancy of the Property as a principal residence. If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**7. Protection of Lender's Rights in the Property.** If Borrower fails to perform the covenants and agreements contained in this Security Instrument, or there is a legal proceeding that may significantly affect Lender's rights in the Property (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture or to enforce laws or regulations), then Lender may do and pay for whatever is necessary to protect the value of the Property and Lender's rights in the Property. Lender's actions may include paying any sums secured by a lien which has priority over this Security Instrument, appearing in court, paying reasonable attorneys' fees and entering on the Property to make repairs. Although Lender may take action under this paragraph 7, Lender does not have to do so.

Any amounts disbursed by Lender under this paragraph 7 shall become additional debt of Borrower secured by this Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

**8. Mortgage Insurance.** If Lender required mortgage insurance as a condition of making the loan secured by this Security Instrument, Borrower shall pay the premiums required to maintain the mortgage insurance in effect. If, for any reason, the mortgage insurance coverage required by Lender lapses or ceases to be in effect, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the mortgage insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the mortgage insurance previously in effect, from an alternate mortgage insurer approved by Lender. If substantially equivalent mortgage insurance coverage is not available, Borrower shall pay to Lender each month a sum equal to one-twelfth of the yearly mortgage insurance premium being paid by Borrower when the insurance coverage lapsed or ceased to be in effect. Lender will accept, use and retain these payments as a loss reserve in lieu of mortgage insurance. Loss reserve payments may no longer be required, at the option of Lender, if mortgage insurance coverage (in the amount and for the period that Lender requires) provided by an insurer approved by Lender again becomes available and is obtained. Borrower shall pay the premiums required to maintain mortgage insurance in effect, or to provide a loss reserve, until the requirement for mortgage insurance ends in accordance with any written agreement between Borrower and Lender or applicable law.

**CALIFORNIA**-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT   Page 3 of 6   Form 3005 9/90

GENESIS 2000, INC. * V9.3/W11.0 * (818) 223-3260



Initials: ____

Amended 5/91

2009-0207376
04/28/2009 08:00A
3 of 6

Exhibit "7"

00015

**9. Inspection.** Lender or its agent may make reasonable entries upon and inspections of the Property. Lender shall give Borrower notice at the time of or prior to an inspection specifying reasonable cause for the inspection.

**10. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking of any part of the Property, or for conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender.

In the event of a total taking of the Property, the proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with any excess paid to Borrower. In the event of a partial taking of the Property in which the fair market value of the Property immediately before the taking is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the taking, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the taking, divided by (b) the fair market value of the Property immediately before the taking. Any balance shall be paid to Borrower. In the event of a partial taking of the Property in which the fair market value of the Property immediately before the taking is less than the amount of the sums secured immediately before the taking, unless Borrower and Lender otherwise agree in writing or unless applicable law otherwise provides, the proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the condemnor offers to make an award or settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the proceeds, at its option, either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due.

Unless Lender and Borrower otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments referred to in paragraphs 1 and 2 or change the amount of such payments.

**11. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to any successor in interest of Borrower shall not operate to release the liability of the original Borrower or Borrower's successors in interest. Lender shall not be required to commence proceedings against any successor in interest or refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or Borrower's successors in interest. Any forbearance by Lender in exercising any right or remedy shall not be a waiver of or preclude the exercise of any right or remedy.

**12. Successors and Assigns Bound; Joint and Several Liability; Co-Signers.** The covenants and agreements of this Security Instrument shall bind and benefit the successors and assigns of Lender and Borrower, subject to the provisions of paragraph 17. Borrower's covenants and agreements shall be joint and several. Any Borrower who co-signs this Security Instrument but does not execute the Note: (a) is co-signing this Security Instrument only to mortgage, grant and convey that Borrower's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower may agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without that Borrower's consent.

**13. Loan Charges.** If the loan secured by this Security Instrument is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge under the Note.

**14. Notices.** Any notice to Borrower provided for in this Security Instrument shall be given by delivering it or by mailing it by first class mail unless applicable law requires use of another method. The notice shall be directed to the Property Address or any other address Borrower designates by notice to Lender. Any notice to Lender shall be given by first class mail to Lender's address stated herein or any other address Lender designates by notice to Borrower. Any notice provided for in this Security Instrument shall be deemed to have been given to Borrower or Lender when given as provided in this paragraph.

**15. Governing Law; Severability.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. In the event that any provision or clause of this Security Instrument or the Note conflicts with applicable law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision. To this end the provisions of this Security Instrument and the Note are declared to be severable.

**16. Borrower's Copy.** Borrower shall be given one conformed copy of the Note and of this Security Instrument.

**17. Transfer of the Property or a Beneficial Interest in Borrower.** If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period,

---

CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT     Page 4 of 6                     Form 3005 9/90

GENESIS 2000, INC. * V9.3/W11.0 * (818) 223-3260                                                       Amended 5/91



Initials: _____  _____  _____

Public Record

Exhibit "7"
00016

Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**18. Borrower's Right to Reinstate.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earlier of: (a) 5 days (or such other period as applicable law may specify for reinstatement) before sale of Property pursuant to any power of sale contained in this Security Instrument; or (b) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees; and (d) takes such action as Lender may reasonably require to assure that the lien of this Security Instrument, Lender's rights in the Property and Borrower's obligation to pay the sums secured by this Security Instrument shall continue unchanged. Upon reinstatement by Borrower, this Security Instrument and the obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under paragraph 17.

**19. Sale of Note; Change of Loan Servicer.** The Note or a partial interest in the Note (together with this Security Instrument) may be sold one or more times without prior notice to Borrower. A sale may result in a change in the entity (known as the "Loan Servicer") that collects monthly payments due under the Note and this Security Instrument. There also may be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change in accordance with paragraph 14 above and applicable law. The notice will state the name and address of the new Loan Servicer and the address to which payments should be made. The notice will also contain any other information required by applicable law.

**20. Hazardous Substances.** Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property that is in violation of any Environmental Law. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property.

Borrower shall promptly give Lender written notice of any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substances or Environmental Law of which Borrower has actual knowledge. If Borrower learns, or is notified by any governmental or regulatory authority, that any removal or other remediation of any Hazardous Substances affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law.

As used in this paragraph 20, "Hazardous Substances" are those substances defined as toxic or hazardous substances by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials. As used in this paragraph 20, "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**21. Acceleration; Remedies.** LENDER SHALL GIVE NOTICE TO BORROWER PRIOR TO ACCELERATION FOLLOWING BORROWER'S BREACH OF ANY COVENANT OR AGREEMENT IN THIS SECURITY INSTRUMENT (BUT NOT PRIOR TO ACCELERATION UNDER PARAGRAPH 17 UNLESS APPLICABLE LAW PROVIDES OTHERWISE). THE NOTICE SHALL SPECIFY: (A) THE DEFAULT; (B) THE ACTION REQUIRED TO CURE THE DEFAULT; (C) A DATE, NOT LESS THAN 30 DAYS FROM THE DATE THE NOTICE IS GIVEN TO BORROWER, BY WHICH THE DEFAULT MUST BE CURED; AND (D) THAT FAILURE TO CURE THE DEFAULT ON OR BEFORE THE DATE SPECIFIED IN THE NOTICE MAY RESULT IN ACCELERATION OF THE SUMS SECURED BY THE SECURITY INSTRUMENT AND SALE OF THE PROPERTY. THE NOTICE SHALL FURTHER INFORM BORROWER OF THE RIGHT TO REINSTATE AFTER ACCELERATION AND THE RIGHT TO BRING A COURT ACTION TO ASSERT THE NON-EXISTENCE OF A DEFAULT OR ANY OTHER DEFENSE OF BORROWER TO ACCELERATION AND SALE. IF THE DEFAULT IS NOT CURED ON OR BEFORE THE DATE SPECIFIED IN THE NOTICE, LENDER, AT ITS OPTION, MAY REQUIRE IMMEDIATE PAYMENT IN FULL OF ALL SUMS SECURED BY THIS SECURITY INSTRUMENT WITHOUT FURTHER DEMAND AND MAY INVOKE THE POWER OF SALE AND ANY OTHER REMEDIES PERMITTED BY APPLICABLE LAW. LENDER SHALL BE ENTITLED TO COLLECT ALL EXPENSES INCURRED IN PURSUING THE REMEDIES PROVIDED IN THIS PARAGRAPH 21, INCLUDING, BUT NOT LIMITED TO, REASONABLE ATTORNEYS' FEES AND COSTS OF TITLE EVIDENCE.

IF LENDER INVOKES THE POWER OF SALE, LENDER SHALL EXECUTE OR CAUSE TRUSTEE TO EXECUTE A WRITTEN NOTICE OF THE OCCURRENCE OF AN EVENT OF DEFAULT AND OF LENDER'S ELECTION TO CAUSE THE PROPERTY TO BE SOLD. TRUSTEE SHALL CAUSE THIS NOTICE TO BE RECORDED IN EACH COUNTY IN WHICH ANY PART OF THE PROPERTY IS LOCATED. LENDER OR TRUSTEE SHALL MAIL COPIES OF THE NOTICE AS PRESCRIBED BY APPLICABLE LAW TO BORROWER AND TO THE OTHER PERSONS PRESCRIBED BY APPLICABLE LAW. TRUSTEE SHALL GIVE PUBLIC NOTICE OF SALE TO THE PERSONS AND IN THE MANNER PRESCRIBED BY APPLICABLE LAW. AFTER THE TIME REQUIRED BY APPLICABLE LAW, TRUSTEE, WITHOUT DEMAND ON BORROWER, SHALL SELL THE PROPERTY AT PUBLIC AUCTION TO THE HIGHEST BIDDER AT THE TIME AND PLACE AND UNDER THE TERMS DESIGNATED IN THE NOTICE OF SALE IN ONE OR MORE PARCELS AND IN ANY ORDER TRUSTEE DETERMINES. TRUSTEE MAY POSTPONE SALE OF ALL OR ANY PARCEL OF THE PROPERTY BY PUBLIC ANNOUNCEMENT AT THE TIME AND PLACE OF ANY PREVIOUSLY SCHEDULED SALE. LENDER OR ITS DESIGNATE MAY PURCHASE THE PROPERTY AT ANY SALE.

TRUSTEE SHALL DELIVER TO THE PURCHASER TRUSTEE'S DEED CONVEYING THE PROPERTY WITHOUT ANY COVENANT OR WARRANTY, EXPRESSED OR IMPLIED. THE RECITALS IN THE TRUSTEE'S DEED SHALL BE PRIMA FACIE EVIDENCE OF THE TRUTH OF THE STATEMENTS MADE THEREIN. TRUSTEE SHALL APPLY THE PROCEEDS OF THE SALE IN THE FOLLOWING ORDER: (A) TO ALL EXPENSES OF THE SALE, INCLUDING, BUT NOT LIMITED TO, REASONABLE TRUSTEE'S AND ATTORNEYS' FEES;

CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT        Page 5 of 6        Form 3005 9/90

GENESIS 2000, INC. * V9.3/W11.0 * (818) 223-3260                                                          Amended 5/91

Initials:    _____  _____  _____

2009-0207376
04/28/2009 08:00A
5 of 6

Public Record

Exhibit "7"

00017

(B) TO ALL SUMS SECURED BY THIS SECURITY INSTRUMENT; AND (C) ANY EXCESS TO THE PERSON OR PERSONS LEGALLY ENTITLED TO IT.

**22. Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Such person or persons shall pay any reconveyance fees or recordation costs.

**23. Substitute Trustee.** Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to call the title, powers and duties conferred upon the Trustee herein and by applicable law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

**24. Request for Notices.** Borrower requests that copies of the notices of default and sale be sent to Borrower's address which is the Property Address.

**25. Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

**25. Riders to this Security Instrument.** If one or more riders are executed by Borrower and recorded together with this Security Instrument, the covenants and agreements of each such rider shall be incorporated into and shall amend and supplement the covenants and agreements of this Security Instrument as if the rider(s) were a part of this Security Instrument.

[Check applicable box(es)]

| | | |
|---|---|---|
| ☐ Adjustable Rate | ☐ Condominium | ☐ 1-4 Family |
| ☐ Graduated Payment | ☐ Planned Unit Development | ☐ Biweekly Payment |
| ☐ Balloon | ☐ Rate Improvement | ☐ Second Home |
| ☐ V.A. | ☐ Other Rider(s) [specify] | |

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any rider(s) executed by Borrower and recorded with it.

Witnesses:

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

State of California }
County of RIVERSIDE } ss.

On 12-7-09 before me, SARAH TORRES

Personally appeared

LETICIA ARCINIEGA

,personally known to me
(or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s) or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

SARAH TORRES
COMM. #1681351
Notary Public-California
RIVERSIDE COUNTY
My Comm. Exp. July 15, 2010

_Sarah Torres_ 

(This area for official notarial seal)

CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Page 6 of 6          Form 3005 9/90
GENESIS 2000, INC. * V9.3/W11.0 * (818) 223-3260                                                                Amended 5/91

2009-0207376
04/28/2009 08:00A
6 of 6

**Exhibit "7"**
**00018**

WHEN RECORDED MAIL TO:

DAVID D. CHRISTIAN
890 VERONA AVE
SAN JACINTO, CA 92583



DOC # 2009-0251898
05/19/2009 08:00A Fee:24.00
Page 1 of 1
Recorded in Official Records
County of Riverside
Larry W. Ward
Assessor, County Clerk & Recorder

| S | R | U | PAGE | SIZE | DA | MISC | LONG | RFD | COPY |
|---|---|---|---|---|---|---|---|---|---|
| 2 | | | 1 | | 2 | | | | |
| M | A | L | 465 | 426 | PCOR | NCOR | SMF | NCHG | EXAM 703 |

## SUBSTITUTION OF TRUSTEE AND FULL RECONVEYANCE

C
703

WHEREAS, David D. Christian was the Trustor, David D. Christian the original Trustee, and David D. Christian the Beneficiary, under that certain Deed of Trust dated 12/07/2007 and recorded 04/28/2009 as Instrument No. Doc #2009-0207376, Official Records of the County of Riverside, State of California, and

WHEREAS, the undersigned Beneficiary desires to substitute a new Trustee under said Deed of Trust in place and instead of David D. Christian now therefore, the undersigned hereby substitutes himself as Trustee under said Deed of Trust and does hereby reconvey, without warranty, to the person or persons legally entitled thereto, the Estate now held by him thereunder.

Dated: May 19, 2009

David D. Christian

---------------------------------------------------------------------

### ACKNOWLEDGEMENT

State of California
County of Riverside

On May 19, 2009 before me, Sarah M. Torres, personally appeared David D. Christian, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

I certify under PENALY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature: _Sarah Torres_ _____ (Seal)

SARAH TORRES
COMM. #1681351
Notary Public-California
RIVERSIDE COUNTY
My Comm. Exp. July 15, 2010



May 2, 2009

Citimortgage
Homeownership Preservation Department
Delivered via email: Servicing@email.citimortgage.com

Re:   CitiMortgage Loan # ▮▮▮405-9, 1st Mtg: James A. Clark & Leticia J. Arciniega
       CitiMortgage Loan # ▮▮▮517-6, 2nd Mtg: Leticia J. Arciniega
       Property Address: 890 Verona Ave, San Jacinto, CA 92583

Dear Sir or Madam,

I have been in communication with various representatives of Citimortgage for several months. Since January I have been in a 'forbearance' program. This program was initially described to me as having no consequence to my credit scores and I understood that the unpaid portion of the payment would be added to the mortgage balance.

After I made the first modified payment I learned differently; my credit report reflected the loan as delinquent before the end of the first 30 days. I called Citimortgage and was informed that due to my 'forbearance' status; I was in fact delinquent. As a consequence; one of my credit card providers has closed my account, causing a negative result to my credit scores. The documents I received from Citi after we began the partial payment program indicate I must make up the arrears at the end of the three month period or face foreclosure, short sale or deed in lieu of foreclosure.

I have lived in my house for 18 years; I do not want to lose it but I need help.

First, I will explain my situation:

James A. Clark and I bought this house in 1991. I have lived here continuously since then. I have made every mortgage payment.

We refinanced the house when interest rates dropped; we used James' VA entitlement to secure a 15 year, 5% first mortgage.

James and I have divorced (I've enclosed a copy of the divorce decree). Our divorce was amicable and we made no changes to the property title or loan. In 2006 James remarried and he quit-claimed the title of the house over to me, copy enclosed of the Inter-spousal Transfer/Quitclaim.

I work as an independent contractor, providing consulting and management services to financial institutions. At the beginning of 2007 I saw what appeared to be an opportunity for investment in real estate and took a second mortgage on the house. Again, I have made the payments for this mortgage completely on my own. Ironically, I made no such investment. (Since the forbearance on the first became effective, I've received no statement for this second mortgage; no one will talk to me about it as, I am told, "we're not doing anything with them".)

James and I have effected a property settlement that requires that I remove his name from the mortgage on this house. I am very willing to do this, however several factors have complicated this considerably:

1.      Due to James' remarriage, he has absolutely declined to allow me to assume his VA entitlement, meaning that I must, somehow establish a new mortgage.

2.      As a consultant for last 12 years I have experienced as much as $165,000 in annual income, however, during 2007 I earned less than $65,000 and during 2008 I earned less than $24,000. This amount makes it very hard for me to qualify for a mortgage. (Copies of 2007 1040 and 2008 1099's

Exhibit "8"
00020

are enclosed; my 2008 tax filing has been delayed). This is a direct result of the extreme economic downturn experienced by my clients, several of which no longer exist.

3.   As a result of the declining real estate market, my house will not appraise for an amount sufficient to allow for a refinance.

4.   As in years past, when my earnings were low, I have drawn on my savings to subsidize my reduced income; I have exhausted those reserves, completely. I've never gone this long without a financially sustaining contract before.

5.   I have strong hopes of returning to my consulting work. I believe that once the economy stabilizes; or my clients begin to accept the situation as 'normal', the respective boards of directors will again begin to approve expenditures for outsourced assistance from specialists such as myself. Until then, I am living with the two very real issues:

   a.   I must remove James' name from the loan, and
   b.   I don't know how long it will be before I see contract work again; meanwhile I risk the loss of my home if I do not forestall my probable delinquency, default and eventual foreclosure.

In an effort to be proactive, and as a result of CitiMortgage's recommendation, I contacted Hope for Homeowners/Springboard Services in December of 2008, describing my situation. I was provided with valuable ideas and together we outlined a budget for me to work with, copy attached.

I have put those recommendations into effect. I am currently earning $2700, gross, per month as an office assistant for a local business. I have contacted my consumer debt creditors and we are working on payment deferrals so that I may establish some financial stability and have an opportunity to institute a plan that will allow me to achieve a measure of debt service without losing my house.

I am now appealing to you for help. Over these several months I have tried repeatedly to sustain the mortgages on my house. I have made repeated calls to your different departments trying to find some way to maintain the loans and not fall into delinquency. I have submitted complete packages of financials, hardship letter, bank statements, etc., on three different occasions. I have made no progress, I have failed. The forbearance plan is a simple deferment of a partial payment; not relief. I cannot sustain a $1700 mortgage obligation on a $2700 a month income.

I have researched what I should be spending on my income. The following table shows where I am and where I should be in terms of my income and expenses.

| Expense Type | Actual | % of Income | Should Be | % of Income |
|---|---|---|---|---|
| Housing + txs/ins | 1700.00 | 63.0 | 945.00 | 35.0 |
| Food | 262.00 | 9.7 | 262.00 | 9.7 |
| Consumer Dbt | 750.00 | 27.8 | 270.00 | 10.0 |
| Utilities | 216.00 | 8.0 | 216.00 | 8.0 |
| Auto & Trans | 690.00 | 25.5 | 690.00 | 25.5 |
| Medical | 364.00 | 13.5 | 364.00 | 13.5 |
| Savings | 00 | 00 | 00 | 00 |
| Misc | 00 | 00 | 00 | 00 |
| Total | $3,982.00 | 147.50% | $2,747.00 | 101.70% |

Leticia J. Arciniega
890 Verona Ave, San Jacinto, CA 92583
Ph: 951-654-1095
Page 2 of 3

Exhibit "8"
00021

The proposed housing amount of $945 .00 per month includes taxes ($150/mo) and insurance ($92/mon), and leaves the amount of $703.33 to be applied to principle and interest. Working with 15 years loan term at 5% this represents an initial balance of $89,000.00.

I am asking to re-write my loans under the term, rate and balance described.

The starting balance of $89,000 closely reflects the home's current market value. The house at 852 Verona Ave, which is a 3 bedroom, 1247 sq ft house sold recently for $103,000.00. My house is a two bedroom, with 1075 sq feet.

Having worked for financial institutions for over 37 years, the idea of late payments, delinquencies, defaults, falling credit scores, etc. is not simply repugnant, it is cause for intense anxiety. I have worked hard to achieve a level of financial responsibility, prudence and self-sufficiency-it is all leaking away.

The article about CEO Sanjiv Das on April 24, 2009 has given me hope and prompted this letter.

I am enclosing the following documents:

    A.      Divorce Decree
    B.      Inter-Spousal Transfer/Quit Claim
    C.      2007 1040 and 2008 1099s
    D.      Springboard Budget
    E.      CitiMortgage Letter January 22, 2009, re: submitted data
    F.      CitiMortgage Letter February 12, 2009 re: Forbearance request
    G.      CitiMortgage Letter March 17, 2009 re: Credit Bureau inquiry
    H.      CitiMortgage Email April 7, 2009 re: Citi has received documents
    I.      CitiMortgage Letter April 13, 2009 re: Submit information within 10 days  for Workable Solutions
    J.      CitiMortgage Letter April 20, 09 re: Delinquency of account
    K.      Sale of 864 Verona Ave

I am prepared to provide any other documentation that may be necessary. Please let me know immediately if any is needed.

Please accept my deepest gratitude and appreciation for your time and attention; I hope you can help me.

Sincerely,

Leticia J. Arciniega

Cc: CEO Sanjiv Das; 1000 Technology Drive, O'Fallon, MO 63368-2240

Attached Total: 24 pages

Exhibit "8"
00022

Created on 3/10/2010 10:21:00 AM 

Since March of 1998 I have worked as an independent contractor, providing consulting and management services to financial institutions. I have had excellent years of very high earnings. As a consultant for last 12 years I have experienced as much as $165,000 in annual income, however, during 2007 I earned less than $65,000 and during 2008 and 2009 I earned less than $24,000. This amount makes it very hard for me to qualify for a mortgage. (Copies of 2008 1040 and 2008 1099's are available; my 2009 tax filing has not been completed). This is a direct result of the extreme economic downturn experienced by my clients, several of which no longer exist.

In 2000 I divorced from James A. Clark, who is the co-borrower on the first mortgage on this property. He has signed over the title to me entirely.

At the beginning of 2007 I saw what appeared to be an opportunity for investment in real estate and took a second mortgage on the house. I have made the payments for this mortgage completely on my own. Ironically, I made no such investment.

As in years past, when my earnings were low, I have drawn on my savings to subsidize my reduced income; I have exhausted those reserves, completely. I've never gone this long without a financially sustaining contract before.

I have strong hopes of returning to my consulting work. I believe that once the economy stabilizes; or my clients begin to accept the situation as 'normal', the respective boards of directors will again begin to approve expenditures for outsourced assistance from specialists such as myself. Until then, I don't know how long it will be before I see contract work again; meanwhile I risk the loss of my home if I do not forestall my probable delinquency, default and eventual foreclosure.

I am currently earning $2700, gross, per month as an office assistant for a local business. I have contacted my consumer debt creditors and we are working on payment deferrals so that I may establish some financial stability and have an opportunity to institute a plan that will allow me to achieve a measure of debt service without losing my house.

I am now appealing to you for help. Over these several months I have tried repeatedly to sustain the mortgages on my house. I have previously submitted complete packages of financials, hardship letter, bank statements, etc. I have made progress, most significantly when CitiMortgage granted a modification on the first mortgage in 2009.

I have researched what I should be spending on my income. The following table shows where I am and where I should be in terms of my income and expenses.

| Expense Type | Actual | % of Income | Should Be | % of Income |
|---|---|---|---|---|
| House 1st, 2nd, txs & ins | 1,394.00 | 51.6 | 945.00 | 35.0 |
| Food | 262.00 | 9.7 | 262.00 | 9.7 |
| Consumer Dbt | 750.00 | 27.8 | 270.00 | 10.0 |
| Utilities | 216.00 | 8.0 | 216.00 | 8.0 |
| Auto & Trans | 460.00 | 17.0 | 460.00 | 17.0 |
| Medical | 388.00 | 14.4 | 388.00 | 14.4 |
| Savings | 00 | 00 | 00 | 00 |
| Misc | 00 | 00 | 00 | 00 |
| Total | $3,470.00 | 128.50% | $2,541.00 | 94.10% |

Exhibit "9"
00023

Created on 3/10/2010 10:45:00 AM

4Pb 29

## Modification Program Hardship Affidavit

Borrower Name (first, middle, last): Leticia J. Arciniega    Date of Birth: ▓1953
Co-Borrower Name (first, middle, last): _N/A _____ Date of Birth: _____
Property Street Address: 890 Verona Ave._____
Property City, ST, Zip:    San Jacinto, CA 92583 _____
Servicer:        CitiMortgage_____
Loan Number:        #▓517-6 _____

In order to qualify for CitiMortgage's ("Servicer") offer to enter into an agreement to modify my loan under the federal government's Home Affordable Modification Program (the "Agreement"), I/we am/are submitting this form to the Servicer and indicating by my/our checkmarks ("✓") the one or more events that contribute to my/our difficulty making payments on my/our mortgage loan.

| Borrower | | Co-Borrower | | |
|---|---|---|---|---|
| Yes | No | Yes | No | |
| ☒ | ☐ | ☐ | ☐ | My income has been reduced or lost. For example: unemployment, underemployment, reduced job hours, reduced pay, or a decline in self-employed business earnings. I have provided details below under "Explanation." |
| Yes ☐ | No ☐ | Yes ☐ | No ☐ | My household financial circumstances have changed. For example: death in family, serious or chronic illness, permanent or short-term disability, increased family responsibilities (adoption or birth of a child, taking care of elderly relatives or other family members). I have provided details below under "Explanation." |
| Yes ☐ | No ☐ | Yes ☐ | No ☐ | My expenses have increased. For example: monthly mortgage payment has increased or will increase, high medical and health-care costs, uninsured losses (such as those due to fires or natural disasters), unexpectedly high utility bills, increased real property taxes. I have provided details below under "Explanation." |
| Yes ☒ | No ☐ | Yes ☐ | No ☐ | My cash reserves are insufficient to maintain the payment on my mortgage loan and cover basic living expenses at the same time. Cash reserves include assets such as cash, savings, money market funds, marketable stocks or bonds (excluding retirement accounts). Cash reserves do not include assets that serve as an emergency fund (generally equal to three times my monthly debt payments). I have provided details below under "Explanation." |
| Yes ☐ | No ☐ | Yes ☐ | No ☐ | My monthly debt payments are excessive, and I am overextended with my creditors. I may have used credit cards, home equity loans or other credit to make my monthly mortgage payments. I have provided details below under "Explanation." |
| Yes | No | Yes | No | |

Freddie Mac Form 1122            Page 1 of 4            April 2009

**Exhibit "9"**
**00024**

Created on 3/10/2010 10:45:00 AM

☐ ☐ ☐ ☐     There are other reasons I/we cannot make our mortgage payments.  I have
provided details below under "Explanation."

## Information for Government Monitoring Purposes

The following information is requested by the federal government in order to monitor compliance with federal statutes that prohibit discrimination in housing.  **You are not required to furnish this information, but are encouraged to do so.  The law provides that a lender or servicer may not discriminate either on the basis of this information, or on whether you choose to furnish it.**  If you furnish the information, please provide both ethnicity and race.  For race, you may check more than one designation.  If you do not furnish ethnicity, race, or sex, the lender or servicer is required to note the information on the basis of visual observation or surname if you have made this request for a loan modification in person.  **If you do not wish to furnish the information, please check the box below.**

| BORROWER ☐ I do not wish to furnish this information | | CO-BORROWER ☐ I do not wish to furnish this information | |
|---|---|---|---|
| Ethnicity: | ☒ Hispanic or Latino<br>☐ Not Hispanic or Latino | Ethnicity: | ☐ Hispanic or Latino<br>☐ Not Hispanic or Latino |
| Race: | ☐ American Indian or Alaska Native<br>☐ Asian<br>☐ Black or African American<br>☐ Native Hawaiian or Other Pacific Islander<br>☒ White | Race: | ☐ American Indian or Alaska Native<br>☐ Asian<br>☐ Black or African American<br>☐ Native Hawaiian or Other Pacific Islander<br>☐ White |
| Sex: | ☒ Female<br>☐ Male | Sex: | ☐ Female<br>☐ Male |
| To be Completed by Interviewer | Interviewer's Name (print or type) | Name/Address of Interviewer's Employer | |
| ☐ Face-to-face interview<br>☐ Mail<br>☐ Telephone<br>☐ internet | Interviewer's Signature    Date<br><br>Interviewer's Phone Number (include area code) | | |

## Borrower/Co-Borrower Acknowledgement

1. Under penalty of perjury, I/we certify that all of the information in this affidavit is truthful and the event(s) identified above has/have contributed to my/our need to modify the terms of my/our mortgage loan.
2. I/we understand and acknowledge the Servicer may investigate the accuracy of my/our statements, may require me/us to provide supporting documentation, and that knowingly submitting false information may violate Federal law.
3. I/we understand the Servicer will pull a current credit report on all borrowers obligated on the Note.
4. I/we understand that if I/we have intentionally defaulted on my/our existing mortgage, engaged in fraud or misrepresented any fact(s) in connection with this Hardship Affidavit, or if I/we do not provide all of the required documentation, the Servicer may cancel the Agreement and may pursue foreclosure on my/our home.

Exhibit "9"
00025

Created on 3/10/2010 10:45:00 AM

5. I/we certify that my/our property is owner-occupied and I/we have not received a condemnation notice.
6. I/we certify that I/we am/are willing to commit to credit counseling if it is determined that my/our financial hardship is related to excessive debt.
7. I/we certify that I/we am/are willing to provide all requested documents and to respond to all Servicer communication in a timely manner. I/we understand that time is of the essence.
8. I/we understand that the Servicer will use this information to evaluate my/our eligibility for a loan modification or other workout, but the Servicer is not obligated to offer me/us assistance based solely on the representations in this affidavit.
9. I/we authorize and consent to Servicer disclosing to the U.S. Department of Treasury or other government agency, Fannie Mae and/or Freddie Mac any information provided by me/us or retained by Servicer in connection with the Home Affordable Modification Program.

| _____ | 3/10/2010__ | _____ | _____ |
| Borrower Signature | Date | Co-Borrower Signature | Date |

E-mail Address: ████@verizon.net___          E-mail Address: _____

Cell Phone # ████1095_____          Cell Phone # _____

Home Phone # same_____          Home Phone # _____

Work Phone # same_____          Work Phone # _____

Social Security # ████292⁄          Social Security # ___ __ _____

Explanation:

Since March of 1998 I have been self-employed and worked as an independent contractor, providing consulting and management services to financial institutions. I have had excellent years of very high earnings. As a consultant for last 12 years I have experienced as much as $165,000 in annual income, however, during 2007 I earned less than $65,000 and during 2008 and 2009 I earned less than $24,000. (Copies of 2008 1040 and 2008 and 2009 1099's are available; my 2009 tax filing has not been completed). This is a direct result of the extreme economic downturn experienced by my clients, several of which no longer exist.

In 2000 I divorced from James A. Clark, who is the co-borrower on the first mortgage on this property. He has signed over the title to me entirely. I have always made the mortgage payments from my own earnings.

At the beginning of 2007 I saw what appeared to be an opportunity for investment in real estate and took a second mortgage on the house. I have made the payments for this mortgage completely on my own. Ironically, I made no such investment.

Exhibit "9"
00026

Created on 3/10/2010 10:45:00 AM

As in years past, when my earnings were low, I have drawn on my savings to subsidize my reduced income; I have exhausted those reserves, completely. I've never gone this long without a financially sustaining contract before.

I have strong hopes of returning to my consulting work. I believe that once the economy stabilizes; or my clients begin to accept the situation as 'normal', the respective boards of directors will again begin to approve expenditures for outsourced assistance from specialists such as myself. Until then, I don't know how long it will be before I see contract work again; meanwhile I risk the loss of my home if I do not forestall my probable delinquency, default and eventual foreclosure.

I am currently earning $2700, gross, per month as an office assistant for a local business. I have contacted my consumer debt creditors and we are working on payment deferrals so that I may establish some financial stability and have an opportunity to institute a plan that will allow me to achieve a measure of debt service without losing my house.

I am now appealing to you for help. Over these several months I have tried repeatedly to sustain the mortgages on my house. I have previously submitted complete packages of financials, hardship letter, bank statements, etc. I have made progress, most significantly when CitiMortgage granted a modification on the first mortgage in 2009.

I have researched what I should be spending on my income. The following table shows where I am and where I should be in terms of my income and expenses.

| Expense Type | Actual | % of Income | Should Be | % of Income |
|---|---|---|---|---|
| House 1st, 2nd, txs & ins | 1,394.00 | 51.6 | 945.00 | 35.0 |
| Food | 262.00 | 9.7 | 262.00 | 9.7 |
| Consumer Dbt | 750.00 | 27.8 | 270.00 | 10.0 |
| Utilities | 216.00 | 8.0 | 216.00 | 8.0 |
| Auto & Trans | 460.00 | 17.0 | 460.00 | 17.0 |
| Medical | 388.00 | 14.4 | 388.00 | 14.4 |
| Savings | 00 | 00 | 00 | 00 |
| Misc | 00 | 00 | 00 | 00 |
| Total | $3,470.00 | 128.50% | $2,541.00 | 94.10% |

Please contact me if you need additional documentation.

Thanks for your help.

Tish

Exhibit "9"
00027

Re: Loan #0771342517 & 2001719405
Borrower: Leticia J Arciniega
Property Address: 890 Verona Ave, San Jacinto, CA 92583

Created on 1/11/2011 5:34:00 PM
January 12, 2011

**42**

Dear Susan,

Since March of 1998 I have worked as an independent contractor, providing consulting and management services to financial institutions. I have had excellent years of very high earnings. As a consultant for the last 12 years I have experienced as much as $165,000 in annual income, however, during 2007 I earned less than $65,000 and during 2008 and 2009 I earned less than $24,000. This amount has made it very hard for me to meet my debts. (Copies of 2008 1040 and 2008 and 2009 1099's are included in this package). This is a direct result of the current extreme economic downturn experienced by all, including my clients, several of which no longer exist.

As in years past, when my earnings were low, I have drawn on my savings to subsidize my reduced income; I have exhausted those reserves, completely. I've never gone this long without a financially sustaining contract before.

I have strong hopes of returning to my consulting work. I believe that once the economy stabilizes; or my clients begin to accept the situation as 'normal', the respective boards of directors will again begin to approve expenditures for outsourced assistance from specialists such as myself. Until then, I don't know how long it will be before I see contract work again; meanwhile I risk the loss of my home if I do not forestall my probable delinquency, default and eventual foreclosure.

I am currently earning $2700, gross, per month as an office assistant for a Main Street Realty. I have contacted my consumer debt creditors and we are working on payment deferrals so that I may establish some financial stability and have an opportunity to institute a plan that will allow me to achieve a measure of debt service without losing my house.

I am now appealing to you for help. Over these several months I have tried repeatedly to sustain the mortgages on my house. I have previously submitted complete packages of financials, hardship letter, bank statements, etc. I have made progress, most significantly when CitiMortgage granted a modification on the first mortgage in 2009.

I have researched what I should be spending on my income. The following table shows where I am and where I should be in terms of my income and expenses.

| Expense Type | Actual | % of Income | Should Be | % of Income |
|---|---|---|---|---|
| House 1st, 2nd, txs & ins | 1,375.96 | 51.6 | 945.00 | 35.0 |
| Food | 262.00 | 9.7 | 262.00 | 9.7 |
| Auto Loan | 234.60 | 8.7 | 270.00 | 10.0 |
| Utilities | 426.00 | 17.8 | 216.00 | 8.0 |
| Telephone | 150.00 | 5.6 | 150.000 | 5.6 |
| Auto Expense | 150.00 | 5.6 | 460.00 | 17.0 |
| Insurance | 594.54 | 22.0 | 388.00 | 14.4 |
| Total | $3,193.10 | 121.00% | $2,541.00 | 99.70% |

I sincerely hope the information I am submitting now is sufficient to support my request for a modification.

Please let me know immediately if you have any questions or need additional documents.

Thanks!

Leticia (Tish) Arciniega

**Exhibit "10"**
**00028**

## AGREEMENT OF COMPROMISE, SETTLEMENT, AND
## MUTUAL AND GENERAL RELEASE

This Agreement of Compromise, Settlement, and Mutual and General Release ("Agreement") is made by and among Plaintiff, JAMES CLARK, (hereinafter referred to as "Plaintiff") and Defendant, Leticia Arciniega (hereinafter referred to as "Settling Defendant.")

### I.    RECITALS

This Agreement is entered into with reference to the following facts:

A.      The undersigned understand, acknowledge, and agree that the execution of this Agreement constitutes the compromise of disputed and contested claims and is not to be construed as an admission of liability on the part of any of the parties hereto. It is the parties' desire and intention to effect a final settlement and resolution of any and all claims by and between the parties hereto, including claims that may or may not have accrued as of the date of this Agreement.

B.      On March 2, 2007, Plaintiff filed a complaint against Settling Defendant bearing case number SCVSS147607 in the Superior Court of the State of California, County of San Bernardino. On or about May 30, 2008, Plaintiff filed a first amended complaint for breach of contract, specific performance, resulting trust, declaratory relief, and partition of the real property located at 3047 North Arrowhead Avenue, San Bernardino, California 92405 ("Subject Property.") Settling Defendant answered both complaints and asserted defenses, claims, etc. The complaint, the amendment to the complaint, the answer to both and all allegations, causes of action and claims are hereinafter referred to as the "Pending Litigation."

C.      Each of the parties hereto considers it to be in his or her interest, and to his or her advantage, forever to dismiss, settle, adjust, and compromise all claims and defenses which have been, or could have been asserted in the settled matters, and all other claims and defenses which have been asserted, or could have been asserted, by any party hereto against any other party hereto.

D.      Each of the parties hereto recognizes that to litigate claims and defenses would involve extensive time delays and substantial expenditures of resources.

### II.    AGREEMENT

NOW, THEREFORE, for good and valuable consideration including, but not necessarily limited to, the covenants, conditions and promises contained herein, the receipt, sufficiency and adequacy of which consideration is conclusively acknowledged by the parties, the parties hereto covenant and agree as follows:

A. Plaintiff will pay Settling Defendant the principal sum of Fifty Thousand Dollars ($50,000). The settlement draft will be made payable to defendant and her counsel of record. This payment is due on Wednesday May 13, 2009, so long as all parties have executed the settlement agreement and defendant has provided plaintiff with a properly signed and notarized quitclaim deed granting her entire interest in the

JC000077

Exhibit "11"
00029

Subject Property to plaintiff. Plaintiff is required to pay defendant $1,000 for each day that he is late in delivering the settlement funds to defendant, so long as all the conditions set forth above are met.

B.  No later than May 13, 2010, defendant will take all necessary measures to pay off the existing VA loan and removing plaintiff's name from the loan on her property located at 890 Verona Avenue, Hemet, California. Defendant will not attempt to assume the VA loan. Defendant agrees to pay plaintiff liquidated damages at the rate of $1000 per day for everyday that she is late complying with this provision. Plaintiff will execute all necessary documents so as to enable defendant effectuate the removal of plaintiff's name from the loan on her property on 890 Verona, Hemet, CA.

C.  Subject to defendant fulfilling the obligations set forth above in Paragraph IIB, plaintiff hereby waives any and all interests he may have in the property located at 890 Verona Avenue, Hemet, California.

**1.    Attorney's Fees and Costs**

Each party shall bear his or her own attorney's fees and costs in connection with the Pending Litigation. In the event of future actions including, but not limited to filing a motion to enforce settlement, litigation or arbitration relating to the enforcement of this Agreement, the prevailing party shall be entitled to his or her reasonable attorney's fees, expenses and costs incurred therein pursuant to California *Civil Code* section 1717.

**2.    Request for Dismissal**

Upon exchange of the signed settlement documents, quitclaim deed and settlement draft, Plaintiff will file a Request for Dismissal of his Complaint with the Court. Plaintiff will forward a conformed copy of the Request for Dismissal to Settling Defendant.

**3.    Mutual Releases**

In consideration of the terms and provisions of this Agreement, and with the exception of the obligations set forth herein, all parties to this Agreement shall and do hereby relieve, and release, and discharge all parties to this Agreement, their successors and assigns, and all of their present and former attorneys, and agents, representatives, insurance carriers, and each of them and their successors, assigns, and heirs from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, costs, expenses (including but not limited to attorney fees), damages, actions and causes of actions, of whatever kind or nature, whether now known or unknown, suspected or unsuspected, based on, arising out of, or in connection with anything whatsoever done, omitted, or suffered to be done at any time prior to the date of execution of this Agreement, in connection with the matters or facts alleged or set forth in, or related to, the Pending Litigation, all claims which were raised or could have been raised in the Pending Litigation, as well as all claims that relate to or arise out of any of the allegations in the Pending Litigation and any and all other causes of action, suits, debts, controversies, claims and demands whatsoever, whether known or unknown, suspected, claimed, which either party ever had, now have, or may have by reason of any matter, event or thing whatsoever from the beginning of time to the date on which this Agreement becomes effective.

JC000078

**Exhibit "11"**
**00030**

4.    **Court to Retain Jurisdiction Pursuant to C.C.P. § 664.6**

The parties agree and stipulate that the court shall retain jurisdiction over the parties to enforce this Agreement until full performance thereof and this settlement Agreement shall be enforceable to the fullest extent provided by *Code of Civil Procedure* section 664.6. If any of the parties to this agreement are forced to take any action to enforce the terms of the settlement, including but not limited to, filing a motion to enforce, arbitration or a new action, the prevailing party will be entitled to recover their attorney's fees and costs.

5.    **Incorporation of Recitals**

By their signatures hereon, the parties hereby restate, confirm, acknowledge and warrant the facts, purposes and recitations contained in the recitals hereof as though same were terms of this Agreement.

6.    **No Admission of Liability**

This settlement is a compromise of a dispute and represents the compromise of a disputed claim. The parties have entered into this Agreement for the purpose of terminating and resolving their various disputes and differences and for the purpose of avoiding the cost, expense, uncertainty and inconvenience of litigation. Accordingly, neither this Agreement, nor any action taken pursuant hereto, constitutes now, nor shall be construed to constitute, any admission of liability or of any of the claims made against any party, all of which liability or fault is expressly denied. No rights shall inure to any party hereto, or any third party, from the obligations, representations and agreements of the parties made herein, as this Agreement is made solely for the purpose of terminating the disputes between the parties.

7.    **Acknowledgement of Civil Code Section 1542**

In making this mutual release, and with the exception of the obligations set forth herein, the parties intend to release each other from any and all liability of any nature whatsoever, from any claim of damages or injury, or for equitable or declaratory relief of any kind, whether the basis thereof is suspected, unsuspected, known or unknown. Thus, except as otherwise provided herein, the parties expressly waive the protections afforded by California *Civil Code* section 1542, which provides as follows:

> A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his settlement with the debtor.

8.    **Declaration re: Reliance**

No party, nor any agents or related entities of a party, has made any statement or representation to any other party regarding any fact relied upon in entering into this Agreement, and each party expressly states that, except as otherwise provided in this section, he or she does not rely upon any statement, representation or promise of any other party or any party's agents or related entities in executing this Agreement, or in making the settlement provided for herein, except as is expressly stated in this Agreement. Each party to this Agreement has had full opportunity to consult with counsel as to the interpretation and intent of this Agreement, and has

JC000079

Exhibit "11"
00031

made such investigation of the facts pertaining to this settlement, and this Agreement, and of all
other matters pertaining thereto, as he or she deems necessary and appropriate.

9.    **Entire Agreement**
This Agreement contains the entire understanding and agreement of the parties with
respect to the subject matter hereof, and supersedes any prior or contemporaneous written or oral
agreements between them concerning same. This Agreement may be waived, modified or
amended only by a subsequent writing signed by all of the parties, specifically referring to this
document.

10.    **No Waiver**
The delay in enforcement, or waiver, by any party of the timely or other performance of
any covenant, condition or promise contained herein shall neither invalidate this Agreement nor
be construed as a waiver by that party of their right to subsequently demand timely, or other,
performance of that, or any other, covenant, condition or promise contained herein.

11.    **Headings**
The headings and subheadings of the different paragraphs of this Agreement are
inserted for convenience and reference only, and are not to be considered part of this Agreement
or relevant to the interpretation of the meaning, construction or effect of the relating body.

12.    **Partial Invalidity**
In the event any term, condition or provision of this Agreement is held to be invalid,
void or unenforceable by a court of competent jurisdiction, then the remaining provisions hereof
shall remain in full force and effect, and shall in no way be effected, impaired or invalidated by
such holding. To the extent necessary, any such remaining provisions shall be interpreted in
accordance with the intent of the parties as evidenced by all other provisions, including the
offending provisions hereof.

13.    **Governing Law and Venue**
This Agreement has been drafted with reference to California law. Accordingly, this
Agreement shall be interpreted and enforced in accordance with the laws of the State of
California.

14.    **Binding Effect**
This Agreement shall inure to the benefit of, and shall be binding upon, the respective
assigns, successors in interest, personal representatives, executors, estate heirs, legatees, agents
and related entities of each of the parties hereto.

15.    **Execution of Documents and Necessary Acts**
The parties agree to promptly, and without charge, perform such further acts, and to
execute, acknowledge and deliver such additional documents, as may be reasonably requested,
necessary or appropriate to carry out the provisions of this Agreement.

JC000080

Exhibit "11"
00032

**16.    Authority to Execute Agreement**

The signatories to this Agreement represent and warrant, each to the other, that they have full power and authority to execute this Agreement on behalf of the entity for which it is executed, and to do any and all of the things reasonably required hereunder.

**17.    Construction and Interpretation**

The parties acknowledge that this Agreement represents the joint product of negotiation between the parties and should, therefore, be interpreted fairly and simply, in accordance with ordinary meaning, and not for or against either party as the drafter thereof.

**18.    Warranty of No Transfer**

Each of the parties hereto represents and warrants to the other that each such party has not heretofore assigned, transferred or hypothecated, or purported to assign, transfer or hypothecate to any person or other entity any debt, judgment, claim, liability, demand, action, cause of action, or any interest therein, based upon, arising out of, pertaining to, concerning, or connected with any matters, facts, events, circumstances or things released hereby, and further agrees to indemnify and hold each other harmless of any claim, demand or cause of action if subsequently brought based upon any such assignment, transfer or hypothecation. The parties, and each of them, further warrant that they are, at the date hereof, the holders of any and all claims released hereby.

**19.    Execution, Effective Date, and Counterparts**

This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. The effective date hereof shall be the date last executed by a party hereto. Any party may execute this Agreement by way of a facsimile signature, a copy of which will operate as an original. The party executing the facsimile copy shall promptly transmit a copy thereof to all other parties.

IN WITNESS WHEREOF, the parties have executed this Agreement effective as indicated at paragraph 19 above.

DATED: May 4 , 2009

_____
JAMES CLARK

DATED: May 11 , 2009

_____
LETICIA ARCINIEGA

///

///

Page 5 of 6

JC000081

**Exhibit "11"**
**00033**

APPROVED AS TO FORM:

DATED: May _11_, 2009   **FARZAD & MAZAREI, ALC**

      By: _____

        Tawny Mazarei
        Attorneys for Plaintiff, JAMES CLARK

DATED: May _____, 2009   **MILTON & DeKRUIF**

      By: _____

        Michael K. DeKruif
        Attorneys for Defendant, LETICIA ARCINIEGA

JC000082

**Exhibit "11"**
**00034**

B6A (Official Form 6A) (12/07) - Cont.

In re   __Leticia Joy Arciniega_____,    Case No. _____
                                    Debtor

# SCHEDULE A - REAL PROPERTY
### (Continuation Sheet)

| Description and Location of Property | Nature of Debtor's Interest in Property | Husband, Wife Joint, or Community | Current Value of Debtor's Interest in Property, without Deducting any Secured Claim or Exemption | Amount of Secured Claim |
|---|---|---|---|---|
| **2 unbuildable lots in 1 Parcel** | | - | **2,062.50** | **0.00** |

**Parcel Number: 547110053-4**
**POR Lot 4 MB 006/304 SD Jose A Estudillos Sub**
**TRPOR NW 1/4 of Sec and POR  Sec 19 T4S R1EF**

**Parcel Number: 547110051-2**
**.03 acres M/L in Por Lot 4 MB 006/304 SD Jose A**
**Estudillos Sub TR VII RO S J Viejo**


**Debtor has 50% interest.**
**Debtor retaining Property.**

| | | |
|---|---|---|
| Sub-Total > | **2,062.50** | (Total of this page) |
| Total > | **249,715.30** | |

Sheet __1__ of __1__ continuation sheets attached to the Schedule of Real Property

(Report also on Summary of Schedules)

**Exhibit "12"**

**00035**

B6B (Official Form 6B) (12/07)

In re   **Leticia Joy Arciniega**                                                ,        Case No. _____
                                                        Debtor

# SCHEDULE B - PERSONAL PROPERTY

Except as directed below, list all personal property of the debtor of whatever kind. If the debtor has no property in one or more of the categories, place an "x" in the appropriate position in the column labeled "None." If additional space is needed in any category, attach a separate sheet properly identified with the case name, case number, and the number of the category. If the debtor is married, state whether husband, wife, both, or the marital community own the property by placing an "H," "W," "J," or "C" in the column labeled "Husband, Wife, Joint, or Community." If the debtor is an individual or a joint petition is filed, state the amount of any exemptions claimed only in Schedule C - Property Claimed as Exempt.

**Do not list interests in executory contracts and unexpired leases on this schedule.  List them in Schedule G - Executory Contracts and Unexpired Leases.**

If the property is being held for the debtor by someone else, state that person's name and address under "Description and Location of Property."
If the property is being held for a minor child, simply state the child's initials and the name and address of the child's parent or guardian, such as "A.B., a minor child, by John Doe, guardian." Do not disclose the child's name. See, 11 U.S.C. §112 and Fed. R. Bankr. P. 1007(m).

| Type of Property | N O N E | Description and Location of Property | Husband, Wife, Joint, or Community | Current Value of Debtor's Interest in Property, without Deducting any Secured Claim or Exemption |
|---|---|---|---|---|
| 1.  Cash on hand | | **Cash on Hand** | - | **40.00** |
| 2.  Checking, savings or other financial accounts, certificates of deposit, or shares in banks, savings and loan, thrift, building and loan, and homestead associations, or credit unions, brokerage houses, or cooperatives. | | **Savings Account #8047 Wells Fargo Bank** | - | **1.16** |
| | | **Checking Account #5563 Wells Fargo Bank** | - | **167.78** |
| 3.  Security deposits with public utilities, telephone companies, landlords, and others. | X | | | |
| 4.  Household goods and furnishings, including audio, video, and computer equipment. | | **Household Goods and Furnishings** | - | **2,500.00** |
| 5.  Books, pictures and other art objects, antiques, stamp, coin, record, tape, compact disc, and other collections or collectibles. | | **Books, Pictures & Collectibles** | - | **150.00** |
| 6.  Wearing apparel. | | **Wearing Apparel** | - | **700.00** |
| 7.  Furs and jewelry. | | **Fashion Jewelry** | - | **750.00** |
| 8.  Firearms and sports, photographic, and other hobby equipment. | X | | | |
| 9.  Interests in insurance policies. Name insurance company of each policy and itemize surrender or refund value of each. | | **Whole Life Insurance Policy #6578 NY Life** | - | **7,356.01** |
| | | **Outstanding Loan Balance $8952.31** | | |
| 10. Annuities. Itemize and name each issuer. | X | | | |

Sub-Total >        **11,664.95**
(Total of this page)

__3__  continuation sheets attached to the Schedule of Personal Property

Software Copyright (c) 1996-2010 - Best Case Solutions - Evanston, IL - www.bestcase.com                                           Best Case Bankruptcy

**Exhibit "12"**
**00036**

B6B (Official Form 6B) (12/07) - Cont.

In re    **Leticia Joy Arciniega**                                         ,    Case No. _____
                                              Debtor

## SCHEDULE B - PERSONAL PROPERTY
(Continuation Sheet)

| Type of Property | N O N E | Description and Location of Property | Husband, Wife, Joint, or Community | Current Value of Debtor's Interest in Property, without Deducting any Secured Claim or Exemption |
|---|---|---|---|---|
| 11. Interests in an education IRA as defined in 26 U.S.C. § 530(b)(1) or under a qualified State tuition plan as defined in 26 U.S.C. § 529(b)(1). Give particulars. (File separately the record(s) of any such interest(s). 11 U.S.C. § 521(c).) | X | | | |
| 12. Interests in IRA, ERISA, Keogh, or other pension or profit sharing plans. Give particulars. | | **Merrill Lynch Retirement Account Account #2694** | - | 101,237.30 |
| | | **Merrill Lynch Retirement Account Account #2766** | - | 21.49 |
| 13. Stock and interests in incorporated and unincorporated businesses. Itemize. | | **Interest in Business: MSRE, Inc. dba Main St. Realty (MSRE, Inc. a Service Corporation)- Liabilities exceed assets.** | - | 0.00 |
| | | **Debtor has $135,556.32 in the business bank accounts. These are client's Trust accounts- for clients, rents, security deposits and misc. expenses). These are not debtor's funds.** | | |
| 14. Interests in partnerships or joint ventures. Itemize. | X | | | |
| 15. Government and corporate bonds and other negotiable and nonnegotiable instruments. | X | | | |
| 16. Accounts receivable. | X | | | |
| 17. Alimony, maintenance, support, and property settlements to which the debtor is or may be entitled. Give particulars. | X | | | |
| 18. Other liquidated debts owed to debtor including tax refunds. Give particulars. | X | | | |
| 19. Equitable or future interests, life estates, and rights or powers exercisable for the benefit of the debtor other than those listed in Schedule A - Real Property. | X | | | |

Sub-Total >    101,258.79
(Total of this page)

Sheet __1__ of __3__ continuation sheets attached
to the Schedule of Personal Property

Software Copyright (c) 1996-2010 - Best Case Solutions - Evanston, IL - www.bestcase.com

Best Case Bankruptcy

**Exhibit "12"**
**00037**

B6B (Official Form 6B) (12/07) - Cont.

In re    **Leticia Joy Arciniega**                              ,    Case No. _____
                                    Debtor

# SCHEDULE B - PERSONAL PROPERTY
### (Continuation Sheet)

| Type of Property | N O N E | Description and Location of Property | Husband, Wife, Joint, or Community | Current Value of Debtor's Interest in Property, without Deducting any Secured Claim or Exemption |
|---|---|---|---|---|
| 20. Contingent and noncontingent interests in estate of a decedent, death benefit plan, life insurance policy, or trust. | X | | | |
| 21. Other contingent and unliquidated claims of every nature, including tax refunds, counterclaims of the debtor, and rights to setoff claims. Give estimated value of each. | X | | | |
| 22. Patents, copyrights, and other intellectual property. Give particulars. | X | | | |
| 23. Licenses, franchises, and other general intangibles. Give particulars. | X | | | |
| 24. Customer lists or other compilations containing personally identifiable information (as defined in 11 U.S.C. § 101(41A)) provided to the debtor by individuals in connection with obtaining a product or service from the debtor primarily for personal, family, or household purposes. | X | | | |
| 25. Automobiles, trucks, trailers, and other vehicles and accessories. | | **1986 Chevy Corvette** **mileage in excess of 250,000 miles. Salvaged.** | - | **5,700.00** |
| | | **2006 Ford Escape** **Mileage in excess of 10,600** | - | **10,685.00** |
| | | **2007 Ford Ranger** **Mileage in excess of 85,000** | - | **3,307.50** |
| 26. Boats, motors, and accessories. | X | | | |
| 27. Aircraft and accessories. | X | | | |
| 28. Office equipment, furnishings, and supplies. | | **office furnishings, wall pictures, computer, phones, fax/copy machine, office supplies, misc. office equipment** | - | **1,500.00** |
| | | **Estimated Income Tax Refund** | - | **100.00** |
| 29. Machinery, fixtures, equipment, and supplies used in business. | X | | | |

Sub-Total >        **21,292.50**
(Total of this page)

Sheet  **2**  of  **3**  continuation sheets attached
to the Schedule of Personal Property

Software Copyright (c) 1996-2010 - Best Case Solutions - Evanston, IL - www.bestcase.com

Best Case Bankruptcy

**Exhibit "12"**
**00038**

B6B (Official Form 6B) (12/07) - Cont.

In re    **Leticia Joy Arciniega**                                    ,    Case No. _____
                                    Debtor

## SCHEDULE B - PERSONAL PROPERTY
### (Continuation Sheet)

| Type of Property | N O N E | Description and Location of Property | Husband, Wife, Joint, or Community | Current Value of Debtor's Interest in Property, without Deducting any Secured Claim or Exemption |
|---|---|---|---|---|
| 30. Inventory. | X | | | |
| 31. Animals. | | **Pets: 1 dog** | - | **Unknown** |
| 32. Crops - growing or harvested. Give particulars. | X | | | |
| 33. Farming equipment and implements. | X | | | |
| 34. Farm supplies, chemicals, and feed. | X | | | |
| 35. Other personal property of any kind not already listed. Itemize. | X | | | |

|  |  |
|---|---|
| Sub-Total > | **0.00** |
| (Total of this page) | |
| Total > | **134,216.24** |

(Report also on Summary of Schedules)

Sheet __3__ of __3__ continuation sheets attached
to the Schedule of Personal Property

Software Copyright (c) 1996-2010 - Best Case Solutions - Evanston, IL - www.bestcase.com

Best Case Bankruptcy

**Exhibit "12"**
**00039**

B6C (Official Form 6C) (4/10)

.

In re  **Leticia Joy Arciniega**                                    ,     Case No. _____

Debtor

# SCHEDULE C - PROPERTY CLAIMED AS EXEMPT

Debtor claims the exemptions to which debtor is entitled under:     ☐ Check if debtor claims a homestead exemption that exceeds
(Check one box)                                                        $146,450. *(Amount subject to adjustment on 4/1/13, and every three years thereafter*
☐ 11 U.S.C. §522(b)(2)                                                *with respect to cases commenced on or after the date of adjustment.)*
☑ 11 U.S.C. §522(b)(3)

| Description of Property | Specify Law Providing Each Exemption | Value of Claimed Exemption | Current Value of Property Without Deducting Exemption |
|---|---|---|---|
| **Real Property** | | | |
| **Parcel with 5 unbuildable lots**<br>**Description: Morro Pk VW Sub 2**<br>**BL 10 PTN LTS 5 to 9**<br>**0 Paper Roads, Cayucos**<br>**Debtor retaining property.** | **C.C.P. § 703.140(b)(5)** | **5,252.80** | **5,252.80** |
| **2 unbuildable lots in 1 Parcel** | **C.C.P. § 703.140(b)(5)** | **2,062.50** | **4,125.00** |
| **Parcel Number: 547110053-4**<br>**POR Lot 4 MB 006/304 SD Jose A Estudillos**<br>**Sub TRPOR NW 1/4 of Sec and POR  Sec 19 T4S**<br>**R1EF** | | | |
| **Parcel Number: 547110051-2**<br>**.03 acres M/L in Por Lot 4 MB 006/304 SD Jose**<br>**A Estudillos Sub TR VII RO S J Viejo** | | | |
| **Debtor has 50% interest.**<br>**Debtor retaining Property.** | | | |
| **Cash on Hand** | | | |
| **Cash on Hand** | **C.C.P. § 703.140(b)(5)** | **40.00** | **40.00** |
| **Checking, Savings, or Other Financial Accounts, Certificates of Deposit** | | | |
| **Savings Account #8047**<br>**Wells Fargo Bank** | **C.C.P. § 703.140(b)(5)** | **1.16** | **1.16** |
| **Checking Account #5563**<br>**Wells Fargo Bank** | **C.C.P. § 703.140(b)(5)** | **167.78** | **167.78** |
| **Household Goods and Furnishings** | | | |
| **Household Goods and Furnishings** | **C.C.P. § 703.140(b)(3)** | **2,500.00** | **2,500.00** |
| **Books, Pictures and Other Art Objects; Collectibles** | | | |
| **Books, Pictures & Collectibles** | **C.C.P. § 703.140(b)(5)** | **150.00** | **150.00** |
| **Wearing Apparel** | | | |
| **Wearing Apparel** | **C.C.P. § 703.140(b)(3)** | **700.00** | **700.00** |
| **Furs and Jewelry** | | | |
| **Fashion Jewelry** | **C.C.P. § 703.140(b)(4)** | **750.00** | **750.00** |
| **Interests in Insurance Policies** | | | |
| **Whole Life Insurance Policy #6578**<br>**NY Life** | **C.C.P. § 703.140(b)(8)** | **7,356.01** | **7,356.01** |
| **Outstanding Loan Balance $8952.31** | | | |

___1___  continuation sheets attached to Schedule of Property Claimed as Exempt

**Exhibit "12"**
**00040**

Case 6:11-bk-15412-DS   Doc 1   Filed 02/18/11   Entered 02/18/11 16:41:01   Desc  2/18/11  4:38PM
Main Document      Page 18 of 57

B6C (Official Form 6C) (4/10) -- Cont.

In re   **Leticia Joy Arciniega** _____ ,   Case No. _____

Debtor

## SCHEDULE C - PROPERTY CLAIMED AS EXEMPT
(Continuation Sheet)

| Description of Property | Specify Law Providing Each Exemption | Value of Claimed Exemption | Current Value of Property Without Deducting Exemption |
|---|---|---|---|
| **Interests in IRA, ERISA, Keogh, or Other Pension or Profit Sharing Plans** | | | |
| **Merrill Lynch Retirement Account Account #2694** | **C.C.P. § 703.140(b)(10)(E)** | **101,237.30** | **101,237.30** |
| **Merrill Lynch Retirement Account Account #2766** | **C.C.P. § 703.140(b)(10)(E)** | **21.49** | **21.49** |
| **Automobiles, Trucks, Trailers, and Other Vehicles** | | | |
| **1986 Chevy Corvette mileage in excess of 250,000 miles. Salvaged.** | **C.C.P. § 703.140(b)(5)** | **5,700.00** | **5,700.00** |
| **2006 Ford Escape Mileage in excess of 10,600** | **C.C.P. § 703.140(b)(5)** | **1,182.00** | **10,685.00** |
| **2007 Ford Ranger Mileage in excess of 85,000** | **C.C.P. § 703.140(b)(2) C.C.P. § 703.140(b)(5)** | **3,307.50 0.00** | **6,615.00** |
| **Office Equipment, Furnishings and Supplies** | | | |
| **office furnishings, wall pictures, computer, phones, fax/copy machine, office supplies, misc. office equipment** | **C.C.P. § 703.140(b)(5)** | **1,500.00** | **1,500.00** |
| **Estimated Income Tax Refund** | **C.C.P. § 703.140(b)(5)** | **100.00** | **100.00** |
| **Animals** | | | |
| **Pets: 1 dog** | **C.C.P. § 703.140(b)(3)** | **0.00** | **Unknown** |

Total:   **132,028.54**   **146,901.54**

Sheet __1__ of __1__ continuation sheets attached to the Schedule of Property Claimed as Exempt

Software Copyright (c) 1996-2010 - Best Case Solutions - Evanston, IL - www.bestcase.com                    Best Case Bankruptcy

**Exhibit "12"**

**00041**

B6D (Official Form 6D) (12/07)

In re   **Leticia Joy Arciniega**
_____,   Case No. _____
                          Debtor

## SCHEDULE D - CREDITORS HOLDING SECURED CLAIMS

State the name, mailing address, including zip code, and last four digits of any account number of all entities holding claims secured by property of the debtor as of the date of filing of the petition. The complete account number of any account the debtor has with the creditor is useful to the trustee and the creditor and may be provided if the debtor chooses to do so. List creditors holding all types of secured interests such as judgment liens, garnishments, statutory liens, mortgages, deeds of trust, and other security interests.

List creditors in alphabetical order to the extent practicable. If a minor child is a creditor, the child's initials and the name and address of the child's parent or guardian, such as "A.B., a minor child, by John Doe, guardian." Do not disclose the child's name. See, 11 U.S.C. §112 and Fed. R. Bankr. P. 1007(m). If all secured creditors will not fit on this page, use the continuation sheet provided.

If any entity other than a spouse in a joint case may be jointly liable on a claim, place an "X" in the column labeled "Codebtor" ,include the entity on the appropriate schedule of creditors, and complete Schedule H - Codebtors. If a joint petition is filed, state whether the husband, wife, both of them, or the marital community may be liable on each claim by placing an "H", "W", "J", or "C" in the column labeled "Husband, Wife, Joint, or Community".

If the claim is contingent, place an "X" in the column labeled "Contingent". If the claim is unliquidated, place an "X" in the column labeled "Unliquidated". If the claim is disputed, place an "X" in the column labeled "Disputed". (You may need to place an "X" in more than one of these three columns.)

Total the columns labeled "Amount of Claim Without Deducting Value of Collateral" and "Unsecured Portion, if Any" in the boxes labeled "Total(s)" on the last sheet of the completed schedule. Report the total from the column labeled "Amount of Claim" also on the Summary of Schedules and, if the debtor is an individual with primarily consumer debts, report the total from the column labeled "Unsecured Portion" on the Statistical Summary of Certain Liabilities and Related Data.

☐   Check this box if debtor has no creditors holding secured claims to report on this Schedule D.

| CREDITOR'S NAME AND MAILING ADDRESS INCLUDING ZIP CODE, AND ACCOUNT NUMBER (See instructions above.) | C O D E B T O R | H W J C | DATE CLAIM WAS INCURRED, NATURE OF LIEN, AND DESCRIPTION AND VALUE OF PROPERTY SUBJECT TO LIEN | C O N T I N G E N T | U N L I Q U I D A T E D | D I S P U T E D | AMOUNT OF CLAIM WITHOUT DEDUCTING VALUE OF COLLATERAL | UNSECURED PORTION, IF ANY |
|---|---|---|---|---|---|---|---|---|
| Account No. **xxxxx2517** <br><br> **Creditor #: 1** <br> **Citimortgage Inc** <br> **Po Box 9438** <br> **Gaithersburg, MD 20898** | | | Opened 3/13/07 Last Active 12/17/09 <br> **2nd Mortgage** <br> **Single Family Home** <br> **Primary Residence** <br> **8990 Verona Ave** <br> **San Jacinto, CA 92583** <br> value based on Zillow.com dated 2/15/2011 | | | | | |
| | | | Value $              **93,000.00** | | | | **96,952.00** | **79,659.00** |
| Account No. **xxxxxx9405** <br><br> **Creditor #: 2** <br> **Citimortgage Inc** <br> **Po Box 9438** <br> **Gaithersburg, MD 20898** | | | Opened 4/13/04 Last Active 1/12/11 <br> **1st Mortgage** <br> **Single Family Home** <br> **Primary Residence** <br> **8990 Verona Ave** <br> **San Jacinto, CA 92583** <br> value based on Zillow.com dated 2/15/2011 | | | | | |
| | | | Value $              **93,000.00** | | | | **75,707.00** | **0.00** |
| Account No. **011-5** <br><br> **Creditor #: 3** <br> **Don Kent, Treasurer** <br> **4080 Lemon Street (1st Floor)** <br> **Riverside, CA 92502** | | | **2010 - 2011** <br> **Secured Property taxes** <br> **Commercial Building & 2 Parcels** <br> **288 East Main Street** <br> **San Jacinto, CA** <br> **Parcel number #:437072011-5** <br> **.15 acres M/L in Por Lot 2 blk 18 MB** <br> **007/329 SD Map of Town of San Jacinto** | | | | | |
| | | | Value $              **149,400.00** | | | | **891.80** | **0.00** |
| Account No. **012-6** <br><br> **Creditor #: 4** <br> **Don Kent, Treasurer** <br> **4080 Lemon Street (1st Floor)** <br> **Riverside, CA 92502** | | | **2010 - 2011** <br> **Secured Property Taxes** <br> **Commercial Building & 2 Parcels** <br> **288 East Main Street** <br> **San Jacinto, CA** <br> **Parcel number #:437072011-5** <br> **.15 acres M/L in Por Lot 2 blk 18 MB** <br> **007/329 SD Map of Town of San Jacinto** | | | | | |
| | | | Value $              **149,400.00** | | | | **4,559.88** | **0.00** |

**1**   continuation sheets attached

Subtotal <br> (Total of this page)      **178,110.68**      **79,659.00**

Software Copyright (c) 1996-2010 - Best Case Solutions - Evanston, IL - www.bestcase.com

Best Case Bankruptcy

**Exhibit "12"**
**00042**

B6D (Official Form 6D) (12/07) - Cont.

In re    **Leticia Joy Arciniega**                                                    ,    Case No. _____
                                                          Debtor

## SCHEDULE D - CREDITORS HOLDING SECURED CLAIMS
(Continuation Sheet)

| CREDITOR'S NAME AND MAILING ADDRESS INCLUDING ZIP CODE, AND ACCOUNT NUMBER (See instructions.) | CODEBTOR | Husband, Wife, Joint, or Community H / W / J / C | DATE CLAIM WAS INCURRED, NATURE OF LIEN, AND DESCRIPTION AND VALUE OF PROPERTY SUBJECT TO LIEN | CONTINGENT | UNLIQUIDATED | DISPUTED | AMOUNT OF CLAIM WITHOUT DEDUCTING VALUE OF COLLATERAL | UNSECURED PORTION, IF ANY |
|---|---|---|---|---|---|---|---|---|
| Account No. **xxxx6556** <br><br>**Creditor #: 5**<br>**Ford Cred**<br>**Po Box Box 542000**<br>**Omaha, NE 68154** | | - | **Opened  5/26/06  Last Active  1/01/11**<br><br>**secured purchase**<br><br>**2006 Ford Escape**<br>**Mileage in excess of 10,600** | | | | | |
| | | | Value $           **10,685.00** | | | | **9,503.00** | **0.00** |
| Account No. **6503** <br><br>**Creditor #: 6**<br>**Small Business Adminstration**<br>**P.O. Box 740192**<br>**Atlanta, GA 30374** | | - | **2010**<br>**2nd Mortgage**<br>**Commercial Building & 2 Parcels**<br>**288 East Main Street**<br>**San Jacinto, CA**<br>**Parcel number #:437072011-5**<br>**.15 acres M/L in Por Lot 2 blk 18 MB**<br>**007/329 SD Map of Town of San Jacinto** | | | | | |
| | | | Value $          **149,400.00** | | | | **161,714.70** | **161,714.70** |
| Account No. **4607** <br><br>**Creditor #: 7**<br>**Wells Fargo**<br>**P.O. Box 659700**<br>**San Antonio, TX 78265** | | - | **2010**<br>**1st Mortgage**<br>**Commercial Building & 2 Parcels**<br>**288 East Main Street**<br>**San Jacinto, CA**<br>**Parcel number #:437072011-5**<br>**.15 acres M/L in Por Lot 2 blk 18 MB**<br>**007/329 SD Map of Town of San Jacinto** | | | | | |
| | | | Value $          **149,400.00** | | | | **389,245.15** | **245,296.83** |
| Account No. | | | | | | | | |
| | | | Value $ | | | | | |
| Account No. | | | | | | | | |
| | | | Value $ | | | | | |

Sheet  1  of  1  continuation sheets attached to
Schedule of Creditors Holding Secured Claims

| | | | |
|---|---|---|---|
| Subtotal<br>(Total of this page) | | **560,462.85** | **407,011.53** |
| Total<br>(Report on Summary of Schedules) | | **738,573.53** | **486,670.53** |

B6E (Official Form 6E) (4/10)

.

In re    **Leticia Joy Arciniega**                                                    ,    Case No. _____
                                                  Debtor

# SCHEDULE E - CREDITORS HOLDING UNSECURED PRIORITY CLAIMS

A complete list of claims entitled to priority, listed separately by type of priority, is to be set forth on the sheets provided. Only holders of unsecured claims entitled to priority should be listed in this schedule. In the boxes provided on the attached sheets, state the name, mailing address, including zip code, and last four digits of the account number, if any, of all entities holding priority claims against the debtor or the property of the debtor, as of the date of the filing of the petition. Use a separate continuation sheet for each type of priority and label each with the type of priority.

The complete account number of any account the debtor has with the creditor is useful to the trustee and the creditor and may be provided if the debtor chooses to do so. If a minor child is a creditor, state the child's initials and the name and address of the child's parent or guardian, such as "A.B., a minor child, by John Doe, guardian." Do not disclose the child's name. See, 11 U.S.C. §112 and Fed. R. Bankr. P. 1007(m).

If any entity other than a spouse in a joint case may be jointly liable on a claim, place an "X" in the column labeled "Codebtor," include the entity on the appropriate schedule of creditors, and complete Schedule H-Codebtors. If a joint petition is filed, state whether the husband, wife, both of them, or the marital community may be liable on each claim by placing an "H," "W," "J," or "C" in the column labeled "Husband, Wife, Joint, or Community." If the claim is contingent, place an "X" in the column labeled "Contingent." If the claim is unliquidated, place an "X" in the column labeled "Unliquidated." If the claim is disputed, place an "X" in the column labeled "Disputed." (You may need to place an "X" in more than one of these three columns.)

Report the total of claims listed on each sheet in the box labeled "Subtotals" on each sheet. Report the total of all claims listed on this Schedule E in the box labeled "Total" on the last sheet of the completed schedule. Report this total also on the Summary of Schedules.

Report the total of amounts entitled to priority listed on each sheet in the box labeled "Subtotals" on each sheet. Report the total of all amounts entitled to priority listed on this Schedule E in the box labeled "Totals" on the last sheet of the completed schedule. Individual debtors with primarily consumer debts report this total also on the Statistical Summary of Certain Liabilities and Related Data.

Report the total of amounts _not_ entitled to priority listed on each sheet in the box labeled "Subtotals" on each sheet. Report the total of all amounts not entitled to priority listed on this Schedule E in the box labeled "Totals" on the last sheet of the completed schedule. Individual debtors with primarily consumer debts report this total also on the Statistical Summary of Certain Liabilities and Related Data.

■  Check this box if debtor has no creditors holding unsecured priority claims to report on this Schedule E.

**TYPES OF PRIORITY CLAIMS** (Check the appropriate box(es) below if claims in that category are listed on the attached sheets)

☐ **Domestic support obligations**

Claims for domestic support that are owed to or recoverable by a spouse, former spouse, or child of the debtor, or the parent, legal guardian, or responsible relative of such a child, or a governmental unit to whom such a domestic support claim has been assigned to the extent provided in 11 U.S.C. § 507(a)(1).

☐ **Extensions of credit in an involuntary case**

Claims arising in the ordinary course of the debtor's business or financial affairs after the commencement of the case but before the earlier of the appointment of a trustee or the order for relief. 11 U.S.C. § 507(a)(3).

☐ **Wages, salaries, and commissions**

Wages, salaries, and commissions, including vacation, severance, and sick leave pay owing to employees and commissions owing to qualifying independent sales representatives up to $11,725* per person earned within 180 days immediately preceding the filing of the original petition, or the cessation of business, whichever occurred first, to the extent provided in 11 U.S.C. § 507(a)(4).

☐ **Contributions to employee benefit plans**

Money owed to employee benefit plans for services rendered within 180 days immediately preceding the filing of the original petition, or the cessation of business, whichever occurred first, to the extent provided in 11 U.S.C. § 507(a)(5).

☐ **Certain farmers and fishermen**

Claims of certain farmers and fishermen, up to $5,775* per farmer or fisherman, against the debtor, as provided in 11 U.S.C. § 507(a)(6).

☐ **Deposits by individuals**

Claims of individuals up to $2,600* for deposits for the purchase, lease, or rental of property or services for personal, family, or household use, that were not delivered or provided. 11 U.S.C. § 507(a)(7).

☐ **Taxes and certain other debts owed to governmental units**

Taxes, customs duties, and penalties owing to federal, state, and local governmental units as set forth in 11 U.S.C. § 507(a)(8).

☐ **Commitments to maintain the capital of an insured depository institution**

Claims based on commitments to the FDIC, RTC, Director of the Office of Thrift Supervision, Comptroller of the Currency, or Board of Governors of the Federal Reserve System, or their predecessors or successors, to maintain the capital of an insured depository institution. 11 U.S.C. § 507 (a)(9).

☐ **Claims for death or personal injury while debtor was intoxicated**

Claims for death or personal injury resulting from the operation of a motor vehicle or vessel while the debtor was intoxicated from using alcohol, a drug, or another substance. 11 U.S.C. § 507(a)(10).

_* Amount subject to adjustment on 4/01/13, and every three years thereafter with respect to cases commenced on or after the date of adjustment._

**0**   continuation sheets attached

**Exhibit "12"**
**00044**

B6F (Official Form 6F) (12/07)

In re  **Leticia Joy Arciniega** _____,    Case No. _____

_____
                                    Debtor

# SCHEDULE F - CREDITORS HOLDING UNSECURED NONPRIORITY CLAIMS

State the name, mailing address, including zip code, and last four digits of any account number, of all entities holding unsecured claims without priority against the debtor or the property of the debtor, as of the date of filing of the petition. The complete account number of any account the debtor has with the creditor is useful to the trustee and the creditor and may be provided if the debtor chooses to do so. If a minor child is a creditor, state the child's initials and the name and address of the child's parent or guardian, such as "A.B., a minor child, by John Doe, guardian." Do not disclose the child's name. See, 11 U.S.C. §112 and Fed. R. Bankr. P. 1007(m). Do not include claims listed in Schedules D and E. If all creditors will not fit on this page, use the continuation sheet provided.

If any entity other than a spouse in a joint case may be jointly liable on a claim, place an "X" in the column labeled "Codebtor," include the entity on the appropriate schedule of creditors, and complete Schedule H - Codebtors. If a joint petition is filed, state whether the husband, wife, both of them, or the marital community may be liable on each claim by placing an "H," "W," "J," or "C" in the column labeled "Husband, Wife, Joint, or Community."

If the claim is contingent, place an "X" in the column labeled "Contingent." If the claim is unliquidated, place an "X" in the column labeled "Unliquidated." If the claim is disputed, place an "X" in the column labeled "Disputed." (You may need to place an "X" in more than one of these three columns.)

Report the total of all claims listed on this schedule in the box labeled "Total" on the last sheet of the completed schedule. Report this total also on the Summary of Schedules and, if the debtor is an individual with primarily consumer debts, report this total also on the Statistical Summary of Certain Liabilities and Related Data.

☐    Check this box if debtor has no creditors holding unsecured claims to report on this Schedule F.

| CREDITOR'S NAME, MAILING ADDRESS INCLUDING ZIP CODE, AND ACCOUNT NUMBER (See instructions above.) | C O D E B T O R | Husband, Wife, Joint, or Community | | DATE CLAIM WAS INCURRED AND CONSIDERATION FOR CLAIM. IF CLAIM IS SUBJECT TO SETOFF, SO STATE. | C O N T I N G E N T | U N L I Q U I D A T E D | D I S P U T E D | AMOUNT OF CLAIM |
|---|---|---|---|---|---|---|---|---|
| | | H W J C | | | | | | |
| Account No. **xxxxxxxxxxx7079**<br><br>**Creditor #: 1**<br>**Chase**<br>**Po Box 15298**<br>**Wilmington, DE 19850** | | - | | **Opened 11/19/03  Last Active  4/01/09**<br>**Consumer Goods & Services** | | | | **19,143.00** |
| Account No.<br><br>**Bleier & Cox**<br>**16130 Ventura Blvd #620**<br>**Encino, CA 91436** | | | | **Additional Notify:**<br>**Chase** | | | | **Notice Only** |
| Account No. **xxxxx1399**<br><br>**Creditor #: 2**<br>**Cpu/Cbsd**<br>**Po Box 6497**<br>**Sioux Falls, SD 57117** | | - | | **Opened  3/10/95  Last Active  1/12/11**<br>**Consumer Goods & Services** | | | | **124.00** |
| Account No. **xxxxx2319**<br><br>**Creditor #: 3**<br>**Cpu/Cbsd**<br>**Po Box 6497**<br>**Sioux Falls, SD 57117** | | - | | **Opened  1/01/70  Last Active 12/01/09**<br>**notice only** | | | | **Unknown** |

_2_    continuation sheets attached

Subtotal
(Total of this page)                                                            **19,267.00**

Software Copyright (c) 1996-2010 - Best Case Solutions - Evanston, IL - www.bestcase.com                    S/N:41735-101118    Best Case Bankruptcy

**Exhibit "12"**
**00045**

B6F (Official Form 6F) (12/07) - Cont.

In re  **Leticia Joy Arciniega**                                                ,    Case No. _____
                                              Debtor

## SCHEDULE F - CREDITORS HOLDING UNSECURED NONPRIORITY CLAIMS
### (Continuation Sheet)

| CREDITOR'S NAME, MAILING ADDRESS INCLUDING ZIP CODE, AND ACCOUNT NUMBER (See instructions above.) | C O D E B T O R | H W J C | DATE CLAIM WAS INCURRED AND CONSIDERATION FOR CLAIM. IF CLAIM IS SUBJECT TO SETOFF, SO STATE. | C O N T I N G E N T | U N L I Q U I D A T E D | D I S P U T E D | AMOUNT OF CLAIM |
|---|---|---|---|---|---|---|---|
| Account No. **NA** <br><br> **Creditor #: 4** <br> **Equifax** <br> **PO Box 740241** <br> **Atlanta, GA 30374** | | - | **NA** <br> **notice only** | | | | 0.00 |
| Account No. **NA** <br><br> **Creditor #: 5** <br> **Experian** <br> **PO BOX 2002** <br> **Allen, TX 75013** | | - | **NA** <br> **notice only** | | | | 0.00 |
| Account No. <br><br> **Creditor #: 6** <br> **Farzad & Mazarei** <br> **333 S. Anita Drive #910** <br> **Orange, CA 92868** | | - | **2009** <br> **Notice Only** <br> **Re: Clark v. Arciniega** <br> **SCVSS 147607** | | | | 0.00 |
| Account No. **NA** <br><br> **Creditor #: 7** <br> **James A Clark** <br> **3047 North Arrowhead** <br> **San Bernardino, CA 92405** | | - | **NA** <br> **Liabilities unknown.** <br> **Listed in abundance of caution.** | | | | **Unknown** |
| Account No. **4334** <br><br> **Creditor #: 8** <br> **Portfolio Recovery Associates, LLC** <br> **P.O. Box 12914** <br> **Norfolk, VA 23541** | | - | **2010** <br> **Original Creditor: US Bank** | | | | **16,057.92** |

Sheet no. __1__ of __2__ sheets attached to Schedule of                                 Subtotal                | **16,057.92**
Creditors Holding Unsecured Nonpriority Claims                                  (Total of this page)

Software Copyright (c) 1996-2010 - Best Case Solutions - Evanston, IL - www.bestcase.com

B6F (Official Form 6F) (12/07) - Cont.

In re   **Leticia Joy Arciniega**                                    Case No. _____
                                                         ,
                                    Debtor

## SCHEDULE F - CREDITORS HOLDING UNSECURED NONPRIORITY CLAIMS
### (Continuation Sheet)

| CREDITOR'S NAME, MAILING ADDRESS INCLUDING ZIP CODE, AND ACCOUNT NUMBER (See instructions above.) | C O D E B T O R | Husband, Wife, Joint, or Community | | | DATE CLAIM WAS INCURRED AND CONSIDERATION FOR CLAIM.  IF CLAIM IS SUBJECT TO SETOFF, SO STATE. | C O N T I N G E N T | U N L I Q U I D A T E D | D I S P U T E D | AMOUNT OF CLAIM |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | H | W J | C | | | | | |
| Account No. **2162** | | | | | **2010** | | | | |
| Creditor #: 9 | | | | | **Original Creditor: Yellow Book USA** | | | | |
| **Sakamaki & Baumgartner** | X | - | | | | | | | |
| **500 N. State College Blvd. #1100** | | | | | | | | | |
| **Orange, CA 92868** | | | | | | | | | |
| | | | | | | | | | **12,663.32** |
| Account No. **NA** | | | | | **NA** | | | | |
| Creditor #: 10 | | | | | **notice only** | | | | |
| **TransUnion Consumer Solutions** | | - | | | | | | | |
| **PO BOX 2000** | | | | | | | | | |
| **Crum Lynne, PA 19022-2000** | | | | | | | | | |
| | | | | | | | | | **0.00** |
| Account No. **xxxxxxxxxxx9554** | | | | | **Opened 10/16/07  Last Active  3/01/09** | | | | |
| Creditor #: 11 | | | | | **Consumer Goods & Services** | | | | |
| **Wells Fargo Business D** | | - | | | | | | | |
| **Po Box 29482** | | | | | | | | | |
| **Phoenix, AZ 85038** | | | | | | | | | |
| | | | | | | | | | **26,351.00** |
| Account No. **xxxxxxxxxxx8153** | | | | | **Opened 10/04/07  Last Active  6/01/09** | | | | |
| Creditor #: 12 | | | | | **Consumer Goods & Services** | | | | |
| **Wells Fargo Business D** | | - | | | | | | | |
| **Po Box 29482** | | | | | | | | | |
| **Phoenix, AZ 85038** | | | | | | | | | |
| | | | | | | | | | **17,957.00** |
| Account No. **7-42** | | | | | **Commercial Building & 2 Parcels** | | | | |
| Creditor #: 13 | | | | | **288 East Main Street** | | | | |
| **WT Capital Lender Services** | | | | | **San Jacinto, CA** | | | | |
| **7522 North Colonial AVe #101** | | | | | **Parcel number #:437072011-5** | | | | |
| **Fresno, CA 93711** | | | | | **.15 acres M/L in Por Lot 2 blk 18 MB 007/329** | | | | |
| | | | | | **SD Map of Town of San Jacinto** | | | | |
| | | | | | **Parcel number #: 437072012-6** | | | | |
| | | | | | **.21 acres M/L in Por Lo** | | | | **479,676.55** |

Sheet no. __2___ of __2___ sheets attached to Schedule of
Creditors Holding Unsecured Nonpriority Claims

|  | Subtotal (Total of this page) | **536,647.87** |
| --- | --- | --- |
|  | Total (Report on Summary of Schedules) | **571,972.79** |

**Exhibit "12"**
**00047**

B6G (Official Form 6G) (12/07)

In re    **Leticia Joy Arciniega**                                    Case No. _____
                                                                    ,
                          Debtor

# SCHEDULE G - EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Describe all executory contracts of any nature and all unexpired leases of real or personal property.  Include any timeshare interests.  State nature of debtor's interest in contract, i.e., "Purchaser", "Agent", etc.  State whether debtor is the lessor or lessee of a lease.  Provide the names and complete mailing addresses of all other parties to each lease or contract described.  If a minor child is a party to one of the leases or contracts, state the child's initials and the name and address of the child's parent or guardian, such as "A.B., a minor child, by John Doe, guardian." Do not disclose the child's name. See, 11 U.S.C. §112 and Fed. R. Bankr. P. 1007(m).

☐ Check this box if debtor has no executory contracts or unexpired leases.

| Name and Mailing Address, Including Zip Code, of Other Parties to Lease or Contract | Description of Contract or Lease and Nature of Debtor's Interest. State whether lease is for nonresidential real property. State contract number of any government contract. |
|---|---|
| **Fine Publications, Inc.**<br>**901 S.State Street #500**<br>**Hemet, CA 92543** | **Adversting Agreement** |
| **Leticia Arciniega, Landlord**<br>**890 Verona Avenue**<br>**San Jacinto, CA 92583** | **Lease Agreement with MSRE, Inc.** |
| **SuperMedia LLC**<br>**P.O. Box 610609**<br>**Dallas, TX 75261** | **Advertising Agreement** |

**0**

_____ continuation sheets attached to Schedule of Executory Contracts and Unexpired Leases

Software Copyright (c) 1996-2010 - Best Case Solutions - Evanston, IL - www.bestcase.com                          Best Case Bankruptcy

**Exhibit "12"**
**00048**

B6H (Official Form 6H) (12/07)

In re  **Leticia Joy Arciniega** _____,    Case No. _____
                    Debtor

# SCHEDULE H - CODEBTORS

   Provide the information requested concerning any person or entity, other than a spouse in a joint case, that is also liable on any debts listed
by debtor in the schedules of creditors.  Include all guarantors and co-signers.  If the debtor resides or resided in a community property state,
commonwealth, or territory (including Alaska, Arizona, California, Idaho, Louisiana, Nevada, New Mexico, Puerto Rico, Texas, Washington, or
Wisconsin) within the eight year period immediately preceding the commencement of the case, identify the name of the debtor's spouse and of
any former spouse who resides or resided with the debtor in the community property state, commonwealth, or territory.  Include all names used
by the nondebtor spouse during the eight years immediately preceding the commencement of this case.  If a minor child is a codebtor or a creditor,
state the child's initials and the name and address of the child's parent or guardian, such as "A.B., a minor child, by John Doe, guardian." Do not
disclose the child's name. See, 11 U.S.C. §112 and Fed. R. Bankr. P. 1007(m).
☐  Check this box if debtor has no codebtors.

| NAME AND ADDRESS OF CODEBTOR | NAME AND ADDRESS OF CREDITOR |
|---|---|
| **MSRE , Inc.**<br>**288 E Main Street**<br>**San Jacinto, CA 92583-4233** | **Sakamaki & Baumgartner**<br>**500 N. State College Blvd. #1100**<br>**Orange, CA 92868** |

**0**
____  continuation sheets attached to Schedule of Codebtors

Software Copyright (c) 1996-2010 - Best Case Solutions - Evanston, IL - www.bestcase.com
Best Case Bankruptcy

Exhibit "12"
00049

2/18/11 4:39PM

B6I (Official Form 6I) (12/07)

In re   **Leticia Joy Arciniega**                                    Case No. _____

        ————————————————————————
                 Debtor(s)

## SCHEDULE I - CURRENT INCOME OF INDIVIDUAL DEBTOR(S)

The column labeled "Spouse" must be completed in all cases filed by joint debtors and by every married debtor, whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed. Do not state the name of any minor child.  The average monthly income calculated on this form may differ from the current monthly income calculated on Form 22A, 22B, or 22C.

| Debtor's Marital Status: | DEPENDENTS OF DEBTOR AND SPOUSE | |
|---|---|---|
| **Divorced** | RELATIONSHIP(S):  **None.** | AGE(S): |

| Employment: | DEBTOR | SPOUSE |
|---|---|---|
| Occupation | **manager** | |
| Name of Employer | **Self-Employed; MSRE, Inc.** | |
| How long employed | **4/2007** | |
| Address of Employer | **288 E Main Street**  **San Jacinto, CA 92583** | |

INCOME:  (Estimate of average or projected monthly income at time case filed)

| | | DEBTOR | | SPOUSE |
|---|---|---|---|---|
| 1. Monthly gross wages, salary, and commissions  (Prorate if not paid monthly) | $ | 0.00 | $ | N/A |
| 2. Estimate monthly overtime | $ | 0.00 | $ | N/A |
| 3. SUBTOTAL | $ | 0.00 | $ | N/A |
| 4. LESS PAYROLL DEDUCTIONS | | | | |
| a. Payroll taxes and social security | $ | 0.00 | $ | N/A |
| b. Insurance | $ | 0.00 | $ | N/A |
| c. Union dues | $ | 0.00 | $ | N/A |
| d. Other (Specify): | $ | 0.00 | $ | N/A |
| | $ | 0.00 | $ | N/A |
| 5. SUBTOTAL OF PAYROLL DEDUCTIONS | $ | 0.00 | $ | N/A |
| 6. TOTAL NET MONTHLY TAKE HOME PAY | $ | 0.00 | $ | N/A |
| 7. Regular income from operation of business or profession or farm (Attach detailed statement) | $ | 0.00 | $ | N/A |
| 8. Income from real property | $ | 0.00 | $ | N/A |
| 9. Interest and dividends | $ | 0.00 | $ | N/A |
| 10. Alimony, maintenance or support payments payable to the debtor for the debtor's use or that of dependents listed above | $ | 0.00 | $ | N/A |
| 11. Social security or government assistance (Specify): | $ | 0.00 | $ | N/A |
| | $ | 0.00 | $ | N/A |
| 12. Pension or retirement income | $ | 0.00 | $ | N/A |
| 13. Other monthly income (Specify):  **Net Monthly Draws** | $ | 1,429.16 | $ | N/A |
| | $ | 0.00 | $ | N/A |
| 14. SUBTOTAL OF LINES 7 THROUGH 13 | $ | 1,429.16 | $ | N/A |
| 15. AVERAGE MONTHLY INCOME (Add amounts shown on lines 6 and 14) | $ | 1,429.16 | $ | N/A |
| 16. COMBINED AVERAGE MONTHLY INCOME: (Combine column totals from line 15) | | | $ | 1,429.16 |

(Report also on Summary of Schedules and, if applicable, on
Statistical Summary of Certain Liabilities and Related Data)

17. Describe any increase or decrease in income reasonably anticipated to occur within the year following the filing of this document:
**Debtor owns an S Corporation (MSRE, Inc. dba Main Street Realty).  Debtor's draws from the business averages out to approximately $1429.00 monthly.  In order to make ends meet, debtor took out early distributions from her retirement account (Debtor cashed out $15,000 in 2009 and $45,000 in 2010).**

**Exhibit "12"**

**00050**

2/18/11  4:39PM

B6J (Official Form 6J) (12/07)

In re __Leticia Joy Arciniega__           Case No. _____
                 Debtor(s)

# SCHEDULE J - CURRENT EXPENDITURES OF INDIVIDUAL DEBTOR(S)

Complete this schedule by estimating the average or projected monthly expenses of the debtor and the debtor's family at time case filed.  Prorate any payments made bi-weekly, quarterly, semi-annually, or annually to show monthly rate.  The average monthly expenses calculated on this form may differ from the deductions from income allowed on Form 22A or 22C.

☐  Check this box if a joint petition is filed and debtor's spouse maintains a separate household.  Complete a separate schedule of expenditures labeled "Spouse."

| | | |
|---|---|---:|
| 1. Rent or home mortgage payment (include lot rented for mobile home) | $ | 711.33 |
|    a. Are real estate taxes included?       Yes **X**    No ___ | | |
|    b. Is property insurance included?     Yes **X**    No ___ | | |
| 2. Utilities:    a. Electricity and heating fuel | $ | 195.00 |
|               b. Water and sewer | $ | 100.00 |
|               c. Telephone | $ | 75.00 |
|               d. Other   **Cable and Cell Phone** | $ | 150.00 |
| 3. Home maintenance (repairs and upkeep) | $ | 50.00 |
| 4. Food | $ | 200.00 |
| 5. Clothing | $ | 50.00 |
| 6. Laundry and dry cleaning | $ | 25.00 |
| 7. Medical and dental expenses | $ | 50.00 |
| 8. Transportation (not including car payments) | $ | 400.00 |
| 9. Recreation, clubs and entertainment, newspapers, magazines, etc. | $ | 100.00 |
| 10. Charitable contributions | $ | 0.00 |
| 11. Insurance (not deducted from wages or included in home mortgage payments) | | |
|               a. Homeowner's or renter's | $ | 0.00 |
|               b. Life | $ | 50.85 |
|               c. Health | $ | 423.00 |
|               d. Auto | $ | 100.08 |
|               e. Other | $ | 0.00 |
| 12. Taxes (not deducted from wages or included in home mortgage payments) | | |
|     (Specify)   **See Detailed Expense Attachment** | $ | 16.41 |
| 13. Installment payments: (In chapter 11, 12, and 13 cases, do not list payments to be included in the plan) | | |
|               a. Auto | $ | 234.60 |
|               b. Other   **2nd Mortgage (primary residence)** | $ | 664.83 |
|               c. Other | $ | 0.00 |
| 14. Alimony, maintenance, and support paid to others | $ | 0.00 |
| 15. Payments for support of additional dependents not living at your home | $ | 0.00 |
| 16. Regular expenses from operation of business, profession, or farm (attach detailed statement) | $ | 0.00 |
| 17. Other | $ | 0.00 |
|     Other | $ | 0.00 |

| | | |
|---|---|---:|
| 18. AVERAGE MONTHLY EXPENSES (Total lines 1-17. Report also on Summary of Schedules and, if applicable, on the Statistical Summary of Certain Liabilities and Related Data.) | $ | 3,596.10 |

19. Describe any increase or decrease in expenditures reasonably anticipated to occur within the year following the filing of this document:

    **Transportation expense includes gas, vehicle repairs, registration & license fees. Debtor trying to modify her second mortgage. If unable to do, debtor will surrender property.**

20. STATEMENT OF MONTHLY NET INCOME

| | | |
|---|---|---:|
| a.   Average monthly income from Line 15 of Schedule I | $ | 1,429.16 |
| b.   Average monthly expenses from Line 18 above | $ | 3,596.10 |
| c.   Monthly net income (a. minus b.) | $ | -2,166.94 |

**Exhibit "12"**

00051

2/18/11  4:39PM

**B6J (Official Form 6J) (12/07)**

In re   __**Leticia Joy Arciniega**_____          Case No. _____
                                    Debtor(s)

## SCHEDULE J - CURRENT EXPENDITURES OF INDIVIDUAL DEBTOR(S)
### Detailed Expense Attachment

**Specific Tax Expenditures:**

| | | |
|---|---|---|
| **Property taxes (Parcel** | $ | **7.01** |
| **Property Taxes (Parcel #051-2** | $ | **1.34** |
| **Propety Taxes (Parcel 053-4** | $ | **8.06** |
| **Total Tax Expenditures** | $ | **16.41** |

**Exhibit "12"**
**00052**

2/18/11  4:39PM

B7 (Official Form 7) (04/10)

# United States Bankruptcy Court
## Central District of California

In re    **Leticia Joy Arciniega**

_____    Case No.    _____

Debtor(s)    Chapter    **7**

# STATEMENT OF FINANCIAL AFFAIRS

This statement is to be completed by every debtor. Spouses filing a joint petition may file a single statement on which the information for both spouses is combined. If the case is filed under chapter 12 or chapter 13, a married debtor must furnish information for both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed. An individual debtor engaged in business as a sole proprietor, partner, family farmer, or self-employed professional, should provide the information requested on this statement concerning all such activities as well as the individual's personal affairs. To indicate payments, transfers and the like to minor children, state the child's initials and the name and address of the child's parent or guardian, such as "A.B., a minor child, by John Doe, guardian." Do not disclose the child's name. See, 11 U.S.C. § 112; Fed. R. Bankr. P. 1007(m).

Questions 1 - 18 are to be completed by all debtors. Debtors that are or have been in business, as defined below, also must complete Questions 19 - 25. **If the answer to an applicable question is "None," mark the box labeled "None."** If additional space is needed for the answer to any question, use and attach a separate sheet properly identified with the case name, case number (if known), and the number of the question.

*DEFINITIONS*

*"In business."* A debtor is "in business" for the purpose of this form if the debtor is a corporation or partnership. An individual debtor is "in business" for the purpose of this form if the debtor is or has been, within six years immediately preceding the filing of this bankruptcy case, any of the following: an officer, director, managing executive, or owner of 5 percent or more of the voting or equity securities of a corporation; a partner, other than a limited partner, of a partnership; a sole proprietor or self-employed full-time or part-time. An individual debtor also may be "in business" for the purpose of this form if the debtor engages in a trade, business, or other activity, other than as an employee, to supplement income from the debtor's primary employment.

*"Insider."* The term "insider" includes but is not limited to: relatives of the debtor; general partners of the debtor and their relatives; corporations of which the debtor is an officer, director, or person in control; officers, directors, and any owner of 5 percent or more of the voting or equity securities of a corporate debtor and their relatives; affiliates of the debtor and insiders of such affiliates; any managing agent of the debtor. 11 U.S.C. § 101.

---

**1. Income from employment or operation of business**

None
☐

State the gross amount of income the debtor has received from employment, trade, or profession, or from operation of the debtor's business, including part-time activities either as an employee or in independent trade or business, from the beginning of this calendar year to the date this case was commenced. State also the gross amounts received during the **two years** immediately preceding this calendar year. (A debtor that maintains, or has maintained, financial records on the basis of a fiscal rather than a calendar year may report fiscal year income. Identify the beginning and ending dates of the debtor's fiscal year.) If a joint petition is filed, state income for each spouse separately. (Married debtors filing under chapter 12 or chapter 13 must state income of both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| AMOUNT | SOURCE |
|---|---|
| **$3,275.00** | **2011; Interest payments on Shareholders Note from Business thru 1/31/2011** |
| **$-72,612.00** | **2009; Adjusted Gross Income (2009 Tax Returns)** |

---

**2. Income other than from employment or operation of business**

None
☐

State the amount of income received by the debtor other than from employment, trade, profession, or operation of the debtor's business during the **two years** immediately preceding the commencement of this case. Give particulars. If a joint petition is filed, state income for each spouse separately. (Married debtors filing under chapter 12 or chapter 13 must state income for each spouse whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| AMOUNT | SOURCE |
|---|---|
| **$24.00** | **2009; Income Tax Refund** |
| | **Federal $24.00** |

---

2/18/11  4:39PM

2

| AMOUNT | SOURCE |
|---|---|
| **$42,000.00** | **2010: Draws from self-employment Pension Plan** |

### 3. Payments to creditors

None ☐

*Complete a. or b., as appropriate, and c.*

a.    *Individual or joint debtor(s) with primarily consumer debts.*   List all payments on loans, installment purchases of goods or services, and other debts to any creditor made within **90 days** immediately preceding the commencement of this case unless the aggregate value of all property that constitutes or is affected by such transfer is less than $600. Indicate with an (*) any payments that were made to a creditor on account of a domestic support obligation or as part of an alternative repayment schedule under a plan by an approved nonprofit budgeting and credit counseling agency. (Married debtors filing under chapter 12 or chapter 13 must include payments by either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NAME AND ADDRESS OF CREDITOR | DATES OF PAYMENTS | AMOUNT PAID | AMOUNT STILL OWING |
|---|---|---|---|
| **CitiMortage**<br>**P.o. Box 9438**<br>**Gaithersburg, MD 20898** | **11/8/2010; 12/6/2010;**<br>**1/10/11**<br>**$711.33** | **$2,133.99** | **$75,707.00** |
| **Ford Credit**<br>**P.O. Box 542000**<br>**Omaha, NE 68154** | **11/8/2010; 12/6/2010;**<br>**1/10/2011** | **$703.80** | **$9,503.00** |

None ■

b.    *Debtor whose debts are not primarily consumer debts:* List each payment or other transfer to any creditor made within **90 days** immediately preceding the commencement of the case unless the aggregate value of all property that constitutes or is affected by such transfer is less than $5,850*.  If the debtor is an individual, indicate with an asterisk (*) any payments that were made to a creditor on account of a domestic support obligation or as part of an alternative repayment schedule under a plan by an approved nonprofit budgeting and credit counseling agency.  (Married debtors filing under chapter 12 or chapter 13 must include payments and other transfers by either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NAME AND ADDRESS OF CREDITOR | DATES OF PAYMENTS/ TRANSFERS | AMOUNT PAID OR VALUE OF TRANSFERS | AMOUNT STILL OWING |
|---|---|---|---|

None ■

c.    *All debtors:* List all payments made within **one year** immediately preceding the commencement of this case to or for the benefit of creditors who are or were insiders. (Married debtors filing under chapter 12 or chapter 13 must include payments by either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NAME AND ADDRESS OF CREDITOR AND RELATIONSHIP TO DEBTOR | DATE OF PAYMENT | AMOUNT PAID | AMOUNT STILL OWING |
|---|---|---|---|

### 4.  Suits and administrative proceedings, executions, garnishments and attachments

None ☐

a. List all suits and administrative proceedings to which the debtor is or was a party within **one year** immediately preceding the filing of this bankruptcy case. (Married debtors filing under chapter 12 or chapter 13 must include information concerning either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| CAPTION OF SUIT AND CASE NUMBER | NATURE OF PROCEEDING | COURT OR AGENCY AND LOCATION | STATUS OR DISPOSITION |
|---|---|---|---|
| **Chase v. Arciniega**<br>**HEC 10003211** | **Complaint for Money** | **Superior Court of CA, County of Riverside**<br>**880 N. State Street, Hemet, CA 92543** | **Pending** |
| **Clark v. Arciniega**<br>**SCVSS147607** | **Breach of Contract** | **Superior Court of the State of California**<br>**Sounty of San Bernardino** | **Settled in 4/2009.** |

* Amount subject to adjustment on 4/01/13, and every three years thereafter with respect to cases commenced on or after the date of adjustment.

Best Case Bankruptcy

**Exhibit "13"**
**00054**

3

None
■

b. Describe all property that has been attached, garnished or seized under any legal or equitable process within **one year** immediately preceding the commencement of this case. (Married debtors filing under chapter 12 or chapter 13 must include information concerning property of either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NAME AND ADDRESS OF PERSON FOR WHOSE BENEFIT PROPERTY WAS SEIZED | DATE OF SEIZURE | DESCRIPTION AND VALUE OF PROPERTY |
| --- | --- | --- |

### 5. Repossessions, foreclosures and returns

None
■

List all property that has been repossessed by a creditor, sold at a foreclosure sale, transferred through a deed in lieu of foreclosure or returned to the seller, within **one year** immediately preceding the commencement of this case. (Married debtors filing under chapter 12 or chapter 13 must include information concerning property of either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NAME AND ADDRESS OF CREDITOR OR SELLER | DATE OF REPOSSESSION, FORECLOSURE SALE, TRANSFER OR RETURN | DESCRIPTION AND VALUE OF PROPERTY |
| --- | --- | --- |

### 6. Assignments and receiverships

None
■

a. Describe any assignment of property for the benefit of creditors made within **120 days** immediately preceding the commencement of this case. (Married debtors filing under chapter 12 or chapter 13 must include any assignment by either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NAME AND ADDRESS OF ASSIGNEE | DATE OF ASSIGNMENT | TERMS OF ASSIGNMENT OR SETTLEMENT |
| --- | --- | --- |

None
■

b. List all property which has been in the hands of a custodian, receiver, or court-appointed official within **one year** immediately preceding the commencement of this case. (Married debtors filing under chapter 12 or chapter 13 must include information concerning property of either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NAME AND ADDRESS OF CUSTODIAN | NAME AND LOCATION OF COURT CASE TITLE & NUMBER | DATE OF ORDER | DESCRIPTION AND VALUE OF PROPERTY |
| --- | --- | --- | --- |

### 7. Gifts

None
■

List all gifts or charitable contributions made within **one year** immediately preceding the commencement of this case except ordinary and usual gifts to family members aggregating less than $200 in value per individual family member and charitable contributions aggregating less than $100 per recipient. (Married debtors filing under chapter 12 or chapter 13 must include gifts or contributions by either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NAME AND ADDRESS OF PERSON OR ORGANIZATION | RELATIONSHIP TO DEBTOR, IF ANY | DATE OF GIFT | DESCRIPTION AND VALUE OF GIFT |
| --- | --- | --- | --- |

### 8. Losses

None
■

List all losses from fire, theft, other casualty or gambling within **one year** immediately preceding the commencement of this case **or since the commencement of this case.** (Married debtors filing under chapter 12 or chapter 13 must include losses by either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| DESCRIPTION AND VALUE OF PROPERTY | DESCRIPTION OF CIRCUMSTANCES AND, IF LOSS WAS COVERED IN WHOLE OR IN PART BY INSURANCE, GIVE PARTICULARS | DATE OF LOSS |
| --- | --- | --- |

**Exhibit "13"**
**00055**

4

## 9. Payments related to debt counseling or bankruptcy

None ☐

List all payments made or property transferred by or on behalf of the debtor to any persons, including attorneys, for consultation concerning debt consolidation, relief under the bankruptcy law or preparation of the petition in bankruptcy within **one year** immediately preceding the commencement of this case.

| NAME AND ADDRESS OF PAYEE | DATE OF PAYMENT, NAME OF PAYOR IF OTHER THAN DEBTOR | AMOUNT OF MONEY OR DESCRIPTION AND VALUE OF PROPERTY |
|---|---|---|
| **Lorene Lynn Mies, APLC**<br>**38975 Sky Canyon Drive,  Suite 204**<br>**Murrieta, CA 92563** | **Prior to Filing-**<br>**Paid by MSRE, Inc.** | **$2,501.00 attorney's fees;**<br>**$299.00 US Bankruptcy Court** |

## 10. Other transfers

None ☐

a. List all other property, other than property transferred in the ordinary course of the business or financial affairs of the debtor, transferred either absolutely or as security within **two years** immediately preceding the commencement of this case. (Married debtors filing under chapter 12 or chapter 13 must include transfers by either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NAME AND ADDRESS OF TRANSFEREE, RELATIONSHIP TO DEBTOR | DATE | DESCRIBE PROPERTY TRANSFERRED AND VALUE RECEIVED |
|---|---|---|
| **Leticia Arciniega** | **2010** | **Self-Employment Pension Plan Distribution:**<br>**$45,578.34**<br>**Merrill Lynch**<br>**P.O. Box 2150**<br>**Lakewood NJ 08701**<br>**Debtor used this funds for living expenses.** |
| **Leticia Arciniega** | **2009** | **Self-Employment Pension Plan Distribution:**<br>**$15,000**<br>**Merrill Lynch**<br>**P.O. Box 2150**<br>**Lakewood NJ 08701**<br>**Debtor used this funds for living expenses.** |
| **Leticia Arciniega** | **4/2009** | **Interspousal Transfer/Change of Title of House**<br>**3047 N. Arrowhead Ave**<br>**San Bernardino, Ca 92405**<br>**Debtor received $30,000 in exchange for the Transfer.**<br>**Debtor used this funds for living expenses.** |

None ■

b. List all property transferred by the debtor within **ten years** immediately preceding the commencement of this case to a self-settled trust or similar device of which the debtor is a beneficiary.

| NAME OF TRUST OR OTHER DEVICE | DATE(S) OF TRANSFER(S) | AMOUNT OF MONEY OR DESCRIPTION AND VALUE OF PROPERTY OR DEBTOR'S INTEREST IN PROPERTY |
|---|---|---|

**Exhibit "13"**
**00056**

2/18/11  4:39PM

5

### 11.  Closed financial accounts

None
☐

List all financial accounts and instruments held in the name of the debtor or for the benefit of the debtor which were closed, sold, or otherwise transferred within **one year** immediately preceding the commencement of this case. Include checking, savings, or other financial accounts, certificates of deposit, or other instruments; shares and share accounts held in banks, credit unions, pension funds, cooperatives, associations, brokerage houses and other financial institutions. (Married debtors filing under chapter 12 or chapter 13 must include information concerning accounts or instruments held by or for either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NAME AND ADDRESS OF INSTITUTION | TYPE OF ACCOUNT, LAST FOUR DIGITS OF ACCOUNT NUMBER, AND AMOUNT OF FINAL BALANCE | AMOUNT AND DATE OF SALE OR CLOSING |
| --- | --- | --- |
| **Bank of the West**<br>**1450 Treat Blvd**<br>**Walnut Creek, CA 94597** | **Account #0801; 1501** | **Closed 2009** |

### 12.  Safe deposit boxes

None
■

List each safe deposit or other box or depository in which the debtor has or had securities, cash, or other valuables within **one year** immediately preceding the commencement of this case. (Married debtors filing under chapter 12 or chapter 13 must include boxes or depositories of either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NAME AND ADDRESS OF BANK OR OTHER DEPOSITORY | NAMES AND ADDRESSES OF THOSE WITH ACCESS TO BOX OR DEPOSITORY | DESCRIPTION OF CONTENTS | DATE OF TRANSFER OR SURRENDER, IF ANY |
| --- | --- | --- | --- |

### 13.  Setoffs

None
■

List all setoffs made by any creditor, including a bank, against a debt or deposit of the debtor within **90 days** preceding the commencement of this case. (Married debtors filing under chapter 12 or chapter 13 must include information concerning either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NAME AND ADDRESS OF CREDITOR | DATE OF SETOFF | AMOUNT OF SETOFF |
| --- | --- | --- |

### 14.  Property held for another person

None
■

List all property owned by another person that the debtor holds or controls.

| NAME AND ADDRESS OF OWNER | DESCRIPTION AND VALUE OF PROPERTY | LOCATION OF PROPERTY |
| --- | --- | --- |

### 15.  Prior address of debtor

None
■

If the debtor has moved within **three years** immediately preceding the commencement of this case, list all premises which the debtor occupied during that period and vacated prior to the commencement of this case. If a joint petition is filed, report also any separate address of either spouse.

| ADDRESS | NAME USED | DATES OF OCCUPANCY |
| --- | --- | --- |

### 16.  Spouses and Former Spouses

None
☐

If the debtor resides or resided in a community property state, commonwealth, or territory (including Alaska, Arizona, California, Idaho, Louisiana, Nevada, New Mexico, Puerto Rico, Texas, Washington, or Wisconsin) within **eight years** immediately preceding the commencement of the case, identify the name of the debtor's spouse and of any former spouse who resides or resided with the debtor in the community property state.

NAME
**James Clark, Former Spouse**

**Exhibit "13"**
**00057**

6

### 17. Environmental Information.

For the purpose of this question, the following definitions apply:

"Environmental Law" means any federal, state, or local statute or regulation regulating pollution, contamination, releases of hazardous or toxic substances, wastes or material into the air, land, soil, surface water, groundwater, or other medium, including, but not limited to, statutes or regulations regulating the cleanup of these substances, wastes, or material.

"Site" means any location, facility, or property as defined under any Environmental Law, whether or not presently or formerly owned or operated by the debtor, including, but not limited to, disposal sites.

"Hazardous Material" means anything defined as a hazardous waste, hazardous substance, toxic substance, hazardous material, pollutant, or contaminant or similar term under an Environmental Law

None
■ a. List the name and address of every site for which the debtor has received notice in writing by a governmental unit that it may be liable or potentially liable under or in violation of an Environmental Law. Indicate the governmental unit, the date of the notice, and, if known, the Environmental Law:

| SITE NAME AND ADDRESS | NAME AND ADDRESS OF GOVERNMENTAL UNIT | DATE OF NOTICE | ENVIRONMENTAL LAW |
|---|---|---|---|

None
■ b. List the name and address of every site for which the debtor provided notice to a governmental unit of a release of Hazardous Material. Indicate the governmental unit to which the notice was sent and the date of the notice.

| SITE NAME AND ADDRESS | NAME AND ADDRESS OF GOVERNMENTAL UNIT | DATE OF NOTICE | ENVIRONMENTAL LAW |
|---|---|---|---|

None
■ c. List all judicial or administrative proceedings, including settlements or orders, under any Environmental Law with respect to which the debtor is or was a party. Indicate the name and address of the governmental unit that is or was a party to the proceeding, and the docket number.

| NAME AND ADDRESS OF GOVERNMENTAL UNIT | DOCKET NUMBER | STATUS OR DISPOSITION |
|---|---|---|

### 18 . Nature, location and name of business

None
☐ a. *If the debtor is an individual*, list the names, addresses, taxpayer identification numbers, nature of the businesses, and beginning and ending dates of all businesses in which the debtor was an officer, director, partner, or managing executive of a corporation, partner in a partnership, sole proprietor, or was self-employed in a trade, profession, or other activity either full- or part-time within **six years** immediately preceding the commencement of this case, or in which the debtor owned 5 percent or more of the voting or equity securities within **six years** immediately preceding the commencement of this case.

*If the debtor is a partnership*, list the names, addresses, taxpayer identification numbers, nature of the businesses, and beginning and ending dates of all businesses in which the debtor was a partner or owned 5 percent or more of the voting or equity securities, within **six years** immediately preceding the commencement of this case.

*If the debtor is a corporation*, list the names, addresses, taxpayer identification numbers, nature of the businesses, and beginning and ending dates of all businesses in which the debtor was a partner or owned 5 percent or more of the voting or equity securities within **six years** immediately preceding the commencement of this case.

| NAME | LAST FOUR DIGITS OF SOCIAL-SECURITY OR OTHER INDIVIDUAL TAXPAYER-I.D. NO. (ITIN)/ COMPLETE EIN | ADDRESS | NATURE OF BUSINESS | BEGINNING AND ENDING DATES |
|---|---|---|---|---|
| **MSRE, Inc. dba Main St Realty** | **2570** | **490 Verona Avenue San Jacinto, CA 92583** | **Real Estate Sales** | **4/2007 - Present** |
| **Leticia Consulting** | | **890 Verona Avenue San Jacinto, CA 92583** | **Consulting Service **Debtor was a 1099 employee. No dba.** | **3/1998 - Present** |

2/18/11  4:39PM

7

None
■    b. Identify any business listed in response to subdivision a., above, that is "single asset real estate" as defined in 11 U.S.C. § 101.

NAME                           ADDRESS

      The following questions are to be completed by every debtor that is a corporation or partnership and by any individual debtor who is or has been, within **six years** immediately preceding the commencement of this case, any of the following: an officer, director, managing executive, or owner of more than 5 percent of the voting or equity securities of a corporation; a partner, other than a limited partner, of a partnership, a sole proprietor, or self-employed in a trade, profession, or other activity, either full- or part-time.

     *(An individual or joint debtor should complete this portion of the statement **only** if the debtor is or has been in business, as defined above, within six years immediately preceding the commencement of this case. A debtor who has not been in business within those six years should go directly to the signature page.)*

---

     **19. Books, records and financial statements**

None
■    a. List all bookkeepers and accountants who within **two years** immediately preceding the filing of this bankruptcy case kept or supervised the keeping of books of account and records of the debtor.

NAME AND ADDRESS                          DATES SERVICES RENDERED

None
■    b. List all firms or individuals who within the **two years** immediately preceding the filing of this bankruptcy case have audited the books of account and records, or prepared a financial statement of the debtor.

NAME                  ADDRESS                   DATES SERVICES RENDERED

None
■    c. List all firms or individuals who at the time of the commencement of this case were in possession of the books of account and records of the debtor. If any of the books of account and records are not available, explain.

NAME                           ADDRESS

None
■    d. List all financial institutions, creditors and other parties, including mercantile and trade agencies, to whom a financial statement was issued by the debtor within **two years** immediately preceding the commencement of this case.

NAME AND ADDRESS                          DATE ISSUED

---

     **20. Inventories**

None
■    a. List the dates of the last two inventories taken of your property, the name of the person who supervised the taking of each inventory, and the dollar amount and basis of each inventory.

DATE OF INVENTORY           INVENTORY SUPERVISOR           DOLLAR AMOUNT OF INVENTORY
                                                                  (Specify cost, market or other basis)

None
■    b. List the name and address of the person having possession of the records of each of the two inventories reported in a., above.

DATE OF INVENTORY                               NAME AND ADDRESSES OF CUSTODIAN OF INVENTORY
                                                         RECORDS

---

     **21 . Current Partners, Officers, Directors and Shareholders**

None
■    a. If the debtor is a partnership, list the nature and percentage of partnership interest of each member of the partnership.

NAME AND ADDRESS                       NATURE OF INTEREST                 PERCENTAGE OF INTEREST

**Exhibit "13"**
**00059**

8

None ■  b. If the debtor is a corporation, list all officers and directors of the corporation, and each stockholder who directly or indirectly owns, controls, or holds 5 percent or more of the voting or equity securities of the corporation.

| NAME AND ADDRESS | TITLE | NATURE AND PERCENTAGE OF STOCK OWNERSHIP |
|---|---|---|

**22 . Former partners, officers, directors and shareholders**

None ■  a. If the debtor is a partnership, list each member who withdrew from the partnership within **one year** immediately preceding the commencement of this case.

| NAME | ADDRESS | DATE OF WITHDRAWAL |
|---|---|---|

None ■  b. If the debtor is a corporation, list all officers, or directors whose relationship with the corporation terminated within **one year** immediately preceding the commencement of this case.

| NAME AND ADDRESS | TITLE | DATE OF TERMINATION |
|---|---|---|

**23 . Withdrawals from a partnership or distributions by a corporation**

None ■  If the debtor is a partnership or corporation, list all withdrawals or distributions credited or given to an insider, including compensation in any form, bonuses, loans, stock redemptions, options exercised and any other perquisite during **one year** immediately preceding the commencement of this case.

| NAME & ADDRESS OF RECIPIENT, RELATIONSHIP TO DEBTOR | DATE AND PURPOSE OF WITHDRAWAL | AMOUNT OF MONEY OR DESCRIPTION AND VALUE OF PROPERTY |
|---|---|---|

**24. Tax Consolidation Group.**

None ■  If the debtor is a corporation, list the name and federal taxpayer identification number of the parent corporation of any consolidated group for tax purposes of which the debtor has been a member at any time within **six years** immediately preceding the commencement of the case.

| NAME OF PARENT CORPORATION | TAXPAYER IDENTIFICATION NUMBER (EIN) |
|---|---|

**25. Pension Funds.**

None ■  If the debtor is not an individual, list the name and federal taxpayer-identification number of any pension fund to which the debtor, as an employer, has been responsible for contributing at any time within **six years** immediately preceding the commencement of the case.

| NAME OF PENSION FUND | TAXPAYER IDENTIFICATION NUMBER (EIN) |
|---|---|

### DECLARATION UNDER PENALTY OF PERJURY BY INDIVIDUAL DEBTOR

I declare under penalty of perjury that I have read the answers contained in the foregoing statement of financial affairs and any attachments thereto and that they are true and correct.

Date  **February 18, 2011**          Signature  **/s/ Leticia Joy Arciniega**
                                                **Leticia Joy Arciniega**
                                                Debtor

*Penalty for making a false statement: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571*

Account     9401



Check 1012, Date 06/11, Amount $2,600.00

1140

Exhibit "14"
00061

Account 9401



Check 1017, Date 08/20, Amount $2,060.00

1140

Exhibit "15"
00062

Account ████ 9401



Check 1018, Date 07/08, Amount $1,775.00

1142

**Exhibit "16"**
00063

Account ███████ 9401



Check 1020, Date 08/26, Amount $1,880.00

1144

Exhibit "17"
00064

Account █████9401



Check 1025, Date 09/10, Amount $2,170.00

1146

Exhibit "18"
00065

Account ████ 9401



Check 1026, Date 09/16, Amount $2,390.00

1146

Exhibit "19"
00066

Account  9401



Check 1028, Date 09/16, Amount $900.00

1146

Exhibit "20"
00067

Account █████9401





Check 1030, Date 10/06, Amount $1,000.00

1148

Exhibit "21"
00068

Account ████ 9401



Check 1031, Date 10/14, Amount $4,370.00

1148

Exhibit "22"
00069

Account ████ 9401



Check 1075, Date 01/07, Amount $750.00

1101

Exhibit "23"
00070

Account █████9401



Check 1076, Date 01/13, Amount $800.00

1101

Exhibit "24"
00071

Account ████ 9401



Check 1098, Date 02/18, Amount $100.00

1104

Exhibit "25"
00072

Account     9401



Check 1119, Date 02/19, Amount $1,550.00

1105

Exhibit "26"
00073

Account  9401



Check 1120, Date 02/20, Amount $250.00

1105

Exhibit "27"
00074

Account ▮▮▮ 9401



Check 1121, Date 02/19, Amount $500.00

*1105*

Exhibit "28"
00075

Account ████9401



Check 1139, Date 04/09, Amount $500.00

Exhibit "29"
00076

Account ████ 9401



Check 1140, Date 04/20, Amount $2,000.00

Exhibit "30"
00077

Account ██████ 9401



Check 1154, Date 05/05, Amount $500.00

Exhibit "31"
00078

Account █████ 9401



Check 1174, Date 05/26, Amount $700.00

Exhibit "32"
00079

Account  9401



Check 1175, Date 05/28, Amount $200.00

Exhibit "33"
00080

Account ███ 9401



Check 1176, Date 06/09, Amount $2,700.00

Exhibit "34"
00081

Account 9401



Check 1179, Date 06/19, Amount $600.00

Account ████ 9401



Check 1181, Date 07/02, Amount $5,000.00

Exhibit "36"
00083

Account  9401



Check 1183, Date 07/15, Amount $2,000.00

Exhibit "37"
00084

Account:          9401
Statement Date: 10/02/2009



1192 $2,700.00

1126

Exhibit "38"
00085

Account:  ▓▓▓▓ 9401
Statement Date: 10/02/2009





1193 $2,063.84

1

Exhibit "39"
00086

Account: ████ 9401
Statement Date: 10/31/2009



1195 $2,000.00





**Exhibit "40"**
00087

Account: ████ 9401
Statement Date: 10/31/2009





1196 $100.00



Exhibit "41"
00088

Account: ████ 9401
Statement Date: 10/31/2009





1197 $2,063.84





**Exhibit "42"**
**00089**

Account: ▮▮▮▮9401
Statement Date: 01/30/2010



1203 $2,700.00

1065

Exhibit "43"
00090

Account: _____9401
Statement Date: 02/27/2010



1204 $2,700.00

1068

**Exhibit "44"**
00091

Account: 9401
Statement Date: 04/01/2010



1205 $2,700.00



Exhibit "45"
00092

Account: 9401
Statement Date: 04/01/2010





1208 $700.00



**Exhibit "46"**
**00093**

Account: 9401
Statement Date: 04/01/2010





1209 $1,000.00

Exhibit "47"
00094

Account: ████ 9401
Statement Date: 05/03/2010



1210 $3,500.00

Exhibit "48"
00095

Account: 9401
Statement Date: 05/24/2010



1211 $2,700.00

1077

Exhibit "49"
00096

 9401





#1213     6/14/10          $2,000.00

Exhibit "50"
00097

9401

PAGE   3   of 3





#1225      11/08/10            $1,500.00

Exhibit "51"
00098

█ 9401





#1226     11/15/10          $300.00

Exhibit "52"
00099

 9401

PAGE   3  of 3







#1227    12/02/10        $300.00

477

Exhibit "53"
00100

 9401

PAGE   3  of 3



#1228    12/06/10        $2,700.00

Exhibit "54"
00101

9401                                      PAGE   3  of 3



#1229   12/23/10        $500.00

477

Exhibit "55"
00102

9401

PAGE   3   of 3





#1230    1/11/11         $2,700.00



1031

Exhibit "56"
00103

9401



#1231    1/12/11         $200.00



Exhibit "57"
00104

9401





#1232    1/14/11        $50.00

1031

Exhibit "58"
00105

9401

PAGE   3   of 3



#1233     1/18/11          $25.00

Exhibit "59"
00106

9401





#1234    1/28/11         $300.00

Exhibit "60"
00107

9401



#1236    2/07/11              $400.00

Exhibit "61"
00108

9401





#1239    2/28/11        $2,700.00

Exhibit "62"
00109

9401

PAGE   3  of 3





#1240    3/21/11            $200.00

1037

Exhibit "63"
00110

9401

PAGE   3   of 3





#1241     4/01/11          $2,700.00

104C

9401

PAGE   3   of 3



#1242    4/25/11              $200.00

104C

 9401





#1245    5/04/11             $2,700.00

1043

Exhibit "66"
00113

9401



00  #1246    5/16/11           $300.00

9401

PAGE   3   of 3





#1248    6/02/11              $2,700.00



1046

Exhibit "68"
00115

2.

 **WaMu**®

62-20/311  **2353807586**


**WASHINGTON MUTUAL** FIVE ZERO ZERO ZERO CTSCTS
*************Apr 30, 2009 50 THOUSAND DOLLARS AND 00 CENTS *************

Washington Mutual, a division of JPMorgan Chase Bank, N.A.

Pay to
the
order
of:

Milton and DeKruif and Leticia Arciniega
TAX ID 20-0293743

**DRAWER / PURCHASER COPY**
**NON-NEGOTIABLE**

Remitter
JAMES A CLARK
SETTLEMENT

1294 113

Citibank, N.A. - One Penn's Way - New Castle DE 19720

303111401 REV1 02/08 8810013776

HOLD DOCUMENT UP TO THE LIGHT TO VIEW TRUE WATERMARK  **OFFICIAL CHECK**  HOLD DOCUMENT UP TO THE LIGHT TO VIEW TRUE WATERMARK

**WaMu**®

62-20/311  **2353807586**

**MATCH THE AMOUNT IN WORDS WITH THE AMOUNT IN NUMBERS**

**WASHINGTON MUTUAL** FIVE ZERO ZERO ZERO CTSCTS
*************Apr 30, 2009 50 THOUSAND DOLLARS AND 00 CENTS *************

Pay to
the
order
of:

Milton and DeKruif and Leticia Arciniega
TAX ID 20-0293743

Drawer:Washington Mutual, a division of JPMorgan Chase Bank, N.A.

AUTHORIZED SIGNATURE

REMITTER
JAMES A CLARK
SETTLEMENT

1294 113

Citibank, N.A. - One Penn's Way - New Castle DE 19720

0 209

JC000083

**Exhibit "69"**
**00116**



# PROMISSORY NOTE

**RECITATIONS:**
- DATE: April 24, 2009
- PAYEE: DAVID D. CHRISTIAN
- PRINCIPAL: $120,000.00
- TERM: ONE YEAR

- BORROWER: LETICIA J. ARCINIEGA
- BORROWER'S ADDRESS: 890 VERONA AVE, SAN JACINTO, CA 92583

**INTEREST RATE:** NO INTEREST SHALL BE APPLIED        **PAYMENT TERMS:** ONE PAYMENT OF $120,000.00

**DEFAULT AND ACCELERATION CLAUSE:** If Borrower defaults in the payment of this Note or in the performance of any obligation, then Payee may declare the unpaid principal balance on this Note immediately due, and the entire balance may be attached as a lien to the Borrower's residence identified above as Borrower's Address, or attached for any other real property or assets owned by Borrower. Such amount to be recorded against the title of the subject property(ies) and/or assets. Borrower and each surety, endorser, and guarantor waive all demands for payment, presentation for payment, notices of intentions to accelerate maturity, notices of acceleration of maturity, protests, and notices of protest, to the extent permitted by law.

**ATTORNEY'S FEES:** If this Note is given to an attorney for collection or enforcement, or if suit is brought for collection or enforcement, or if it is collected or enforced through probate, bankruptcy, or other judicial proceeding, then Borrower shall pay Payee all costs of collection and enforcement, including reasonable attorney's fees and court costs in addition to other amounts due.

**SEVERABILITY:** If any provision of this Note or the application thereof shall, for any reason and to any extent, be invalid or unenforceable, neither the remainder of this Note nor the application of the provision to other persons, entities or circumstances shall be affected thereby, but instead shall be enforced to the maximum extent permitted by law.

**BINDING EFFECT:** The covenants, obligations and conditions herein contained shall be binding on and inure to the benefit of the heirs, legal representatives, and assigns of the parties hereto.

**GOVERNING LAW:** This Note shall be governed, construed and interpreted by, through and under the Laws of the State of California.

**DISBURSEMENTS:** This Note supersedes and incorporates the Note previously signed on December 18, 2006. That amount is contained as the first amount and disbursement of the following schedule:

| Date | Amount |
|------|--------|
| December 6, 2006 | $80,000.00 |
| May 2, 2008 | $5,000.00 |
| May 30, 2008 | $5,000.00 |
| July 1, 2008 | $5,000.00 |
| August 1, 2008 | $6,500.00 |
| September 1, 2008 | $4,000.00 |
| October 13, 2008 | $5,000.00 |
| February 22, 2009 | $1,000.00 |
| March 17, 2009 | $2,000.00 |
| March 31, 2009 | $3,000.00 |
| April 24, 2009- includes $1,500.00 of outstanding receipt reimbursements | $3,500.00 |
| Total | $120,000.00 |

Borrower is responsible for all obligations represented by this Note.

Executed this 24th day of April, 2009.

Leticia J. Arciniega

4/24/2009

37

Exhibit "70"
00117

**WELLS FARGO**

# Portfolio Management Account®
Statement period: December 09, 2006 - January 09, 2007

Illulululululululululululululululululululul
LETICIA JOY ARCINIEGA
890 VERONA AVE
SAN JACINTO CA 92583-2961

**Your PMA relationship number**
5304

Questions about this statement or your accounts?
Call 1-800-742-4932
Or visit us at wellsfargo.com

Page 1 of 10

Take advantage of everything your PMA account has to offer!

-FREE online access 24 hours a day
-FREE Bill Pay and Online Statements
-Discounts on Wells Fargo loans, lines of credit, and mortgages*
-View all of your accounts on one convenient statement

For more information or to take advantage of these products and
services, please call the phone number listed on this statement.
Equal Housing Lender.

*Loans, lines of credit and mortgages are subject to credit
approval.

## Table of contents

PMA® Overview ............................................ 3    Other Checking Account ........................ 9
PMA Checking Account ................................ 5    Savings Account .................................... 10

**Exhibit "71"**
**00118**

**WELLS FARGO**

## Portfolio Management Account®
Statement period: December 09, 2006 - January 09, 2007

Your PMA relationship number    S304

Page 2 of 10

## General Statement Policies for Wells Fargo Banks

For customer service, write to:
Wells Fargo Bank, N.A.
P.O. Box 6995
Portland, Or 97228-6995

or call:
1-800-742-4932
TTY 1-800-600-4833

### Checking Account Information

After balancing your checking account, please report any differences to us within 30 days.

Special provisions, including a reporting period of up to 60 days, apply if the difference involves an electronic funds transfer. These provisions are explained below.

### In Case of Errors or Questions About Your Electronic Transfers

If you think your statement or receipt is wrong or if you need more information about a transfer on your statement or receipt, you can either call us at the customer service telephone number or write us at the address shown on this page as soon as you can. We must hear from you no later than 60 days after we sent you the first statement on which the error or problem appeared.

• Tell us your name and account number, if any.
• Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
• Tell us the dollar amount of the suspected error.

We will investigate your complaint and correct any error promptly. If we take more than 10 business days to do this, we will recredit your account for the amount you think is in error, so that you will have the use of the money during the time it takes us to complete our investigation.

## To Dispute or Report Inaccuracies in Information We Have Furnished to a Consumer Reporting Agency about Your Accounts

You have the right to dispute the accuracy of information that Wells Fargo Bank, N.A. has furnished to a consumer reporting agency by writing to us at Wells Fargo Servicing, P.O. Box 14415, Des Moines, IA 50306-3415. Please describe the specific information that is inaccurate or in dispute and the basis for the dispute along with all supporting documentation. If you believe the information furnished is the result of identity theft, please provide us with an identity theft report.

## Worksheet to Balance Your Checking Account

1. Go through your check register and mark each check (this includes cancelled, converted and substitute checks that may appear on your statement), withdrawal, ATM transaction, payment, deposit or other credit listed in the "Deposits and interest", "Checks", and "Withdrawals" sections of your statement. Be sure your register shows any interest or dividends paid into your account and any service charges, automatic payments or transfers withdrawn from your account during this statement period.
2. Using the chart below, list any outstanding, converted, or substitute checks, as well as any ATM withdrawals, payments or any other withdrawals (including any from previous months) which are listed in your register but are not shown on your statement.
3. Balance your account by filling in the spaces below.

| NUMBER | ITEMS OUTSTANDING | AMOUNT |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| **TOTAL** | | **$** |

**A ▼ ENTER**
The ENDING BALANCE shown on your statement    $_____

**B ▼ ADD**
Any deposits listed in your register or transfers into your account which are not shown on your statement
$_____
$_____
$_____
TOTAL  +$_____

**CALCULATE THE SUBTOTAL**
(Add Parts A and B)    $_____

**C ▼ SUBTRACT**
The total outstanding checks and withdrawals from the chart at left    -$_____

**CALCULATE THE ENDING BALANCE**
(Part A + Part B - Part C)
This amount should be the same as the current balance shown in your check register    =$_____

88
88
65

37763

**Exhibit "71"**

**00119**

**WELLS FARGO**

# Portfolio Management Account®
Statement period: December 09, 2006 - January 09, 2007

Your PMA relationship number  3004

Page 3 of 10

## An overview of your Wells Fargo PMA® Account

### A look at your assets

| | |
|---|---|
| 45% PMA Primary | |
| 55% Savings | |

**Total assets**  $ 31,149.40

* Funds which represent less than 1% of your total account balance will not be represented in the pie chart

### A look at your liabilities

100% Commercial Loans

**Total liabilities**  $ 572,260.06

* Funds which represent less than 1% of your total account balance will not be represented in the pie chart

**PMA Qualification Balance** $603,409.46
* This balance is used to determine monthly service fees and other discounts and benefits.

988

37764

### Daily access accounts

| Account/Held by | Account Number | Balance last month | Balance this month |
|---|---|---|---|
| PMA Prime Checking Account[1] Wells Fargo Bank, N.A. | 5563 | $ 29,904.34 | $ 13,927.86 |
| Advantage Checking[1] Wells Fargo Bank, N.A. | 7801 | 100.00 | 100.00 |
| Wells Fargo Growth Savings[1] Wells Fargo Bank, N.A. | 8047 | 105,785.83 | 17,121.54 |
| **Total daily access accounts** | | **$ 135,790.17** | **$ 31,149.40** |
| **Total assets** | | **$ 135,790.17** | **$ 31,149.40** |

### Credit and loan accounts

| Account/Held by | Account Number | Outstanding balance last month | Outstanding balance this month |
|---|---|---|---|
| Commercial Loan [2] Wells Fargo Bank AFB Loans | 4607 | $ 0.00 | $ 572,260.06 |
| **Total credit and loan accounts** | | **$ 0.00** | **$ 572,260.06** |
| **Total liabilities** | | **$ 0.00** | **$ 572,260.06** |

### Interest and income paid to you

| Account | Account Number | This month | This year |
|---|---|---|---|
| PMA Prime Checking Account | 5563 | $ 57.52 | $ 57.52 |
| Wells Fargo Growth Savings | 8047 | 135.71 | 135.71 |
| **Total interest and income paid to you** | | **$ 193.23** | **$ 193.23** |

[1] Member FDIC. Eligible for FDIC insurance.
[2] Not FDIC insured / May lose value / No bank guarantee
Wells Fargo Investments, LLC, ("WFI"), member SIPC, a non-bank affiliate of Wells Fargo & Company.
*A separate statement will be mailed to you.

**Exhibit "71"**
**00120**

**WELLS FARGO**

## Portfolio Management Account®
Statement period: December 09, 2006 - January 09, 2007

### An overview of your Wells Fargo PMA® Account

Getting the most out of your PMA relationship? Remember that nearly all of your accounts, and accounts of others within your household, can be combined together to avoid a monthly service fee. Balances from your checking and savings accounts, time accounts (CDs), IRAs, brokerage, plus any outstanding balances on your loans, lines of credit and your Wells Fargo credit card can all be added together. Don't hesitate to contact your banker or call a Premier Phone Banker at the number on your statement to ensure you are getting the most benefit from your PMA.

NEW TERMS: For PMA-linked accounts, beginning April 2, 2007, Balance Inquiries at non-Wells Fargo ATMs (U.S. and International) will be $1.50 each. This fee does not apply to your primary account – (i.e., PMA Checking, PMA Prime Checking, or PMA Money Market Checking).

For questions, please contact your Wells Fargo banker or call the telephone number on your statement. We appreciate your business and look forward to continuing to serve your financial needs.

¹Member FDIC. Eligible for FDIC insurance.
²A separate statement will be mailed to you.

³Not FDIC insured / May lose value / No bank guarantee
⁴Wells Fargo Investments, LLC ("WFI"), member SIPC, a non-bank affiliate of Wells Fargo & Company.

**Exhibit "71"**
**00121**

37/65

L88



**WELLS FARGO**

## Portfolio Management Account®
Statement period: December 09, 2006 – January 09, 2007

Your PMA relationship number
5304

Page 5 of 10

## PMA Prime Checking Account

Wells Fargo Bank, N.A., California
Member FDIC

For customer service, refer to the
General Statement Policies page.

Leticia Joy Archiniega

Account Number:             5563

### Activity summary

| | |
|---|---|
| Balance on 12/08 | $ 29,904.34 |
| Additions | 5,458.44 |
| Subtractions | - 21,434.92 |
| Balance on 01/09 | $ 13,927.86 |

### Interest you've earned

| | |
|---|---|
| Interest paid on 01/09 | $ 57.52 |
| Average collected balance this month | $ 22,133.45 |
| Annual percentage yield earned this year | 3.01% |
| Interest and bonuses paid this year | $ 57.52 |
| Total interest and bonuses paid in 2006 | $ 206.89 |

## Activity detail

### Additions
**Deposits and interest**

| Date | Description | $ Amount |
|---|---|---|
| 12/11 | ATM Deposit - 12/08 Mach ID 2109R Hemet Hemet Ca 2109 | 2,058.00 |
| 01/05 | ATM Deposit - 01/05 Mach ID 2109R Hemet Hemet Ca 4236 | 3,342.92 |
| 01/09 | Interest Payment | 57.52 |
| **Total additions** | | **$ 5,458.44** |

### Subtractions
**Checks**

| Number | Date | $ Amount | Number | Date | $ Amount | Number | Date | $ Amount |
|---|---|---|---|---|---|---|---|---|
| 5507 | 12/11 | 38.68 | 5512 | 12/29 | 45.00 | 5517 | 12/29 | 600.00 |
| 5508 | 12/12 | 90.00 | 5513 | 12/28 | 88.00 | 5522* | 01/02 | 75.00 |
| 5509 | 12/22 | 60.00 | 5514 | 12/27 | 88.00 | 5524* | 01/05 | 30.00 |
| 5510 | 12/26 | 125.00 | 5515 | 01/05 | 44.00 | 5526* | 01/08 | 42.00 |
| 5511 | 12/21 | 10,000.00 | 5516 | 12/28 | 4,796.94 | | | |

888

37766

**Exhibit "71"**

00122

Exhibit "71"
00123

**WELLS FARGO**

## Portfolio Management Account®
Statement period: December 09, 2006 - January 09, 2007

**Your PMA relationship number** 5304

Page 6 of 10

## PMA Prime Checking Account

Account number: ...5563

### Did you know that as a PMA customer, you are eligible for the following benefits?

**The PMA Advantage**

- No annual fee Wells Fargo credit card* with free Wells Fargo Rewards
- Bonus rewards points as relationship balance grows
- Free Online Banking and free Online Bill Pay at www.wellsfargo.com
- No Wells Fargo access fee at any ATM*
- An annual fee on a select line of credit account
- Free checks (select styles)
- Special discount on select home loan programs* through Wells Fargo Home Mortgage
- No fee Travelers Cheques (including Checks for Two), cashiers/official checks and money orders
- And more...

: Subject to credit qualification. Surcharges imposed by non-Wells Fargo ATM owners and operators may apply.

688
37767

## Activity detail
### Subtractions (continued)
**Checks (continued)**

| Number | Date | $ Amount | Number | Date | $ Amount | Number | Date | $ Amount |
|---|---|---|---|---|---|---|---|---|
| 5528* | 01/05 | 800.00 | 5530* | 01/08 | 40.00 | 5733* | 12/27 | 50.00 |

Total checks                                      $ 17,010.62

* Gap in check sequence

**Withdrawals**

| Date | Description | $ Amount |
|---|---|---|
| 12/11 | POS Purchase - 12/11 Mach ID 000000 Sou Ross Store Sou Ross Shemai Ca 2109 ?MCC=5331 121042882DA | 88.28 |
| 12/11 | POS Purchase - 12/09 Mach ID 000000 Marshalls Marshmarshalls Hemet Ca 2109 ?MCC=5651 121042882DA | 48.47 |
| 12/11 | POS Purchase - 12/09 Mach ID 000000 Stater Bros. #1Stater Brosan Jacinto Ca 2109 ?MCC=5411 121042882DA | 28.26 |
| 12/11 | POS Purchase - 12/11 Mach ID 000000 Rite Aid #8293 Rite Aid #San Jacinto Ca 2109 ?MCC=5912 121042882DA | 27.43 |
| 12/11 | POS Purchase - 12/11 Mach ID 000000 Petsmart Petsmart Hemet Ca 2109 ?MCC=5995 121042882DA | 26.92 |
| 12/11 | POS Purchase - 12/08 Mach ID 000000 Stater Bros. #1Stater Brosan Jacinto Ca 2109 ?MCC=5411 121042882DA | 24.43 |
| 12/11 | POS Purchase - 12/11 Mach ID 000000 Stater Bros. #1Stater Brosan Jacinto Ca 2109 ?MCC=5411 121042882DA | 19.70 |
| 12/12 | NEW York Life Ins. Prem. Dec 06 37 746 578 Leticia Joy Arciniega | 50.85 |
| 12/18 | POS Purchase - 12/18 Mach ID 000000 Stater Bros. #1Stater Brosan Jacinto Ca 4236 ?MCC=5411 121042882DA | 54.24 |
| 12/20 | POS Purchase - 12/19 Mach ID 000000 Samsclub #6624 Samsclub #San Bernadin Ca 4236 ?MCC=5300 121042882DA | 93.65 |
| 12/22 | POS Purchase - 12/21 Mach ID 000000 Albertsons/Sav-A Albertsonshemet Ca 4236 ?MCC=5411 121042882DA | 67.72 |

068

37768



**Portfolio Management Account®**
Statement period: December 09, 2006 - January 09, 2007

**PMA Prime Checking Account**

Account number: █████5563

Have you signed up for free Online
Banking and B ill Pay yet?

With free Online Banking, you'll save time
and enjoy knowing what checks have cleared
without having to wait for your monthly
statements. B ill Pay lets you pay anyone in
the U.S. with just a few clicks - your phone
company, credit card, or a friend. Sign up
online today at
www.wellsfargo.com

**Your PMA relationship number** █████5304

Page 7 of 10

## Activity detail

### Subtractions (continued)

**Withdrawals (continued)**

| Date | Description | $ Amount |
|------|-------------|---------:|
| 12/26 | POS Purchase - 12/23 Mach1 ID 000000 Stater Bros. 1000000000San Jacinto Ca 4236 ?MCC=5411 1210428820A | 12.12 |
| 12/27 | POS Purchase - 12/27 Mach ID 000000 Arco Payporit Arco Paypoanaheim Ca 4236 ?MCC=5541 1210428820A | 43.01 |
| 12/27 | POS Purchase - 12/26 Mach1 ID 000000 Arco Payporit Arco Payposan Jacinto Ca 4236 ?MCC=5541 1210428820A | 35.17 |
| 12/29 | POS Purchase - 12/28 Mach ID 000000 Stater Bros. #19Stater Brosan Jacinto Ca 4236 ?MCC=5411 1210428820A | 88.00 |
| 12/29 | POS Purchase - 12/28 Mach ID 000000 Cardenas Marketcardenas Msan Jacinto Ca 4236 ?MCC=6411 1210428820A | 28.53 |
| 01/02 | POS Purchase - 12/30 Mach ID 000000 Arco Payporit Arco Paypoanaheim Ca 4236 ?MCC=5541 1210428820A | 31.37 |
| 01/03 | Bill Pay 01 Citimortgage On-Line xxxxxx4059 On 01-03 | 1,100.00 |
| 01/03 | Bill Pay 14 Ford On-Line xxxx6556 On 01-03 | 565.71 |
| 01/03 | Bill Pay 12 Harley On-Line xxxxxxxxxxx4534 On 01-03 | 500.00 |
| 01/03 | Bill Pay 10 Kaiser On-Line xxxxxxxx0042 On 01-03 | 270.00 |
| 01/03 | Bill Pay 02 Sce On-Line xxxxxx0309 On 01-03 | 145.00 |
| 01/03 | Bill Pay 13 Cingular On-Line xxxxx2307 On 01-03 | 144.95 |
| 01/03 | Bill Pay 07 Adelphia On-Line xxxxxxxxxxxx6416 On 01-03 | 142.55 |
| 01/03 | Bill Pay 04 Verizon On-Line xxxxxxxxxxxx6500 On 01-03 | 137.81 |
| 01/03 | Bill Pay 08 Emwd On-Line xxxxx2502 On 01-03 | 73.12 |
| 01/03 | Bill Pay 09 Iwyl Loan On-Line xxxx6578 On 01-03 | 70.00 |
| 01/03 | Bill Pay 23 Emwd On-Line xxx2903 On 01-03 | 63.10 |
| 01/03 | Bill Pay 24 Adelphia On-Line xxxxxxxxxxxxx6390 On 01-03 | 46.32 |
| 01/03 | Bill Pay 03 SCG On-Line xxxxxx7009 On 01-03 | 36.00 |
| 01/03 | Bill Pay 22 Segas On-Line xxxxxxx7607 On 01-03 | 31.00 |
| 01/03 | Bill Pay Publishers Clear On-Line xxxxxxxx4436 On 01-03 | 15.85 |
| 01/03 | POS Purchase - 01/02 Mach ID 000000 Staples, Inc. Staples, Ihemet Ca 4236 ?MCC=5111 1210428820A | 218.23 |

Exhibit "71"
00124

168

37769

**WELLS FARGO**

## PMA Prime Checking Account

## Portfolio Management Account®
Statement period: December 09, 2006 - January 09, 2007

Account number: ▆▆▆▆ 5563

Your PMA relationship number ▆▆▆▆ 5304

Page 8 of 10

## Activity detail
### Subtractions (continued)
#### Withdrawals (continued)

| Date | Description | $ Amount |
|------|-------------|----------|
| 01/05 | POS Purchase - 01/04 Mach ID 000000 Stater Bros. #1Stater Brosan Jacinto Ca 4236 | |
| | ?MCC=5411 121042882DA | 59.51 |
| 01/08 | POS Purchase - 01/06 Mach ID 000000 Arco Payploint Arco Payposan Jacinto Ca 4236 | |
| | ?MCC=5541 121042882DA | 37.00 |

Total withdrawals $ 4,424.30

Total subtractions $ 21,494.92

## Daily balance summary

| Date | $ Amount | Date | $ Amount | Date | $ Amount |
|------|----------|------|----------|------|----------|
| 12/08 | 29,904.34 | 12/22 | 21,243.71 | 01/03 | 11,579.93 |
| 12/11 | 31,698.85 | 12/26 | 21,106.59 | 01/05 | 13,989.34 |
| 12/12 | 31,519.32 | 12/27 | 20,893.41 | 01/08 | 13,870.34 |
| 12/18 | 31,465.08 | 12/28 | 16,007.47 | 01/09 | 13,927.86 |
| 12/20 | 31,371.43 | 12/29 | 15,245.94 | | |
| 12/21 | 21,371.43 | 01/02 | 15,139.57 | | |

**Exhibit "71"**
00125

**WELLS FARGO**

## Portfolio Management Account®
Statement period: December 09, 2006 - January 09, 2007

Your PMA relationship number
5304

## Advantage Checking

Wells Fargo Bank, N.A., California
Member FDIC

Leticia Joy Arciniega
Account Number: 7601

### Activity summary

| | |
|---|---|
| Balance on 12/08 | $ 100.00 |
| Additions | 0.00 |
| Subtractions | - 0.00 |
| Balance on 01/09 | $ 100.00 |

### Activity detail

#### Daily balance summary

| Date | $ Amount |
|---|---|
| 12/08 | 100.00 |

Page 9 of 10

37770

268

892

Exhibit "71"
00126

**WELLS FARGO**

## Portfolio Management Account®
Statement period: December 09, 2006 - January 09, 2007

### Wells Fargo Growth Savings

Wells Fargo Bank, N.A., California
Member FDIC

Leticia Joy Archilega
Account Number: ███████8047

### Activity summary

| | |
|---|---|
| Balance on 12/08 | $ 105,785.83 |
| Additions | 135.71 |
| Subtractions | - 88,800.00 |
| **Balance on 01/09** | **$ 17,121.54** |

### Activity detail

#### Additions

| Date | Description | $ Amount |
|---|---|---|
| 01/09 | Interest Payment | 135.71 |
| **Total additions** | | **$ 135.71** |

#### Subtractions

| Date | Description | $ Amount |
|---|---|---|
| 12/21 | Withdrawal Made In A Branch/Store | 88,800.00 |
| **Total subtractions** | | **$ 88,800.00** |

### Interest you've earned

| | |
|---|---|
| Interest paid on 01/09 | $ 135.71 |
| Average collected balance this month | $ 50,285.83 |
| Annual percentage yield earned | 3.12% |
| Interest and bonuses paid this year | $ 135.71 |
| Total interest and bonuses paid in 2006 | $ 2,216.19 |

88 37771
£99

Exhibit "71"
00127

1              UNITED STATES BANKRUPTCY COURT

2      CENTRAL DISTRICT OF CALIFORNIA - RIVERSIDE DIVISION

3

4

5   In re                    ) Case No. 6:11-bk-15412-DS
                             )
6   LETICIA JOY ARCINIEGA,    ) Chapter 7
                             )
7              Debtor,        ) Adv. No. 6:11-ap-01735-DS
    _____)
8                            )
    JAMES CLARK,              )
9                            )
                Plaintiff,    )
10         vs.                )
                             )
11  LETICIA JOY ARCINIEGA,    )
                             )
12              Defendant.    )
    _____)
13

14

15    DEPOSITION OF :   LETICIA JOY ARCINIEGA
      TAKEN BY     :   CHAD V. HAES, ESQUIRE
16    Commencing   :   9:08 a.m.
      Location     :   870 Roosevelt Avenue
17                     Irvine, California
      Day, Date    :   Wednesday, January 30, 2013
18    Reported by  :   CORIN M. MULRENIN, C.S.R. NO. 9496
      Pursuant to  :   Notice
19    Original to  :   BARUCH C. COHEN, ESQUIRE

20

21

22  Pages 1 - 196

23  Job No. 130573

24

25

Exhibit "72"
00128

```
 1                   APPEARANCES OF COUNSEL

 2                         PRESENT

 3

 4   FOR THE PLAINTIFF:     MARSHACK HAYS
                            870 Roosevelt Avenue
 5                          Irvine, California 92620
                            949.333.7777
 6                          BY:  CHAD V. HAES, ESQUIRE
                                     -and-
 7                            SARAH C. BOONE, ESQUIRE

 8

 9   FOR THE DEFENDANT:     LAW OFFICES OF BARUCH C. COHEN
                            4929 Wilshire Boulevard
10                          Suite 940
                            Los Angeles, California 90010
11                          323.937.4501
                            BY:  BARUCH C. COHEN, ESQUIRE
12

13

14   ALSO PRESENT:         JAMES CLARK

15

16

17

18

19

20

21

22

23

24

25
```

**Exhibit "72"**
**00129**

1                          I-N-D-E-X

2   WITNESS:                                        PAGE

3        LETICIA JOY ARCINIEGA

4             Examination by Mr. Haes ...............  8
              Examination by Ms. Booth ............... 64
5             Further Examination by Mr. Haes ........ 66
              Further Examination by Ms. Booth .......185
6

7

8                         EXHIBITS

9   PLAINTIFF'S                              MARKED FOR
    EXHIBIT NO.          DESCRIPTION       IDENTIFICATION
10
        1        Agreement of Compromise,          55
11               Settlement, and Mutual
                 and General Release
12
        2        Copy of checks payable            57
13               to Milton and DeKruif
                 and Leticia Arciniega
14
        3        Wells Fargo Portfolio             66
15               Management Account from
                 from 12/9/06 to 1/9/07
16
        4        Deed of Trust for 890             68
17               Verona Avenue, San Jacinto,
                 CA 92583-0000
18
        5        Account statements from           69
19               The Bank of Hemet
20
        6        Recap of loan activity            89
                 from David D. Christian
21               to Leticia J. Arciniega
22
        7        Official Records from             98
23               Riverside County
                 Assessor-County
                 Clerk-Recorder
24

25

Exhibit "72"
00130

Page 4

I-N-D-E-X - Continued

EXHIBITS

| PLAINTIFF'S EXHIBIT NO. | DESCRIPTION | MARKED FOR IDENTIFICATION |
|---|---|---|
| 8 | Promissory Note dated 4/24/09 | 93 |
| 9 | Promissory Installment Note dated 12/18/06 | 94 |
| 10 | Statement of Financial Affairs regarding Leticia Joy Arciniega entered 2/18/11 | 105 |
| 11 | Defendant Leticia Joy Arciniega's Amended Verified Response to Plaintiff's First Set of Interrogatories F.R.C.P. 33 F.R.B.P. 7034 | 111 |
| 12 | Client Action Plan dated 12/11/08 fro Springboard | 119 |
| 13 | Letter dated 1/22/09 to James Clark from CitiMortgage Loss Mitigation | 124 |
| 14 | Letter dated 2/12 to James A. Clark and Leticia J. Arciniega from Adela McAllister | 128 |
| 15 | Letter dated 4/13/09 to James A. Clark and Leticia J. Arciniega from CitiMortgage | 134 |
| 16 | Letter dated 4/20/09 to James A. Clark and Leticia J. Arciniega from CitiMortgage | 136 |

Page 6

I-N-D-E-X - Continued

EXHIBITS   (Continued)

| PLAINTIFF'S EXHIBIT NO. | DESCRIPTION | MARKED FOR IDENTIFICATION |
|---|---|---|
| 26 | The Bank of Hemet account statement dated 8/31/10 for MSRE, Inc. | 153 |
| 27 | The Bank of Hemet account statement dated 1/31/11 for MSRE, Inc. | 153 |
| 28 | The Bank of Hemet account statement dated 1/31/11 for MSRE, Inc. | 154 |
| 29 | Schedule A - Real Property | 158 |
| 30 | Chapter 7 Individual Debtor's Statement of Intention | 159 |
| 31 | Schedule I - Current Income of Individual Debtor(s) | 163 |
| 32 | Chapter 7 Statement of Current Monthly Income and Means-Test Calculation | 164 |
| 33 | Schedule B - Personal Property | 166 |
| 34 | Schedule C - Property Claimed as Exempt | 172 |
| 35 | 2010/11 Secured Tax Bill | 178 |

Page 5

I-N-D-E-X - Continued

EXHIBITS   (Continued)

| PLAINTIFF'S EXHIBIT NO. | DESCRIPTION | MARKED FOR IDENTIFICATION |
|---|---|---|
| 17 | Letter dated 5/2/09 to CitiMortgage from Leticia J. Arciniega | 138 |
| 18 | Wells Fargo Advantage Checking account statement dated 8/11/09 through 9/9/09 for Leticia Joy Arciniega | 143 |
| 19 | Wells Fargo PMA Package account statement dated 12/9/08 through 1/9/09 for Leticia Joy Arciniega | 144 |
| 20 | UnionBank Statement of Accounts dated 2/25/01 through 3/04/11 for Leticia J. Arciniega | 146 |
| 21 | The Bank of Hemet account statement dated 1/31/11 for MSRE, Inc. | 147 |
| 22 | The Bank of Hemet account statement dated 1/31/11 for MSRE, Inc. | 148 |
| 23 | The Bank of Hemet account statement dated 1/31/11 for MSRE, Inc. | 149 |
| 24 | The Bank of Hemet account statement dated 1/31/11 for MSRE, Inc. | 150 |
| 25 | The Bank of Hemet account statement dated 1/31/11 for MSRE, Inc. | 151 |

Page 7

I-N-D-E-X - Continued

INFORMATION REQUESTED

(None)

QUESTIONS NOT ANSWERED

(None)

Exhibit "72"

00131

Page 8

1    IRVINE, CALIFORNIA, WEDNESDAY, JANUARY 30, 2013
2         9:08 A.M.
3         -o0o-
4
5         LETICIA JOY ARCINIEGA,
6    the deponent herein, after having been first
7    duly sworn, was deposed and testified as follows:
8
9         EXAMINATION
10   BY MR. HAES:
11   Q    Would you please give your full name for the
12   record.
13   A    Leticia Joy Arciniega.
14   Q    Okay.  Well, good morning.  My name is Chad
15   Haes.  This is Sarah Boone.  We are the attorneys
16   representing Mr. Clark, the Plaintiff in the adversary
17   proceeding against you.  I will be asking you questions
18   during this deposition, and I would like to start off by
19   getting a few instructions out of the way.
20        If you need to take a break, please let me know,
21   and we can take a break at any time so long as I don't
22   have a question pending.  We will also take a lunch
23   break.
24        When I ask a question, please wait until I have
25   completed the question before you answer.  In order for

Page 9

1    the court reporter to hear everything that we say and so
2    we have a clear record, we can't interrupt each other,
3    and you can't talk over me.
4         We will need a verbal answer to each question.
5    Please don't shake your head or nod in response to a
6    question and avoid responses like "uh-huh" or "huh-uh."
7    Just a clear "yes" or "no" is what we need.
8         Please don't guess in response to a question.
9    If you can estimate or approximate, please do.  If you
10   don't know the answer, you can and should say you don't
11   know the answer.
12        That being said, I'm entitled to your best
13   estimates.  If you are unclear about the difference
14   between a guess and an estimate, please tell me, and I
15   will explain.
16        For example, if I ask you how much a gallon of
17   milk costs in Southern California, you might have a good
18   idea based on your experience and knowledge that a gallon
19   of milk costs $3.50.  That is an estimate.  If I ask you
20   how much a gallon of milk costs in Paris, if you have
21   never been there, you will have no idea and might pull a
22   number from the air and say it would cost five Euros.
23   That's a guess.
24        The other lawyers here, Sarah included, are
25   allowed to ask you questions if they so choose.  I'll ask

Page 10

1    them to wait until I'm done before they ask you
2    questions.
3         The court reporter is taking everything down and
4    will prepare a written record of everything that is said
5    which is something we call a transcript.  If you wish,
6    after we are done, you will be able to review the
7    transcript to check if it's accurate and make any
8    corrections before signing it.
9         Do you understand everything so far?
10   A    I do.
11   Q    Okay.  Do you have any questions so far?
12   A    I do not.
13   Q    Do all of these instructions make complete sense
14   to you?
15   A    They do.
16   Q    It's really important that you understand the
17   questions that I ask you and give accurate answers.  If
18   there is anything that you don't understand or anything
19   that you don't know or aren't sure of, please let us
20   know.
21        Okay?
22   A    Yes.
23   Q    Okay.  Is there anything on your mind which
24   would prevent you from answering any of my questions
25   fully and truthfully today?

Page 11

1    A    No.
2    Q    Have you consumed alcohol in the last eight
3    hours?
4    A    No.
5    Q    Are you on any medications or other drugs which
6    would prevent you from answering my questions fully and
7    truthfully today?
8    A    No.
9    Q    Okay.  Is Leticia Joy Arciniega your full name?
10   A    It is.
11   Q    Do you have any nicknames?
12   A    Yes.
13   Q    What is that?
14   A    Tish.
15   Q    Is that your only nickname?
16   A    My family calls me Joy.
17   Q    Spell Tish.
18   A    T-i-s-h.
19   Q    Very well.  What is your date of birth?
20   A    November 19, 1953.
21   Q    And where were you born?
22   A    San Bernardino, California.
23   Q    Where do you currently reside?
24   A    890 Verona Avenue, San Jacinto, California,
25   92853.

Exhibit "72"
00132

Page 12

1    Q    Are you currently married or single?
2    A    I'm unmarried.
3    Q    Do you currently reside with anybody?
4    A    I do.
5    Q    What is that person's name?
6    A    David Dodd Christian.
7    Q    Do you reside with anybody else?
8    A    I do not.
9    Q    What is your relationship with David Christian?
10   A    Domestic partner.
11   Q    How long have you resided with David Christian?
12   A    Since 1995.
13   Q    What is the highest level of education that you
14   have obtained?
15   A    I have a non-transferable bachelor's degree that
16   I earned in Mexico.
17   Q    Okay.  What is the major for that degree?
18   A    Biology, premed.
19   Q    Do you have any other degrees?
20   A    I do not.
21   Q    Did you graduate from high school?
22   A    I did.
23   Q    In what year?
24   A    '71.
25   Q    Is that 1971?

Page 13

1    A    It is.
2    Q    Do you have any certificates or licenses?
3    A    I do.
4    Q    Okay.  What are those?
5    A    I have a realtor's license, California
6    Association of Realtors license.
7    Q    What is your real estate license number?
8    A    01803573.
9    Q    Do you have any other certificates or licenses?
10   A    No.
11   Q    Okay.  Briefly describe your employment history.
12   A    I started as a teller in a part-time position
13   for a bank in 1972, and I wound up being senior
14   vice-president of information technology in 1997.
15   Q    Are you currently employed?
16   A    I am not.  I'm self-employed.
17   Q    Do you own any businesses?
18   A    I do.
19   Q    What form of business is it?
20   A    I have a realty office.
21   Q    Is it a sole proprietorship?
22   A    "S" corp.
23   Q    Do you own any other corporations?
24   A    I do not.
25   Q    What is the name of the corporation that you are

Page 14

1    the owner of?
2    A    MSRE, Inc.
3    Q    Have you ever owned any other corporations?
4    A    I have not.
5    Q    When you say that you are self-employed, please
6    explain exactly what you do.
7    A    A couple of things.  I do compliance consulting
8    for financial institutions, and I own the realty
9    business.
10   Q    What type of consulting is compliance
11   consulting?
12   A    As you are aware, financial institutions,
13   whether they are banks, savings institutions, or
14   commercial banks, all function under regulatory guidance.
15   Oftentimes, they go astray of guidance either through
16   lack of understanding or resources to implement the
17   guidance appropriately.  At those times they run afoul of
18   the regulators, the examiners, so they will call me in to
19   bring them back in line with their compliance
20   requirements.
21   Q    Do these compliance requirements relate to
22   loans?
23   A    It relates to the entire enterprise from teller
24   function and operations, I.T., audit processes, board
25   guidelines.  Yes, it includes loans.

Page 15

1    Q    Would you say that you are experienced with the
2    loan process through your job?
3    A    I'm experienced from the pipeline process.  Job
4    related, no.  I'm concerned with the guidelines that
5    outline the processes.
6    Q    Okay.  Is the consulting you do through MSRE?
7    A    No.
8    Q    Okay.  What type of business is MSRE?
9    A    MSRE, Inc. is a corporation that holds Main
10   Street Realty as a dba.  That is its only involvement.
11   Q    When was MSRE, Inc. incorporated?
12   A    Originally, 2006.
13   Q    Okay.  When did you become self-employed?
14   A    1997.  October 7th.
15   Q    How much money did you make in 1997?
16   A    In 1997, I was a payroll employee, and I think I
17   made less than 75,000.
18   Q    How about in 1998?
19   A    In 1998, I think I made 110.
20   Q    '99?
21   A    I don't remember.
22   Q    2000?
23   A    I don't remember.
24   Q    Approximately?  An estimate?
25   A    I couldn't.  I would have to sit and think about

Exhibit "72"
00133

Page 16

1  it. I can't remember. In '99, I know that I did really
2  well. I think I might have made like 160 for '99 maybe.
3  2000, I didn't work much that year. 2001, I didn't work
4  much that year. 2002, I sold some real estate. That is
5  not what you are asking me, but that is what my source of
6  income was. 2003 and '04, I couldn't tell you. 2004,
7  '5, and '6, I started doing consulting work again.
8      Q   Do you know how much money you made in 2002?
9      A   I don't. I don't remember.
10     Q   Not even an estimate?
11     A   I couldn't tell you. I would have to look at my
12  tax returns.
13     MR. COHEN: We will interpose objections based on
14  relevance to income that was generated or earned going
15  back to far as 2002.
16  BY MR. HAES:
17     Q   Do you know how much money you made in 2003?
18     A   I don't.
19     MR. COHEN: Same objection. Relevance.
20  BY MR. HAES:
21     Q   Do you know how much money you made in 2004?
22     MR. COHEN: Same objection. Relevance.
23     THE WITNESS: I don't.
24  BY MR. HAES:
25     Q   Estimate? Not even an estimate in 2004?

Page 17

1      A   No.
2      Q   Do you know how much money you made in 2005?
3      MR. COHEN: Same objection. Relevance.
4  BY MR. HAES:
5      Q   You may answer the question.
6      A   I don't remember.
7      Q   Not even an estimate?
8      A   No.
9      MR. COHEN: Objection. Relevance.
10  BY MR. HAES:
11     Q   How about 2006?
12     MR. COHEN: Objection. Relevance.
13  BY MR. HAES:
14     Q   You may answer the question.
15     A   I don't remember.
16     Q   Not even an estimate of your income in 2006?
17     A   No.
18     Q   I'm entitled to your best estimate.
19     A   My income varies widely from year to year
20  depending on what I'm doing. In 2006, I honestly don't
21  remember. It could have been anywhere from 20,000 and
22  120,000.
23     Q   Okay. How about your income for 2007?
24     A   I don't remember.
25     Q   Okay. Can you give me an estimate for your

Page 18

1  income for 2007?
2      A   No.
3      Q   What was your income for 2008?
4      A   Less than 30,000. Less than 20,000. It's a
5  guess. It's in my tax filings.
6      Q   What were your typical monthly living expenses
7  in 2008?
8      A   $2,700 a month.
9      Q   What did these typical living expenses include?
10  What types of expenses?
11     A   House payment, car payment, health insurance,
12  gas, water, lights, telephone, cable, internet.
13     Q   What were your typical business expenses in
14  2008?
15     A   When you refer to business expenses, please
16  define business expenses.
17     Q   Expenses related either to self-employment or
18  MSRE, Inc.
19     A   So you are asking me for personal or corporate?
20     Q   We will start with personal.
21     A   Personal, business expenses, telephone,
22  internet, mileage, meals, occasional supplies that I
23  purchased.
24     Q   Okay. Other than your typical living -- well,
25  let's go back.

Page 19

1          How about your typical business expenses for
2  2008 for the corporation for MSRE, Inc.?
3      A   Please repeat that.
4      Q   What were your typical business expenses for
5  MSRE, Inc. in 2008?
6      MR. COHEN: Objection. Relevance.
7  BY MR. HAES:
8      Q   You may answer.
9      MR. COHEN: Unless I tell you not to answer, you
10  answer.
11     THE WITNESS: Okay. Mortgage. In 2008?
12  BY MR. HAES:
13     Q   That's correct. For MSRE, Inc. in 2008.
14     A   Mortgage, utilities, insurance, subscriptions,
15  licenses, advertising and payroll.
16     Q   How much did those amount to approximately?
17     A   15,000 a month, approximately.
18     Q   For your personal business, your
19  self-employment, how much did that amount to
20  approximately per month in 2008?
21     A   Expenses?
22     Q   Expenses.
23     A   I didn't do consulting work in 2008.
24     Q   Okay.
25     A   If I did, it was very minimal.

California Deposition Reporters

Exhibit "72"
00134

Page 20

1    Q   So there were some expenses related to
2 consulting work in 2008 that you can think of?
3    A   That I can think of.
4    Q   Other than your typical living expenses and
5 typical business expenses in 2008, are there any
6 extraordinary expenses out of the ordinary for 2008 that
7 you can think of?
8    A   Lawyer fees.
9    MR. COHEN:  Objection.  Relevance.
10 BY MR. HAES:
11    Q   What was the amount of those lawyer fees
12 approximately?
13    A   I don't remember.
14    MR. COHEN:  Objection.  Relevance.
15       You need to wait a second and let me interpose
16 an objection.
17    THE WITNESS:  Okay.
18 BY MR. HAES:
19    Q   Can you think of any extraordinary fees you had
20 aside from typical business expenses and personal
21 expenses in 2007?
22    MR. COHEN:  Objection.  Relevance.
23    THE WITNESS:  Does that mean I can or can't?
24    MR. COHEN:  You can answer.  I need to make an
25 objection, and unless I instruct you not to answer, you

Page 21

1 are to answer.
2    THE WITNESS:  Oh, got it.  Please repeat the
3 question.
4 BY MR. HAES:
5    Q   Aside from typical living and business-related
6 expenses in 2007, can you think of any extraordinary
7 expenses you incurred that year?
8    MR. COHEN:  Objection.  Relevance.
9    THE WITNESS:  I can't recall.
10 BY MR. HAES:
11    Q   I'm entitled to your best estimate.
12    A   That's my best estimate.  I don't remember.
13    Q   You don't remember at all 2007?
14    MR. COHEN:  Asked and answered.
15 BY MR. HAES:
16    Q   How about 2006, are there any extraordinary
17 expenses you can think of for 2006?
18    MR. COHEN:  Objection.  Relevance.
19    THE WITNESS:  No.  I don't recall.
20 BY MR. HAES:
21    Q   Not even an estimate?
22    A   If I can't recall an incident, I couldn't
23 estimate it.
24    Q   What were your typical living expenses in 2009,
25 monthly living expenses?

Page 22

1    A   $2,700 a month.
2    Q   Generally, what did that consist of?  Expenses
3 for what?
4    A   Mortgage, car payment, auto insurance,
5 utilities, health insurance.
6    Q   And what was your income in 2009?
7    A   I don't remember.  I would need to see my taxes.
8    Q   So you can't even give me an estimate for 2009?
9    MR. COHEN:  Asked and answered.  She said
10 she wants to see her tax returns before she provides an
11 answer.
12    THE WITNESS:  If we are looking for accuracy, then I
13 should be able to look at the documents that I recorded.
14 BY MR. HAES:
15    Q   Well, I'm entitled to your best estimate.
16    MR. COHEN:  I'll object on the basis of asked and
17 answered.
18 BY MR. HAES:
19    Q   Do you have an estimate for 2009 of typical
20 living expenses?
21    A   I gave you typical living expenses, $2,700 a
22 month.  You asked me income.  I don't have an estimate
23 for income.
24    Q   What was your income in 2010?
25    A   Miserable.  Under 20,000.

Page 23

1    Q   Okay.  And I apologize.  Going back to 2009 for
2 a second, what were your typical business expenses for
3 2009?
4    A   It would have been the same that I had stated
5 earlier with the difference that in 2009 I no longer had
6 a paid broker.  I went to a rent-a-broker.
7    Q   Okay.  Did that decrease your business expenses?
8    A   It did from 15,000 a month to about 12.
9    Q   What were your typical business expenses for
10 2010 monthly?
11    A   Mortgage and I had two lines of credit,
12 utilities, payroll, so it was running about 10 to 12,000
13 a month.
14    Q   What were your typical living expenses for 2010?
15    A   $2,700 a month.
16    Q   What did that consist of?
17    A   House payment, car payment, car insurance,
18 health insurance, utilities.
19    Q   Can you think of any extraordinary business or
20 living expenses in 2009 aside from your typical living
21 expenses?
22    MR. COHEN:  Objection.  Relevance.
23    THE WITNESS:  Lawyer fees.
24 BY MR. HAES:
25    Q   Do you know approximately how much those fees

Exhibit "72"
00135

Page 24

1  were?
2      MR. COHEN: Same objections.
3      THE WITNESS: At least 20,000.
4  BY MR. HAES:
5      Q   Can you think of any extraordinary expenses for
6  2010 other than typical living and business expenses?
7      A   I cannot.
8      Q   What was your income for 2011?
9      A   I think it reads 14,400.
10     Q   What are your typical living expenses or what
11 were they for 2011?
12     A   2,700 a month.
13     Q   What did that consist of generally?
14     A   House payment, car payment, health insurance,
15 car insurance, utilities.
16     Q   What were your typical business expenses for
17 2011?
18     A   I would say close to 6,000 a month or somewhere
19 between six and seven.
20     Q   In 2006, did MSRE broker any property
21 transactions?
22     A   No.
23     MR. COHEN: Objection. Relevance.
24 BY MR. HAES:
25     Q   In 2007, did MSRE broker any property

Page 25

1  transactions?
2      MR. COHEN: Objection. Relevance.
3      THE WITNESS: Yes.
4  BY MR. HAES:
5      Q   What pieces of property were sold in 2007?
6      MR. COHEN: Same objection.
7      THE WITNESS: I don't recall.
8  BY MR. HAES:
9      Q   Do you have any idea? Do you recall what those
10 properties sold for, if any?
11     A   No.
12     Q   Did MSRE broker any property transactions in
13 2008?
14     MR. COHEN: Same objection. Relevance.
15     THE WITNESS: Yes.
16 BY MR. HAES:
17     Q   All right. And what properties were sold in
18 2008?
19     A   I don't recall.
20     MR. COHEN: Objection. Relevance.
21 BY MR. HAES:
22     Q   Did MSRE broker any property transactions in
23 2009?
24     A   Yes.
25     MR. COHEN: Objection. Relevance.

Page 26

1  BY MR. HAES:
2      Q   What properties were sold in 2009?
3      A   I don't recall.
4      Q   Did MSRE broker any property transactions in
5  2010?
6      MR. COHEN: Objection. Relevance.
7      THE WITNESS: Yes.
8  BY MR. HAES:
9      Q   What properties were sold in 2010?
10     A   I don't recall.
11     Q   Did MSRE broker any property transactions in
12 2011?
13     MR. COHEN: Objection. Relevance.
14     THE WITNESS: Yes.
15 BY MR. HAES:
16     Q   What properties were sold in 2011?
17     A   I don't recall.
18     Q   All right. For any transaction that is
19 brokered by MSRE, what does MSRE get from that
20 transaction?
21     MR. COHEN: Objection. Relevance.
22     THE WITNESS: It depends on what side the broker is
23 involved with or whether it's both sides. It also
24 depends on the split with the agent that brought the
25 contract to the table.

Page 27

1  BY MR. HAES:
2      Q   Generally, does MSRE get commissions or a
3  portion of whatever property sale is for every sale that
4  is brokered by MSRE?
5      A   Yes.
6      Q   What range are those percentages?
7      A   Can we break that down? If you are talking
8  gross commission that is paid to the broker, if you
9  understand how real estate commissions are broken down,
10 the broker is paid in full for their split of the
11 transaction. The agent is given their compensation for
12 bringing the transaction to the table.
13         Depending on the split with the agent, there are
14 times when the corporation makes less than $300 after
15 paying expenses to the listing broker that exercises the
16 broker license, the agent that brought the transaction to
17 the table.
18         For example, if you sell $100,000 with a six
19 percent commission and you are listing the house but
20 another agent from another office brings you the buyer,
21 there is three percent to each offer being paid. I get a
22 whopping $3,000 gross from that.
23         If the agent that brought it to me is a 90
24 percent split agent, I take 10 percent off the top. I
25 get 100 bucks, and I pay my rent-a-broker $400 per

Exhibit "72"
00136

Page 28

1  transaction. Technically, I'm in the hole, but he and I
2  have an arrangement where we only split anything that is
3  going to be less than $400. My agent would be getting 90
4  percent of the deal.
5      Q   Is there a specific range of percent from each
6  deal that MSRE, Inc. typically gets when it brokers a
7  real estate transaction?
8      MR. COHEN: Objection. Relevance.
9      THE WITNESS: No.
10 BY MR. HAES:
11     Q   Moneywise, in terms of dollar amount, what is
12 the range that MSRE, Inc. could bring in for each
13 transaction that it brokers?
14     MR. COHEN: Objection. Relevance.
15     THE WITNESS: It's anywhere between $150 to maybe
16 2,500.
17 BY MR. HAES:
18     Q   Are you aware of any extraordinary expenses
19 aside from your typical business expenses and typical
20 living expenses for 2011?
21     A   Yes.
22     Q   What are those?
23     A   Lawyer expenses.
24     Q   Approximately, how much were your lawyer
25 expenses in 2011?

Page 29

1      MR. COHEN: Objection. Relevance.
2      THE WITNESS: I would say somewhere in the vicinity
3  of 15 to 20,000.
4  BY MR. HAES:
5      Q   Typically, how many transactions does MSRE, Inc.
6  broker per year?
7      A   What type of transactions are you asking about?
8      Q   Real estate sales of property or property sales.
9      A   Through 2011, about 10 to 12 a year.
10     Q   Since the inception of -- since MSRE was
11 incorporated through 2011, between 10 to 12 per year?
12     A   Average.
13     Q   Okay. Does MSRE, Inc. generate income in any
14 other manner?
15     A   Yes.
16     Q   How else does MSRE, Inc. generate income?
17     A   Property management.
18     Q   How many properties does MSRE, Inc. manage?
19     A   Between 70 to 90 homes.
20     Q   Currently?
21     A   Currently.
22     Q   On average on a monthly basis, how much income
23 is produced pursuant to property management services
24 provided by MSRE, Inc.?
25     A   About 6,000 a month.

Page 30

1      Q   Would that include 2006?
2      MR. COHEN: Objection. Relevance.
3      THE WITNESS: No.
4  BY MR. HAES:
5      Q   How much would MSRE, Inc. be generating in
6  income from property management services in 2006?
7      A   Zero.
8      MR. COHEN: Objection. Relevance.
9  BY MR. HAES:
10     Q   Approximately, how much was MSRE, Inc.
11 generating in property management services in 2007?
12     MR. COHEN: Objection. Relevance.
13     THE WITNESS: Maybe 2,000 a month.
14 BY MR. HAES:
15     Q   How about 2008?
16     MR. COHEN: Objection. Relevance.
17     THE WITNESS: Probably about five to six.
18     MR. COHEN: Five to six what?
19     THE WITNESS: Thousand.
20 BY MR. HAES:
21     Q   2009?
22     MR. COHEN: Objection. Relevance.
23     THE WITNESS: Six to seven.
24 BY MR. HAES:
25     Q   Six to 7,000 per month?

Page 31

1      A   Yes.
2      Q   2010?
3      MR. COHEN: Objection. Relevance.
4      THE WITNESS: Six to 7,000 per month.
5  BY MR. HAES:
6      Q   And 2011?
7      A   Six to 7,000 per month.
8      Q   Have you ever received redevelopment funds from
9  the city of San Jacinto?
10     A   I did.
11     Q   In what year?
12     A   I believe it was 2009.
13     Q   Is that the only year you've ever received
14 redevelopment funds from the City of San Jacinto?
15     A   It is.
16     Q   How many times in that year did you receive
17 redevelopment funds?
18     A   Once.
19     Q   What was the amount?
20     A   $2,500.
21     Q   Have you ever received redevelopment funds from
22 any other city?
23     A   No.
24     Q   Prior to your work for MSRE, Inc. and prior to
25 being self-employed, what did you do for a living?

Exhibit "72"
00137

Page 32

1  A  I was an employee of financial institutions.
2  Q  Okay.  Prior to MSRE, Inc. and being
3 self-employed, which financial institutions did you work
4 for?
5  A  Hemet Federal.
6  Q  What was your job title there?
7  A  Senior vice-president, information technology.
8  Q  What were your job duties as senior
9 vice-president of information technology?
10  A  I oversaw the technology for the institution.
11  Q  Define technology.  Did that have anything to do
12 with marketing?  Was that mostly in house?  Monitoring
13 E-mails?  What did you do in terms of monitoring
14 technology?
15  A  I ensured that the organization had adequate
16 resources that were supporting the infrastructure
17 necessary to conduct business.  That entailed both
18 outsourcing technology, and we had an in-house processor
19 as well my job was to ensure that we had both budgetary
20 resources available as well as the technology resources
21 and the soft resources in the way of humans that knew how
22 to maintain and support the users and technologies and
23 the processes dependent on hardware and software.
24  Q  What was your compensation at the time that you
25 left Hemet Federal?

Page 33

1  MR. COHEN:  Objection.  Relevance.
2  THE WITNESS:  As I stated earlier, less than 75,000.
3 BY MR. HAES:
4  Q  Prior to your work at Hemet Federal, where did
5 you work?
6  A  Redlands Federal.
7  Q  What was your job title there?
8  A  It was a funny title.  Something like liability
9 product development officer.
10  Q  When did you start at Redlands Federal?
11  A  September of 1985.
12  Q  And when did you leave Redlands Federal?
13  A  The end of March 1989.
14  Q  Is that when you began at Hemet Federal?
15  A  Yes.
16  Q  When did you leave Hemet Federal?
17  A  October 7, 1997.
18  Q  Why did you leave Hemet Federal?
19  MR. COHEN:  Objection.  Relevance.
20  THE WITNESS:  It was voluntary.
21 BY MR. HAES:
22  Q  For what reason?
23  A  Politics.
24  Q  You were unhappy there?
25  A  The company had converted from a mutual to a

Page 34

1 stock organization.  Our CEO had basically moved out of
2 the picture and promoted someone who didn't have a
3 functional grey cell in his head to run the operation.
4 There were a number of us that left.  Six months later
5 the corporation sold to an outside investment group and
6 the company no longer exists.  It was time.
7  Q  Why did you leave Redlands Federal?
8  MR. COHEN:  Objection.  Relevance.
9  THE WITNESS:  Because of an offer from Hemet Federal.
10 I never looked for a job.
11 BY MR. HAES:
12  Q  What were your job duties at Redlands Federal?
13  A  It was a marvelous job.  It was like being a mad
14 scientist.  They opened the entire company to me and said
15 to find out what it costs us to offer a product and tell
16 us how we can make a profit doing that.
17  I conducted an in-depth time management analysis
18 whereby I fed a formula of FTE costs, the overhead costs,
19 and was able to calculate what it would cost the
20 institution to open a savings account and at what rate
21 and what balance it would earn a profit for the bank,
22 taking into consideration reserves, overnight funds, just
23 everything.  It was fascinating.
24  Q  Were those your job duties for your entire time
25 at Redlands Federal?

Page 35

1  A  Pretty much, with the exception of managing an
2 acquisition.
3  Q  What did you manage?
4  A  The acquisition.  We bought eight branches, and
5 I managed it.
6  Q  So you managed the acquisition of eight
7 additional branches?
8  A  Correct.
9  Q  Very well.  What was your compensation at the
10 time you left --
11  MR. COHEN:  Objection.  Relevance.
12 BY MR. HAES:
13  Q  -- Redlands Federal?
14  MR. COHEN:  Sorry.  I didn't mean to interrupt you.
15 I thought you finished your question.  Objection.
16 Relevance.
17  MR. HAES:  No problem.
18  THE WITNESS:  About 48,000 a year.
19 BY MR. HAES:
20  Q  Prior to your work at Redlands Federal, where
21 did you work?
22  MR. COHEN:  Objection.  Relevance.
23  THE WITNESS:  Pacific Savings Bank.
24 BY MR. HAES:
25  Q  When did you start at Pacific Savings Bank?

Exhibit "72"
00138

Page 36

1    A    Well, that is a long story.  Actually, I started
2  there when it was Santa Fe Federal.  It merged twice, and
3  it converted charters twice.  It wound up being Pacific
4  Savings Bank.  I start in 1977, it must have been.
5    Q    What was your job title there?
6    A    I started as a temporary part-time teller in the
7  pool.
8    Q    Did you move up from there?
9    A    Yes.
10    Q    What was your job title after part-time teller?
11    A    After part-time teller, I was a savings
12  counselor, and then I was a trainer, a teller trainer.
13  Then I was in administration support, and then I wrote my
14  own job description as a resource specialist.  That was
15  the title I held when I left.
16    Q    Well, let's take one at a time.
17        You said after teller you were a savings
18  manager?
19    A    Savings counselor.
20    Q    What were your job duties as a savings
21  counselor?
22    A    I opened accounts for people.
23    Q    After savings counselor, what were your promoted
24  to?
25    A    Teller trainer.

Page 37

1    Q    What were your job duties as a teller trainer?
2    A    I trained tellers.
3    Q    Basically, tellers' duties include what types of
4  services?
5    A    Handling transactions, monetary transactions for
6  customers.
7    Q    Where did you go from teller trainer?  Were you
8  promoted from there?
9    A    Yeah.  I moved into a function as a back office
10  administrative support person.
11    Q    What were your job duties as an administrative
12  support person?
13    A    Writing policy and procedure.
14    Q    What type of policy and procedure?
15    A    Deposit or what is referred to in the business
16  as retail operations, policies and procedures.
17    Q    Did any of that involve policies and procedures
18  as it related to customers?
19    A    Yes.
20    Q    Did it involve policies and procedures as it
21  related to loans?
22    A    No.
23    Q    So when you started there, it was Pacific
24  Federal?
25    A    No.  It was Santa Fe Federal.

Page 38

1    Q    Prior to Santa Fe Federal, where did you work?
2    A    The Bank of California.
3    Q    What was your job title there?
4    A    Teller, drive-up.
5    Q    Other than being self-employed and owning MSRE,
6  Inc., do you have currently any other sources of income?
7    A    No.
8    Q    Beginning in 2006, other than MSRE, Inc. and
9  consulting, do you have or did you have any other sources
10  of income?
11    MR. COHEN:  Objection.  Relevance.
12    THE WITNESS:  No.
13  BY MR. HAES:
14    Q    2007, any other sources of income?
15    MR. COHEN:  Objection.  Relevance.
16    THE WITNESS:  No.
17  BY MR. HAES:
18    Q    2008, any other sources of income?
19    MR. COHEN:  Objection.  Relevance.
20    THE WITNESS:  No.
21  BY MR. HAES:
22    Q    2009, any other sources of income?
23    A    No.
24    Q    2010, any other sources of income?
25    A    No.

Page 39

1    Q    2011, any other sources of income?
2    A    No.
3    Q    Do you have any investments, annuities or
4  retirement accounts?
5    A    I have an IRA.
6    Q    How much money is in your IRA?
7    A    A little under 100,000.
8    Q    Under 100,000?
9    A    Yes.
10    Q    About how much under 100,000?
11    A    Maybe 3,000 under 100,000.
12    Q    So approximately $97,000?
13    A    Approximately, $97,000.
14    Q    Do you have a 401K?
15    A    No.
16    Q    Have you ever had a 401K?
17    A    Yes.
18    Q    Did you cash out your 401K?
19    A    I did.
20    Q    In what year?
21    A    1990.
22    Q    How much did you receive from the cash-out?
23    MR. COHEN:  Objection.  Relevance.
24    THE WITNESS:  Approximately $3,500.  I used it as a
25  down payment to purchase the house in San Jacinto.

Exhibit "72"

00139

Page 40

BY MR. HAES:

Q   Do you have any other investments or annuities
or retirement accounts?

A   No.

Q   Other than the accounts you've already
mentioned, have you ever had any other investments or
retirement accounts?

A   I had a SEP.

Q   Did you cash out the SEP?

A   I did.

Q   When did you cash out the SEP?

A   I think I took the last distribution during the
early part of 2010.  I think it was 2010.  It might have
been 2009.

Q   Let me go back for a second.  Please define SEP.

A   It's a self-employed pension plan.

Q   All of the cash-out of the SEP, did they all
occur in 2010?

A   Either 2009 or 2010.  They were all within about
a one-year period, but I think they started in '09 and
ended in '10.

Q   How much did you receive as a result of cashing
out your SEP?

A   45,000.

Q   Have you ever had any other investment or

Page 41

retirement accounts?

A   No.

Q   What is the address for MSRE, Inc.?

A   890 Verona Avenue, San Jacinto, California
92583.

Q   How long has MSRE, Inc. been located at that
address?

A   Since inception.

Q   Is that where MSRE, Inc. conducts its business?

A   No.

Q   Where does MSRE, Inc. conduct its business now?

A   2537, Unit B, San Jacinto Avenue, San Jacinto,
California 92583.

Q   Do you own that property?

A   I do not.

Q   Prior to that location, where did MSRE, Inc.
conduct its business?

A   288 East Main Street, San Jacinto, California
92583.

Q   Do you own that property?

A   No.

Q   Did you ever own that property?

A   I did.

Q   What was the disposition of that property?

A   It was foreclosed upon.

Page 42

Q   For how long did you own that property?

A   From January 2nd, 2007 until February 28th,
2011.

MR. COHEN:  What address are you referring to right
now?  You mentioned three addresses.  I just want to make
sure I'm following which address this line of questioning
is.

MR. HAES:  Would you repeat the last address back to
us, please.

(The record was read by the reporter
as follows:
"A   288 East Main Street, San Jacinto,
California 92583.")

MR. HAES:  That is the address I'm referring to.

MR. COHEN:  Thank you.

BY MR. HAES:

Q   During the entire time that you owned that
property, 288 Main Street in San Jacinto, was MSRE
conducting its business out of that property?

A   Yes.

Q   Were you receiving rent from MSRE, Inc.?

A   No.  It's illegal by IRS terms.

Q   Were you receiving any type of compensation from
MSRE, Inc. for the use of that property?

A   No.

Page 43

Q   Did you own any other property where MSRE, Inc.
conducted its business?

A   No.

Q   Have you ever filed for bankruptcy?

A   Yes.

Q   How many times?

A   Twice.

Q   What year was your first filing?

A   I think it was in 1988.

Q   When did you receive your discharge?

A   I believe it was the early part of 1989.

Q   What year was your second filing?

A   2011.

Q   When did you receive your discharge?

A   I have not.

Q   When did you marry James Clark?

A   February 29, 1976.

Q   How long did the marriage last?

A   Until July of 2000.

Q   Did you own any property prior to your marriage
to James?

A   No.

Q   No personal property of any significant value?

A   No.

Q   Was there any property that you acquired during

**Exhibit "72"**

**00140**

Page 44

1    the marriage with James Clark?
2        A    Yes.
3        Q    What property was acquired during the marriage?
4        A    We acquired a lot purchased through a tax sale
5    that my parents gave us as a wedding gift in East
6    Highlands.
7        Q    Do you know the address of that lot?
8        A    It was unimproved property.  It's underneath the
9    freeway now.
10       Q    What was the disposition of that lot?  Do you
11   still own that lot?
12       A    No.
13       Q    What was the disposition of that lot?
14       A    It was taken by condemnation proceedings by
15   Caltrans for the freeway.  They paid us for it.
16       Q    How much did they pay you?
17       A    Over 40,000.
18       Q    Who did that money go to?
19       A    We had liens on the property, so it went to the
20   lienholders.
21       Q    Okay.  What other property did you acquire
22   during the course of the marriage?
23       A    We had a property in Fontana that we purchased
24   through a tax sale.
25       Q    What is the address of that property?

Page 45

1        A    I don't know.
2        Q    When was that property acquired?
3        A    I don't remember.
4        Q    Approximately?
5        A    I would say somewhere in the mid eighties.
6        Q    What was the purchase price for that property?
7        A    3,500, I think, or 2,500 or something.
8        Q    Do you still own that property?
9        A    No.
10       Q    What was the disposition of that property?
11       A    We sold it.
12       Q    "We" meaning --
13       A    Clark and I.
14       Q    How much was it sold for?
15       A    I don't remember.
16       Q    Not even an estimate?
17       A    No.  I don't remember.
18       Q    Any other property acquired during the marriage?
19       A    A house at 3047 North Arrowhead Avenue in
20   San Bernardino.
21       Q    What was the purchase price?
22       A    41,500.
23       Q    When was that property acquired?
24       A    1978, '79.  '78.
25       Q    Do you still have any interest in that property?

Page 46

1        A    No.
2        Q    What was the disposition of that property?
3        A    Mr. Clark sued me and so we settled and he has
4    it.
5        Q    Any other property acquired during the marriage?
6        A    The house I have on Verona in San Jacinto.
7        Q    When was that property acquired?
8        A    1991.
9        Q    What was the purchase price for that property?
10       A    110.
11       Q    Do you still own that property?
12       A    I do.
13       Q    Any other property acquired during the course of
14   the marriage?
15       A    A timeshare.  A timeshare, approximately 1989.
16       Q    Where is that property located?
17       A    I don't remember where it was located.  We never
18   used it.  We did a reversion of trust because there were
19   too many complications with the ownership of it.  The
20   monies were refunded in full.
21       Q    What county or state?
22       A    Orange County.  You would need to refer to
23   Mr. Clark.  I don't recall the details on that.  He was
24   the principal involved in purchasing it.
25       Q    Do you know what the purchase price was?

Page 47

1        A    I don't remember.
2        Q    Do you have any ownership interest in that
3    property currently?
4        A    No.
5        Q    Do you know what the disposition of that
6    property was?
7        A    As I stated, we executed a reversion of trust.
8    We gave it back.
9        Q    Okay.  Any other properties that were acquired
10   during the course of the marriage?
11       A    I don't recall any.
12       Q    What pieces of real property do you currently
13   own?
14       A    I own the house on Verona, and I own half
15   interest in a vacant lot described as Soboba Heights.  I
16   own a total of 4,000 square feet or less in the County of
17   San Luis Obispo referred to as Paper Roads.
18       Q    When was the Soboba Heights property acquired?
19       A    I'm sorry?
20       Q    Spell Soboba.
21       A    Soboba, S-o-b-o-b-a.
22       Q    When was that property acquired?
23       A    I think that was about 10 years ago.
24       Q    What was the purchase price?
25       A    I think it was $7,000.

Exhibit "72"
00141

Page 48

1  Q   Who is the co-owner of that property?
2  A   David Dodd Christian.
3  Q   What is the current value of that property?
4  A   About $7,500.
5  Q   What do you base that on?
6  A   There is an enormous concrete pond on it.  It
7  was a former tank site.  The water district moved the
8  water tank off of the site because seismically it was
9  found to be unsound.  The whole hillside is unsound.  In
10 order to mitigate the earthquake risk, it is
11 substantially more than the property would be worth.
12 Q   When did you acquire the Paper Roads property?
13 A   When Mr. Clark signed them over to me --
14 actually, I forgot to mention to you that during the
15 course of the marriage, we purchased those lots, and that
16 would have been way back in the late seventies maybe.
17 Q   What was the purchase price?
18 A   10,000.
19 Q   Are you the sole owner of that property
20 currently?
21 A   I am now, yes.
22 Q   What is the value of that property?
23 A   According to market studies, under $10,000.
24 Q   Where have you seen these market studies?
25 A   I've done an analysis based on the MLS data

Page 49

1  available to me as a realtor.
2  Q   Based on comparables?
3  A   Correct, and also through title documents.  In
4  addition to that, because of the economic recession in
5  terms of real estate values in California, a great number
6  of the counties -- and you will have seen this yourself
7  in property in your own tax billings -- that most of the
8  counties do a recalculation of tax bills during the last
9  two to three years and certainly in the year of 2011
10 where they took the valuations that were coming in on
11 purchases and used them to recast tax values.  The County
12 of San Luis Obispo did that and sent me a notice saying
13 they re-valuated the assessed values.
14 Q   Do you currently own any other real properties?
15 A   No.
16 Q   Are you familiar with the property acquired by
17 you and Jim in Morro Bay?
18 A   That is the Paper Roads.
19 Q   Okay.  Do you also refer to that property as the
20 Cayucos property?
21 A   Yes.
22 Q   With respect to the Verona property, how is
23 title taken to that property?
24 A   James A. Clark and Leticia J. Arciniega, husband
25 and wife.  I don't recall exactly, but I'm assuming that

Page 50

1  is what it was.
2  Q   And the property was purchased in 2000?
3  A   No.
4  Q   When was the property purchased?
5  A   1991.
6  Q   Were you and James still legally married at that
7  time?
8  A   Yes.
9  Q   Were you separated at that time?
10 A   No.  That was right before we became separated.
11 Q   Were you discussing separation at that time?
12 A   I don't believe so.
13 Q   What was the down payment for the Verona
14 property?
15 A   $3,500.
16 Q   What was the source of the down payment?
17 A   My 401K.
18 Q   How was the home financed?
19 A   We took a mortgage.
20 Q   What type of mortgage was it?
21 A   Fixed rate, 30-year.
22 Q   Was it a V.A. loan?
23 A   Yes.
24 Q   Was the home ever refinanced?
25 A   Oh, yes.

Page 51

1  Q   How many times?
2  A   At least two other times, maybe three.
3  Q   What years was the home refinanced?
4  A   I don't recall the exact years for the initial
5  refinancing.  All I know is there was an event in 2004
6  and some months preceding which is the current mortgage
7  that exists on the loan and then some months preceding
8  that that there had been another refinance because the
9  rates came down pretty dramatically.
10        We refinanced it, and then the rates continued
11 to drop contrary to normal interest cycles.  The first
12 time we refinanced, it was in February, and it was
13 through Wells Fargo.  Then when the rates continued to
14 drop, we looked into refinancing it again because we were
15 going to be able to recapture within a sort period of
16 time the cost of the refinancing.
17 Q   You are saying the first time you refinanced was
18 in February of 2004?
19 A   I am not saying that.  I'm saying that the last
20 time we refinanced was in 2004, but there had been a
21 previous incident of that earlier in 2004.  I don't
22 recall the number or the dates of the times that we
23 refinanced it between 2000 and 2004, but I believe there
24 were other incidents, at least one.
25 Q   Do you remember what year the first refinance

Exhibit "72"
00142

Page 52

1  was?
2  A  I don't.
3  Q  Do you know how many refinances there were on
4  the property?
5  A  I don't.
6  Q  Do you know when the last refinance was?
7  A  Yes.
8  Q  When was that?
9  A  2004.
10  Q  What was the purpose for the refinance?
11  A  To lower the rate.
12  Q  What was the purpose for the other refinances?
13  A  To lower the rate.
14  Q  How many loans are currently secured by the
15  Verona property?
16  A  Two.
17  Q  Have any of those loans been paid off?
18  A  No.
19  Q  Is the first lien on the Verona property still
20  the V.A. loan?
21  A  Yes.
22  Q  Have any of the loans on the Verona property
23  been modified?
24  A  Yes.
25  Q  Which loans?

Page 53

1  A  The first.
2  Q  How many times has the first loan been modified?
3  A  Once.
4  Q  When did that modification occur?
5  A  I think 2009.
6  Q  Is Jim Clark still on the V.A. loan?
7  A  Yes.  Do you have water?
8  MR. HAES:  Do I have your permission to take a break?
9  MR. COHEN:  Yes.
10  MR. HAES:  We both agree we need a break.
11  Can we go off record?
12  MR. COHEN:  Very well.
13  (Recess)
14  MR. HAES:  We are back on the record.
15  Let the record reflect we just came back from a
16  short break.
17  BY MR. HAES:
18  Q  I was asking about the V.A. loan on the Verona
19  property.
20  There is still a V.A. loan on the Verona
21  property, correct?
22  A  Yes.
23  Q  Okay.  James is still on that loan, correct?
24  A  Yes.
25  Q  Is James on title to the Verona property?

Page 54

1  A  No.
2  Q  Why is he not on title to the Verona property?
3  A  He quitclaimed it to me.
4  Q  Why did he quitclaim the Verona report to you?
5  A  He chose to.
6  Q  Did you ask him to quitclaim the Verona property
7  to you?
8  A  Yes.
9  Q  When did you ask him to quitclaim the Verona
10  property to you?
11  A  In 2006.
12  Q  Why did you ask him to quitclaim the Verona
13  property to you?
14  A  He had remarried.
15  Q  Did you feel like you were entitled to have the
16  Verona property quitclaimed to you?
17  A  Yes.
18  Q  For what reason?
19  A  I had bought it with my 401K, and I had made
20  every mortgage payment on it.  I had paid all utilities,
21  maintenance, and repairs necessary.  I resided in it full
22  time from the day it was purchased.
23  Q  Did Jim contribute to the mortgage payments on
24  the Verona property?
25  A  No.

Page 55

1  Q  Did Jim make any contribution toward the Verona
2  property?
3  A  No.
4  Q  Never?
5  A  No.
6  Q  Aside from the properties already mentioned, do
7  you own any other real property in Mexico or any other
8  country at all?
9  A  No.
10  Q  Just to clarify, you mentioned earlier that you
11  and David Christian were domestic partners?
12  A  Yes.
13  Q  Are you registered domestic partners?
14  A  No.
15  Q  Let me show you a document.  Please identify
16  this document.  I apologize.
17  MR. HAES:  Will you please mark this document as
18  Exhibit 1.  Thank you.
19  (Plaintiff's Exhibit 1 was marked
20  for identification, the original of which
21  is attached hereto.)
22  BY MR. HAES:
23  Q  Leticia, would you please identify this
24  document.
25  A  This is the settlement agreement regarding the

Exhibit "72"
00143

Page 56

1  house on Arrowhead that we entered into in May of 2009.
2      Q    Would you please read aloud the caption or title
3  of the document.
4      A    "Agreement of Compromise, Settlement, and Mutual
5         and General Release."
6      Q    Would you please turn to page 6 of 6 the
7  document.  I apologize.  It's page 5 of 5 of the
8  document.
9      MR. COHEN:  You don't mean 5 of 5.
10     MR. HAES:  It's 5 of 6.  I didn't mean 5 of 5.  It's
11 5 of 6.
12 BY MR. HAES:
13     Q    Is that your signature at the bottom of the
14 page?
15     A    Yes.
16     Q    Would you please flip back to the first page of
17 the document.  Please read paragraph II-A at the bottom
18 of the page.  Please read it aloud.
19     A    "A.  Plaintiff will pay Settling Defendant the
20        principal sum of $50,000.  The settlement draft
21        will be made payable to defendant and her
22        counsel of record.  This Payment is due on
23        Wednesday, May 13, 2009, so long as all parties
24        have executed the settlement agreement and
25        defendant has provided plaintiff with a properly

Page 57

1         signed and notarized quitclaim deed granting
2         her entire interest in the Subject Property to
3         plaintiff.  Plaintiff is required to pay
4         defendant $1,000 for each day that he is late in
5         delivering the settlement funds to defendant, so
6         long as all the conditions set forth above are
7         met."
8      Q    Thank you.  Did James pay you the $50,000 on or
9  before May 13, 2009?
10     A    He made payment to my attorney, yes, my counsel
11 of record.
12     Q    Let me show you another document.
13     MR. COHEN:  Are we done with number 1?
14     MR. HAES:  We may refer back to it.
15     MR. COHEN:  I'll put it here.
16     MR. HAES:  Okay.
17     MR. HAES:  Can we have this marked as Exhibit 2.
18 Thank you.
19       (Plaintiff's Exhibit 2 was marked
20        for identification, the original of which
21        is attached hereto.)
22 BY MR. HAES:
23     Q    Do you recognize the images on this document?
24     A    I don't.
25     Q    Please describe the images on the document.

Page 58

1      A    It's a cashier's check or camera check issued by
2  Washington Mutual in the amount of $50,000 to Milton and
3  DeKruif and Leticia Arciniega dated April 30th, 2009.
4      Q    What is Milton and DeKruif?
5      A    My attorney at the time.
6      Q    Do you acknowledge receipt of $50,000 from James
7  to you?
8      A    I acknowledge receipt.  I've never seen this
9  item.
10     Q    Did Jim fulfill his portion of the agreement as
11 described in Exhibit A?
12     MR. COHEN:  Objection.  Calls for a legal conclusion.
13 BY MR. HAES:
14     Q    Did James pay you $50,000 as a result of the
15 settlement agreement?
16     A    Yes.
17     Q    Did Jim have any other obligations under the
18 settlement agreement?
19     MR. COHEN:  Objection.  Calls for a legal conclusion.
20 BY MR. HAES:
21     Q    Let's refer back to Exhibit 1.  You may answer
22 the question.
23         Did Jim have any other obligations under the
24 settlement agreement?
25     MR. COHEN:  Objection.  The document speaks for

Page 59

1  itself, not only under agreements, but under release and
2  requests for dismissals.
3      THE WITNESS:  I'm so sorry.
4      MR. COHEN:  Please turn it off.
5      THE WITNESS:  I am going to.
6  BY MR. HAES:
7      Q    Leticia, would you please turn to page 2 of
8  Exhibit 1, the settlement agreement.
9         Would you please read paragraph "B" near the top
10 of page 2 out loud?
11     A    "No later than May 13, 2010, defendant will take
12        all necessary measures to pay off the existing
13        V.A. loan and remove plaintiff's name from the
14        loan on her property located at 890 Verona
15        Avenue, Hemet, California.  Defendant will not
16        attempt to assume the V.A. loan.  Defendant
17        agrees to pay plaintiff liquidated damages at
18        the rate of $1,000 per day for every day that
19        she is late complying with this provision.
20        Plaintiff will execute all necessary documents
21        so as to enable defendant to effectuate the
22        removal of plaintiff's name from the loan on her
23        property on 890 Verona, Hemet, California."
24     Q    Thank you.  Does paragraph "B" say that you
25 would make your best efforts or that you would take all

**Exhibit "72"**
**00144**

Page 60

1 necessary measures?
2   MR. COHEN:  Objection.  The document speaks for
3 itself, Counsel.
4 BY MR. HAES:
5   Q   You may answer the question.
6   A   It says to take all necessary measures to pay
7 off the existing V.A. loan.
8   Q   Are there any limitations to that?
9   MR. COHEN:  Objection.  Calls for a legal conclusion.
10 Calls for an opinion.  Calls for speculation.
11 BY MR. HAES:
12   Q   You may answer.
13   A   It states "Plaintiff will execute all necessary
14 documents so as to enable defendant to effectuate the
15 removal of plaintiff's name."
16   Q   Would you consider that a limitation to taking
17 all necessary measures to paying off the loan and
18 removing Plaintiff's name?
19   A   Yes.
20   Q   Does the agreement say anywhere that you are not
21 required to surrender the property or use settlement or
22 retirement funds to comply with the provisions stated in
23 paragraph "B"?
24   MR. COHEN:  Objection.  Calls for total speculation
25 and conjecture.  The document is what it is.  You are

Page 61

1 asking this witness to speculate about what it doesn't
2 say.
3   MR. HAES:  I'm asking the witness whether the
4 document says that.
5   MR. COHEN:  Well, then give her the time to read the
6 six pages then.
7 BY MR. HAES:
8   Q   You can have your time.
9   A   I understood that the intent of the document was
10 to bring to my attention that I needed to remove the
11 Plaintiff's name from the mortgage.  I did not read the
12 document to say that I should commit financial suicide or
13 put myself on the street as a result of any such action.
14   Q   We all agree the document says take all
15 necessary measures?
16   A   I don't interpret it the way perhaps you are.  I
17 do not and I refuse to put myself on the street and ruin
18 myself financially in order to satisfy an unspecified
19 requirement in this document.
20   Q   What requirement is unspecified?
21   A   Necessary measures would seem to invoke what is
22 real, practical, and prudent on my behalf and not
23 necessarily to put myself in a position of financial risk
24 and ruin.  Necessary measures are strategies and steps
25 taken to effectuate the removal of his name from the

Page 62

1 mortgage, not to withdraw the mortgage or the house from
2 my ownership.  There is a difference.
3   Q   Did Jim ever fail to execute any documents that
4 would pay off the loan and remove his name from the loan?
5   A   There was no opportunity to pay off the loan
6 from the time this document was written to today's date.
7 Other than somebody throwing cash at it, the loan cannot
8 be refinanced.
9   MR. COHEN:  You need to answer the question.
10   THE WITNESS:  No.
11 BY MR. HAES:
12   Q   Did you agree to take all necessary measures to
13 pay off the loan, correct?
14   A   I did.
15   MR. COHEN:  The question is did you agree.
16   MR. HAES:  I think she answered the question.
17   MR. COHEN:  I think she did.
18 BY MR. HAES:
19   Q   In the same paragraph, in paragraph "B," you
20 agree that you will not attempt to assume the V.A. loan,
21 correct?
22   A   Correct.
23   Q   Did you ever attempt to assume the V.A. loan?
24   A   Before this document was written, yes.
25   Q   How about after the document was written?

Page 63

1   A   I inquired of the opportunity to do so if we
2 could fulfill the obligation that the Plaintiff placed on
3 me to eliminate his eligibility being involved.
4   Q   Also, in the same paragraph, you agree to pay
5 James liquidated damages at a rate of $1,000 a day for
6 every day you are late in taking all necessary measures
7 to pay off the loan and remove his name, correct?
8   MR. COHEN:  Objection.  Mischaracterizes what the
9 agreement says.
10 BY MR. HAES:
11   Q   You may answer the question.
12   MR. COHEN:  Actually, it's mischaracterizing it.  If
13 you are going to cite from the liquidated damages
14 provision, it has to be cited accurately.  Otherwise, I
15 will object and instruct this witness not to answer.  It
16 mischaracterizes the question.
17 BY MR. HAES:
18   Q   Did you agree to pay liquidated damages to James
19 Clark in the event the loan was not paid off in full and
20 his name removed from the loan?
21   A   Please specify more clearly because one thing is
22 to pay off the loan and the other thing is to remove his
23 name.
24   Q   Well, paragraph "B" includes both paying off the
25 loan and removal of his name, correct?

Exhibit "72"
00145

Page 64

1    A   I can't help it if it is ambiguous.  One thing
2  is removing the name, and the other thing is paying off
3  the loan.
4    MR. COHEN:  What counsel what is getting to, I guess,
5  is the confusion is the term necessary measures applies
6  to both elements, removing Plaintiff's name from the loan
7  and to pay off the existing V.A. loan or is it only to
8  the first.  Hence, the question contains a confusing
9  statement.
10    MS. BOONE:  We are not going to resolve what counsel
11  alleges and the deponent alleges to be an ambiguity in a
12  settlement document today.  We are just trying to get
13  Leticia's best testimony.  Let's back up and try this
14  line of questioning again in a different way.
15       Counsel, if you will allow me to rephrase?
16    MR. COHEN:  Sure.
17
18       EXAMINATION
19  BY MS. BOONE:
20    Q   Ms. Arciniega, would you kindly read to us the
21  sentence beginning on the fourth line of  paragraph "B"
22  starting with "Defendant agrees."
23    A   "Defendant agrees to pay plaintiff liquidated
24       damages at the rate of $1,000 per day for every
25       day she is late complying with this provision."

Page 65

1    MR. COHEN:  Counsel, which provision does this refer
2  to?
3    MS. BOONE:  At this point that is not a question that
4  is pending.
5    MR. COHEN:  Okay.
6  BY MS. BOONE:
7    Q   Ms. Arciniega, did you pay off the existing
8  V.A. loan?
9    A   I took all necessary measures within my scope to
10  try to pay off the loan.
11    Q   That wasn't the question.  I'm sorry.
12       Did you pay off the existing V.A. loan?
13    A   I did not.
14    Q   Did you remove Plaintiff's name from the loan on
15  your property located at 890 Verona Avenue, Hemet,
16  California?
17    A   I did not.
18    Q   And have you paid Plaintiff, which in this case
19  refers to Mr. Clark, damages of $1,000 a day for every
20  day that you were late complying with this provision?
21       And before I draw the objection, have you paid
22  $1,000 a day for every day that you were late in paying
23  off the existing V.A. loan?
24    A   I have not.
25    Q   Have you paid Plaintiff, Mr. Clark, $1,000 a day

Page 66

1  for every day that you were late removing Mr. Clark's
2  name from the loan on the Verona property?
3    A   I have not.
4    MS. BOONE:  Thank you.
5
6       FURTHER EXAMINATION
7  BY MR. HAES:
8    Q   In paragraph "C" of the agreement -- well, why
9  don't I have you read paragraph "C" of the agreement on
10  page 2 of 6.
11    A   "Subject to defendant fulfilling the obligations
12       set forth above in paragraph II-B, plaintiff
13       hereby waives any and all interests he may have
14       in the property located at 890 Verona Avenue,
15       Hemet, California."
16       For the record, it's not Hemet.  It's
17  San Jacinto.
18    Q   Thank you.  Let me show you another document.
19    MR. HAES:  Can we have this marked as Exhibit 3.
20  Thank you.
21       (Plaintiff's Exhibit 3 was marked
22       for identification, the original of which
23       is attached hereto.)
24  BY MR. HAES:
25    Q   Do you recognize this document?

Page 67

1    A   Yes.
2    Q   Was this a document produced by you to us?
3    A   Yes.
4    Q   Please describe this document.
5    A   It's a statement from December 6, 2006 or
6  December 9, 2006 to January 9, 2007 of my Wells Fargo PMA
7  account.
8    Q   What account number is it?
9    MS. BOONE:  I'm going to intercept and just say that
10  we will ask you to identify the last six digits of the
11  account number.
12    THE WITNESS:  Okay.  The last six digits?
13  BY MR. HAES:
14    Q   Yes.
15    A   364304.
16    Q   May I direct your attention to page 10 of 10 of
17  the document?  If you would please look down near the
18  bottom of the document to the section entitled
19  "Subtractions."
20       What is listed under subtractions?
21    A   $88,000.
22    Q   Well, was the $88,000 a withdrawal or a deposit?
23    A   It's a withdrawal.
24    Q   How does it describe the withdrawal?  Would you
25  please read it?

Exhibit "72"
00146

Page 68

1   A   "Withdrawal made in branch."
2   Q   On what date?
3   A   12/21.
4   Q   12/21 of what year?
5   A   2007 -- no.  12/21/2006.
6   Q   Did you withdraw those funds?
7   A   I did.
8   Q   I would like to show you another document.
9   MR. HAES:  Can you mark this Exhibit 4.  Thank you.
10      (Plaintiff's Exhibit 4 was marked
11   for identification, the original of which
12   is attached hereto.)
13   BY MR. HAES:
14   Q   Do you recognize this document?
15   A   I do.
16   Q   Please describe this document.
17   A   It's a deed of trust securing a second mortgage
18   on the house on Verona.
19   Q   Are you the trustor on the deed of trust?
20   A   I am.
21   Q   Is the information -- well, the deed of trust
22   indicates a loan.
23      In what amount was the loan?
24   A   100,000.
25   Q   Did you receive the $100,000 on account of this

Page 69

1   deed of trust?
2   A   I did.
3   Q   Thank you.  When and how did you receive those
4   funds on account of that loan, the $100,000?
5   A   I received a check in the mail.
6   Q   When?
7   A   In 2007.
8   Q   Do you recall when in 2007?
9   A   Sometime in the month of March.
10   MR. HAES:  I have another document here.  Would you
11   please mark this as Exhibit 5.  Thank you.
12      (Plaintiff's Exhibit 5 was marked
13   for identification, the original of which
14   is attached hereto.)
15   BY MR. HAES:
16   Q   As you can see, this document is quite
17   voluminous.
18      Do you recognize at least the cover page, the
19   front page of this document?
20   A   I do.
21   Q   Please describe the front page of this document.
22   A   The front page of this document is page number 1
23   one of The Bank of Hemet statement on the MSRE, Inc.
24   account ending in 289401.
25   Q   I'm going to, for sake of brevity, flip through

Page 70

1   pages here and try to direct you to the relevant pages of
2   this document.
3   A   Okay.
4   Q   I'm going to quickly ask you questions related
5   to copies of certain checks that appear on each page.
6   MR. COHEN:  What do you mean by quickly ask her?
7   MR. HAES:  Well, I'm going to reference checks, and
8   I'm going to ask her whether or not she recognizes the
9   checks and whether or not those checks were payable to
10   her and whether she received those funds.
11   MS. BOONE:  To the extent you want a minute to flip
12   through the document and through the exhibit, go ahead
13   and take the time to do so.
14   MR. HAES:  Actually, I think that's a great idea.
15   BY MR. HAES:
16   Q   I would like to know your opinion as to whether
17   or not these are documents produced by you to us.
18   MR. COHEN:  I'll object to the question and this
19   document on the basis of we can't determine what you
20   collated and what you produced from all the documents
21   that we produced to form this one document.
22      From the Bates stamping at the bottom, it looks
23   like it starts off at 475 and then it jumps to 1,029.  I
24   would object to this witness authenticating this entire
25   document as a whole because I don't know how you collated

Page 71

1   it.  I would prefer you ask her specific questions about
2   specific items.
3   MS. BOONE:  Absolutely.  We are not asking her to
4   verify the authenticity of this exhibit as a whole right
5   now.  I simply am asking Ms. Arciniega to be able to flip
6   through it for her comfort.  There will be specific
7   questions about specific pages in this document rather
8   than questioning as a whole.
9   MR. COHEN:  Okay.
10   MS. BOONE:  Thank you.
11   BY MR. HAES:
12   Q   Let us know when you are prepared.
13   A   I am good.
14   Q   Okay.  Please turn to the third page in.  The
15   full number appears at the corner.  It says 477.  Some of
16   the numbers may be cut off.
17      Do you see on the top left-hand corner check
18   number 1227?
19   A   I do.
20   Q   The check is made out to you in the amount of
21   $300.
22      Do you recognize this check?
23   A   I do.
24   Q   Were those funds received and cashed?
25   A   Those funds were received but not cashed.

Exhibit "72"

00147

Page 72

1  Q   Were those funds received by you?
2  A   Yes.
3  Q   Do you recognize check number 1228 in the amount
4  of $2,700 made out to you on December 2nd, 2010?
5  A   I do.
6  Q   Were those funds received by you?
7  A   They were.
8  Q   Do you recognize check number 1229 made out to
9  you in the amount of $500 on December 21st, 2010?
10  A   I do.
11  Q   Were these funds received by you?
12  A   They were.
13  Q   Okay.  Let's flip a few more pages.  If you have
14  it on the bottom right-hand corner of your page, it's
15  1031.
16       Do you recognize the check in the top left-hand
17  corner, check number --
18       MR. COHEN:  Hold on.  Which page?
19       MR. HAES:  1031.  Are you there?
20       MR. COHEN:  Yes.  I'm here.
21  BY MR. HAES:
22  Q   Do you recognize the check in the top left-hand
23  corner made out to you in the amount of $2,700?
24  A   I do.
25  Q   It's check number 1230, correct?

Page 73

1  A   Yes.
2  Q   Did you receive those funds?
3  A   I did.
4  Q   Right next to that top right-hand corner, do you
5  recognize the check in the top right-hand corner, check
6  number 1231, made out to you in the amount of $200?
7  A   I do.
8  Q   Did you receive those funds?
9  A   I did.
10  Q   Do you recognize check number 1232 made out to
11  you in the amount of $50?
12  A   I do.
13  Q   Did you receive those funds?
14  A   I did.
15  Q   Do you recognize check number 1233 made out to
16  you in the amount of $25?
17  A   I do.
18  Q   Did you receive those funds?
19  A   I did.
20  Q   Did you recognize check number 1234 made out to
21  you in the amount of $300?
22  A   I do.
23  Q   Did you receive those funds?
24  A   I did.
25  Q   So we are going one, two, three flips, and we

Page 74

1  should be at 1034 if it shows up on your page.
2       Do you recognize in the top right-hand corner,
3  check number 1236, made out to you in the amount of $400?
4  A   I do.
5  Q   Did you receive those funds?
6  A   I did.
7  Q   Do you recognize check number 1238 just below
8  that made out to you in the amount of $200?
9  A   No.  It's not made out to me.
10  Q   Oh, it's not.  Oh.  Hard to read.
11       Do you recognize check number 1239 made out to
12  you in the amount of $2,700 on the bottom of the page?
13  A   I do.
14  Q   Did you receive those funds?
15  A   I did.
16  Q   One, two, three flips, and you should be at
17  1037.
18       Do you recognize check number 1240 made out to
19  you in the amount of $200?
20  A   I do.
21  Q   Did you receive those funds?
22  A   I did.
23  Q   One, two, three flips, and you should be at
24  1040.
25       Do you recognize check number 1241 in the amount

Page 75

1  of $2,700 made out to you?
2  A   I do.
3  Q   Did you receive those funds?
4  A   I did.
5  Q   Do you recognize check number 1242 made out to
6  you in the amount of $200?
7  A   I do.
8  Q   Did you receive those funds?
9  A   I did.
10  Q   One, two, three, flips, and you should be at
11  1043.
12       Do you recognize check number 1245 made out to
13  you in the amount of $2,700?
14  A   I do.
15  Q   Did you receive those funds?
16  A   I did.
17  Q   Do you recognize check number 1246 made out to
18  you in the amount of $300?
19  A   I do.
20  Q   Did you receive those funds?
21  A   I did.
22  Q   One, two, three flips, and you should be at
23  1046, bottom right-hand corner of the page.
24       Do you recognize check number 1248 made out to
25  you in the amount of $2,700?

Exhibit "72"
00148

Page 76

1    A   I do.
2    Q   Did you receive those funds?
3    A   I did.
4    Q   Opposite corner, do you recognize check number
5  1251 made out to you in the amount of $2,700?
6    Q   Did you receive those funds?
7    A   I did.
8    Q   One, two, three flips, and you should be at
9  1049.
10   Do you recognize check number 1252 made out to
11  you in the amount of $300?
12   A   I do.
13   Q   Did you receive those funds?
14   A   I did.
15   Q   Do you recognize check number 1253 made out to
16  you in the amount of $300?
17   A   I do.
18   Q   Did you receive those funds?
19   A   I did.
20   Q   Okay.  One, two, three flips, and you should be
21  at 1052.
22   MR. COHEN:  This is going to be a long day.
23  BY MR. HAES:
24   Q   Do you recognize check number 1254 made out to

Page 77

1  you in the amount of $2,700?
2    A   I do.
3    Q   Did you receive those funds?
4    A   I did.
5    Q   One, two, three flips, and you should be at
6  1050.
7    Do you recognize number 1257 made out to you in
8  the amount of $100?
9    A   I do.
10   Q   Did you receive those funds?
11   A   Yes.
12   Q   Did you recognize check number 1258 made out to
13  you in the amount of $100?
14   A   I do.
15   Q   Did you receive those funds?
16   A   I did.
17   Q   One, two flips, and you should be at 1057.
18   Do you recognize check number 1259 made out to
19  you in the amount of $200?
20   A   I do.
21   Q   Did you receive those funds?
22   A   I did.
23   Q   Do you recognize check number 1262 made out to
24  you in the amount of $2,000?
25   A   I do.

Page 78

1    Q   Did you receive those funds?
2    A   I did.
3    Q   Okay.  One, two, three, four, five flips, and
4  you should be at 1062.
5    Do you recognize check number 1267 made out to
6  you in the amount of $1,250?
7    A   I do.
8    Q   Did you receive those funds?
9    A   I did.
10   Q   Bottom of the page, do you recognize check
11  number 1268 made out to you in the amount of $1,450?
12   A   I do.
13   Q   Did you receive those funds?
14   A   I did.
15   Q   Okay.  One, two, three flips, and you should be
16  at 1065, if you can read it.
17   Do you recognize --
18   MR. COHEN:  Give me one second, please.
19   MR. HAES:  Sure.  1065.
20   MR. COHEN:  Give me one second, please.
21   MR. HAES:  Sure.
22  BY MR. HAES:
23   Q   Are you at 1065, Ms. Arciniega?
24   A   Yes.
25   Q   Do you recognize check 1203 made out to you in

Page 79

1  the amount of $2,700?
2    A   I do.
3    Q   Did you receive those funds?
4    A   I did.
5    Q   Okay.  One, two, three flips, and you should be
6  at 1068.
7    Do you recognize check number 1204 made out to
8  you in the amount of $2,700?
9    A   I do.
10   Q   Did you receive those funds?
11   A   I did.
12   Q   Okay.  One, two, three flips, and you should be
13  at 1071.
14   Do you recognize check number 1205 made out to
15  you in the amount of $2,700?
16   A   I do.
17   Q   Did you receive those funds?
18   A   I did.
19   Q   Two checks down, do you recognize check number
20  1208 made out to you in the amount of $700?
21   A   I do.
22   Q   Did you receive those funds?
23   A   I did.
24   Q   Last check, do you recognize check number 1209
25  in the amount of $1,000 made out to you?

Exhibit "72"
00149

Page 80

1    A    I do.
2    Q    Did you receive those funds?
3    A    I did.
4    Q    Okay.  One, two, three flips, and you should be
5    at 1074.
6        Do you recognize check number 1210 in the amount
7    of $3,500 made out to you?
8    A    I do.
9    Q    Did you receive those funds?
10   A    I did.
11   Q    Okay.  One, two, three flips, and you should be
12   at 1077.
13       Do you recognize check number 1211 made out to
14   you in the amount of $2,700?
15   A    I do.
16   Q    Did you receive those funds?
17   A    I did.
18   Q    One, two, three, four, five flips, and you
19   should be at 1082.
20       Do you recognize check number 1213 made out to
21   you in the amount of $2,000?
22   A    I do.
23   Q    Did you receive those funds?
24   A    I did.
25   Q    One, two, three, four, five, six, seven, eight,

Page 81

1    nine, 10, 11, 12, 13, 14, 15 flips, and you should be at
2    1097.
3        Do you recognize check number 1225 made out to
4    you in the amount of $1,500?
5    A    I do.
6    Q    Did you receive those funds?
7    A    I did.
8    Q    Did you recognize check number 1226 made out to
9    you in the amount of $300?
10   A    I do.
11   Q    Did you receive those funds?
12   A    I did.
13   Q    Okay.  One, two, three, four flips, and you
14   should be at page 1101.
15       Do you recognize check number 1075 at the top
16   right-hand corner of the page made out to you in the
17   amount of $750?
18   A    I do.
19   Q    Did you receive those funds?
20   A    I did.
21   Q    In the row below that on the left, do you
22   recognize check number 1076 made out to you in the amount
23   of $800?
24   A    I do.
25   Q    Did you receive those funds?

Page 82

1    A    I did.
2    Q    Okay.  One, two, three flips, and you should be
3    at page 1104, left-hand side of the page, second check
4    down.
5        Do you recognize check number 1098 made out to
6    you in the amount of $100?
7    A    Yes.
8    Q    Did you receive those funds?
9    A    Yes.
10   Q    Okay.  Moving on, one page over, you are at
11   1105.
12       The last three checks on the page, do you
13   recognize check number 1119 made out to you in the amount
14   of $1,550?
15   A    Yes.
16   Q    Did you receive those funds?
17   A    I did.
18   Q    Next to that, do you recognize check number 1120
19   made out to you in the amount of $250?
20   A    I do.
21   Q    Did you receive those funds?
22   A    I did.
23   Q    The last check on the page, do you recognize
24   check number 1121 made out to you in the amount of $500?
25   A    I do.

Page 83

1    Q    Did you receive those funds?
2    A    I did.
3    Q    Okay.  Moving on, one, two, three, four, five
4    flips, and you should be at 1110.
5        The top left-hand corner, do you recognize check
6    number 1139 made out to you in the amount of $500?
7    A    I do.
8    Q    Did you receive those funds?
9    A    I did.
10   Q    Do you recognize check number 1140 made out to
11   you in the amount of $200?
12   A    I do.
13   Q    Did you receive those funds?
14   A    I did.
15   Q    Okay.  Moving on, one, two, three flips, and you
16   should be at 1113.
17       The top right-hand corner of that page, do you
18   recognize check number 1154 made out to you in the amount
19   of $500?
20   A    I do.
21   Q    Did you receive those funds?
22   A    I did.
23   Q    Moving on, one flip over, page 1114.
24       Do you recognize check number 1174 made out to
25   you in the amount of $700?

Exhibit "72"
00150

Page 84

1      A    I do.
2      Q    Did you receive those funds?
3      A    I did.
4      Q    Do you recognize check number 1175 made out to
5  you in the amount of $200?
6      A    I do.
7      Q    Did you receive those funds?
8      A    I did.
9      Q    Okay.  Moving on, one, two, three flips, and you
10  should be at 1117.
11      The top right-hand corner of that page, do you
12  recognize check number 1176 made out to you in the amount
13  of $2,700?
14      A    I do.
15      Q    Did you receive those funds?
16      A    I did.
17      Q    Do you recognize the check below that check,
18  number 1179, made out to you in the amount of $600?
19      A    I do.
20      Q    Did you receive those funds?
21      A    Yes, I did.
22      Q    Okay.  Moving on, one, two, three, four flips,
23  and you should be at 1121.
24      Do you recognize check number 1181 in the top
25  right-hand corner made out to you in the amount of

Page 85

1  $5,000?
2      A    Top right-hand corner?
3      Q    Top left-hand corner.  I apologize.
4      A    I see it.  Yes.  I recognize it.
5      Q    Did you receive those funds?
6      A    I did.
7      Q    Just below that, do you recognize check number
8  1183 made out to you in the amount of $2,000?
9      A    I recognize it.
10      Q    Did you receive those funds?
11      A    I did.
12      Q    Okay.  Moving on, one, two, three, four, five
13  flips, and you should be at 1126.
14      Last two checks on the page first, do you
15  recognize check number 1192 made out to you in the amount
16  of $2,700?
17      A    I do.
18      Q    Did you receive those funds?
19      A    I did.
20      Q    Just below that, check number 1193 made out to
21  you in the amount of $2,063.84, do you recognize that
22  check?
23      A    I do.
24      Q    Did you receive those funds?
25      A    I did.

Page 86

1      Q    Moving on, one, two, three flips, and you should
2  be at 1129, second check down.
3      Do you recognize check number 1195 made out to
4  you in the amount of $2,000?
5      A    I do.
6      Q    Did you receive those funds?
7      A    I did.
8      Q    Next check down, do you recognize check number
9  1196 made out to you in the amount of $100?
10      A    I do.
11      Q    Did you receive those funds?
12      A    I did.
13      Q    Next check down, do you recognize check number
14  1197 made out to you in the amount of $2,063.84?
15      A    I do.
16      Q    Did you receive those funds?
17      A    I did.
18      Q    Moving on, one, two, three, four, five, six,
19  seven, eight, nine, 10, 11 flips, and you should be at
20  page 1140.
21      Top left-hand corner of the page, do you
22  recognize check number 1012 made out to you in the amount
23  of $2,000?
24      A    What number?
25      Q    1012.

Page 87

1      A    For what amount?
2      Q    $2,600.
3      A    I recognize it.
4      Q    Did you receive those funds?
5      A    I did.
6      Q    Bottom right-hand corner of the page, do you
7  recognize check number 1017 made out to you in the amount
8  of $2,060?
9      A    I do.
10      Q    Did you receive those funds?
11      A    I did.
12      Q    Moving on, one, two flips, and you should be at
13  page 1142, top left-hand corner of the page.
14      Do you recognize check number 1018 made out to
15  you in the amount of $1,775?
16      A    I do.
17      Q    Did you receive those funds?
18      A    I did.
19      Q    Moving on, one, two flips, and you should be at
20  page 1144, top left-hand corner.
21      Do you recognize check number 1020 made out to
22  you in the amount of $1,880?
23      A    I do.
24      Q    Did you receive those funds?
25      A    I did.

Exhibit "72"
00151

Page 88

1   Q   Moving on, one, two flips, and you should be at
2   page 1146.
3       In the middle row, left-hand side, do you
4   recognize check number 1025 made out to you in the amount
5   of $2,170?
6   A   I do.
7   Q   Did you receive those funds?
8   A   I did.
9   Q   Right next to that, do you recognize check
10  number 1026 made out to you in the amount of $2,390?
11  A   I do.
12  Q   Did you receive those funds?
13  A   I did.
14  Q   Right below that, do you recognize check number
15  1028 made out to you in the amount of $900?
16  A   I do.
17  Q   Did you receive those funds?
18  A   I did.
19  Q   Okay.  Moving on, two flips, and you should be
20  at page number 1148, top right-hand corner.
21      Do you recognize check number 1030 made out to
22  you in the amount of $1,000?
23  A   I do.
24  Q   Did you receive those funds?
25  A   I did.

Page 89

1   Q   Bottom check, do you recognize check number 1031
2   made out to you in the amount of $4,370?
3   A   I do.
4   Q   Did you receive those funds?
5   A   I did.
6   Q   Moving on, one, two, three, four, five, six,
7   seven, last check, page 1155.
8       Do you recognize check number zero made out to
9   you in the amount of $3,500?
10  A   I do.
11  Q   Did you receive those funds?
12  A   I did.
13  Q   Okay.  Thank you.
14  MR. HAES:  What time is it?
15  MS. BOONE:  It is 11:04 according to my computer.
16  MR. HAES:  Okay.  Good.
17  BY MR. HAES:
18  Q   I'm going to show you another document.
19  MR. HAES:  Can you please mark this as Exhibit 6.
20  Thank you.
21      (Plaintiff's Exhibit 6 was marked
22      for identification, the original of which
23      is attached hereto.)
24  BY MR. HAES:
25  Q   Do you recognize this document?

Page 90

1   A   I do.
2   Q   Was this document produced by you?
3   A   It was.
4   Q   Please describe this document.
5   A   This is a recap of loan activity from
6   David D. Christian to Leticia J. Arciniega.  It shows the
7   date, amount, and check numbers that Mr. Christian wrote
8   to me as loans.
9   Q   Okay.  Prior to 2006, approximately how much
10  money was lent to you by David Christian?
11  A   I would need a calculator to add that up, but it
12  would be line number 16 on up to line number 1.  There
13  were previous amounts that don't appear here, but they
14  were paid back.
15  Q   Okay.  What was the purpose of the loans prior
16  to 2006?
17  A   The purpose of the loans prior to 2006 was to
18  help me with my living expenses.
19  Q   All right.  And would you read entries 1
20  through 15.  Just quickly read off date, check number,
21  and amount for each payment or for each check David wrote
22  out to you from the first entry through the fifteenth
23  entry.
24  MR. COHEN:  Counsel, isn't there a more effective use
25  of our time than having her read 15 entries on a

Page 91

1   register?
2   BY MR. HAES:
3   Q   Do you have a calculator with you?
4   A   I don't.
5   Q   Okay.
6   MS. BOONE:  You can certainly use the calculator on
7   my phone if you need a calculator.
8   MR. HAES:  I would rather just go grab one.
9       Do we have a standard one?
10  MS. BOONE:  I will go get one.
11  MR. HAES:  Thank you.
12  MS. BOONE:  I will be right back.  Excuse me.
13      (Pause in proceedings)
14  MR. HAES:  Thank you, Sarah.
15  MS. BOONE:  You are welcome.
16  BY MR. HAES:
17  Q   Would you do me a favor and please add entries
18  1 through 15.
19  MR. COHEN:  No.  I'm objecting.  The debtor is not
20  here to do your calculations.
21  MR. HAES:  Okay.  Very well.  I will.
22  BY MR. HAES:
23  Q   Would you agree that between 2000 and 2006, you
24  were loaned approximately $40,000 by David Christian?
25  A   No.  It's more than that.

California Deposition Reporters

Exhibit "72"
00152

Page 92

1    Q   Approximately?

2    A   No.  It's more than that.

3    MR. COHEN:  The question is, do you agree?  "Yes" or

4  "no."

5    THE WITNESS:  I don't agree.

6  BY MR. HAES:

7    Q   Okay.  Approximately, how much do you believe

8  you were loaned between June of 2000 and, let's say, the

9  beginning of 2006 or at the end of 2006 by David

10  Christian?

11    A   It's more like 70 or 80,000.

12    Q   Are all of the checks or payments from David

13  Christian to you as a loan reflected on this document?

14    MR. COHEN:  Objection.  Asked and answered.  The

15  Debtor already testified that certain transactions were

16  not included because they were paid back already.

17  BY MR. HAES:

18    Q   Are all of the payments made to you as a loan by

19  David Christian reflected in any promissory note in favor

20  of David Christian on this statement?

21    A   Please repeat that question.

22    Q   Any payment that David Christian made to you as

23  a loan that he holds a promissory note for, will those

24  payments all be reflected on this document?

25    A   David holds no promissory note.

Page 93

1    Q   Okay.  I would like to share another document.

2    MR. HAES:  I would like to mark this as Exhibit 8.

3  Thank you.

4    MR. COHEN:  Are you coming back to number 6?

5    MR. HAES:  Yes.  We will also come back to number 7

6  as well.

7        (Plaintiff's Exhibit 8 was marked

8      for identification, the original of which

9      is attached hereto.)

10  BY MR. HAES:

11    Q   This here is Exhibit 8.

12    A   Okay.

13    Q   Please describe this document.

14    A   This is a promissory note signed by me dated

15  April 24th, 2009 wherein it's a note.  It's a promissory

16  note in David's favor.  The balance is 120,000.

17    Q   Have you made any payments to David Christian on

18  account of this promissory note?

19    A   I have not.

20    Q   Is David Christian still the holder of this

21  promissory note in his favor?

22    A   No.

23    Q   Why not?

24    A   He accepted to be placed as a beneficiary on my

25  retirement account and life insurance policy in lieu of

Page 94

1  having a note.

2    Q   All right.  I would like to show you another

3  document.

4    MR. HAES:  Would you please mark this as Exhibit 9.

5  Thank you.

6        (Plaintiff's Exhibit 9 was marked

7      for identification, the original of which

8      is attached hereto.)

9  BY MR. HAES:

10    Q   Please describe this document.

11    A   This is a promissory note dated December 18,

12  2006 for a principal amount of 80,000 signed by me in

13  favor of David Christian.

14    Q   Have you made any payments to David Christian on

15  behalf of this promissory note?

16    A   No.

17    Q   Why not?

18    A   It's included in Exhibit 7 or 8.  I lost track

19  of the numbers.  It's number 8.

20    Q   Is David Christian the current holder of this

21  promissory note in his favor?

22    A   He has no promissory note.

23    Q   Okay.

24    MR. COHEN:  That's a "yes" or a "no."

25    THE WITNESS:  No.

Page 95

1  BY MR. HAES:

2    Q   Why not?

3    A   Excuse me?

4    Q   Why isn't he a current holder of this promissory

5  note in his favor?

6    A   I answered that previously.  He accepted being a

7  beneficiary on my retirement account and life insurance

8  policy.

9    Q   So that is applicable to this note as well?

10    A   There is only one --

11    MR. COHEN:  It's a "yes" or a "no."

12    THE WITNESS:  Yes.

13  BY MR. HAES:

14    Q   I would like to get back to Exhibit Number 6,

15  please.  Please direct your attention to line item

16  number 16.

17        Would you please read that entire line item out

18  loud.

19    A   "Missing items.  Prior to 2006.  $21,250."

20    Q   What do you mean by "missing items"?

21    A   Well, I was apparently able to identify amounts

22  that David had provided me with prior to 2006, but we

23  were unable to find the canceled checks.

24    Q   Okay.  So there are no checks to corroborate

25  that portion of the loan in the amount of $21,250?

Exhibit "72"
00153

Page 96

1    MR. COHEN:  Objection.  Mischaracterizes what the
2   witness just said.  She said she wasn't able to locate
3   those checks.  Your question is "There are no checks."
4   It is mischaracterizing her testimony.
5   BY MR. HAES:
6    Q    Do any documents exist anywhere to corroborate
7   the portion of the loan listed in item number 16 in the
8   amount of $21,250?
9    A    Please repeat that.
10    Q    Are there any documents anywhere that would
11   corroborate the portion of the loan listed in line item
12   number 16 in the amount of $21,250?
13    MR. COHEN:  Objection.  Calls for speculation as to
14   what is out there.
15   BY MR. HAES:
16    Q    Please answer the question.
17    A    Bank histories.  If I received the money, it
18   went through my account.
19    Q    Okay.
20    A    I don't know how far back.  I don't know if
21   banks would retain the history on the items that far
22   back, but it would clearly show the canceled checks that
23   were deposited to my accounts.
24    Q    Okay.  Do you have access to those bank
25   histories?

Page 97

1    A    I don't.
2    Q    These bank histories are related to your
3   accounts, correct?
4    A    Correct.
5    Q    Why do you not have access to these bank
6   histories?
7    A    I would have to go to the bank to request them.
8    Q    So you do have access to the bank histories?
9    A    I have to access the bank and request them.
10   Whether they are available, as I said to start with, I
11   don't know how far they keep them.
12    Q    Okay.  Is there a chance that the amounts were
13   reserved in cash or given to you in cash and that is why
14   there are no checks?
15    A    No.
16    Q    I would like to ask that you please obtain
17   those bank statements to reflect the missing $21,250.
18   I would like to make a formal request for those
19   statements.
20    MR. COHEN:  Your request is noted.  I'll also note
21   this information was made available to this Plaintiff,
22   and the Plaintiff could have conducted discovery to have
23   obtained this information from the bank just as equally
24   as this witness could have done so.
25    MR. HAES:  Duly noted.

Page 98

1   BY MR. HAES:
2    Q    Were the notes in favor of David Christian
3   canceled?
4    MR. COHEN:  Objection.  Calls for a legal conclusion.
5   BY MR. HAES:
6    Q    How would you characterize the -- well, answer
7   the question, please.
8       Were the notes canceled?
9    A    They were substituted.
10    Q    Define substituted.
11    A    He is satisfied that his investment has been
12   secured.
13    Q    I would like to share another document with you.
14    MR. HAES:  Can you mark this as Exhibit 7, please.
15   Thank you.
16       (Plaintiff's Exhibit 7 was marked
17        for identification, the original of which
18        is attached hereto.)
19    MR. HAES:  For the record, I would also like to
20   formally request written proof of the satisfaction on the
21   notes.
22    MR. COHEN:  Your request is duly noted.
23   BY MR. HAES:
24    Q    Do you recognize the document listed as
25   Exhibit 7?

Page 99

1    A    I do.
2    Q    Was this document produced by you?
3    A    It was.
4    Q    Please describe this document.
5    A    This is proof that David is satisfied with the
6   substitution, what you just asked for us to produce --
7    MR. COHEN:  Describe the document.
8    THE WITNESS:  It is a reconveyance filed by David, in
9   effect, a release on a $120,000 lien that had been filed
10   against the property at 890 Verona.  He recorded it on
11   May 19th, 2009.
12   BY MR. HAES:
13    Q    What prompted David Christian to record the deed
14   of trust on the Verona property?
15    MS. BOONE:  I'm sorry.  Before you go forward, I'm
16   going to ask that the deponent describe the document
17   again because this document is not a reconveyance.
18    THE WITNESS:  This document is not a reconveyance.
19   This is a copy of a recordation of reconveyance.
20    MR. COHEN:  I would like a minute with my client so
21   that your questions are properly answered.
22    MS. BOONE:  Thank you.
23    MR. COHEN:  Give me a minute to step outside.
24    MS. BOONE:  I don't think we have a question pending,
25   so we'll go off the record.

Exhibit "72"
00154

Page 100

1    MR. COHEN:  It will just be a minute.  Okay.  Thank
2  you.
3    MS. BOONE:  Thank you.
4    (Recess)
5    MR. HAES:  Okay.  We are back on the record.
6    Let the record reflect we just came back from a
7  short break.
8  BY MR. HAES:
9    Q   We were on the document listed as Exhibit
10  Number 7 which is -- well, you were describing the
11  document.
12    What is that document?
13    A   This document is a copy of an online inquiry for
14  documents that were recorded under the name of Leticia
15  Arciniega or David Christian.  The time period is May of
16  2011.
17    Q   Was the document produced by you to us?
18    A   Yes.
19    Q   Would you please read the entry described as
20  document number 2009-0215647 with the black "X" next to
21  it.  Would you read that entry.
22    A   "Document Type:  Trust Deed.  Arciniega, Leticia
23    Joy.  Christian, David D.  Document Number:
24    2009-0215647.  Number of Pages:  1.  Recording
25    Date:  2009-04-30.  Cost to Buy:  $7.  Add $1.00

Page 101

1    for Certified Copy.  Buy Now."
2    Q   This is a record apparently, according to you,
3  an online record from Riverside Assessor-County
4  Clerk-Recorder; is that correct?
5    A   Yes.
6    Q   What does that entry reflect, the one you just
7  read off?  In your opinion, what does that reflect?
8    MR. COHEN:  Objection.  Calls for a legal conclusion.
9    THE WITNESS:  It reflects the recording of the trust
10  deed in favor of David Christian on April 30th of 2009.
11  BY MR. HAES:
12    Q   What prompted David Christian to record a deed
13  of trust on the Verona property on that date?
14    MR. COHEN:  Objection.  Calls for speculation.
15    THE WITNESS:  You would have to ask David.
16  BY MR. HAES:
17    Q   Did you discuss with David Christian the
18  recordation of a deed of trust on that date?
19    A   What did I discuss with David?  Repeat the
20  question.
21    Q   At any time prior to the recordation of that
22  deed of trust, did you discuss with David Christian that
23  he would be recording a deed of trust on that date?
24    A   No.
25    Q   Generally, did you discuss with him that he

Page 102

1  would be recording a deed of trust on the Verona property
2  generally?
3    A   No.
4    Q   Did you ever have any discussion with David
5  Christian regarding the recordation of a deed of trust on
6  the Verona property?
7    A   No.
8    Q   Were you aware that David Christian recorded a
9  deed of trust on the Verona property shortly after the
10  recordation of the deed of trust?
11    A   Yes.
12    Q   How were you made aware of that fact?
13    A   David made me aware of it.
14    Q   So you did discuss the recordation of the deed
15  of trust with David Christian?
16    MR. COHEN:  Objection.  Mischaracterizes the
17  witness's testimony.  The earlier question was
18  discussions prior to the recordation.
19    MR. HAES:  I believe I asked if she ever discussed
20  with David the recordation.
21    MR. COHEN:  Just ask the question.
22  BY MR. HAES:
23    Q   Did you ever discuss the recordation of the deed
24  of trust with David Christian?
25    A   Yes.

Page 103

1    Q   And what did David Christian share with you or
2  tell you with respect to the recordation of the deed of
3  trust?
4    MR. COHEN:  Objection.  Hearsay.
5    THE WITNESS:  He told me he had it recorded.
6  BY MR. HAES:
7    Q   Did he say why?
8    MR. COHEN:  Objection.  Hearsay.
9    THE WITNESS:  No.
10  BY MR. HAES:
11    Q   Did you ask him why?
12    A   No.
13    MR. COHEN:  Objection.  Hearsay.
14  BY MR. HAES:
15    Q   Do you know why?
16    MR. COHEN:  Objection.  Calls for speculation.
17    THE WITNESS:  He was concerned.
18  BY MR. HAES:
19    Q   What was he concerned about?
20    A   I was being sued by the Plaintiff, and David had
21  a substantial investment in me and did what he did.
22    Q   Which was?
23    A   Record the deed of trust.
24    Q   Shortly after he recorded the deed of trust,
25  there is another entry on this exhibit, Exhibit Number 7,

Exhibit "72"
00155

Page 104

1  entitled "Reconveyance."
2      Do you see that entry on the document?
3  A  I do.
4  Q  In your opinion, what does that entry reflect?
5  MR. COHEN: Objection. Calls for a legal conclusion.
6  THE WITNESS: It is an entry on the Riverside County
7  Assessor-County Clerk-Recorder's website of a document
8  that was recorded, document number 2009-0251898 of a
9  reconveyance by David Christian.
10 BY MR. HAES:
11 Q  Did David Christian ever discuss with you the
12 reconveyance?
13 A  Yes.
14 Q  Did he explain to you why he recorded the
15 reconveyance?
16 A  No.
17 Q  Did you ask him why he recorded the
18 reconveyance?
19 A  No.
20 Q  Did you ever have a conversation with David
21 Christian as to why he recorded the reconveyance?
22 A  No.
23 Q  Do you know why David Christian recorded the
24 reconveyance?
25 A  Yes.

Page 105

1  Q  Why did he record the reconveyance?
2  A  I put him on as a beneficiary on my retirement
3  account and just my life insurance policy.
4  Q  At that point, at the point in which you put him
5  on as a beneficiary, were you still being sued by the
6  Plaintiff?
7  A  Yes.
8  Q  On what date did you put or did you add David
9  Christian as a beneficiary on the account?
10 A  I don't know.
11 Q  Approximately?
12 A  I don't know.
13 Q  I would like to show you another document.
14 MR. HAES: Can you mark this as Exhibit Number 10,
15 please. Thank you.
16     (Plaintiff's Exhibit 10 was marked
17     for identification, the original of which
18     is attached hereto.)
19 THE WITNESS: Thank you.
20 BY MR. HAES:
21 Q  You are welcome.
22 MR. COHEN: You just acceded to my request.
23 MS. BOONE: While we are on the subject, you had said
24 you wanted a copy during lunch.
25     Do you want me to print it for you now?

Page 106

1  MR. COHEN: Well, if you can.
2  MS. BOONE: I'll try and have it delivered to the
3  conference room. Unfortunately, I am unable to print the
4  docket to reflect that there were no amendments, but you
5  can look at my computer if you want to see the document.
6  MR. COHEN: Do you plan on showing the Debtor her
7  schedules as well?
8  MR. HAES: Yes.
9  MR. COHEN: All right. Are you going to show it to
10 her before lunch?
11 MR. HAES: I believe we are going to try to cover as
12 much as we can, and I think we will get there.
13 MR. COHEN: Then I will have it.
14 MS. BOONE: Let me know if you need something else.
15 MR. COHEN: Just the docket to make sure there are no
16 amendments.
17     Do you happen to have the web page?
18 MR. HAES: I won't be able to print it, but I can
19 just show it to you.
20 MR. COHEN: Can I come around? Is that okay?
21 MS. BOONE: Yes.
22     Can we go off the record for a moment while we
23 do that?
24 MR. COHEN: Sure.
25 MS. BOONE: We will go off the record. Thank you.

Page 107

1      (Discussion off the record)
2  MR. HAES: We are back on the record. Let the record
3  reflect we just came back from a short break.
4  BY MR. HAES:
5  Q  Please read the title of the document I just
6  gave you.
7  A  "Statement of Financial Affairs. United States
8      Bankruptcy Court. Central District of
9      California."
10 Q  That's fine. Who prepared this document for
11 you?
12 A  Lorene Mies.
13 Q  Page 8 of this document purports to be signed
14 electronically by you.
15     Do you recall reviewing this document?
16 MR. COHEN: Objection as to time.
17 BY MR. HAES:
18 Q  Do you recall ever reviewing this document?
19 A  I referred the material that was submitted.
20 This document, no.
21 MR. COHEN: "Yes" or "no."
22 THE WITNESS: This document, no.
23 BY MR. HAES:
24 Q  Did you review your petition and schedules prior
25 to them being filed with the bankruptcy court?

Exhibit "72"
00156

Page 108

1  A   Yes.

2  Q   But not this one?  You don't recall this one in

3 particular?

4  A   Excuse me?

5  Q   But you don't recall whether or not you reviewed

6 this document in particular?

7  A   I don't.

8  Q   Okay.  Please turn to page 4 of the document.

9 I'll direct your attention to question number 10 entitled

10 "Other transfers."

11  A   Uh-huh.

12  Q   Do you recognize the first transfer of cash

13 described in question number 10 dated 2010?  Do you

14 recognize that transfer?

15  A   No.

16  Q   Please describe the first transfer listed in

17 question number 10.

18  A   "Self-Employment Pension Plan Distribution:

19    $45,578.34.  Merrill Lynch.  P.O. Box 2150,

20    Lakewood,  New Jersey.  08701.  Debtor used .

21    these funds for living expenses."

22  Q   Okay.  Do you remember receiving that

23 distribution from Merrill Lynch in 2010?

24  A   No.

25  Q   Did you receive that distribution from Merrill

Page 109

1 Lynch in 2010?

2  A   No.

3  Q   Did you ever receive a distribution from Merrill

4 Lynch in the amount of $45,578.34?

5  A   May I talk to you for a minute?

6  MR. COHEN:  There is a pending question right now.

7  THE WITNESS:  Okay.

8  MR. COHEN:  The practice is if there is a pending

9 question, you don't take a break.

10    Do you understand the question?

11  THE WITNESS:  I do.

12  MR. COHEN:  Okay.

13 BY MR. HAES:

14  Q   Please answer the question.

15  MR. COHEN:  Then you have to answer the question.

16  THE WITNESS:  I did not receive a distribution for

17 $45,578.34 from Merrill Lynch in 2010.

18 BY MR. HAES:

19  Q   No.  The question was ever.

20  A   I did not ever receive a distribution of

21 $45,578.34 from Merrill Lynch in 2010.

22  Q   Did you receive a distribution from Merrill

23 Lynch in 2010 at all?

24  A   Yes.

25  Q   Please describe the distribution or

Page 110

1 distributions you received from Merrill Lynch in 2010.

2  A   I received several distributions from Merrill

3 Lynch in 2010 totaling approximately $45,000.

4  Q   Okay.  Do you recognize the distribution listed

5 in question number 10 as having been received in 2009?

6  A   Yes.

7  Q   Would you please read the description of that

8 distribution?

9  A   "Self-Employment Pension Plan Distribution.

10    $15,000.  Merrill Lynch.  P.O. Box 2150,

11    Lakewood, New Jersey 08701.  Debtor used these

12    funds for living expenses."

13  Q   Did you receive that distribution as described

14 in 2009?

15  A   Yes.

16  Q   Okay.  Do you recognize the third transfer

17 listed in question number 10?

18  A   Yes.

19  Q   Please describe that transfer.

20  A   "Interspousal Transfer/Change of Title of

21    House."  This wasn't the settlement amount I

22    received.  "3047 North Arrowhead Avenue,

23    San Bernardino, California 29405.  Debtor

24    received $30,000 in exchange for the Transfer.

25    Debtor used these funds for living expenses."

Page 111

1  Q   Did you receive that transfer as described in

2 question number 10?

3  A   Yes.

4  Q   Okay.  So to be clear, in 2010, you acknowledge

5 receiving a total of approximately $45,000 in the form of

6 a pension plan distribution from Merrill Lynch, correct?

7  A   Correct.

8  Q   In 2009, you acknowledge receiving approximately

9 $15,000 in the form of a pension plan distribution from

10 Merrill Lynch, correct?

11  A   Correct.

12  Q   In 2009, in April of 2009, you acknowledge

13 receiving an interspousal transfer/change of title of

14 house and receiving cash in the amount of $30,000 in

15 exchange for the transfer; is that correct?

16  A   Correct.

17  Q   I would like to show you another document.

18  MR. HAES:  Could you please mark this as Exhibit 11.

19 Thank you.

20    (Plaintiff's Exhibit 11 was marked

21    for identification, the original of which

22    is attached hereto.)

23 BY MR. HAES:

24  Q   Do you recognize this document?

25  A   I do.

Exhibit "72"
00157

Page 112

1    Q   Please describe this document.  Why don't you
2  just please read off the caption of the document.
3    A   "Defendant Leticia Joy Arciniega's Amended
4       Verified Response to Plaintiff's First Set of
5       Interrogatories F.R.C.P. 33 F.R.B.P. 7034."
6    Q   Who prepared this document?
7    A   My counsel.
8    Q   Did you review this document after it was
9  prepared?
10   A   Yes.
11   Q   Please turn to page 6 of the document.  I'll
12 direct your attention to your response to special
13 interrogatory number 4.
14      Would you please read that special
15 interrogatory.
16   A   "Identify any and all property of greater value
17      than $1,000 belonging to You at any time during
18      the period commencing on May 4, 2007, through
19      and including the petition date."
20   Q   Under sub header "ii," where it states "Values
21 as of the date of filing," please read the second item
22 listed.
23   A   "New York Life Whole Life Insurance Policy."
24   Q   In what amount?
25   A   $7,356.01.

Page 113

1    Q   Are you still the holder of the New York Life
2  Whole Life Insurance Policy listed in item number 2?
3    A   I am.
4    Q   What is the current value of that policy?
5    A   I don't know.
6    Q   Approximately?
7    A   I don't know.  I'm sorry.  I don't know.
8    Q   Not even an estimate?
9    A   The face value is 50,000.
10   Q   Okay.
11   A   That's if I die.
12   Q   So you have no idea on the cash surrender?
13   A   I'm sorry.  No, I don't.
14   Q   Please read the third item listed right below
15 the insurance policy.
16   A   Merrill Lynch IRA, $101,237.30."
17   Q   That is $101,237.30?
18   A   It is.
19   Q   Okay.  Do you still have that Merrill Lynch IRA?
20   A   I do.
21   Q   What is the current balance of the IRA?
22   A   Approximately, 97,000.
23   Q   Okay.  Please turn to page 9 of the document.
24 I'll direct your attention to your response to special
25 interrogatory number 12.

Page 114

1       Would you please read that special
2  interrogatory.
3    A   "Identify any and all loans obtained by You
4       during the period commencing on May 4, 2007,
5       through and including the petition date."
6    Q   Okay.  Under sub header number "i," where it
7  states "Loans incurred May 4th, 2007 through petition
8  date," please read the first item listed.
9    A   "WFB Business, $26,351."
10   Q   When did you take out that loan?
11   A   It was the latter part of, I think, 2007.
12   Q   Is the loan in your name?
13   A   I don't remember.  I believe it was in my name.
14   Q   Is there anybody else's name the loan would be
15 in?
16   A   No.
17   Q   So are you confident the loan was in your name?
18   A   Either mine or the corporation.  Most likely
19 mine.
20   Q   Do you acknowledge receipt of this loan or the
21 funds related to that loan?
22   A   I do.
23   Q   Are there any documents anywhere to corroborate
24 this loan?
25   A   Yes.

Page 115

1    Q   I would ask that you please provide us with
2  those documents.
3    MR. COHEN:  Your request is noted.
4  BY MR. HAES:
5    Q   Please read the second item listed.
6    A   "WFB Business, $17,957."
7    Q   Is that another loan?
8    A   It is.
9    Q   When did you take out that loan?
10   A   In the same time period as the first one.
11   Q   What was that time period?
12   A   The latter part of 2007.
13   Q   Is that loan in your name?
14   A   Yes.
15   Q   Do you acknowledge receipt of the funds
16 associated with that loan?
17   A   I do.
18   Q   Are there any documents anywhere to corroborate
19 this loan?
20   A   Yes.
21   Q   I would like to formally request you produce
22 those documents.
23   MR. COHEN:  The request is noted.
24 BY MR. HAES:
25   Q   Please read the third item listed.

Exhibit "72"
00158

Page 116

1 A "David D. Christian (continued) $43,000 later
2 settled prior to filing."
3 Q Do you acknowledge receipt of that loan in the
4 amount of $43,000 from David Christian to you?
5 A Yes.
6 Q When did you receive those funds?
7 A In the time period prior to filing -- during the
8 time period described, May 4th, through and including the
9 petition date.
10 Q Please be more specific.
11 MR. COHEN: Objection. The question only asks for a
12 time period from May 4th, 2007 until the petition date.
13 It does not ask for specific dates.
14 MS. BOONE: To try to help clarify this issue, the
15 question is being asked in the course of the deposition
16 on what dates were those funds received. The question is
17 not whether the response to the interrogatory is
18 responsive to the interrogatory or not. The question is,
19 can you now tell us when did you receive those funds?
20 THE WITNESS: May I have the schedule?
21 MR. COHEN: Which schedule?
22 THE WITNESS: It's 7 or 8, something.
23 MS. BOONE: You are referring to Exhibit 6?
24 THE WITNESS: Exhibit 6. I'm referring to Exhibit 6,
25 and I'm referring to items 17 through 27.

Page 117

1 BY MR. HAES:
2 Q What is that date period?
3 A May 2nd, 2008 through April 28, 2009.
4 Q Thank you.
5 A Uh-huh.
6 Q Right beside the $43,000 sum under item
7 number 3, it says "Later settled prior to filing."
8 What does that mean?
9 A That means that I put David on my life insurance
10 policy and my IRA as a beneficiary.
11 Q Is it your contention that you no longer owe
12 these funds to David Christian?
13 A No.
14 Q Have you made any payments on this loan to David
15 Christian?
16 A No.
17 Q Read the fourth item listed.
18 A "U.S. Bank, $16,057.92."
19 Q Is that another loan?
20 A Yes.
21 Q Do you acknowledge receipt of the funds
22 associated with this loan?
23 A Yes.
24 Q When did you take out that loan?
25 A 1993.

Page 118

1 Q 1993?
2 A Yes.
3 Q Are you saying that loan is erroneously listed
4 in this response to that special interrogatory?
5 MR. COHEN: Well, I'll object to that question on the
6 basis that it asks for a legal conclusion.
7 THE WITNESS: It's a credit card.
8 MR. COHEN: To the extent counsel asked the question
9 as of May 4th, 2007, if this transaction truly occurred
10 in 1993, it should not have been included in this
11 response.
12 THE WITNESS: The card was issued in '93, and I
13 incurred and paid on the card throughout the life of the
14 card. As of the date of filing, that was the balance on
15 it. I could not recreate what amounts I had advanced or
16 paid.
17 MR. COHEN: But the question was a loan that was
18 obtained by you during this period, and you did not
19 obtain this loan during this period?
20 THE WITNESS: Correct.
21 MR. COHEN: Therefore, counsel's question was, was
22 this inaccurate, and the answer is?
23 THE WITNESS: No.
24 BY MR. HAES:
25 Q So you meant to list this, and you purposely

Page 119

1 listed it as a response to special interrogatory
2 number 12?
3 A Erroneously, but yes.
4 MR. HAES: Okay. I'm moving on to a document I
5 would like to have marked as Exhibit Number 12. Thank
6 you.
7 (Plaintiff's Exhibit 12 was marked
8 for identification, the original of which
9 is attached hereto.)
10 BY MR. HAES:
11 Q Do you recognize this document?
12 A I do.
13 Q Please read the caption of this document, the
14 title, top center.
15 A "Client Action Plan."
16 Q What is the date listed on this document?
17 A December 11, 2008.
18 Q Please read the full name of the company who
19 sent you this document in the top left-hand corner.
20 A Springboard.
21 Q Below that?
22 A "Non Profit Consumer Credit Management."
23 Q Please turn to page 2 of the document. I would
24 like for you to please read all of the text that appears
25 below the header entitled "Housing Action Plan" about

**Exhibit "72"**
**00159**

1 halfway down the page. Please read it out loud.
2     A    "Reviewed income and listed housing and
3     transportation expenses. Client has a deficit
4     of $3,820 after listing expenses. Based on
5     financials compiled, reviewed and verified,
6     present Monthly Net Income is insufficient to
7     maintain mortgage."
8     Q    Keep going.
9     A    "Essential living expenses and transportation
10    costs. Client's living expenses are 207.10
11    percent of the net monthly income. The national
12    average is 35 to 45 percent. Client's
13    transportation expenses are 93.20 percent of the
14    net monthly income. National average is 15 to
15    25 percent. I recommended client to maintain
16    and implement a monthly household budget keeping
17    the mortgage the top priority. Eliminate all
18    nonessental spending from client's budget like
19    cable, internet and cell phones, for these are
20    luxuries you can do without until the mortgage
21    issue is resolved. Consider selling assets
22    (unused car, motorcycle, jewelry). I also
23    recommended reducing food budget from $400 to
24    $275. I recommended for client to seek
25    full-time and/or part-time employment, also

1     possibly rent out a room."
2     Q    Keep going.
3     A    "To contact the lender to begin the loss
4     mitigation process. To continue to keep housing
5     as a financial priority. Increase income.
6     Budget improvement needed prior to loan
7     resolution. Listing home/selling recommended.
8     To attend the necessary training that will allow
9     them to manage their finances with a greater
10    amount of skill. Decrease expenses."
11    Q    Do you know why this document was sent to you?
12    MR. COHEN: Objection. Relevance. Lacks foundation.
13 Hearsay. Calls for speculation.
14 BY MR. HAES:
15    Q    Do you know why this document was sent to you?
16    MR. COHEN: Repeat my objections.
17 BY MR. HAES:
18    Q    You can answer.
19    A    I called them. I called them. I called my
20 lender initially, CitiMortgage, to determine --
21    MR. COHEN: The question is "yes" or "no."
22    Do you know why it was sent to you?
23    THE WITNESS: Yeah, I do. Uh-huh.
24 BY MR. HAES:
25    Q    Why was this document sent to you?

1     A    Because I contacted my lender.
2     Q    Did you receive this document on or about the
3 date listed on the document?
4     A    I did.
5     Q    Why did you contact your lender at that point in
6 time?
7     A    I wanted to find out what my options were in
8 terms of having the house refinanced in my name.
9     Q    And this was a response you received to your
10 request to refinance?
11    A    Yes.
12    Q    Did you speak with a Springboard advisor?
13    A    I did.
14    Q    When was that conversation?
15    A    Approximately, December of 2008.
16    Q    Did you take any notes related to that
17 conversation?
18    A    Probably.
19    Q    I would like to formally request that you
20 produce those notes.
21    MR. COHEN: Your request is noted.
22 BY MR. HAES:
23    Q    Actually, I apologize. Please go back to the
24 document we had out before. It's Exhibit 12.
25    What real property was this document in

1 reference to?
2     MR. COHEN: Objection. Lacks foundation.
3 BY MR. HAES:
4     Q    Answer the question.
5     A    Verona.
6     Q    You mentioned that this document was sent to you
7 in response to a telephone call you placed to your
8 lender, correct?
9     A    Yes.
10    Q    All right. What were you calling your lender
11 about?
12    MR. COHEN: Objection. Hearsay.
13    THE WITNESS: Refinancing Verona in my name.
14 BY MR. HAES:
15    Q    So you wanted to discuss the potential refinance
16 of the Verona property?
17    A    Yes.
18    Q    And you believe that this was sent to you in
19 response to that request?
20    MR. COHEN: Objection. Asked and answered.
21    THE WITNESS: Yes.
22 BY MR. HAES:
23    Q    Did you follow any of the recommendations listed
24 in the housing action plan?
25    MR. COHEN: Objection. Lacks foundation.

Page 124

BY MR. HAES:

1  Q   I'm referring to the housing action plan on
2  page 2 that you read off just a couple minutes ago onto
3  the record.
4      MR. COHEN: Objection. Compound question.
5      THE WITNESS: No. It's a code violation in my town
6  to rent --
7      MR. COHEN: The question calls for a "yes" or a "no."
8      THE WITNESS: No. No. No.
9  BY MR. HAES:
10  Q   Why not?
11  A   They are not practical.
12  Q   I would like to show you another document.
13     MR. HAES: Would you please mark this as Exhibit 13.
14  Thank you.
15        (Plaintiff's Exhibit 13 was marked
16     for identification, the original of which
17     is attached hereto.)
18  BY MR. HAES:
19  Q   Do you recognize this document?
20  A   I do.
21  Q   What is the date listed on this document?
22  A   January 22nd, 2009.
23  Q   What is the address listed on this document?
24  A   890 Verona Avenue, San Jacinto, California

Page 125

1  92583.
2  Q   To whom was the document addressed?
3  A   James Clark.
4  Q   Anybody else?
5  A   Well, at the top it's addressed to both of us.
6  Q   Okay.
7  A   Their computer system has a limitation and can
8  only handle one name.
9  Q   So the document was addressed to both you and
10  James Clark?
11  A   Correct.
12  Q   Please read the full name of the company who
13  sent this document to you, the top left-hand corner.
14  A   Citi.
15  Q   Is Citi a lienholder on the Verona property?
16  A   Yes.
17  Q   What position lien do they hold?
18  A   First.
19  Q   Please read the first paragraph of the document
20  out loud.
21  A   "Thank you for submitting your request for
22     assistance on the above-referenced loan which
23     was received on January 22, 2009. Your file has
24     now been forwarded to a loss mitigation
25     specialist for review."

Page 126

1  Q   Now please read the fourth paragraph of the
2  letter.
3  A   "Please be aware that we are unable to suspend
4     collection or foreclosure activity until such a
5     time that a Workable Solution has been approved
6     or completed, depending on the type of solution
7     offered."
8  Q   Did you reach out to Citi prior to them sending
9  this document to you? Did you call Citi?
10  A   Yes.
11  Q   Did you speak with a loss mitigation specialist?
12  A   Possibly.
13  Q   Is that a "yes"?
14     MR. COHEN: "Possibly" is not a "yes," Counsel.
15     THE WITNESS: No, it's not a "yes."
16  BY MR. HAES:
17  Q   Do you remember having a conversation with a
18  representative of Citi regarding this document in
19  particular?
20  A   Yes.
21  Q   Do you remember if that person was a loss
22  mitigation specialist?
23  A   No.
24  Q   Had a workable solution -- well, how would you
25  interpret workable solution as referred to in this

Page 127

1  document?
2      MR. COHEN: Objection. Calls for speculation. Calls
3  for an opinion. The document lacks foundation. These
4  words are not the Debtor's words.
5      MS. BOONE: The question was how would she interpret
6  or understand. I think that's fair.
7      THE WITNESS: A workable solution is generically used
8  to identify anything that the borrower will agree to and
9  the lender will concede to when a loan is in trouble. A
10  loan being in trouble doesn't necessarily mean it's in
11  default or even behind. It just means that there is an
12  anticipated hardship.
13        Consequently, workable could be anything from
14  the bank slashing the principle on the loan to extending
15  the loan term, reducing the interest rate applicable, any
16  number of concessions either permanent or temporary.
17        The rule of thumb is that the mortgage payment
18  should not exceed 31 percent of the borrower's income.
19  Subsequent to this document, there have been substantial
20  changes.
21     MR. COHEN: Wait. Wait. Stop.
22     THE WITNESS: Thank you.
23  BY MR. HAES:
24  Q   In your opinion, did you complete the review
25  process described in paragraph 2?

Exhibit "72"
00161

Page 128

1    MR. COHEN:  Objection. Lacks foundation. Relevance.
2    THE WITNESS:  I completed the review process, yes.
3    BY MR. HAES:
4    Q    Have you read paragraph 2?
5    A    I did.
6    Q    What did the review process consist of in your
7    opinion?
8    A    The review process consisted of me providing
9    full financials and tax reports, income and expense.
10    Q    Were you aware of the possibility of foreclosure
11    at the time you read this document?
12    A    No.
13    Q    Was a workable solution ever approved or
14    completed?
15    A    Yes.
16    Q    What were the terms of the workable solution?
17    A    I don't remember the exact terms, but the
18    payment went from $1,031 per month to $715.
19    Q    Would you characterize that as a loan
20    modification?
21    A    It is a loan modification.
22    Q    I would like to show you another document.
23    MR. HAES:  Would you please mark this as Exhibit 14.
24    Thank you.
25        (Plaintiff's Exhibit 14 was marked

Page 129

1        for identification, the original of which
2        is attached hereto.)
3    BY MR. HAES:
4    Q    Do you recognize this document?
5    A    I do.
6    Q    To whom is this document addressed on the top
7    left-hand corner?
8    A    To James A. Clark and Leticia J. Arciniega.
9    Q    What is the address listed on this document?
10    A    890 Verona Avenue, San Jacinto, California
11    92583.
12    Q    Did you ever show this document to Mr. Clark?
13    A    No.
14    Q    Please read the full name of the company that
15    sent this document to you.
16    A    Citi.
17    Q    Do you acknowledge receipt of this document?
18    A    I do.
19    Q    Please read the first paragraph of this
20    document.
21    A    "Dear Mortgagor: CitiMortgage (CMI) has
22        reviewed your request for a forbearance plan.
23        The enclosed contract sets forth the terms under
24        which CMI will accept a schedule of payments
25        during the time of plan."

Page 130

1    Q    When did you receive this document?
2    A    Somewhere around February 12th, whatever the
3    year was, 2009.
4    Q    There is a fax receipt line at the top of the
5    document.
6    A    Yes, there is.  2/26.
7    Q    This document was sent to you in reference to
8    which property?
9    A    Verona.
10    Q    Please turn to page 2 of the document.
11    A    Okay.
12    Q    Please read the caption or title at the top
13    center of the document.
14    A    "Stipulated Special Forbearance Plan Agreement."
15    Q    What is the date listed on the stipulated
16    special forbearance plan agreement?
17    A    Third day of February, 2009.
18    Q    Under the header entitled "Recitals," please
19    read aloud recital "B."
20    A    "The Borrower has failed and omitted to make
21        regular monthly payments in accordance with the
22        terms of the Note and Deed of Trust/Mortgage.
23        Therefore, the loan is in default, and CMI has
24        exercised its rights to institute collections
25        (and/or foreclosure, if applicable)."

Page 131

1    Q    You were aware of the possibility of foreclosure
2    at the time you read this document, correct?
3    A    No.
4    Q    Notwithstanding the plain language of the
5    document?
6    A    Notwithstanding the plain language of the
7    document.  I need to editorialize.
8    MR. COHEN:  Restrain yourself, please.
9    BY MR. HAES:
10    Q    Now, please read recital "C."
11    A    "The Borrower has requested that CMI enter into
12        this agreement to place its collections (and/or
13        foreclosure on hold, if applicable).  CMI wishes
14        to assist Borrower, but does not wish to
15        discontinue collections (and/or foreclosure, if
16        applicable) until the loan is brought current."
17    MR. COHEN:  By the way, the witness wants to
18    elaborate on her answer.  I guess it's up to you if you
19    want her to.
20    MR. HAES:  No.
21    MR. COHEN:  You don't want her to.  Okay.
22    BY MR. HAES:
23    Q    Please turn to page 3 of the document.  Please
24    read provision number 9 of the document.
25    A    "CMI will not discontinue the pending collection

Exhibit "72"
00162

Page 132

1 (and/or foreclosure, if applicable), until
2 Borrower's account is current."
3 It's canned language. They are obligated under
4 federal law to state these items whether or not they
5 apply to the loan in specific.
6 Q   Is it your contention that your loan was not in
7 jeopardy at the time you entered into the forbearance
8 agreement?
9 A   Go back to the Springboard document. It says
10 the loan is current.
11 MS. BOONE: Correction. Just to be clear, I believe
12 that that document says that Ms. Arciniega says that the
13 loan is current.
14 THE WITNESS: It was always current.
15 MR. COHEN: That is your answer.
16 MS. BOONE: Anyway, that document speaks for
17 itself.
18 MR. COHEN: Well, she answered your question. It's
19 current.
20 THE WITNESS: The loan document speaks for itself.
21 The loan history speaks for itself. The loan was never
22 delinquent, never in foreclosure, never in default. The
23 computer for the systems at that point in time could not
24 allow a modification to occur concurrently with a current
25 loan. They had to market --

Page 133

1 BY MR. HAES:
2 Q   There is no question pending right now.
3 A   Thank you.
4 Q   The forbearance agreement attached hereto, would
5 you just turn to the last page of the document, please.
6 Is that your signature on the last page of the
7 document?
8 A   It is.
9 Q   On what date did you sign this document?
10 A   February 25th, 2009.
11 Q   I would like to show you another document.
12 MR. COHEN: I would like to break for lunch in the
13 near future. It's 12:30.
14 MR. HAES: Do you want to do it now? Well, let's do
15 it now.
16 What time is it?
17 MR. COHEN: It's 12:20.
18 MR. HAES: Let's do it now.
19 MR. COHEN: It's been a long stretch.
20 MR. HAES: Yes, it has. Do you agree we go off the
21 record for lunch?
22 MR. COHEN: Yes, I do.
23 (LUNCH RECESS)
24
25

Page 134

1 IRVINE, CALIFORNIA, WEDNESDAY, JANUARY 30, 2013
2 (AFTERNOON SESSION)
3
4
5 MR. HAES: Okay. We are back on the record.
6 Let the record reflect that we just back from a
7 lunch break. I was about to pass out another document.
8 MR. COHEN: I thought you were about to pass out.
9 MR. HAES: We are moving on to a document and if you
10 could tag this as Exhibit 15, please. Thank you.
11 (Plaintiff's Exhibit 15 was marked
12 for identification, the original of which
13 is attached hereto.)
14 BY MR. HAES:
15 Q   Do you recognize this document?
16 A   I do.
17 Q   Okay. What is the date listed on this document?
18 A   April 13th, 2009.
19 Q   What is the address listed on the document?
20 A   890 Verona Avenue, San Jacinto, California
21 92583.
22 Q   Who is the document addressed to?
23 A   James A. Clark and Leticia J. Arciniega.
24 Q   Did you ever show this document to James?
25 A   No.

Page 135

1 Q   Please read the full name of the company who
2 sent this document to you.
3 A   CitiMortgage.
4 Q   Okay. And did you receive this document at or
5 around April 13th, 2009?
6 A   I would imagine so.
7 Q   Please read the first sentence of the first
8 paragraph of the document.
9 A   "In response to your recent inquiry regarding
10 assistance with your mortgage, enclosed is a
11 financial information form for you to complete
12 and return to us for review."
13 Q   If you would, please read the third paragraph
14 starting with "If we are unable."
15 A   "If we are unable to find a solution to help you
16 keep your home or you do not wish to keep your
17 home, we have additional alternatives to
18 foreclosure that may include monetary assistance
19 to satisfy other lienholders or help pay moving
20 costs."
21 Q   Go on.
22 A   "Pre-Foreclosure Sale. We can allow you to sell
23 your home for its market value to a qualified
24 purchaser and pay us the sale proceeds to
25 satisfy the debt, even if the proceeds are less

Exhibit "72"
00163

1  than the total owed.  Deed-in-Lieu of
2  foreclosure.  If you are unable to sell your
3  home after a specified period of time, we may be
4  able to accept the property itself as settlement
5  of the account."
6      You realize either course of action would have
7  shot the hell out of his credit.
8    MS. BOONE:  That was not the question.
9    THE WITNESS:  My contribution --
10   MR. COHEN:  She said it anyway.
11   MR. HAES:  Okay.  I have another document.  Would you
12  please label this document number 16, Exhibit Number 16.
13  Thank you.
14      (Plaintiff's Exhibit 16 was marked
15      for identification, the original of which
16      is attached hereto.)
17  BY MR. HAES:
18   Q   Do you recognize that document?
19   A   I do.
20   Q   What is the date listed on that document?
21   A   April 20th, 2009.
22   Q   What is the address listed on the document?
23   A   890 Verona Avenue, San Jacinto, California
24  92853.
25   Q   Who is the document addressed to?

1   A   James A. Clark and Leticia J. Arciniega.
2   Q   Did you share this document with James?
3   A   No.
4   Q   Please read the full name of the company that
5  sent you the document.
6   A   CitiMortgage.
7   Q   What real property was this document sent to you
8  in reference to?
9   A   890 Verona.
10  Q   Okay.  Please read the first paragraph of the
11  document.
12  A   "We are concerned because your mortgage account
13      is still delinquent."
14  Q   Keep going.
15  A   Oh, you said the first sentence.
16  Q   I believe I said first paragraph.  Did I say
17  first sentence?  First paragraph, please.
18  A   "Our agreement was that we would receive this
19      payment no later than 4/20/09.  However, your
20      account is still due for a total amount of
21      $2,182.38, including zero in late charges, $30
22      in delinquencies, and zero in other fees."
23   MR. HAES:  Okay.  I have another document here.
24      Would you please mark this Exhibit Number 17.
25  Thank you.

1      (Plaintiff's Exhibit 17 was marked
2      for identification, the original of which
3      is attached hereto.)
4    THE WITNESS:  There is a second page to this.
5  BY MR. HAES:
6   Q   This is all that we have.  I wasn't going to ask
7  you about the second page anyway.
8   A   Okay.
9    MR. COHEN:  Then wait one second, please.
10   MR. HAES:  Sure.
11   MR. COHEN:  I'll object to this document on the basis
12  that it lacks foundation.
13   MR. HAES:  Okay.
14  BY MR. HAES:
15  Q   Do you recognize this document?
16  A   I do.
17  Q   Did you draft this document?
18  A   I did.
19  Q   What is the date listed on the document?
20  A   May 2nd, 2009.
21  Q   Please read the first, second, and third
22  paragraphs.  The third paragraph is just a single
23  sentence.
24  A   "I have been in communication with various
25      representatives of CitiMortgage for several

1      months.  Since January I have been in a
2      'forbearance' program.  This program was
3      initially described to me as having no
4      consequence to my credit scores and I understood
5      that the unpaid portion of the payment would be
6      added to the mortgage balance.
7      After I made the first modified payment, I
8      learned differently:  my credit report reflected
9      the loan as delinquent before the end of the
10     first 30 days.  I called CitiMortgage and was
11     informed that due to my 'forbearance' status, I
12     was, in fact, delinquent.  As a consequence, one
13     of my credit card providers has closed my
14     account, causing a negative result to my credit
15     scores.  The documents I received from Citi
16     after we began the partial payment program
17     indicate I must make up the arrears at the end
18     of the three-month period or face foreclosure,
19     short sale or deed in lieu of foreclosure.
20         I have lived in my house for 18 years.  I
21     do not want to lose it, but I need help."
22  Q   At this point you were aware of the possibility
23  of foreclosure at the time you wrote this letter,
24  correct?
25  A   No.

Page 140

1  Q   That's what the document says?
2  MR. COHEN:  Objection.  Argumentative.
3      Is there a question pending?
4  MR. HAES:  No.  No, there is not.
5  MR. COHEN:  Chad --
6  MR. HAES:  Let the record reflect that both counsel
7  have requested a short break off the record.
8      (Recess)
9  MR. HAES:  Let the record reflect that we are back on
10 the record after a short break.
11     Where was I?
12 BY MR. HAES:
13 Q   Would you please reread for me the last sentence
14 of the second paragraph.
15 A   "The documents I received from Citi after we
16    began the partial payment program indicate I
17    must make up the arrears at the end of the
18    three-month period or face foreclosure, short
19    sale or deed in lieu of foreclosure."
20 Q   At the time you drafted this, were you aware
21 that if you failed to make up the arrears, that you would
22 face foreclosure, short sale, deed in lieu of
23 foreclosure?
24 A   Correct.
25 Q   Were you aware at the time you wrote this letter

Page 141

1  that you were delinquent on your loan?
2  A   No.
3  Q   Were you aware at the time you wrote this letter
4  that CitiMortgage considered you delinquent on your loan?
5  A   No.
6  Q   Would you reread the second sentence of the
7  second paragraph, please.
8  A   "The documents I received from Citi after we
9    began the partial payment indicate I must make
10   up the arrears at the end of the three-month
11   period or face foreclosure, short sale, deed in
12   lieu of foreclosure."
13 MS. BOONE:  That is the final sentence of the
14 paragraph.
15 THE WITNESS:  I'm sorry.  Which sentence?
16 MR. HAES:  The second sentence of the second
17 paragraph.
18 THE WITNESS:  "I called CitiMortgage and was
19    informed that due to my 'forbearance' status, I
20    was, in fact, delinquent."
21 BY MR. HAES:
22 Q   So it's your assertion that you were not aware
23 that CitiMortgage considered you delinquent despite that
24 language?
25 A   Hang with me.  I was aware that I was not

Page 142

1  delinquent regardless of their correspondence.  The
2  correspondence was in error.  It's canned correspondence
3  based on erroneous programs.
4  MS. BOONE:  That is not actually responsive to the
5  question.
6      Could you read back the last question?
7  MR. COHEN:  I think it is responsive.  You can reask
8  it.
9  BY MR. HAES:
10 Q   The question was, are you saying that --
11 MR. HAES:  Could you reread my question, please.
12     (The record was read by the reporter
13      as follows:
14     "Q   So it's your assertion that you were not
15      aware that CitiMortgage considered you
16      delinquent despite that language?")
17 MR. COHEN:  Do you understand the question?
18 THE WITNESS:  Yeah.  I'm aware that CitiMortgage did
19 not consider me delinquent despite the correspondence I
20 received.
21 BY MR. HAES:
22 Q   I'm sorry.  I'm not referring to the
23 correspondence.  I'm referring to the specific language
24 of the letter that you drafted.
25     Despite the sentence that says "and was informed

Page 143

1  that due to my 'forbearance' status, I was, in fact,
2  delinquent," despite that language, it's your contention
3  that CitiMortgage did not consider you delinquent?
4  A   Correct.
5  MR. HAES:  Got it.  Okay.  I have another document
6  here.  Would you please mark this Exhibit Number 18.
7  Thank you.
8      (Plaintiff's Exhibit 18 was marked
9      for identification, the original of which
10     is attached hereto.)
11 BY MR. HAES:
12 Q   Do you recognize this document?
13 A   I do.
14 Q   Please describe the document including the
15 account number and the name of the bank where the account
16 is held.
17 A   This is a Wells Fargo checking account.
18 Q   I'm sorry to interrupt you.  Just go with the
19 last four digits of the account number.
20 A   Okay.  Wells Fargo checking account statement
21 dated August 11 through September 9, 2009 for account
22 ending in 7601.
23 Q   Okay.  When was this account opened?
24 A   I think this was opened in 1989.
25 Q   Is the account still open?

Exhibit "72"
00165

Page 144

1    A    No.
2    Q    When was the account closed?
3    A    I believe it's about the time period for this
4  statement.
5    Q    September of 2009?
6    A    I think so.  I don't recall the exact dates.
7    Q    Okay.  Why was the account closed?
8    A    Somebody tampered with my I.D. and tried to get
9  into the account online.  I believed it was somebody who
10  knew me enough to know my social security, address, and
11  my pertinent data, so I closed it.
12    Q    At the time it was closed, how much money was in
13  the account?
14    A    According to this, it was $10.99 in the
15  negative.
16    MR. HAES:  Okay.  I have another document here.
17  Would you mark this exhibit number 19.  Thank you.
18        (Plaintiff's Exhibit 19 was marked
19      for identification, the original of which
20      is attached hereto.)
21  BY MR. HAES:
22    Q    Do you recognize this document?
23    A    I do.
24    Q    Please describe the document including the
25  account number, the last four digits of the account

Page 145

1  number, and the name of the bank where the account is
2  held.
3    A    This is a Wells Fargo bank account statement
4  dated December 9, 2008 through January 9, 2009, account
5  number ending in 5304.
6    Q    Okay.  When was this account opened?
7    A    I think around 2000.  I don't remember.
8    Q    Is the account still open?
9    A    I don't believe so.  Maybe.
10    Q    Do you want to think about it?
11    A    That's my answer.  I don't remember.  I know I
12  have a Wells Fargo account that I haven't used in the
13  last two and a half years.  It's open, but I don't
14  remember the account number.
15    Q    Do you have any PMA accounts open at Wells
16  Fargo?
17    A    No.
18    Q    Okay.  Why did you open the account?
19    A    The business relationship I had with them, the
20  mortgage balance was 500-some odd dollars, and it
21  entitled me to privileges and benefits and offered me
22  a package of services.  I took them up on it.  You have
23  to maintain a certain balance to qualify, and I didn't
24  have that after a while.
25    MR. HAES:  I have another document here.  Would you

Page 146

1  please mark this as Exhibit Number 20.  Thank you.
2        (Plaintiff's Exhibit 20 was marked
3      for identification, the original of which
4      is attached hereto.)
5  BY MR. HAES:
6    Q    Do you recognize this document?
7    A    I do.
8    Q    Please describe the document including the
9  account number or the last four digits of the account
10  number and the name of the bank where the bank account is
11  held.
12    A    This is a Union Bank checking account statement.
13  The date is February 25th, 2011 through March 4th, 2011.
14        What was the other thing?  I'm sorry.
15    MR. COHEN:  Last four digits.
16    THE WITNESS:  Last four digits of the account number
17  are 6286.
18  BY MR. HAES:
19    Q    When was this account opened?
20    A    The end of February 2011.
21    Q    Why was this account opened?
22    A    I had a checking account at Wells Fargo, and I
23  had a mortgage loan at Wells Fargo, commercial mortgage.
24  I had two lines of credit.  The business office for Wells
25  Fargo advised me to close my Wells Fargo account because

Page 147

1  Wells Fargo would, in fact, seize my assets and use them
2  to be applied against whatever monies I owed to them.  I
3  didn't close the account.  I had it down to a few dollars
4  and started doing business through Union Bank.
5    Q    Is the account still open?
6    A    It is.
7    Q    How much money is currently in the account?
8    A    Approximately $6,000.
9    MR. HAES:  Okay.  I have another document here.
10        Would you please mark this as Exhibit Number 21.
11  Thank you.
12        (Plaintiff's Exhibit 21 was marked
13      for identification, the original of which
14      is attached hereto.)
15  BY MR. HAES:
16    Q    Do you recognize this document?
17    A    I do.
18    Q    Please describe the document including the last
19  four digits of the account number and the name of the
20  bank where the account is held.
21    A    This is a Bank of Hemet commercial checking
22  account statement for the period of 12/31/10 to
23  January 31st, 2011.  The holder of the account is MSRE,
24  Inc.  Last four digits of the account number is 1901.
25    Q    When was this account opened?

Exhibit "72"
00166

Page 148

1   A   In January of 2007.
2   Q   Is this account still open?
3   A   It is.
4   Q   Okay.  How much money is currently in the
5   account?
6   A   I think it's $76,000.
7   Q   Where did the $76,000 come from?
8   A   Our tenant security deposits for the homes we
9   rent.  As the titled states, this is a security deposit
10  trust account.
11  MR. HAES:  Would please mark this as Exhibit
12  Number 22.  Thank you.
13      (Plaintiff's Exhibit 22 was marked
14      for identification, the original of which
15      is attached hereto.)
16  BY MR. HAES:
17  Q   Do you recognize this document?
18  A   I do.
19  Q   Please describe the document including the last
20  four digits of the account number and the name of the
21  bank where the account is held.
22  A   This is a Bank of Hemet commercial account to
23  MSRE, Inc. for 12/31/10 through 1/31/11.  The last four
24  of the account number are 3201.
25  Q   When was the account opened?

Page 149

1   A   January 2007.
2   Q   Why was the account opened?
3   A   It manages the commissions that are paid to the
4   office on transactions, sales transactions.
5   Q   Is this account still open?
6   A   It is.
7   Q   How much is currently in the account?
8   A   I believe it's $240.
9   MR. HAES:  Okay.  Please mark this Exhibit Number 23.
10  Thank you.
11      (Plaintiff's Exhibit 23 was marked
12      for identification, the original of which
13      is attached hereto.)
14  BY MR. HAES:
15  Q   Do you recognize this document?
16  A   I do.
17  Q   Please describe the document including the last
18  four digits of the account number and the name of the
19  bank where the account is held.
20  A   This is the Bank of Hemet commercial checking
21  account statement issued to MSRE, Inc. for 12/31/10
22  through 1/31/11.  The last four digits 1601.
23  Q   When was the account opened?
24  A   January 2007.
25  Q   Why was the account opened?

Page 150

1   A   To handle escrow trust funds for any escrow
2   transactions we might manage.
3   Q   Is the account still open?
4   A   No.
5   Q   When was the account closed?
6   A   I think 2009.
7   Q   This is a statement for 2011?
8   A   It had to be after 2011.  We haven't used it in
9   years.
10  Q   Why was the account closed?
11  A   We stopped doing escrows.  There was no business
12  for escrows.
13  Q   At the time the account was closed, how much
14  money was in the account?
15  A   What is in there?  $107.20.
16  MR. HAES:  Would you mark this Exhibit Number 24,
17  please.  Thank you.
18      (Plaintiff's Exhibit 24 was marked
19      for identification, the original of which
20      is attached hereto.)
21  BY MR. HAES:
22  Q   Do you recognize this document?
23  A   I do.
24  Q   Please describe the document including the last
25  four digits of the account number and the number of the

Page 151

1   bank where the account is held.
2   A   This is a Bank of Hemet commercial checking
3   account statement issued to MSRE, Inc. for the period of
4   12/31/10 through January 31st, 2011.  The last four are
5   2401.
6   Q   When was the account opened?
7   A   January 2007.
8   Q   Why was the account opened?
9   A   It's a general fund for the business.
10  Q   Is the account still open?
11  A   It is.
12  Q   How much money is currently in the account?
13  A   $2,453.
14  MR. HAES:  I have another document.
15  Would you please mark this as Exhibit Number 25.
16  Thank you.
17      (Plaintiff's Exhibit 25 was marked
18      for identification, the original of which
19      is attached hereto.)
20  THE WITNESS:  Thank you.
21  BY MR. HAES:
22  Q   You are welcome.
23  Do you recognize this document?
24  A   I do.
25  Q   Please describe the document including the last

Exhibit "72"
00167

1 four digits of the account number and the name of the
2 bank where the account is held.
3     A    This says Bank of Hemet, 12/31/10 through
4 1/31/11.  The last four digits are 4001.
5     Q    When was the account opened?
6     A    January 2007.
7     Q    Why was the account opened?
8     A    It was to handle related expenses to property
9 management.
10     Q    Is the account still open?
11     A    It is not.
12     Q    When was the account closed?
13     A    Sometime in 2012.
14     Q    Why was the account closed?
15     A    We didn't use it.
16     Q    At the time it was closed, how much money was in
17 the account?
18     A    What is on the balance?  $1,106.36.
19     Q    What did you do with the money when the account
20 was closed?
21     A    We put it into the rent trust account.
22     Q    Do you know which account number is the rent
23 trust account?
24     A    No.  But you are coming up on it.  You haven't
25 come to it yet.

1     MR. HAES:  Okay.  Could you mark this as Exhibit
2 Number 26.  Thank you.
3     (Plaintiff's Exhibit 26 was marked
4     for identification, the original of which
5     is attached hereto.)
6     THE WITNESS:  Same account.
7 BY MR. HAES:
8     Q    It is actually.
9     A    It's the same account.  It's a duplicate.
10     MR. HAES:  You can leave it as 26, but I have no
11 questions regarding that.
12     Would please mark this as Exhibit Number 27.
13 Thank you.
14     (Plaintiff's Exhibit 27 was marked
15     for identification, the original of which
16     is attached hereto.)
17     THE WITNESS:  We did this already, I thought.
18 BY MR. HAES:
19     Q    Do you have the last four digits in your record
20 ending there 9401?  We haven't done this one yet.
21 Actually, no.
22     MR. COHEN:  While you are looking, give me 30
23 seconds.
24     MS. REPORTER:  Off the record?
25     MS. BOONE:  No.  We will stay on the record.  Thank

1 you.
2     MR. HAES:  Okay.  We are still on the record.
3 BY MR. HAES:
4     Q    I don't believe we've done Exhibit Number 27
5 yet.
6     Would you please describe this document
7 including the last four digits of the account number and
8 the name of the bank where the account is held.
9     A    This is a Bank of Hemet commercial account
10 statement issued to MSRE, Inc. for the period 12/31/10
11 through 1/31/11.  The last four digits are 9401.
12     Q    When was this account opened?
13     A    January 2007.
14     Q    Why was this account opened?
15     A    This is the corporate account that pays bills
16 for the corporation.
17     Q    Is the account still open?
18     A    It is.
19     Q    How much is in the account?
20     A    It's less than $500.
21     MR. HAES:  Okay.  Would you please mark this as
22 Exhibit Number 28.  Thank you.
23     (Plaintiff's Exhibit 28 was marked
24     for identification, the original of which
25     is attached hereto.)

1 BY MR. HAES:
2     Q    Do you recognize this document?
3     A    I do.
4     Q    Please describe the document including the last
5 four digits of the account number and the name of the
6 bank where the account is held.
7     A    This is a Bank of Hemet commercial checking
8 account statement for the period of 12/31/10 to 1/31/11
9 provided to MSRE, Inc.  The last four are 3501.
10     Q    When was the account opened?
11     A    January of 2007.
12     Q    Why was the account opened?
13     A    To collect the rent monies, the gross rent
14 monies paid by tenants.  It's a trust account.
15     Q    Is the account still open?
16     A    It is.
17     Q    How much money is in the account?
18     A    Earlier this week, it was 56,000.
19     Q    Actually, would you please go back to Exhibit
20 Number 10.
21     MR. COHEN:  Which one is 10?
22     MR. HAES:  The statement of financial affairs.
23     MR. COHEN:  Wait a minute.  I took it with me.  That
24 is why.
25     THE WITNESS:  Thank you.

Exhibit "72"
00168

Page 156

1   MR. HAES:  It looks like this.
2   MR. COHEN:  Yes.
3   THE WITNESS:  Uh-huh.
4   MR. COHEN:  I just took her copy with me.
5   BY MR. HAES:
6   Q   Okay.  Please turn to page 4 of the document.  I
7   will direct your attention to question number 10 entitled
8   "Other transfers."
9       Regarding the third transfer listed in question
10  number 10, please read your answer as to how the funds
11  received pursuant to that transfer were spent way down at
12  the bottom far right-hand side.
13      Well, first of all, read a description of the
14  transfer.
15  A   "Interspousal Transfer/Change of Title of House
16      3047 North Arrowhead Avenue, San Bernardino,
17      California 92405.  Debtor received $30,000 in
18      exchange for the Transfer.  Debtor used this
19      funds for living expenses."
20  Q   Generally, what was that transfer for, the
21  $30,000?
22  A   That was the settlement agreement.
23  Q   From whom did you receive that money?
24  A   From Clark.
25  Q   When did you receive that money?

Page 157

1   A   In May of 2009.
2   Q   According to this, once again, how were the
3   funds spent?
4   A   I put them into MSRE.
5   Q   Well, no.  I'm asking what it says here on the
6   statement of financial affairs.
7   A   Please restate your question.
8   Q   How were the funds spent according to your
9   statement under oath on the statement of financial
10  affairs?
11  A   I drew on them for living expenses.
12  Q   Now, if you would go back to Exhibit Number 11
13  which is this one.
14  MR. COHEN:  Give me a second.
15  MR. HAES:  Yes.
16  BY MR. HAES:
17  Q   May I direct your attention to your response to
18  special interrogatory number 3.  Actually, go to page
19  number 6.
20      Under sub header "i" near the top of the page,
21  would you read sub header "i"?
22  A   "MSRE, Inc. received the full sum of $30,000
23      resulting from the settlement with the Plaintiff
24      in 2009, the sum being transferred as an owner
25      contribution to the business."

Page 158

1   Q   Okay.  Thank you.  I have another document here
2   I would like to show you.
3   MR. HAES:  Would you please label this Exhibit
4   Number 29.  Thank you.
5       (Plaintiff's Exhibit 29 was marked
6       for identification, the original of which
7       is attached hereto.)
8   THE WITNESS:  Thank you.
9   BY MR. HAES:
10  Q   You are welcome.  Would you read the title of
11  this document near the top in the center in bold, dark
12  print?
13  A   "Schedule A - Real Property."
14  Q   Who prepared this document?
15  A   Lorene Mies.
16  Q   Do you recall reviewing this document?
17  A   Yes.
18  Q   Okay.  Please read the description of the first
19  real property listed up at the top right and left-hand
20  corner.
21  MR. COHEN:  I'm going to object to the document on
22  the basis it lacks foundation.
23  THE WITNESS:  "Single family home.  Primary
24  Residence.  8990 Verona Avenue, San Jacinto, California
25  92853."

Page 159

1   BY MR. HAES:
2   Q   Okay.  Do you acknowledge that this document was
3   filed along with your petition and schedules when you
4   filed your bankruptcy?
5   A   I do.  For the record, the address is 890
6   Verona.
7   Q   Very well.  Thank you.
8       Would you please read the paragraph below the
9   description of the property.
10  A   "Value based on Zillow.com dated 2/15/2011.
11      Debtor trying to modify second mortgage.  If
12      unable to do, Debtor will surrender property."
13  Q   Okay.  Thank you.  I have another document.
14  MR. HAES:  Would you please mark this as document
15  number 30.  Thank you.
16      (Plaintiff's Exhibit 30 was marked
17      for identification, the original of which
18      is attached hereto.)
19  BY MR. HAES:
20  Q   Will you please read the title of this document,
21  not the United States Bankruptcy Court, but just below
22  that center, bold print.
23  A   "Chapter 7 Individual Debtor's Statement of
24  Intention."
25  Q   Do you recall reviewing this document?

Exhibit "72"
00169

Page 160

1    MR. COHEN:  Objection.  Lacks foundation.
2  BY MR. HAES:
3    Q    Did you ever review this document?
4    A    I don't know if it was this, but I submitted the
5  data for it.
6    Q    Okay.  Do you acknowledge that this document was
7  filed with your petition and schedules when you filed for
8  bankruptcy?
9    A    I acknowledge that it was filed with my
10  petition.
11    Q    Who prepared this document?
12    A    Lorene Mies.
13    Q    Please read the description of the real property
14  in the box on the right in the middle of the page.
15    A    "Single Family Home.  Primary Residence.  8990
16  Verona Avenue, San Jacinto, California 92583."
17    Q    Now, read the paragraph below that.
18    A    "Value based on Zillow.com dated 2/15/2011.
19        Debtor is trying to modify second mortgage.  If
20        unable to do, Debtor will surrender property."
21    MR. HAES:  I need a short break.
22        Would you agree to a short break?
23    MR. COHEN:  Sure.
24        (Recess)
25    MR. HAES:  Let's go back on the record.

Page 161

1        Let the record reflect we have just gotten back
2  from another quick break.
3  BY MR. HAES:
4    Q    We were on document number 30.  Previous to that
5  document number 29, you read off a paragraph.
6        Do you have document number 30 in front of you?
7    MR. COHEN:  Yes.
8    MR. HAES:  It's just to get back on the same line of
9  questioning.
10  BY MR. HAES:
11    Q    Regarding the Verona property on the first page,
12  you read off the property description.  Actually, it's
13  listed incorrectly here, but that is with respect or
14  supposed to be with respect to your residence, correct?
15    A    Correct.
16    Q    And please, one more time for the record, just
17  read the paragraph just below the property description.
18    A    "Value based on Zillow.com dated 2/15/2011.
19        Debtor trying to modify second mortgage.  If
20        unable to do, Debtor will surrender property."
21    Q    Have you surrendered the property?
22    A    No.
23    Q    You know, I just wanted some clarification.
24        On the earlier question I asked regarding
25  Exhibits 10 and 11, do you recall that question?  Do you

Page 162

1  want me to repeat the question?
2    A    Please repeat it.
3    Q    Basically, Exhibit Number 10, you acknowledged
4  that it stated that the funds received from Jim, the
5  settlement funds, in Exhibit Number 10 which was your
6  statement of financial affairs, that in Exhibit
7  Number 10, it stated that the funds were used for living
8  expenses.
9        Then you acknowledged that in Exhibit Number 11,
10  which was your amended verified response to first set of
11  interrogatories, it stated that the funds were -- well,
12  I'll pull up the exact language -- transferred as an
13  owner contribution to the business.  Then today you
14  stated that you drew down on the funds.
15        Just for the record, because we have three kinds
16  of differing responses, which one is it?  Which is the
17  correct answer?
18    A    There is only one response.  I transferred the
19  funds to the business as an owner contribution, and I
20  drew on them as a shareholder for living expenses.
21    Q    Okay.
22    A    The $2,700 checks we walked through earlier.
23    Q    Let's see.  I have another document to show you.
24    MR. HAES:  Would you please mark this as Exhibit
25  Number 31.  Thank you.

Page 163

1        (Plaintiff's Exhibit 31 was marked
2        for identification, the original of which
3        is attached hereto.)
4    THE WITNESS:  Thank you.
5  BY MR. HAES:
6    Q    You're welcome.
7    MR. COHEN:  Objection.  Lacks foundation.
8  BY MR. HAES:
9    Q    Do you recognize this document?
10    A    No.  Not in this form.
11    Q    Do you remember what you listed as your income
12  on your petition?
13    A    Not off the top of my head, no.
14    Q    Will you please read what it states as your
15  other monthly income on question number 13 or line
16  number 13 on the document I just presented you with.
17    MR. COHEN:  Objection.  Lacks foundation.
18    THE WITNESS:  Net monthly draw is $1,429.16.
19  BY MR. HAES:
20    Q    Would you please read the title of the document
21  near the top center in bold print.
22    A    "Schedule I - Current Income of Individual
23  Debtor."
24    Q    Okay.  Even above that on the very top left-hand
25  corner, there is a case number there.

Exhibit "72"
00170

Page 164

1       Would you read that case number out loud.
2       A    6:11-bk-15412-DS.
3       Q    Okay.  What does it say after the case number?
4  Just keeping going across.
5       A    "Doc 1.  Filed 218 02/18/11.  Entered 02/18/11.
6       16:41:01.  Desc."
7       Q    Did you provide the information that appears as
8  your other monthly income in the amount of $1,429.16 to
9  your attorney?
10      A    I did.
11      Q    Okay.  Do you recall reviewing this document?
12      A    The drafts.  Not this document.
13      Q    How did you arrive at this total for your
14  monthly income?
15      A    It's what I drew from the business.  It's what I
16  drew from all sources.  This was the average of draws.
17      Q    The average for how long?
18      A    The year for the period I was required to
19  disclose, which I think was 15 months, something like
20  that.
21      Q    Okay.  I'll show you another document.
22      MR. HAES:  Would you please mark this Exhibit 32.
23  Thank you.
24      (Plaintiff's Exhibit 32 was marked
25      for identification, the original of which

Page 165

1  is attached hereto.)
2  BY MR. HAES:
3      Q    Could you please read the caption of this
4  document.
5      A    "Chapter 7 - Statement of Current Monthly Income
6  and Means-Test Calculation."
7      MR. COHEN:  I will object on this on the basis it
8  lacks foundation.
9  BY MR. HAES:
10     Q    Okay.  Do you recognize this document?
11     A    Not in this format.
12     Q    Up on the top left-hand corner, there is a case
13  number.
14          Could you read that case number out loud.
15     A    "Case 6:11-bk-15412-DS.  Doc 1.  Filed 02/18/11.
16          Entered 02/18/11.  16:41:01 Desc."
17     Q    Can you turn to page 2 of the document, please.
18          Read off the amount of money listed as gross
19  receipts in box 4, little (a).
20     A    $1,429.17.
21     Q    And in the column right beside that?
22     A    $1,429.17.
23     Q    Thank you.  And next page, top of page 3, under
24  "Total Current Monthly Income," what is the amount listed
25  all the way over to the right?

Page 166

1      A    $1,429.17.
2      Q    Okay.  How did you arrive at that total?
3      MR. COHEN:  Objection.  This document is not derived
4  by the Debtor's filling out the form.  This is a
5  computer-generated form done by an attorney.
6      MR. HAES:  Okay.
7      MR. COHEN:  This is attorney calculations.  This is
8  not the Debtor's calculations.
9      MS. BOONE:  Your objection is noted, Counsel.
10     MR. HAES:  Very well.
11  BY MR. HAES:
12     Q    Okay.  I'll show you another document.
13     MR. HAES:  Would you please mark this as Exhibit
14  Number 33.  Thank you.
15         (Plaintiff's Exhibit 33 was marked
16     for identification, the original of which
17     is attached hereto.)
18  BY MR. HAES:
19     Q    Do you recognize this document?
20     MR. COHEN:  I'll object on the basis it lacks
21  foundation.
22     THE WITNESS:  I've seen it before.
23  BY MR. HAES:
24     Q    Okay.  Would you please read the caption or
25  title of the document.

Page 167

1      A    "Schedule B - Personal Property."
2      Q    And would you please also go up to the top
3  left-hand corner and read all the way across, case
4  number, and the other information following that.
5      A    "Case 6:11-bk-15412-DS.  Doc 1.  Filed 02/18/11.
6          Entered 02/18/11.  16:41:01.  Desc."
7      Q    Who prepared this document?
8      A    Lorene Mies.
9      Q    Have you ever viewed this document?
10     A    Yes.
11     Q    Did you provide the information on this document
12  to your attorney?
13     A    I did.
14     Q    Please direct your attention to item number 5 on
15  the first page.
16     A    Okay.
17     Q    "Books, Pictures, and Collectibles."
18     A    Okay.
19     Q    Do you still own a signed, first edition book
20  collection?
21     A    No.
22     Q    What happened to that book collection?
23     A    Yard sale.
24     Q    So the book collection was sold?
25     A    Right.

Exhibit "72"
00171

Page 168

1    Q   Are there any documents to corroborate the sale
2  or corroborate the sale of the books?
3    A   No.
4    Q   Okay.  How much did you sell the book collection
5  for?
6    A   $150.
7    Q   Okay.  Do you still own a collection of Lladro
8  porcelain statues?
9    A   I have a Nativity scene.
10    MR. COHEN:  The question is "yes" a or "no."
11    THE WITNESS:  Yes.
12  BY MR. HAES:
13    Q   Aside from the Nativity scene that you are still
14  in possession of, did you ever own any other Lladro
15  porcelain collectible statues?
16    A   While I was married to Mr. Clark.
17    Q   Okay.  Aside from the Nativity scene that you
18  still own, what were the other porcelain statues --
19    MR. COHEN:  Objection.  Mischaracterizes the
20  witness's testimony as to whether she owns it.
21  BY MR. HAES:
22    Q   Aside from the Nativity scene that is still
23  currently in your possession, what other Lladro porcelain
24  collectibles did you own at any point in time?
25    A   We had several pieces.  I don't remember the

Page 169

1  number of them.  We had some Norman Rockwell Lladro.
2    Q   When you say some Norman Rockwell, how many did
3  you have?
4    A   Five or seven.  I don't remember how many.
5    Q   What else?
6    A   There were individual pieces.  The Girl with the
7  Ducks.  I don't remember what they all were.  It's
8  painful to recall most things.  He kept them all except
9  for the Nativity scene and sold them on eBay is what I
10  was told.
11    Q   You are still in possession of the Nativity
12  scene, correct?
13    A   I am.
14    Q   Would you consider yourself the owner of the
15  Nativity scene?
16    A   I would.
17    Q   Okay.  What would you say is the value of that?
18    A   The head broke off on one of the shepherds.  I
19  have no idea what it is worth at this point.
20    Q   Other than the one shepherd with the head broken
21  off, is every other member of the Nativity scene still
22  intact?
23    A   They are.
24    Q   How many pieces are there in total including the
25  one with the broken off head?

Page 170

1    MR. COHEN:  You mean how many pieces in the Nativity
2  scene?
3  BY MR. HAES:
4    Q   How many porcelain statues included in the
5  Nativity scene in total?
6    A   Maybe eight.
7    Q   One of those eight has a head broken off head?
8    A   Baltazar.
9    MR. COHEN:  Which one?
10    THE WITNESS:  Baltazar.
11  BY MR. HAES:
12    Q   Okay.  How exactly did you go about determining
13  a value for your books, pictures and collectibles?
14    A   What I would pay for them if I came across them
15  and wanted to purchase them.
16    Q   Now, you already mentioned that you sold the
17  book collection for $150 which apparently -- strike that
18        When did you sell the book collection?
19    A   Before 2002.  It was before -- it was in August
20  of 2000.  We had a flood in the house, and the house was
21  severely damaged.  I had to dismantle the bookcases and
22  everything in the den.
23    Q   Okay.  In your evaluation of $150 for books,
24  pictures and collectibles, were the remaining pieces of
25  the Lladro collection included in that estimate?

Page 171

1    A   I don't think I went through and evaluated item
2  by item in the house.  I was just trying to get a general
3  accumulation of numbers.
4    Q   Okay.  Moving further down, schedule "B," you
5  assign a value of $750 to furs and jewelry.
6        Do you see that?
7    A   I do.
8    Q   Do you still own a custom gold and diamond ring
9  made for you by James, a heart-shaped diamond?
10    A   I do.
11    Q   What would you say is the value of that ring?
12    A   I haven't got a clue.  It was a gift.
13    Q   Okay.
14    A   He can have it back if he likes.
15    Q   Was the ring or an estimate of the value of the
16  ring included in the $750 for furs and jewelry that you
17  listed on your schedule "B"?
18    A   Yes.  I wasn't eliminating any pieces.
19    Q   How did you go about determining the value of
20  that ring?
21    A   What I would have paid for it.
22    Q   Did you make any affirmative attempt to
23  determine the value of the ring before filing your
24  petition and schedules?
25    MR. COHEN:  Objection.  Assumes facts not in evidence

Exhibit "72"
00172

Page 172

1 and also assumes the Debtor has this obligation as you
2 just described.
3    THE WITNESS: I'm not a jeweler, so I have no idea
4 what the real value of it is. It was a gift. I've
5 looked at jewelry here and there and now and then and
6 something that size, whether a stone of that size and of
7 that clarity. I didn't exclude any pieces when I came up
8 with that number.
9 BY MR. HAES:
10    Q   Did you make an affirmative attempt?
11    A   I made an effort to be reasonable about my
12 assessment.
13    Q   What effort did you make?
14    A   To come up with a value that I thought was fair
15 and reasonable.
16    Q   You came up with a value yourself?
17    A   Yes.
18    Q   Okay. I will show you another document.
19    MR. HAES: Could you please mark this as Exhibit
20 Number 34. Thank you.
21    (Plaintiff's Exhibit 34 was marked
22    for identification, the original of which
23    is attached hereto.)
24    MR. COHEN: I'll object on the basis that it lacks
25 foundation. This, too, is a document generated by

Page 173

1 attorneys, not by the Debtor.
2 BY MR. HAES:
3    Q   Can you please read the caption of the document,
4 the title?
5    A   "Schedule C - Property Claimed as Exempt."
6    Q   Could you please go up to the top left-hand
7 corner and read the information across the top including
8 case number and the rest of it.
9    A   "Case 6:11-bk-15412-DS. Doc 1. Filed 02/18/11.
10    Entered 02/18/11. 16:41:01. Desc."
11    Q   Who prepared this document?
12    A   Lorene Mies.
13    MR. COHEN: Objection. Well, withdrawn.
14 BY MR. HAES:
15    Q   Do you recall reviewing this document?
16    A   Not in this format.
17    Q   Are you aware that this document is included in
18 your schedules and statements that are filed and signed
19 under penalty of perjury?
20    A   I am.
21    MR. COHEN: Objection. Counsel, this document is not
22 signed under penalty of perjury. This is the lawyer's
23 application of exemption statutes.
24    MR. HAES: I believe that --
25    MR. COHEN: This is lawyer's application of exemption

Page 174

1 statutes. This is predicated and pulled from information
2 in other schedules.
3    MS. BOONE: Well, Counsel, that depends on how the
4 petition is prepared. Nevertheless, the petition is
5 prepared under penalty of perjury.
6    MR. COHEN: You are correct.
7    MS. BOONE: I think we are all on the same page.
8 Let's just keep going.
9    MR. COHEN: We are not.
10    MS. BOONE: In what respect?
11    MR. COHEN: Questions to the Debtor about applied
12 exemptions, she is not competent to testify about
13 statutory application of exemptions.
14    MS. BOONE: The question isn't pending about the
15 statutory application of exemptions. If one is asked,
16 you can object on that basis.
17    MR. COHEN: I'm objecting on this document being
18 presented to the client and to ask her any information
19 about anything in this document. If you want to go to
20 the source of origin, in other words, if there was
21 something in schedule "A" or in schedule "B," you can ask
22 the Debtor questions about that. In this document I will
23 object.
24    MS. BOONE: Your objection is noted, and we will ask
25 our questions. Thank you, Counsel.

Page 175

1 BY MR. HAES:
2    Q   On the top left-hand corner of the document,
3 would you please read the property description listed
4 there, the very first real property listed on this
5 document?
6    A   "Parcel with five unbuildable lots.
7    Description: Morro Park. View. Subdivision 2.
8    Block 10. Point LTS, five to nine. Zero Paper
9    Roads, Cayucos. Debtor retaining property."
10    Q   Very well. If you shift all the way over to the
11 right, the far right-hand side of the page, do you see
12 the current value of the property without deducting
13 exemption?
14    A   I do.
15    Q   What is that dollar amount?
16    MR. COHEN: I will still object on the basis that
17 this is a document that calls for information from other
18 schedules.
19    MR. HAES: Understood. You said that three times.
20    MR. COHEN: I'll say it a fourth time.
21    MR. HAES: Okay.
22    MR. COHEN: Okay.
23    MR. HAES: Understood.
24    MR. COHEN: Therefore, I object to this line of
25 questioning. It lacks foundation. This Debtor is not

Exhibit "72"
00173

Page 176

1 competent to testify to information that is contained in
2 schedule "C." If you want to go to schedule "A" which is
3 the source, you are welcome to.
4    MR. HAES: Your objection is duly noted for the
5 fourth time.
6 BY MR. HAES:
7    Q    What is the total dollar amount listed there?
8    A    $5,252.80.
9    Q    Did you provide that value to your attorney who
10 prepared these documents?
11    A    I did.
12    MR. COHEN: Objection as to the form of question.
13 You said as to these documents. I object to that
14 question.
15 BY MR. HAES:
16    Q    Did you provide --
17    MR. COHEN: Let me finish. This Debtor did not
18 provide any information to support schedule "C."
19 BY MR. HAES:
20    Q    Did you provide information to your attorney to
21 indicate that the property that you just read off was
22 valued at $5,252.80?
23    MR. COHEN: I'll object. If you want to show the
24 Debtor schedule "A" which is the basis of her real
25 property evaluation, you are welcome to, but you are

Page 177

1 asking an incorrect question which is loaded with
2 landmines and problems. I urge you to go to the source
3 of this schedule and present the Debtor with a
4 schedule "A" to avoid these objections.
5    MR. HAES: Duly noted.
6 BY MR. HAES:
7    Q    Did you provide your attorney who filed your
8 petition for you an estimate of the value of the property
9 that you read off?
10    A    I did.
11    Q    What was that value that you provided your
12 attorney with?
13    A    I would have to see the schedule I drafted.
14    Q    Okay. $5,252.80 sound like the value of that
15 property?
16    A    It does.
17    Q    Does $5,252.80 sound like the value of the
18 property located in Morro Bay, the Cayucos property that
19 you just read off the property description for?
20        Does that sound like the value of the property
21 that you gave to your attorney at the time that you filed
22 your petition?
23    A    Yes.
24    Q    Okay. I've got the last document.
25    A    Great.

Page 178

1    MR. HAES: Would you please mark this as Exhibit
2 Number 35. Thank you.
3        (Plaintiff's Exhibit 35 was marked
4        for identification, the original of which
5        is attached hereto.)
6 BY MR. HAES:
7    Q    Would you please --
8    MR. COHEN: Give me a second, please.
9        (Attorney/client discussion)
10    MS. BOONE: Let the record reflect, please, that
11 Defendant's counsel was conferring with his client
12 privately.
13        (Attorney/client discussion)
14    THE WITNESS: Uh-huh.
15    MR. COHEN: Okay.
16 BY MR. HAES:
17    Q    Would you please read the title of the document
18 I just handed you which is located in the top left-hand
19 corner of the document?
20    A    "Secured Tax Bill."
21    Q    Please include the date and read the title over
22 again.
23    A    "2010/11 Secured Tax Bill."
24    Q    Okay. Please direct your attention to the
25 property description a couple of rows below the document

Page 179

1 title.
2        Would you please read the property description.
3    MR. COHEN: I'll object to this document on the basis
4 that it lacks foundation.
5    MR. HAES: Very well.
6    THE WITNESS: "Morro Rock. View. Subdivision 2. BL
7 10 PTN Lots 5 to 9."
8 BY MR. HAES:
9    Q    Just below the property description, please read
10 the assessed owner as of January 1st, 2010.
11    A    "Arciniega, Leticia J."
12    Q    Is this the same property that we just discussed
13 that was in schedule "C"?
14    A    Yes.
15    Q    Please read the net property value towards the
16 middle of the page. It's the assessed value that is
17 underlined.
18    A    8,000.
19    Q    Would you agree that this is the assessed value
20 for tax purposes as of 2010 and 2011?
21    MR. COHEN: Objection. Calls for speculation. The
22 Debtor is not competent to testify about net value or tax
23 value.
24    THE WITNESS: It's the assessed tax value. It's not
25 the market value.

Exhibit "72"
00174

Page 180

BY MR. HAES:

1  Q   Is it your understanding that based on this
3  document, the assessed value is $8,000?
4  MR. COHEN: Objection. She has no opinion as to the
5  tax value. She is not competent to testify as to what
6  the tax value is.
7  MS. BOONE: Counsel, the question was not regarding
8  tax value. She may have an opinion. Let's get the
9  testimony.
10  MR. COHEN: I'll object on the basis that she is not
11  competent to testify about the tax value of property.
12  MS. BOONE: Again, tax value was not the question.
13  MR. COHEN: I believe it was. Let's read back the
14  question.
15  BY MR. HAES:
16  Q   Is it your understanding based on what this
17  document says that according to this document, the
18  assessed value of the property is $8,000?
19  MR. COHEN: Objection. Lacks foundation. Calls for
20  an opinion. Calls for speculation.
21  THE WITNESS: It states 8,000.
22  BY MR. HAES:
23  Q   Okay. You stated earlier that in response to
24  one of my questions, that you had never owned any other
25  corporation aside from MSRE.

Page 181

1      Have you ever owned any other business aside
2  from MSRE?
3  A   As a separate dba?
4  Q   Just as a business owner, sole proprietor.
5  A   Yes.
6  Q   Okay. What business was that?
7  A   I did immigration document consulting for a
8  while.
9  Q   Okay. What was the name of that company? Was
10  it a corporation?
11  A   No.
12  Q   Okay.
13  A   It was just a dba.
14  Q   And what was the dba called? What was the name?
15  A   Servicios de Imigracion Amistad.
16  MR. HAES: You got that?
17  MR. COHEN: Can you spell it?
18  THE WITNESS: S-e-r-v-i-c-i-o-s, d-e,
19  I-m-i-g-r-a-c-i-o-n, A-m-i-s-t-a-d.
20  BY MR. HAES:
21  Q   What year did you start that business?
22  A   I think it was 2001.
23  Q   Okay. And for how long did the business last?
24  When did you end it?
25  A   Until 2006 and then I transferred it to somebody

Page 182

1  else.
2  Q   Okay. Was the business sold?
3  A   Technically, yes.
4  Q   How much was it sold for?
5  A   Zero. A dollar.
6  Q   Why would you sell it for a dollar?
7  A   There is no book.
8  Q   So there was no book of business associated with
9  it?
10  A   No.
11  Q   Why would someone want it?
12  A   The name, the phone number, the advertising that
13  was out there, the equipment, furniture, fixtures,
14  whatever, used desk, used P.C.
15  Q   While you were running the business, what was
16  the approximate income generated per month from that
17  business?
18  A   Gross?
19  Q   Gross, yeah.
20  A   $350.
21  Q   Okay. And that is from the inception until
22  transfer?
23  A   Correct.
24  Q   Okay. Did you ever own any other business?
25  A   Not that I can recall.

Page 183

1  Q   Okay. I apologize. I'm just going back to a
2  couple of documents. This won't take very much longer.
3      Would you please go back to Exhibit Number 3.
4  In case you need to spot it, it looks something like
5  this. On page 10 of this exhibit, we discussed earlier a
6  withdrawal in the amount of $88,000.
7      Do you see that withdrawal?
8  A   Yes.
9  Q   Would you please, again, for the record state
10  what date it was withdrawn.
11  A   According to the statement, it was 12/21 of
12  2007.
13  Q   Okay. What was the money spent on?
14  A   To buy the building, a down payment.
15  Q   Which building?
16  A   288 East Main Street. It's part of what I lost.
17  Real cash.
18  Q   Okay. Could you take a look at document
19  number 4 once more, please.
20  A   Okay.
21  Q   We talked about this earlier. It's the deed
22  associated with the $1,000 loan that you received.
23      Do you agree with that?
24  A   I do.
25  Q   What was the money spent on?

Page 184

1   A   The $15,000 a month that it was costing me to
2   run the office before it started producing and even after
3   it didn't produce.
4   Q   So the entirety of this loan was used for MSRE,
5   Inc.; is that right?
6   A   Me and MSRE, Inc.
7   Q   Okay.  Would you please take another look at
8   document number 17.  It's the letter you drafted to Citi.
9      You start down at the bottom of the page the
10  numbers 1 and 2?
11  A   Uh-huh.
12  Q   Well, not the paragraph right above that, but
13  the paragraph above where it says "James," the second
14  sentence of that paragraph starts with "At the beginning
15  of 2007."
16     Do you see that?
17  A   I do.
18  Q   Would you please read that sentence.
19  A   "At the beginning of 2007, I saw what appeared
20     to be an opportunity for investment in real
21     estate and took a second mortgage on the house."
22  Q   Okay.  Keep going.
23  A   "Again, I have made the payments for this
24     mortgage completely on my own."
25  Q   Keep going.

Page 185

1   A   "Ironically, I made no such investment.  (Since
2      the forbearance on the first became effective, I
3      received no statement for this second mortgage;
4      no one will talk to me about it.  As I am told,
5      'We're not doing anything with them)."
6   Q   With respect to the funds received, what were
7   those funds used for?
8   A   As I stated during the earlier question, I used
9   them to support myself and the business since it did not
10  produce what I expected it to produce.
11     MR. HAES:  Okay.  We are literally on the verge of
12  being done, but we need to take one tiny break before we
13  wrap it up.
14     Can I get your consent for that?
15     MR. COHEN:  Sure.
16     MR. HAES:  We both agree to a very short break.
17  Thank you.
18     MS. BOONE:  Let's go back on the record.
19
20        FURTHER EXAMINATION
21  BY MS. BOONE:
22  Q   I am going to ask a short series of questions,
23  and then I think we may be ready to wrap up our end of
24  this for the day.
25     I am going to ask you to refer back to some

Page 186

1   documents we looked at before.  I'll tell you the numbers
2   of all of the documents, and we will just pull them all
3   out so they will be easier to see.
4      We will be looking at document number 1 and then
5   documents 12 through 17.  That is 12, 13, 14, 15, 16, 17.
6      MR. COHEN:  Let's just do it one at a time.
7      MS. BOONE:  Yes.  That's fine.
8   BY MS. BOONE:
9   Q   Let's start with document 12.
10     MR. COHEN:  Give me a second.
11     MS. BOONE:  Okay.
12  BY MS. BOONE:
13  Q   Ms. Arciniega, do I understand you to have
14  testified that shortly before receiving this client
15  action plan which is dated December 11, 2008, that you
16  had a conversation with a representative of Springboard?
17  A   Yes.
18     MR. COHEN:  Objection.  Asked and answered.
19     THE WITNESS:  Yes.
20  BY MS. BOONE:
21  Q   And the purpose of the conversation was to
22  modify the payments with respect to the Verona house?
23  A   No.  The purpose was to see if I could refinance
24  the house on my own.
25  Q   Okay.  And then let's look at document 13 which

Page 187

1   is a Citi letter dated January 22nd, 2009.
2      Between the time of the Springboard conversation
3   and the date of this letter, did you request assistance
4   on this loan from Citi?
5   A   I don't recall specifically.
6   Q   Prior to the date of the January 22nd, 2009
7   letter, did you request assistance on the Verona loan?
8   A   I don't recall specifically.  This letter might
9   have been an offshoot of the conversation with
10  Springboard.  I would not have called Springboard first.
11  I would have called CitiMortgage first.  They would have
12  referred me to Springboard.  Whether this letter resulted
13  from my initial contact with Citi or my subsequent
14  conversation with Springboard, I don't recall.
15  Q   Okay.  But to clarify my second question,
16  sometime prior to January 22nd, 2009, you submitted a
17  request to Citi for assistance on the Verona loan,
18  correct?
19  A   This is a canned letter.  I talked to
20  CitiMortgage in December of 2008.  I had spoken to them
21  previously about refinancing the loan on my own.  At this
22  point in time, the lenders were beginning to see more
23  people having hardship issues, and they started
24  streamlining the process.  They were required to refer
25  you to Springboard.  That is how the Springboard letter

Exhibit "72"
00176

Page 188

1 was generated.
2    Q   Okay.
3    A   Again, I don't recall the circumstances that
4 gave rise to this letter of this date.
5    Q   But setting aside specific circumstances, is it
6 fair to say that prior to January 22nd, 2009, that you
7 contacted Citi requesting assistance on the loan?
8    A   Requesting an evaluation to see if I could
9 refinance the loan on my own.
10    Q   Okay.  Thank you for that clarification.
11       Looking to document 14, this is a document that
12 there was some confusion about the date because the date
13 on the front is obscured, but there is a fax date at the
14 top of February 26, 2009, and I believe the signature
15 which you reviewed on the back page says February 25th,
16 2009.
17       Just to be clear about what time frame we
18 are talking about, it looks like sometime between
19 February 12, 2009 and February 25th, 2009 you would have
20 received this document, correct?
21    A   Correct.
22    Q   Can you please read for me the first sentence of
23 this document?
24    MR. COHEN:  Which document?
25    MS. BOONE:  Document 14.

Page 189

1    MR. COHEN:  There is a cover letter and a follow-up.
2    MS. BOONE:  The first sentence of document 14 would
3 be the first sentence of the cover letter.
4    THE WITNESS:  CitiMortgage has reviewed your
5    forbearance plan."
6 BY MS. BOONE:
7    Q   That is fine.  That is the first sentence.
8 Thank you.
9    A   Uh-huh.
10    Q   Prior to February 12, 2009, did you contact
11 CitiMortgage regarding a forbearance plan?
12    A   No.  I contacted them regarding refinancing the
13 house on my own.  When we went through the financials on
14 my own, we determined I could not refinance the house on
15 my own, but I probably qualified for modification and
16 they offered it.
17    Q   So the first sentence of this letter --
18    A   It is canned letter.
19    Q   Canned letter which you maintain is not accurate
20 because you requested a refinance which was not possible
21 and they parlayed that into a forbearance?
22    A   Yes.
23    Q   Thank you for that clarification.  Can we look
24 at document 15, please
25       Document 15 is dated April 13, 2009 in the upper

Page 190

1 left corner.  Again, this first sentence references a
2 recent inquiry regarding assistance with your mortgage.
3       What inquiry regarding assistance with your
4 mortgage does that reference?
5    A   The same one I responded to in the previous
6 questions.
7    Q   Thank you.  Document 16, I believe this may be a
8 document which gave rise to some heated discussion
9 earlier about the word delinquent, but this document is
10 dated April 20th, 2009.
11       The first sentence says, "We are concerned
12 because your mortgage account is still delinquent."
13       Do I understand your testimony correctly that
14 you maintain that as of April 20th, 2009 the account was
15 not delinquent?
16    A   The account was never delinquent.
17    Q   And is this communication, however the bank has
18 characterized the delinquency of the account, was this
19 communication also with respect to your efforts to
20 refinance the property?
21    A   It's a consequence of my efforts to refinance
22 the property.
23    Q   Okay.  Thank you.  I actually don't think we
24 need to refer to document 17.  Now I will go to
25 document 1.  I will ask you to turn to page 2 of 6 on

Page 191

1 document 1.  Actually, let's turn to page 6 of 6 first.
2       Can you read for me the dates that appear --
3 that's not your signature.  Never mind.  It's page 5
4 of 6.  I did the same thing Chad did.
5       Can you read for me the date that appears next
6 to your signature on page 5 of 6?
7    A   May 11th, 2009.
8    Q   Okay.  And now turning to page 2 of 6, the first
9 sentence reads:
10       "No later than May 13, 2010, Defendant
11       will take all necessarily measures to pay off
12       the existing V.A. loan and removing Plaintiff's
13       name from the loan on her property located at
14       8890 Verona Avenue, Hemet, California."
15       I believe you did clarify that is actually
16 San Jacinto, California, and not Hemet, California.
17       Can you tell me, prior to May 11, 2009, whether
18 you signed the document containing paragraph "B," did you
19 inform Mr. Clark of the efforts referenced in the
20 documents to refinance the loan on the Verona property?
21    A   I have had no communication with Mr. Clark from
22 June of 2006.  He refuses any contact on my part.
23    Q   Just to be clear, would that be a no, you did
24 not inform him of these efforts?
25    A   No, I did not inform him.

Exhibit "72"
00177

Page 192

1  Q   I think we were speaking over again.  I'm going
2  to ask the question and ask you wait until I finish.
3      To be clear, did you inform Mr. Clark of your
4  efforts to refinance the loan?
5  A   No.
6  Q   Thank you.
7  MS. BOONE:  That covers it for me.
8      Chad, do you have anything else?
9  MR. HAES:  No, I don't think so.  No, I do not.
10  MS. BOONE:  Baruch, did you have questions you wanted
11  to ask?
12  MR. COHEN:  The only question I have is, do I get my
13  response to document demands today?
14  MR. HAES:  I need to run upstairs.
15  MR. COHEN:  Okay.
16  MR. HAES:  And we will make sure.
17  MS. BOONE:  Why don't we go off the record and make
18  sure we are done.  Baruch and I can talk about the
19  stipulation about dealing with the transcript.
20      We will go off the record.
21      (Recess)
22  MS. BOONE:  We will go back on the record.
23      During the short break from which we are now
24  returning, counsel and I discussed the stipulation for
25  the handling of the transcript of today's deposition.

Page 193

1      I will just recite what we agreed to and then
2  ask counsel to state if that also reflects his
3  understanding.
4      We will ask that the transcript be delivered to
5  Ms. Arciniega for her review through her counsel, meaning
6  that the transcript will be delivered to Mr. Cohen's
7  office at the address that he has provided to the
8  reporter.
9      Ms. Arciniega will have two weeks to review,
10  provide her comments, make any changes.
11      I should clarify that if you do want to make
12  changes to the transcript of your deposition and it's the
13  clarification of a spelling or where there has been
14  something that you think has been mistranscribed, then we
15  will, of course, look for your corrections.  To the
16  extent you are changing your answer and your answer on
17  the record is a "yes" and you want to change it to a
18  "no," that will be something that we reserve the right to
19  bring to the attention of the Court.
20      Your review is essentially for cleanup rather
21  than changes.  We will be able to see any changes that
22  you propose.
23      Counsel has stated that Ms. Arciniega needs two
24  weeks to review the transcript at which point it will be
25  returned.

Page 194

1      Counsel and I have stipulated that the court
2  reporter will be relieved of her duties pursuant to
3  California Code of Civil Procedure Section 2025 and any
4  applicable federal provisions.
5      We have agreed that Marshack & Hays, which is
6  this law firm, will take possession of and maintain
7  originals of the transcripts.
8      We will provide access to counsel or parties to
9  the transcript upon request and reasonable notice and in
10  compliance with all applicable laws and statutes.
11      Counsel, does that reflect your understanding?
12  MR. COHEN:  Yes.
13  MS. BOONE:  Is there anything else we should put on
14  the record at this time?
15  MR. COHEN:  No.
16  MS. BOONE:  I will thank the court reporter for her
17  services today and thank everybody for coming.
18      (Deposition concluded at 3:50 p.m.)
19      (Whereupon it was stipulated by and
20      between counsel that the provisions of
21      2025(q)(1) and 2025(s)(1) were waived.)
22
23
24
25

Page 195

1  PENALTY OF PERJURY CERTIFICATE
2
3
4
5      I hereby declare I am the deponent in the within
6  matter, that I have read the foregoing transcript and
7  know the contents thereof; that I declare that the same
8  is true of my knowledge, except as to the matters which
9  are therein stated upon my information or belief, and as
10  to those matters, I believe them to be true.
11      I declare being aware of the penalties of perjury;
12  that the foregoing answers are true and correct.
13
14
15      Executed on the _____ day of _____
16  20_____, at _____, California.
17
18
19
20
21      _____
22      LETICIA JOY ARCINIEGA
23
24
25

Exhibit "72"
00178

**Condensed transcript marked as Plaintiff's Trial Exhibit 72 does not have a Reporter's Certificate. Plaintiff has appended the full Deposition Transcript with Reporter's Certificate to the Trial Exhibits as Exhibit A.**

**Exhibit "72"
00178(A)**

1  Baruch C. Cohen, Esq. (SBN 159455)
   **LAW OFFICE OF BARUCH C. COHEN**
2      A Professional Law Corporation
   4929 Wilshire Boulevard, Suite 940
3  Los Angeles, California 90010
   (323) 937-4501    Fax (323) 937-4503
4  e-mail: BCC4929@gmail.com
   Linkedin Profile: http://www.linkedin.com/in/baruchcohen
5
6  *Attorney For Defendant* LETICIA JOY ARCINIEGA
7
8
9          **UNITED STATES BANKRUPTCY COURT**
10         **CENTRAL DISTRICT OF CALIFORNIA**
11         **RIVERSIDE DIVISION**
12
   In re                                    Case No. 6:11-BK-15412-DS
13                                          Adversary # 6:11-ap-01735-DS
   LETICIA JOY ARCINIEGA,                   Before the Honorable Deborah J. Salzman
14                                          Chapter 7
       Debtor
15
16
17
   JAMES CLARK,                             DEFENDANT LETICIA JOY ARCINIEGA'S
18                                          VERIFIED RESPONSE TO PLAINTIFF JAMES
       Plaintiff                CLARK'S FIRST SET OF REQUEST FOR
19                                          ADMISSIONS F.R.C.P. 36 F.R.B.P. 7036
   vs.
20
   LETICIA JOY ARCINIEGA,
21
       Defendants
22
23
24     PROPOUNDING PARTY:  PLAINTIFF JAMES CLARK

25     RESPONDING PARTY:   DEFENDANT LETICIA JOY ARCINIEGA

26     SET NO.:        ONE

27     TO PLAINTIFF JAMES CLARK AND HIS ATTORNEYS OF RECORD HEREIN:

28     DEFENDANT LETICIA JOY ARCINIEGA (hereinafter referred to collectively as

F:\DOCS\LETICIA ARCINIEGA\RFA RESPONSE.wpd
8/14-3:01pm

**Exhibit "73"**
**00179**

1  "DEFENDANT")  hereby responds to the PLAINTIFF'S FIRST SET OF REQUEST FOR

2  ADMISSIONS  (hereinafter referred to as "Discovery Requests") issued by PLAINTIFF JAMES

3  CLARK(hereinafter referred to as "PLAINTIFF").

4  **<u>PRELIMINARY STATEMENT</u>**

5          These responses are made solely for the purpose of this action. Each response is subject to

6  all objections as to competence, relevance, materiality, propriety and admissibility, and any and all

7  other objections and grounds that would require the exclusion of any statement herein, if any

8  interrogatory were asked for or any statement contained herein was made by a witness present and

9  testifying in court, all of which objections and grounds are reserved and may be interposed at the

10  time of trial. This responding party is responding to all Discovery Demands to the extent that

11  information has become known by it. However, this responding party's discovery and

12  investigation in preparation for trial is this matter has not been completed as of the date of these

13  responses to Discovery Demands, and, therefore, this responding party does not propose to state

14  herein anything more than information presently known and discovered by it. This responding

15  party reserves the right to continue discovery and investigation in this matter for facts, witnesses

16  and supporting data that may recall information which, if it had presently within its knowledge,

17  would be included in these responses. Consequently, to the extent that the Discovery Demands

18  herein ask for "all facts" or the name of "all persons" or the identity of "all documents", etc., they

19  are responded to fully insofar as the information is presently available to the responding party.

20  This responding party is not precluded from presenting at trial information discovered following

21  the date of these responses. However, Defendant assume no obligation to voluntarily supplement

22  or amend these responses to reflect witnesses, facts and evidence discovered following the mailing

23  of these responses. Except for explicit facts submitted herein, no admissions of any nature

24  whatsoever are implied or should be inferred. The fact that any Discovery Demand herein has been

25  answered should not be taken as an admission, or acceptance, or that existence or any fact or facts

26  set forth or assumed by such Discovery Demand, or that such answer constitutes admissible

27  evidence.

28

F:\DOCS\LETICIA ARCINIEGA\RFA RESPONSE.wpd          -2-
8/14-3:01pm

**Exhibit "73"**
**00180**

1        It is assumed by the responding party that the propounding party and all parties to this

2    lawsuit possess and are familiar with all the discovery proceedings in this action. Therefore, when

3    an interrogatory calls for information which is contained in the discovery materials available to all

4    parties, said interrogatory will be answered only by reference to those discovery materials.

5        This introductory statement is incorporated herein by reference to each of the answers as it

6    is stated in full.

7    **GENERAL OBJECTIONS APPLICABLE TO ALL DISCOVERY DEMANDS**

8        Defendant objects to Plaintiff's Discovery Demands and each request contained therein to

9    the extent they seek information that is vague, ambiguous, over broad, inadequately described,

10   burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

11       Defendant objects to Plaintiff's Discovery Demands and each request contained therein to

12   the extent they seek to impose a duty upon Defendant which is greater than imposed by the Federal

13   Rules of Civil Procedure.

14       Defendant objects to Plaintiff's Discovery Demands and each request contained therein to

15   the extent they call for any documents protected from disclosure or discovery by (i) the attorney-

16   client privilege; (ii) the protection of the attorney work product privilege, including but not limited

17   to documents prepared in anticipation of litigation or for trial; and (iii) any other applicable

18   privilege(s). Defendant claims privileges and protection with respect to all information and

19   documents which are protected from disclosure or discovery by such privilege(s) and protection(s).

20       Defendant objects to Plaintiff's Discovery Demands and each request contained therein to

21   the extent they seek production or disclosure of documents containing confidential, sensitive,

22   private and/or proprietary information of Defendant, their family members and others.

23       Defendant objects to Plaintiff's Discovery Demands and each request contained therein to

24   the extent they seek production or disclosure of documents which are not relevant to the subject

25   matter of this lawsuit.

26       Defendant objects to Plaintiff's Discovery Demands and each request contained therein to

27   the extent they seek production or disclosure of documents that Plaintiffs already have in its

28

F:\DOCS\LETICIA ARCINIEGA\RFA RESPONSE.wpd
8/14-3:01pm

-3-

Exhibit "73"
00181

1  possession.

2        Defendant made a diligent and good faith effort to locate and produce the documents

3  which are responsive to those requests. Defendant, however, has not completed his investigation.

4  Accordingly, the following written responses are based on the current status of Defendant's

5  investigation and discovery, and the accompanying production of documents consists of those

6  documents within Defendant's custody and control which have been located following diligent

7  search. These written responses and the accompanying documents are provided without prejudice

8  to Defendant's right to offer into evidence additional responsive documents or evidence when such

9  are located or ascertained. More over, these responses should not be construed as, and do not

10  constitute, a waiver of Defendant's right to introduce additional evidence, in any form, later on in

11  this proceeding.

12        These written responses and the accompanying production of documents are subject to all

13  objections including but not limited to, relevance, materiality, and admissibility, that would

14  require exclusion of any statement made herein, or any document produced, as if it were made by a

15  witness present and testifying in court, all of which objections and grounds are reserved and may

16  be imposed at the time of arbitration or trial. The fact that Defendant has responded to all or any

17  part of a request for production is not an admission that the request seeks admissible evidence and

18  is not to be construed as a waiver of any proper grounds of objection that may hereafter be

19  interposed to such request or to the admissibility of any documents produced in response thereto.

20        The foregoing General Objections are incorporated into each specific responses made

21  below by Defendant to Plaintiff's Discovery Demands. Defendant's specific responses are made

22  without waiving and are otherwise without prejudice to these General Objections. Furthermore, as

23  set forth below, certain representations in the specific response below as to Defendant's intention

24  and agreement to produce documents in response to these requests are contingent upon the entry in

25  this action of a stipulated protective order to ensure the confidentiality of such documents.

26                          **RESPONSE TO REQUEST FOR ADMISSIONS**

27  1.       REQUEST FOR ADMISSION NO. 1:  Admit that in 1979, You and Plaintiff purchased

28

F:\DOCS\LETICIA ARCINIEGA\RFA RESPONSE.wpd          -4-
8/14-3:01pm

**Exhibit "73"**
**00182**

1    the Arrowhead Property.        **ADMIT**

2    2.    REQUEST FOR ADMISSION NO. 2:  Admit that at the time of its purchase, title to the

3    Arrowhead Property vested in the names of You and Plaintiff.        **DENIED**

4    3.    REQUEST FOR ADMISSION NO. 3:  Admit that in 1991, You and Plaintiff purchased

5    the Verona Property.  **ADMIT**

6    4.    REQUEST FOR ADMISSION NO. 4:  Admit that at the time of the purchase of the

7    Verona Property, You and Plaintiff took out the VA Loan to finance the purchase of the

8    Verona Property.        **ADMIT**

9    5.    REQUEST FOR ADMISSION NO. 5:  Admit that, at the time of the purchase, title to the

10    Verona Property was vested in the names of You and Plaintiff as Husband and Wife as

11    Community Property.  **ADMIT**

12    6.    REQUEST FOR ADMISSION NO. 6:  Admit that upon Your marital separation from

13    Plaintiff in or about 1991, Plaintiff resided at the Arrowhead Property and You resided at

14    the Verona Property.  **ADMIT**

15    7.    REQUEST FOR ADMISSION NO. 7:  Admit that, in or about 1995, You began having a

16    personal relationship with an individual by the name of David D. Christian.

17    **DENIED**

18    8.    REQUEST FOR ADMISSION NO. 8:  Admit that, in or about 1995, You began

19    cohabitating with an individual by the name of David D. Christian. **ADMIT**

20    9.    REQUEST FOR ADMISSION NO. 9:  Admit that, in 2006, You requested that Plaintiff

21    convey his interest in the Verona Property to You.    **ADMIT**

22    10.    REQUEST FOR ADMISSION NO. 10:  Admit that, in 2006, Plaintiff agreed to convey his

23    interest in the Verona Property to You.        **ADMIT**

24    11.    REQUEST FOR ADMISSION NO. 11:  Admit that, subsequent to Your request that

25    Plaintiff convey his interest in the Verona Property to You, Plaintiff conveyed his interest

26    in the Verona Property to You.        **ADMIT**

27    12.    REQUEST FOR ADMISSION NO. 12:  Admit that, on April 28, 2009, You recorded or

28

F:\DOCS\LETICIA ARCINIEGA\RFA RESPONSE.wpd                    -5-
8/14-3:01pm

**Exhibit "73"**
00183

1    caused to be recorded in the County of Riverside, California, a deed of trust purportedly

2    securing the Christian Loan.  **ADMIT**

3    13.    REQUEST FOR ADMISSION NO. 13:  Admit that David D. Christian did not in fact loan

4    You $120,000.**DENIED**

5    14.    REQUEST FOR ADMISSION NO. 14:  Admit that You failed to account in Your sworn

6    Statement of Financial Affairs for the dissipation of any funds received from David D.

7    Christian.    **DENIED**

8    15.    REQUEST FOR ADMISSION NO. 15:  Admit that, to the extent that any Christian Loan

9    did occur within two years immediately preceding the Petition Date, You failed to disclose

10    the transfer of any interest securing such Christian Loan in Your Statement of Financial

11    Affairs.    **DENIED**

12    16.    REQUEST FOR ADMISSION NO. 16:  Admit that You failed to disclose repayment of

13    the Christian Loan in Your sworn Statement of Financial Affairs at question 10.

14    **DENIED**

15    17.    REQUEST FOR ADMISSION NO. 17:  Admit that as of the Petition Date, the Christian

16    Loan was still secured against the Verona Property by deed of trust.**DENIED**

17    18.    REQUEST FOR ADMISSION NO. 18:  Admit that on the Petition Date You were aware

18    that the Christian Loan was still secured against the Verona Property by deed of trust.

19    **DENIED**

20    19.    REQUEST FOR ADMISSION NO. 19:  Admit that within one year prior to the Petition

21    Date, You transferred to one or more third parties Property belonging to You with a value

22    of $1,000 or more.    **DENIED**

23    20.    REQUEST FOR ADMISSION NO. 20:  Admit that one or more transfers You made

24    within one year prior to the Petition Date to one or more third parties of Property belonging

25    to You with a value of $1,000 or more were made with the intent to hinder Your creditors.

26    **DENIED**

27    21.    REQUEST FOR ADMISSION NO. 21:  Admit that one or more transfers You made

28

F:\DOCS\LETICIA ARCINIEGA\RFA RESPONSE.wpd      -6-
8/14-3:01pm

**Exhibit "73"**
**00184**

1  within one year prior to the Petition Date to one or more third parties of Property belonging

2  to You with a value of $1,000 or more were made with the intent to delay Your creditors.

3  **DENIED**

4  22.    REQUEST FOR ADMISSION NO. 22:  Admit that one or more transfers You made

5  within one year prior to the Petition Date to one or more third parties of Property belonging

6  to You with a value of $1,000 or more were made with the intent to defraud Your

7  creditors.    **DENIED**

8  23.    REQUEST FOR ADMISSION NO. 23:  Admit that within one year prior to the Petition

9  Date, You removed from Your possession Property belonging to You.    **DENIED**

10  24.    REQUEST FOR ADMISSION NO. 24:  Admit that Your removal from Your possession

11  of Property belonging to You within one year prior to the Petition Date was done with the

12  intent to hinder Your creditors.    **DENIED**

13  25.    REQUEST FOR ADMISSION NO. 25:  Admit that Your removal from Your possession

14  of Property belonging to You within one year prior to the Petition Date was done with the

15  intent to delay Your creditors.**DENIED**

16  26.    REQUEST FOR ADMISSION NO. 26:  Admit that Your removal from Your possession

17  of Property belonging to You within one year prior to the Petition Date was done with the

18  intent to defraud Your creditors.    **DENIED**

19  27.    REQUEST FOR ADMISSION NO. 27:  Admit that within one year prior to the Petition

20  Date, You concealed Property belonging to You with a value of $1000 or more.

21  **DENIED**

22  28.    REQUEST FOR ADMISSION NO. 28:  Admit that Your concealment of Property

23  belonging to You with a value of $1000 or more within one year prior to the Petition Date

24  was done with the intent to hinder Your creditors.    **DENIED**

25  29.    REQUEST FOR ADMISSION NO. 29:  Admit that Your concealment of Property

26  belonging to You with a value of $1000 or more within one year prior to the Petition Date

27  was done with the intent to delay Your creditors.    **DENIED**

28

F:\DOCS\LETICIA ARCINIEGA\RFA RESPONSE.wpd        -7-
8/14-3:01pm

Exhibit "73"
00185

30. **REQUEST FOR ADMISSION NO. 30:** Admit that Your concealment of Property belonging to You with a value of $1000 or more within one year prior to the Petition Date was done with the intent to defraud Your creditors. **DENIED**

31. **REQUEST FOR ADMISSION NO. 31:** Admit that within one year prior to the Petition Date, You permitted to be transferred to another Property belonging to You with a value of $1000 or more. **DENIED**

32. **REQUEST FOR ADMISSION NO. 32:** Admit that Your permission for transfer of Property belonging to You with a value of $1000 or more within one year prior to the Petition Date was done with the intent to hinder Your creditors. **DENIED**

33. **REQUEST FOR ADMISSION NO. 33:** Admit that Your permission for transfer of Property belonging to You with a value of $1000 or more within one year prior to the Petition Date was done with the intent to delay Your creditors. **DENIED**

34. **REQUEST FOR ADMISSION NO. 34:** Admit that Your permission for transfer of Property belonging to You with a value of $1000 or more within one year prior to the Petition Date was done with the intent to defraud Your creditors. **DENIED**

35. **REQUEST FOR ADMISSION NO. 35:** Admit that within one year prior to the Petition Date, You permitted to be removed from Your possession Property belonging to You. **DENIED**

36. **REQUEST FOR ADMISSION NO. 36:** Admit that Your permission for removal of Property belonging to You within one year prior to the Petition Date was done with the intent to hinder Your creditors. **DENIED**

37. **REQUEST FOR ADMISSION NO. 37:** Admit that Your permission for removal of Property belonging to You within one year prior to the Petition Date was done with the intent to delay Your creditors. **DENIED**

38. **REQUEST FOR ADMISSION NO. 38:** Admit that Your permission for removal of Property belonging to You within one year prior to the Petition Date was done with the intent to defraud Your creditors. **DENIED**

Exhibit "73"
00186

1   39.   REQUEST FOR ADMISSION NO. 39:  Admit that within one year prior to the Petition

2         Date, You permitted to be concealed Property belonging to You with a value of $1000 or

3         more.  **DENIED**

4   40.   REQUEST FOR ADMISSION NO. 40:  Admit that Your permission for concealment of

5         Property belonging to You within one year prior to the Petition Date was done with the

6         intent to hinder Your creditors.        **DENIED**

7   41.   REQUEST FOR ADMISSION NO. 41:  Admit that Your permission for concealment of

8         Property belonging to You within one year prior to the Petition Date was done with the

9         intent to delay Your creditors.**DENIED**

10  42.   REQUEST FOR ADMISSION NO. 42:  Admit that Your permission for concealment of

11        Property belonging to You within one year prior to the Petition Date was done with the

12        intent to defraud Your creditors.        **DENIED**

13  43.   REQUEST FOR ADMISSION NO. 43:  Admit that on May 4, 2009, You executed the

14        Settlement Agreement.        **DENIED**

15  44.   REQUEST FOR ADMISSION NO. 44:  Admit that, pursuant to the Settlement

16        Agreement, on April 30, 2009, Plaintiff delivered to You a check for $50,000.

17        **DENIED**

18  45.   REQUEST FOR ADMISSION NO. 45:  Admit that, pursuant to the Settlement

19        Agreement, You agreed to pay to Plaintiff liquidated damages of $1,000 a day for each day

20        after May 13, 2010, that You failed to pay off the VA Loan.**DENIED**

21  46.   REQUEST FOR ADMISSION NO. 46:  Admit that, pursuant to the Settlement

22        Agreement, You agreed to take all necessary measures to pay off the VA Loan by May 13,

23        2010.  **ADMIT**

24  47.   REQUEST FOR ADMISSION NO. 47:  Admit that You obtained the financial settlement

25        represented by the Settlement Agreement from Plaintiff based on false pretenses.

26        **DENIED**

27  48.   REQUEST FOR ADMISSION NO. 48:  Admit that You obtained the financial settlement

28

F:\DOCS\LETICIA ARCINIEGA\RFA RESPONSE.wpd            -9-
8/14-3:01pm

1    represented by the Settlement Agreement from Plaintiff based on false representations.

2    **DENIED**

3    49.    REQUEST FOR ADMISSION NO. 49:  Admit that You obtained the financial settlement

4    represented by the Settlement Agreement from Plaintiff based on actual fraud.

5    **DENIED**

6    50.    REQUEST FOR ADMISSION NO. 50:  Admit that You failed to take all necessary

7    measures to pay off the VA Loan by May 13, 2010.  **DENIED**

8    51.    REQUEST FOR ADMISSION NO. 51:  Admit that, at the time You agreed to take all

9    necessary measures to pay off the VA Loan by May 13, 2010, You knew Your

10    representation that You would do so was false.    **DENIED**

11    52.    REQUEST FOR ADMISSION NO. 52:  Admit that You agreed to take all necessary

12    measures to pay off the VA Loan by May 13, 2010, in order to induce Plaintiff to enter into

13    the Settlement Agreement.    **DENIED**

14    53.    REQUEST FOR ADMISSION NO. 53:  Admit that You never intended to pay off the VA

15    Loan by May 13, 2010.    **DENIED**

16    54.    REQUEST FOR ADMISSION NO. 54:  Admit that You willfully injured Plaintiff.

17    **DENIED**

18    55.    REQUEST FOR ADMISSION NO. 55:  Admit that You maliciously injured Plaintiff.

19    **DENIED**

20    56.    REQUEST FOR ADMISSION NO. 56:  Admit that You intended to cause Plaintiff harm.

21    **DENIED**

22    57.    REQUEST FOR ADMISSION NO. 57:  Admit that You acted deliberately in causing

23    harm to Plaintiff.    **DENIED**

24    58.    REQUEST FOR ADMISSION NO. 58:  Admit that You acted intentionally in causing

25    harm to Plaintiff.    **DENIED**

26    59.    REQUEST FOR ADMISSION NO. 59:  Admit that You acted wrongfully in causing harm

27    to Plaintiff.    **DENIED**

28

F:\DOCS\LETICIA ARCINIEGA\RFA RESPONSE.wpd    -10-
8/14-3:01pm

**Exhibit "73"**
**00188**

60.    REQUEST FOR ADMISSION NO. 60:  Admit that You acted without just cause and excuse in causing harm to Plaintiff.    **DENIED**

61.    REQUEST FOR ADMISSION NO. 61:  Admit that Your actions which caused harm to Plaintiff caused Plaintiff to suffer damages.    **DENIED**

62.    REQUEST FOR ADMISSION NO. 62:  Admit that as of the Petition Date, the Cayucos Property was worth more than $5,252.80.    **DENIED**

63.    REQUEST FOR ADMISSION NO. 63:  Admit that on the Petition Date, You knew that he Cayucos Property was worth more than $5,252.80.    **DENIED**

64.    REQUEST FOR ADMISSION NO. 64:  Admit that You intentionally misvalued the Cayucos Property on Your Schedule A.    **DENIED**

65.    REQUEST FOR ADMISSION NO. 65:  Admit that on the Petition Date Your interest in books, pictures, and collectibles was worth more than $150.**DENIED**

66.    REQUEST FOR ADMISSION NO. 66:  Admit that on the Petition Date You knew that Your interest in books, pictures, and collectibles was worth more than $150.

**DENIED**

67.    REQUEST FOR ADMISSION NO. 67:  Admit that You intentionally misvalued Your interest in books, pictures, and collectibles on Your Schedule B.    **DENIED**

68.    REQUEST FOR ADMISSION NO. 68:  Admit that on the Petition Date Your interest in office equipment, furnishings, and supplies was worth more than $1,500.    **DENIED**

69.    REQUEST FOR ADMISSION NO. 69:  Admit that on the Petition Date You knew that Your interest in office equipment, furnishings, and supplies was worth more than $1,500.

**DENIED**

70.    REQUEST FOR ADMISSION NO. 70:  Admit that You intentionally misvalued Your interest in office equipment, furnishings, and supplies on Your Schedule B.

**DENIED**

71.    REQUEST FOR ADMISSION NO. 71:  Admit that You intentionally failed to disclose the lien securing the Christian Loan on Your bankruptcy schedules.    **DENIED**

Exhibit "73"
00189

72.    REQUEST FOR ADMISSION NO. 72:  Admit that as of the Petition Date, the Main Street
Property was worth more than $149,400.    **DENIED**

73.    REQUEST FOR ADMISSION NO. 73:  Admit that on the Petition Date, You knew that
the Main Street Property was worth more than $149,400.    **DENIED**

74.    REQUEST FOR ADMISSION NO. 74:  Admit that You intentionally misvalued the Main
Street Property on Your Schedule A. **DENIED**

75.    REQUEST FOR ADMISSION NO. 75:  Admit that You intentionally failed to disclose
rental income from MSRE, Inc. on Your bankruptcy schedules.    **DENIED**

76.    REQUEST FOR ADMISSION NO. 76:  Admit that on the Petition Date You were aware
that Your liability to Plaintiff was $281,000. **DENIED**

77.    REQUEST FOR ADMISSION NO. 77:  Admit that on the Petition Date You were aware
that Your liability to Plaintiff was more than $100,000.    **DENIED**

78.    REQUEST FOR ADMISSION NO. 78:  Admit that You intentionally failed to disclose on
Your bankruptcy schedules Your $281,000 liability to Plaintiff.    **DENIED**

79.    REQUEST FOR ADMISSION NO. 79:  Admit that You intentionally failed to disclose on
Your bankruptcy schedules the precise amount of Your liability to Plaintiff.

**DENIED**

80.    REQUEST FOR ADMISSION NO. 80:  Admit that You intentionally failed to disclose on
Your bankruptcy schedules approximation of the amount of Your liability to Plaintiff.

**DENIED**

81.    REQUEST FOR ADMISSION NO. 81:  Admit that You received $50,000 in exchange for
a transfer of title of the Arrowhead Property to Plaintiff.    **ADMIT**

82.    REQUEST FOR ADMISSION NO. 82:  Admit that on Your sworn Statement of Financial
Affairs You intentionally misrepresented that You had received $30,000 in exchange for
transfer of the title of the Arrowhead Property to Plaintiff.   **DENIED**

83.    REQUEST FOR ADMISSION NO. 83:  Admit that You did not intend to use any funds
You received in association with the Christian Loan to pay off the VA Loan associated

F:\DOCS\LETICIA ARCINIEGA\RFA RESPONSE.wpd
8/14-3:01pm

-12-

1  with the Verona Property.    **DENIED**

2  84.    REQUEST FOR ADMISSION NO. 84:  Admit that You did not intend to use the $50,000

3  You received in exchange for the transfer of title to the Arrowhead Property to pay off the

4  VA Loan associated with the Verona Property.    **DENIED**

5

6

7  DATED:    August 14, 2012    LAW OFFICE OF BARUCH C. COHEN
                                A Professional Law Corporation

8

9  By ___/S/ Baruch C. Cohen_____
   Baruch C. Cohen, Esq.

10  *Attorney For Defendant* LETICIA JOY ARCINIEGA

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

F:\DOCS\LETICIA ARCINIEGA\RFA RESPONSE.wpd    -13-
8/14-3:01pm

**Exhibit "73"**
**00191**

1

## VERIFICATION:

2      The undersigned has reviewed the foregoing DEFENDANT LETICIA JOY
ARCINIEGA'S VERIFIED RESPONSE TO PLAINTIFF JAMES CLARK'S FIRST SET OF
3    REQUEST FOR ADMISSIONS F.R.C.P. 36 F.R.B.P. 7036 and further declares under penalty of
perjury under the laws of the United States and of the State of California that the foregoing are true
4    and correct, except as to those matters stated on information and belief, which the undersigned is
informed and believes are true and correct.

5

6    August 14, 2012                    *Defendant* LETICIA JOY ARCINIEGA

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

F:\DOCS\LETICIA ARCINIEGA\RFA RESPONSE.wpd          -14-
8/14-3:01pm

Exhibit "73"
00192

| In re: LETICIA JOY ARCINIEGA | Chapter 7 No. 6:11-BK-15412-DS |
|---|---|
| JAMES CLARK *against LETICIA JOY ARCINIEGA.* | Adversary # 6:11-ap-01735-DS |

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I. Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

## PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 4929 Wilshire Boulevard, Suite 940, Los Angeles, CA 90010.  The document entitled: **DEFENDANT LETICIA JOY ARCINIEGA'S VERIFIED RESPONSE TO PLAINTIFF JAMES CLARK'S FIRST SET OF REQUEST FOR ADMISSIONS F.R.C.P. 36 F.R.B.P. 7036** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

I.  **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

Baruch C Cohen - bcc4929@gmail.com

Tom Tarter - ttarter@earthlink.net

II.  SERVED BY U.S. MAIL OR OVERNIGHT MAIL(indicate method for each person or entity served): On August 14, 2012 I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. *Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.*
☐Service information continued on attached page

Tom Tarter The Andela Consulting Group 16311 Ventura Blvd., Suite 845 Encino, CA 91436
Phone: (818) 380-3102 Fax: (818) 501-5412

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| *Date*   August 14, 2012 | *Signature* |
|---|---|
| *Type Name* **BARUCH C. COHEN** | By    /S/ Baruch C. Cohen |

F:\DOCS\LETICIA ARCINIEGA\RFA RESPONSE.wpd
8/14-3:01pm

-15-

Exhibit "73"
00193

1    Baruch C. Cohen, Esq. (SBN 159455)
**LAW OFFICE OF BARUCH C. COHEN**
2         A Professional Law Corporation
4929 Wilshire Boulevard, Suite 940
3    Los Angeles, California 90010
(323) 937-4501       Fax (323) 937-4503
4    e-mail: BCC4929@gmail.com
Linkedin Profile: http://www.linkedin.com/in/baruchcohen
5
*Attorney For Defendant* LETICIA JOY ARCINIEGA
6

7

8                    **UNITED STATES BANKRUPTCY COURT**
9
                     **CENTRAL DISTRICT OF CALIFORNIA**
10
                        **RIVERSIDE DIVISION**
11

12   | | |
     |---|---|
     | In re | Case No. 6:11-BK-15412-DS |
13   | | Adversary # 6:11-ap-01735-DS |
     | LETICIA JOY ARCINIEGA, | Before the Honorable Deborah J. Salzman |
14   | | Chapter 7 |
     | Debtor | |

15

16

17   JAMES CLARK,                        DEFENDANT LETICIA JOY ARCINIEGA'S
                                         VERIFIED RESPONSE TO PLAINTIFF'S
18          Plaintiff                    FIRST SET OF INTERROGATORIES F.R.C.P.
                                         33 F.R.B.P. 7034
19   vs.

20   LETICIA JOY ARCINIEGA,

21          Defendants

22

23

24   PROPOUNDING PARTY:    PLAINTIFF JAMES CLARK

25   RESPONDING PARTY:    DEFENDANT LETICIA JOY ARCINIEGA

26   SET NO.:             ONE

27   TO PLAINTIFF JAMES CLARK AND HIS ATTORNEYS OF RECORD HEREIN:

28   DEFENDANT LETICIA JOY ARCINIEGA (hereinafter referred to collectively as

F:\DOCS\LETICIA ARCINIEGA\SROGGS RESPONSE 2.wpd
9/12-5:57pm

Exhibit "74"
00194

1 | "DEFENDANT")  hereby responds to the PLAINTIFF'S FIRST SET OF INTERROGATORIES

2 | F.R.C.P. 33 F.R.B.P. 7034 (hereinafter referred to as "Discovery Requests") issued by

3 | PLAINTIFF JAMES CLARK(hereinafter referred to as "PLAINTIFF").

4 | **PRELIMINARY STATEMENT**

5 |     These responses are made solely for the purpose of this action. Each response is subject to

6 | all objections as to competence, relevance, materiality, propriety and admissibility, and any and all

7 | other objections and grounds that would require the exclusion of any statement herein, if any

8 | interrogatory were asked for or any statement contained herein was made by a witness present and

9 | testifying in court, all of which objections and grounds are reserved and may be interposed at the

10 | time of trial. This responding party is responding to all Discovery Demands to the extent that

11 | information has become known by it. However, this responding party's discovery and

12 | investigation in preparation for trial is this matter has not been completed as of the date of these

13 | responses to Discovery Demands, and, therefore, this responding party does not propose to state

14 | herein anything more than information presently known and discovered by it. This responding

15 | party reserves the right to continue discovery and investigation in this matter for facts, witnesses

16 | and supporting data that may recall information which, if it had presently within its knowledge,

17 | would be included in these responses. Consequently, to the extent that the Discovery Demands

18 | herein ask for "all facts" or the name of "all persons" or the identity of "all documents", etc., they

19 | are responded to fully insofar as the information is presently available to the responding party.

20 | This responding party is not precluded from presenting at trial information discovered following

21 | the date of these responses. However, Defendant assume no obligation to voluntarily supplement

22 | or amend these responses to reflect witnesses, facts and evidence discovered following the mailing

23 | of these responses. Except for explicit facts submitted herein, no admissions of any nature

24 | whatsoever are implied or should be inferred. The fact that any Discovery Demand herein has been

25 | answered should not be taken as an admission, or acceptance, or that existence or any fact or facts

26 | set forth or assumed by such Discovery Demand, or that such answer constitutes admissible

27 | evidence.

28 |     It is assumed by the responding party that the propounding party and all parties to this

F:\DOCS\LETICIA ARCINIEGA\SROGGS RESPONSE 2.wpd      -2-
9/12-5:57pm

**Exhibit "74"**
00195

1   lawsuit possess and are familiar with all the discovery proceedings in this action. Therefore, when

2   an interrogatory calls for information which is contained in the discovery materials available to all

3   parties, said interrogatory will be answered only by reference to those discovery materials.

4        This introductory statement is incorporated herein by reference to each of the answers as it

5   is stated in full.

6          **GENERAL OBJECTIONS APPLICABLE TO ALL DISCOVERY DEMANDS**

7        Defendant objects to Plaintiff's Discovery Demands and each request contained therein to

8   the extent they seek information that is vague, ambiguous, over broad, inadequately described,

9   burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

10        Defendant objects to Plaintiff's Discovery Demands and each request contained therein to

11   the extent they seek to impose a duty upon Defendant which is greater than imposed by the Federal

12   Rules of Civil Procedure.

13        Defendant objects to Plaintiff's Discovery Demands and each request contained therein to

14   the extent they call for any documents protected from disclosure or discovery by (i) the attorney-

15   client privilege; (ii) the protection of the attorney work product privilege, including but not limited

16   to documents prepared in anticipation of litigation or for trial; and (iii) any other applicable

17   privilege(s). Defendant claims privileges and protection with respect to all information and

18   documents which are protected from disclosure or discovery by such privilege(s) and protection(s).

19        Defendant objects to Plaintiff's Discovery Demands and each request contained therein to

20   the extent they seek production or disclosure of documents containing confidential, sensitive,

21   private and/or proprietary information of Defendant, their family members and others.

22        Defendant objects to Plaintiff's Discovery Demands and each request contained therein to

23   the extent they seek production or disclosure of documents which are not relevant to the subject

24   matter of this lawsuit.

25        Defendant objects to Plaintiff's Discovery Demands and each request contained therein to

26   the extent they seek production or disclosure of documents that Plaintiffs already have in its

27   possession.

28        Defendant made a diligent and good faith effort to locate and produce the documents

F:\DOCS\LETICIA ARCINIEGA\SROGGS RESPONSE 2.wpd    -3-
9/12-5:57pm

**Exhibit "74"**
**00196**

1  which are responsive to those requests. Defendant, however, has not completed her investigation.

2  Accordingly, the following written responses are based on the current status of Defendant's

3  investigation and discovery, and the accompanying production of documents consists of those

4  documents within Defendant's custody and control which have been located following diligent

5  search. These written responses and the accompanying documents are provided without prejudice

6  to Defendant's right to offer into evidence additional responsive documents or evidence when such

7  are located or ascertained. More over, these responses should not be construed as, and do not

8  constitute, a waiver of Defendant's right to introduce additional evidence, in any form, later on in

9  this proceeding.

10  These written responses and the accompanying production of documents are subject to all

11  objections including but not limited to, relevance, materiality, and admissibility, that would

12  require exclusion of any statement made herein, or any document produced, as if it were made by a

13  witness present and testifying in court, all of which objections and grounds are reserved and may

14  be imposed at the time of arbitration or trial. The fact that Defendant has responded to all or any

15  part of a request for production is not an admission that the request seeks admissible evidence and

16  is not to be construed as a waiver of any proper grounds of objection that may hereafter be

17  interposed to such request or to the admissibility of any documents produced in response thereto.

18  The foregoing General Objections are incorporated into each specific responses made

19  below by Defendant to Plaintiff's Discovery Demands. Defendant's specific responses are made

20  without waiving and are otherwise without prejudice to these General Objections. Furthermore, as

21  set forth below, certain representations in the specific response below as to Defendant's intention

22  and agreement to produce documents in response to these requests are contingent upon the entry in

23  this action of a stipulated protective order to ensure the confidentiality of such documents.

24

25  **RESPONSE TO INTERROGATORIES**

26  1.    SPECIAL INTERROGATORY NO. 1:  Identify any and all individuals with whom You

27        have communicated regarding this litigation.

28        a.    OBJECTION: This demand is vague (ie, which litigation?), overly broad (no time

Exhibit "74"
00197

1    period), burdensome, and oppressive. Subject to, and without waiver of, said

2    objection, this responding party states that the answer is NONE.

3    2.    SPECIAL INTERROGATORY NO. 2: Identify any and all financial institutions

4    maintaining accounts in Your name, as an individual or jointly with another individual or

5    entity.

6        a.    OBJECTION: This demand is vague, overly broad, irrelevant, burdensome, and

7            oppressive. Plaintiff is not entitled to Debtor's bank statements relating to financial

8            accounts held by her (or jointly).  Subject to, and without waiver of, said objection,

9            this responding party states that the answer is - ALL BANK ACCOUNTS WERE

10            PROPERLY LISTED IN THE DEBTOR'S BANKRUPTCY.

11    3.    SPECIAL INTERROGATORY NO. 3: Identify any and all persons who are holding or

12    have at any time since May 4, 2007, held property for Your benefit.

13        a.    OBJECTION: This demand is vague, overly broad, irrelevant, burdensome, and

14            oppressive.  There is no relevance to this May 4, 2007 date to the specific causes of

15            action in this adversary proceeding. The Arrowhead Litigation was commenced on

16            May 2, 2007, and those claims for declaratory relief, breach of oral contract and

17            specific performance were or will be discharged in the Debtor's bankruptcy. That

18            date has no relevance to the other causes of action herein. The 523(a)(2)(A) and

19            (a)(6) causes of action are for the May 4, 2009 Settlement Agreement between the

20            parties and David Christian & Dolores Arciniega were not involved in that

21            transaction nor were their bank accounts. The 727(a)(2) and (a)(4) causes of action

22            only apply to the February 18, 2011 Petition Date and the 1-year reachback of

23            February 18, 2010. Subject to, and without waiver of, said objection, this

24            responding party states that the answer is - NONE.

25    4.    SPECIAL INTERROGATORY NO. 4:  Identify any and all property of value greater than

26    $1,000 belonging to You at any time during the period commencing on May 4, 2007,

27    through and including the Petition Date.

28        a.    OBJECTION: This demand is vague, overly broad, irrelevant, burdensome, and

Exhibit "74"
00198

1  oppressive. There is no relevance to this May 4, 2007 date to the specific causes of

2  action in this adversary proceeding. The Arrowhead Litigation was commenced on

3  May 2, 2007, and those claims for declaratory relief, breach of oral contract and

4  specific performance were or will be discharged in the Debtor's bankruptcy. That

5  date has no relevance to the other causes of action herein. The 523(a)(2)(A) and

6  (a)(6) causes of action are for the May 4, 2009 Settlement Agreement between the

7  parties and David Christian & Dolores Arciniega were not involved in that

8  transaction nor were their bank accounts. The 727(a)(2) and (a)(4) causes of action

9  only apply to the February 18, 2011 Petition Date and the 1-year reachback of

10  February 18, 2010. Subject to, and without waiver of, said objection, this

11  responding party states that the answer is - NONE.

12  5.    SPECIAL INTERROGATORY NO. 5: Identify any and all encumbrances on the Verona

13  Property.

14      a.    OBJECTION: This demand is vague, overly broad, irrelevant, burdensome, and

15          oppressive. Subject to, and without waiver of, said objection, this responding party

16          states that the answer is - ALL WERE PROPERLY LISTED IN THE DEBTOR'S

17          BANKRUPTCY.

18  6.    SPECIAL INTERROGATORY NO. 6:   Identify any and all efforts You have made to pay

19  off the VA Loan secured by the Verona Property.

20      a.    OBJECTION: This demand is vague, overly broad (no time period), irrelevant,

21          burdensome, and oppressive. Subject to, and without waiver of, said objection, this

22          responding party states that she already produced these documents to Plaintiff after

23          the mediation. Said documents will be produced again. See attached file:

24          SpecInterrog 6 CoA 1.pdf.

25  7.    SPECIAL INTERROGATORY NO. 7:  Identify the disposition of all funds or assets You

26  received from David D. Christian during the period from May 4, 2007, through and

27  including the Petition Date.

28      a.    OBJECTION: This demand is vague, overly broad, irrelevant, burdensome, and

Exhibit "74"
00199

1  oppressive. There is no relevance to this May 4, 2007 date to the specific causes of

2  action in this adversary proceeding. The Arrowhead Litigation was commenced on

3  May 2, 2007, and those claims for declaratory relief, breach of oral contract and

4  specific performance were or will be discharged in the Debtor's bankruptcy. That

5  date has no relevance to the other causes of action herein. The 523(a)(2)(A) and

6  (a)(6) causes of action are for the May 4, 2009 Settlement Agreement between the

7  parties and David Christian & Dolores Arciniega were not involved in that

8  transaction nor were their bank accounts. The 727(a)(2) and (a)(4) causes of action

9  only apply to the February 18, 2011 Petition Date and the 1-year reachback of

10  February 18, 2010. Subject to, and without waiver of, said objection, this

11  responding party states that the answer is - See attached file: "SpecInterrog 7-CoA

12  -3-para 73.pdf"

13  8.   SPECIAL INTERROGATORY NO. 8:  Identify the disposition of the $50,000 You

14  received from Plaintiff in exchange for transfer of title to the Arrowhead Property.

15       a.   OBJECTION: This demand is vague, overly broad, irrelevant, burdensome, and

16           oppressive. Subject to, and without waiver of, said objection, this responding party

17           states that the answer is - $20k to Milton & Associates in payment for services, the

18           balance went to MSRE, Inc. I believe the last of it is reported in my BK filing

19           income/expense worksheet as an Owner Contribution to the business in January of

20           2010.

21  9.   SPECIAL INTERROGATORY NO. 9: Identify any and all transfers from You to any

22  third-party individuals or entities of property belonging to You with a value of $1000 or

23  more during the period commencing on May 4, 2007, through and including the Petition

24  Date.

25       a.   OBJECTION: This demand is vague, overly broad, irrelevant, burdensome, and

26           oppressive. There is no relevance to this May 4, 2007 date to the specific causes of

27           action in this adversary proceeding. The Arrowhead Litigation was commenced on

28           May 2, 2007, and those claims for declaratory relief, breach of oral contract and

F:\DOCS\LETICIA ARCINIEGA\SROGGS RESPONSE 2.wpd       -7-
9/12-5:57pm

1   specific performance were or will be discharged in the Debtor's bankruptcy. That

2   date has no relevance to the other causes of action herein. The 523(a)(2)(A) and

3   (a)(6) causes of action are for the May 4, 2009 Settlement Agreement between the

4   parties and David Christian & Dolores Arciniega were not involved in that

5   transaction nor were their bank accounts. The 727(a)(2) and (a)(4) causes of action

6   only apply to the February 18, 2011 Petition Date and the 1-year reachback of

7   February 18, 2010. Subject to, and without waiver of, said objection, this

8   responding party states that the answer is - NONE.

9   10.   SPECIAL INTERROGATORY NO. 10: Identify any and all real property held in Your

10   name or for Your benefit during the period commencing on May 4, 2007, through and

11   including the Petition Date.

12       a.   OBJECTION: This demand is vague, overly broad, irrelevant, burdensome, and

13           oppressive.  There is no relevance to this May 4, 2007 date to the specific causes of

14           action in this adversary proceeding. The Arrowhead Litigation was commenced on

15           May 2, 2007, and those claims for declaratory relief, breach of oral contract and

16           specific performance were or will be discharged in the Debtor's bankruptcy. That

17           date has no relevance to the other causes of action herein. The 523(a)(2)(A) and

18           (a)(6) causes of action are for the May 4, 2009 Settlement Agreement between the

19           parties and David Christian & Dolores Arciniega were not involved in that

20           transaction nor were their bank accounts. The 727(a)(2) and (a)(4) causes of action

21           only apply to the February 18, 2011 Petition Date and the 1-year reachback of

22           February 18, 2010. Subject to, and without waiver of, said objection, this

23           responding party states that the answer is - - ALL WERE PROPERLY LISTED IN

24           THE DEBTOR'S BANKRUPTCY.

25   11.   SPECIAL INTERROGATORY NO. 11: Identify any and all trusts established in Your

26   name or for Your benefit during the period commencing on May 4, 2007, through and

27   including the Petition Date.

28       a.   OBJECTION: This demand is vague, overly broad, irrelevant, burdensome, and

F:\DOCS\LETICIA ARCINIEGA\SROGGS RESPONSE 2.wpd   -8-
9/12-5:57pm

Exhibit "74"
00201

1    oppressive.  There is no relevance to this May 4, 2007 date to the specific causes of

2    action in this adversary proceeding. The Arrowhead Litigation was commenced on

3    May 2, 2007, and those claims for declaratory relief, breach of oral contract and

4    specific performance were or will be discharged in the Debtor's bankruptcy. That

5    date has no relevance to the other causes of action herein. The 523(a)(2)(A) and

6    (a)(6) causes of action are for the May 4, 2009 Settlement Agreement between the

7    parties and David Christian & Dolores Arciniega were not involved in that

8    transaction nor were their bank accounts. The 727(a)(2) and (a)(4) causes of action

9    only apply to the February 18, 2011 Petition Date and the 1-year reachback of

10    February 18, 2010. Subject to, and without waiver of, said objection, this

11    responding party states that the answer is - NONE.

12   12.    SPECIAL INTERROGATORY NO. 12: Identify any and all loans obtained by You during

13   the period commencing on May 4, 2007, through and including the Petition Date.

14        a.    OBJECTION: This demand is vague, overly broad, irrelevant, burdensome, and

15        oppressive.  There is no relevance to this May 4, 2007 date to the specific causes of

16        action in this adversary proceeding. The Arrowhead Litigation was commenced on

17        May 2, 2007, and those claims for declaratory relief, breach of oral contract and

18        specific performance were or will be discharged in the Debtor's bankruptcy. That

19        date has no relevance to the other causes of action herein. The 523(a)(2)(A) and

20        (a)(6) causes of action are for the May 4, 2009 Settlement Agreement between the

21        parties and David Christian & Dolores Arciniega were not involved in that

22        transaction nor were their bank accounts. The 727(a)(2) and (a)(4) causes of action

23        only apply to the February 18, 2011 Petition Date and the 1-year reachback of

24        February 18, 2010. Subject to, and without waiver of, said objection, this

25        responding party states that the answer is - - ALL WERE PROPERLY LISTED IN

26        THE DEBTOR'S BANKRUPTCY.

27   13.    SPECIAL INTERROGATORY NO. 13: Identify any and all property, tangible or

28   intangible, with a value of $1000 or more transferred to You during the period

F:\DOCS\LETICIA ARCINIEGA\SROGGS RESPONSE 2.wpd        -9-
9/12-5:57pm

1    commencing on May 4, 2007, through and including the Petition Date.

2    a.    OBJECTION: This demand is vague, overly broad, irrelevant, burdensome, and

3    oppressive. There is no relevance to this May 4, 2007 date to the specific causes of

4    action in this adversary proceeding. The Arrowhead Litigation was commenced on

5    May 2, 2007, and those claims for declaratory relief, breach of oral contract and

6    specific performance were or will be discharged in the Debtor's bankruptcy. That

7    date has no relevance to the other causes of action herein. The 523(a)(2)(A) and

8    (a)(6) causes of action are for the May 4, 2009 Settlement Agreement between the

9    parties and David Christian & Dolores Arciniega were not involved in that

10    transaction nor were their bank accounts. The 727(a)(2) and (a)(4) causes of action

11    only apply to the February 18, 2011 Petition Date and the 1-year reachback of

12    February 18, 2010. Subject to, and without waiver of, said objection, this

13    responding party states that the answer is - NONE.

14    14.    SPECIAL INTERROGATORY NO. 14: Identify any and all transfers of property between

15    You and David D. Christian during the period commencing on May 4, 2007, through and

16    including the Petition Date.

17    a.    OBJECTION: This demand is vague, overly broad, irrelevant, burdensome, and

18    oppressive. There is no relevance to this May 4, 2007 date to the specific causes of

19    action in this adversary proceeding. The Arrowhead Litigation was commenced on

20    May 2, 2007, and those claims for declaratory relief, breach of oral contract and

21    specific performance were or will be discharged in the Debtor's bankruptcy. That

22    date has no relevance to the other causes of action herein. The 523(a)(2)(A) and

23    (a)(6) causes of action are for the May 4, 2009 Settlement Agreement between the

24    parties and David Christian & Dolores Arciniega were not involved in that

25    transaction nor were their bank accounts. The 727(a)(2) and (a)(4) causes of action

26    only apply to the February 18, 2011 Petition Date and the 1-year reachback of

27    February 18, 2010. Subject to, and without waiver of, said objection, this

28    responding party states that the answer is - NONE.

F:\DOCS\LETICIA ARCINIEGA\SROGGS RESPONSE 2.wpd    -10-
9/12-5:57pm

Exhibit "74"
00203

15.    SPECIAL INTERROGATORY NO. 15:  Identify any and all transfers of property between

You and Dolores Arciniega during the period commencing on May 4, 2007, through and

including the Petition Date.

    a.    OBJECTION: This demand is vague, overly broad, irrelevant, burdensome, and

oppressive.  There is no relevance to this May 4, 2007 date to the specific causes of

action in this adversary proceeding. The Arrowhead Litigation was commenced on

May 2, 2007, and those claims for declaratory relief, breach of oral contract and

specific performance were or will be discharged in the Debtor's bankruptcy. That

date has no relevance to the other causes of action herein. The 523(a)(2)(A) and

(a)(6) causes of action are for the May 4, 2009 Settlement Agreement between the

parties and David Christian & Dolores Arciniega were not involved in that

transaction nor were their bank accounts. The 727(a)(2) and (a)(4) causes of action

only apply to the February 18, 2011 Petition Date and the 1-year reachback of

February 18, 2010. Subject to, and without waiver of, said objection, this

responding party states that the answer is - NONE.

DATED:    September 12, 2012    LAW OFFICE OF BARUCH C. COHEN
                                      A Professional Law Corporation

                                      By ___ /S/ Baruch C. Cohen _____
                                      Baruch C. Cohen, Esq.
                                      *Attorney For Defendant* LETICIA JOY ARCINIEGA

Exhibit "74"
00204

1

**VERIFICATION:**

2     The undersigned has reviewed the foregoing DEFENDANT LETICIA JOY
ARCINIEGA'S VERIFIED RESPONSE TO PLAINTIFF'S FIRST SET OF

3     INTERROGATORIES F.R.C.P. 33 F.R.B.P. 7034 and further declares under penalty of perjury
under the laws of the United States and of the State of California that the foregoing are true and

4     correct, except as to those matters stated on information and belief, which the undersigned is
informed and believes are true and correct.

5

6     September 12, 2012                    *Defendant* LETICIA JOY ARCINIEGA

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

F:\DOCS\LETICIA ARCINIEGA\SROGGS RESPONSE 2.wpd          -12-
9/12-5:57pm

Exhibit "74"
00205

| In re: LETICIA JOY ARCINIEGA | Chapter 7 No. 6:11-BK-15412-DS |
|---|---|
| JAMES CLARK *against LETICIA JOY ARCINIEGA.* | Adversary # 6:11-ap-01735-DS |

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I. Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

### PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 4929 Wilshire Boulevard, Suite 940, Los Angeles, CA 90010. The document entitled: DEFENDANT LETICIA JOY ARCINIEGA'S VERIFIED RESPONSE TO PLAINTIFF'S FIRST SET OF INTERROGATORIES F.R.C.P. 33 F.R.B.P. 7034 will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

I. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

Baruch C Cohen - bcc4929@gmail.com
Tom Tarter - ttarter@earthlink.net

II. SERVED BY U.S. MAIL OR OVERNIGHT MAIL(indicate method for each person or entity served): On September 12, 2012 I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. *Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.*
☐Service information continued on attached page

Tom Tarter The Andela Consulting Group 16311 Ventura Blvd., Suite 845 Encino, CA 91436 Phone: (818) 380-3102 Fax: (818) 501-5412

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| *Date*   September 12, 2012 | *Signature* |
|---|---|
| *Type Name* **BARUCH C. COHEN** | By    /S/ Baruch C. Cohen |

F:\DOCS\LETICIA ARCINIEGA\SROGGS RESPONSE 2.wpd
9/12-5:57pm                                    -13-

Exhibit "74"
00206

1

Baruch C. Cohen, Esq. (SBN 159455)
**LAW OFFICE OF BARUCH C. COHEN**
A Professional Law Corporation
4929 Wilshire Boulevard, Suite 940
Los Angeles, California 90010
(323) 937-4501     Fax (323) 937-4503
e-mail: BCC4929@gmail.com
Linkedin Profile: http://www.linkedin.com/in/baruchcohen

2

3

4

5

*Attorney For Defendant* LETICIA JOY ARCINIEGA

6

7

8

9

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

10

**RIVERSIDE DIVISION**

11

12

In re

13

LETICIA JOY ARCINIEGA,

14

Debtor

15

16

17

JAMES CLARK,

18

Plaintiff

19

vs.

20

LETICIA JOY ARCINIEGA,

21

Defendants

22

Case No. 6:11-BK-15412-DS
Adversary # 6:11-ap-01735-DS
Before the Honorable Deborah J. Salzman
Chapter 7

DEFENDANT LETICIA JOY ARCINIEGA'S
VERIFIED RESPONSE TO PLAINTIFF JAMES
CLARK'S FIRST SET OF DOCUMENT
DEMANDS F.R.C.P. 34 F.R.B.P. 7034

23

24

PROPOUNDING PARTY:   PLAINTIFF JAMES CLARK

25

RESPONDING PARTY:   DEFENDANT LETICIA JOY ARCINIEGA

26

SET NO.:     ONE

27

TO PLAINTIFF JAMES CLARK AND HIS ATTORNEYS OF RECORD HEREIN:

28

DEFENDANT LETICIA JOY ARCINIEGA (hereinafter referred to collectively as

F:\DOCS\LETICIA ARCINIEGA\DOC DEMAND RESPONSE.wpd
9/11-7:01pm

Exhibit "75"
00207

1  "DEFENDANT")  hereby responds to the PLAINTIFF'S FIRST SET OF DOCUMENT

2  DEMANDS  (hereinafter referred to as "Discovery Requests") issued by PLAINTIFF JAMES

3  CLARK(hereinafter referred to as "PLAINTIFF").

4  **PRELIMINARY STATEMENT**

5      These responses are made solely for the purpose of this action. Each response is subject to

6  all objections as to competence, relevance, materiality, propriety and admissibility, and any and all

7  other objections and grounds that would require the exclusion of any statement herein, if any

8  interrogatory were asked for or any statement contained herein was made by a witness present and

9  testifying in court, all of which objections and grounds are reserved and may be interposed at the

10  time of trial. This responding party is responding to all Discovery Demands to the extent that

11  information has become known by it. However, this responding party's discovery and

12  investigation in preparation for trial is this matter has not been completed as of the date of these

13  responses to Discovery Demands, and, therefore, this responding party does not propose to state

14  herein anything more than information presently known and discovered by it. This responding

15  party reserves the right to continue discovery and investigation in this matter for facts, witnesses

16  and supporting data that may recall information which, if it had presently within its knowledge,

17  would be included in these responses. Consequently, to the extent that the Discovery Demands

18  herein ask for "all facts" or the name of "all persons" or the identity of "all documents", etc., they

19  are responded to fully insofar as the information is presently available to the responding party.

20  This responding party is not precluded from presenting at trial information discovered following

21  the date of these responses. However, Defendant assume no obligation to voluntarily supplement

22  or amend these responses to reflect witnesses, facts and evidence discovered following the mailing

23  of these responses. Except for explicit facts submitted herein, no admissions of any nature

24  whatsoever are implied or should be inferred. The fact that any Discovery Demand herein has been

25  answered should not be taken as an admission, or acceptance, or that existence or any fact or facts

26  set forth or assumed by such Discovery Demand, or that such answer constitutes admissible

27  evidence.

28      It is assumed by the responding party that the propounding party and all parties to this

F:\DOCS\LETICIA ARCINIEGA\DOC DEMAND RESPONSE.wpd    -2-
9/11-7:01pm

**Exhibit "75"**
**00208**

1   lawsuit possess and are familiar with all the discovery proceedings in this action. Therefore, when

2   an interrogatory calls for information which is contained in the discovery materials available to all

3   parties, said interrogatory will be answered only by reference to those discovery materials.

4        This introductory statement is incorporated herein by reference to each of the answers as it

5   is stated in full.

6   **GENERAL OBJECTIONS APPLICABLE TO ALL DISCOVERY DEMANDS**

7        Defendant objects to Plaintiff's Discovery Demands and each request contained therein to

8   the extent they seek information that is vague, ambiguous, over broad, inadequately described,

9   burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

10        Defendant objects to Plaintiff's Discovery Demands and each request contained therein to

11   the extent they seek to impose a duty upon Defendant which is greater than imposed by the Federal

12   Rules of Civil Procedure.

13        Defendant objects to Plaintiff's Discovery Demands and each request contained therein to

14   the extent they call for any documents protected from disclosure or discovery by (i) the attorney-

15   client privilege; (ii) the protection of the attorney work product privilege, including but not limited

16   to documents prepared in anticipation of litigation or for trial; and (iii) any other applicable

17   privilege(s). Defendant claims privileges and protection with respect to all information and

18   documents which are protected from disclosure or discovery by such privilege(s) and protection(s).

19        Defendant objects to Plaintiff's Discovery Demands and each request contained therein to

20   the extent they seek production or disclosure of documents containing confidential, sensitive,

21   private and/or proprietary information of Defendant, their family members and others.

22        Defendant objects to Plaintiff's Discovery Demands and each request contained therein to

23   the extent they seek production or disclosure of documents which are not relevant to the subject

24   matter of this lawsuit.

25        Defendant objects to Plaintiff's Discovery Demands and each request contained therein to

26   the extent they seek production or disclosure of documents that Plaintiffs already have in its

27   possession.

28        Defendant made a diligent and good faith effort to locate and produce the documents

F:\DOCS\LETICIA ARCINIEGA\DOC DEMAND RESPONSE.wpd    -3-
9/11-7:01pm

**Exhibit "75"**
**00209**

1   which are responsive to those requests. Defendant, however, has not completed her investigation.

2   Accordingly, the following written responses are based on the current status of Defendant's

3   investigation and discovery, and the accompanying production of documents consists of those

4   documents within Defendant's custody and control which have been located following diligent

5   search. These written responses and the accompanying documents are provided without prejudice

6   to Defendant's right to offer into evidence additional responsive documents or evidence when such

7   are located or ascertained. More over, these responses should not be construed as, and do not

8   constitute, a waiver of Defendant's right to introduce additional evidence, in any form, later on in

9   this proceeding.

10      These written responses and the accompanying production of documents are subject to all

11   objections including but not limited to, relevance, materiality, and admissibility, that would

12   require exclusion of any statement made herein, or any document produced, as if it were made by a

13   witness present and testifying in court, all of which objections and grounds are reserved and may

14   be imposed at the time of arbitration or trial. The fact that Defendant has responded to all or any

15   part of a request for production is not an admission that the request seeks admissible evidence and

16   is not to be construed as a waiver of any proper grounds of objection that may hereafter be

17   interposed to such request or to the admissibility of any documents produced in response thereto.

18      The foregoing General Objections are incorporated into each specific responses made

19   below by Defendant to Plaintiff's Discovery Demands. Defendant's specific responses are made

20   without waiving and are otherwise without prejudice to these General Objections. Furthermore, as

21   set forth below, certain representations in the specific response below as to Defendant's intention

22   and agreement to produce documents in response to these requests are contingent upon the entry in

23   this action of a stipulated protective order to ensure the confidentiality of such documents.

24                      **RESPONSE TO DOCUMENT DEMANDS**

25   1.    REQUEST FOR PRODUCTION NO. 1: Produce any and all documents relating to

26         communications between You and David D. Christian regarding this litigation.

27         a.    OBJECTION: This demand is vague (ie, which litigation?), overly broad (no time

28               period), burdensome, and oppressive. Subject to, and without waiver of, said

F:\DOCS\LETICIA ARCINIEGA\DOC DEMAND RESPONSE.wpd      -4-
9/11-7:01 pm

Exhibit "75"
00210

1    objection, this responding party states that she is unable to comply with this

2    document demand because the category of documents requested either does not

3    exist or is not in the possession, custody, or control of this responding party.

4    2.    REQUEST FOR PRODUCTION NO. 2: Produce any and all documents relating to

5    communications between You and David D. Christian regarding previous litigation

6    between You and Plaintiff, including but not limited to the settlement of any such

7    litigation.

8        a.    OBJECTION: This demand is vague (ie, which Litigation?), overly broad (no time

9            period), burdensome, and oppressive. Subject to, and without waiver of, said

10           objection, this responding party states that she is unable to comply with this

11           document demand because the category of documents requested either does not

12           exist or is not in the possession, custody, or control of this responding party.

13   3.    REQUEST FOR PRODUCTION NO. 3:  Produce any and all documents relating to

14   communications between You and Dolores Arciniega regarding this litigation.

15       a.    OBJECTION: This demand is vague (ie, which Litigation?), overly broad (no time

16           period), burdensome, and oppressive. Subject to, and without waiver of, said

17           objection, this responding party states that she is unable to comply with this

18           document demand because the category of documents requested either does not

19           exist or is not in the possession, custody, or control of this responding party.

20   4.    REQUEST FOR PRODUCTION NO. 4: Produce any and all documents relating to

21   communications between You and any other third party regarding this litigation.

22       a.    OBJECTION: This demand is vague (ie, which Litigation?), overly broad (no time

23           period), burdensome, and oppressive. Subject to, and without waiver of, said

24           objection, this responding party states that she is unable to comply with this

25           document demand because the category of documents requested either does not

26           exist or is not in the possession, custody, or control of this responding party.

27   5.    REQUEST FOR PRODUCTION NO. 5: Produce any and all bank records relating to bank

28   accounts held by You, jointly, or by You, as an individual, for the period commencing on

Exhibit "75"
00211

1    May 4, 2007, through and including the Petition Date.

2         a.    OBJECTION: This demand is vague, overly broad, irrelevant, burdensome, and

3                oppressive. Plaintiff is not entitled to Debtor's bank statements relating to financial

4                accounts held by her (or jointly) from May 4, 2007 through the February 18, 2011

5                Petition Date. There is no relevance to this May 4, 2007 date to the specific causes

6                of action in this adversary proceeding. The Arrowhead Litigation was commenced

7                on May 2, 2007, and those claims for declaratory relief, breach of oral contract and

8                specific performance were or will be discharged in the Debtor's bankruptcy. That

9                date has no relevance to the other causes of action herein. The 523(a)(2)(A) and

10               (a)(6) causes of action are for the May 4, 2009 Settlement Agreement between the

11               parties and David Christian & Dolores Arciniega were not involved in that

12               transaction nor were their bank accounts. The 727(a)(2) and (a)(4) causes of action

13               only apply to the February 18, 2011 Petition Date and the 1-year reachback of

14               February 18, 2010.

15   6.   REQUEST FOR PRODUCTION NO. 6:  Produce any and all documents relating to Your

16        assets during the period commencing on May 4, 2007, through and including the Petition

17        Date.

18        a.    OBJECTION: This demand is vague, overly broad, irrelevant, burdensome, and

19               oppressive. Plaintiff is not entitled to Debtor's assets from May 4, 2007 through the

20               February 18, 2011 Petition Date. There is no relevance to this May 4, 2007 date to

21               the specific causes of action in this adversary proceeding. The Arrowhead

22               Litigation was commenced on May 2, 2007, and those claims for declaratory relief,

23               breach of oral contract and specific performance were or will be discharged in the

24               Debtor's bankruptcy. That date has no relevance to the other causes of action

25               herein. The 523(a)(2)(A) and (a)(6) causes of action are for the May 4, 2009

26               Settlement Agreement between the parties and David Christian & Dolores

27               Arciniega were not involved in that transaction nor were their bank accounts. The

28               727(a)(2) and (a)(4) causes of action only apply to the February 18, 2011 Petition

F:\DOCS\LETICIA ARCINIEGA\DOC DEMAND RESPONSE.wpd     -6-
9/11-7:01pm

Exhibit "75"
00212

1      Date and the 1-year reachback of February 18, 2010.

2   7.   REQUEST FOR PRODUCTION NO. 7: Produce any and all documents relating to Your

3        current assets.

4        a.    OBJECTION: This demand is vague, overly broad, irrelevant, burdensome, and

5              oppressive. Plaintiff is not entitled to Debtor's current post-petition assets (18

6              months after the February 18, 2011 Petition Date). There is no relevance to the

7              specific causes of action in this adversary proceeding. The 523(a)(2)(A) and (a)(6)

8              causes of action are for the May 4, 2009 Settlement Agreement between the parties

9              and David Christian & Dolores Arciniega were not involved in that transaction nor

10             were their bank accounts. The 727(a)(2) and (a)(4) causes of action only apply to

11             the February 18, 2011 Petition Date and the 1-year reachback of February 18, 2010.

12  8.   REQUEST FOR PRODUCTION NO. 8:  Produce any and all documents relating to the

13       purchase of the property commonly known as 3047 N. Arrowhead Ave., San Bernardino,

14       CA, 92405 (the "Arrowhead Property").

15       a.    OBJECTION: This demand is vague, overly broad, irrelevant, burdensome, and

16             oppressive. The purchase of the Arrowhead Property is not the focus of this

17             nondischargeability litigation. Subject to, and without waiver of, said objection,

18             this responding party states that she is unable to comply with this document

19             demand because the category of documents requested either does not exist or is not

20             in the possession, custody, or control of this responding party.

21  9.   REQUEST FOR PRODUCTION NO. 9: Produce any and all documents relating to any

22       attempt by You to refinance the Arrowhead Property, including but not limited to any

23       communications, loan applications, credit history reports, or tax returns.

24       a.    OBJECTION: This demand is vague, overly broad, irrelevant, burdensome, and

25             oppressive. Subject to, and without waiver of, said objection, this responding party

26             states that she is unable to comply with this document demand because the category

27             of documents requested either does not exist or is not in the possession, custody, or

28             control of this responding party.

F:\DOCS\LETICIA ARCINIEGA\DOC DEMAND RESPONSE.wpd      -7-
9/11-7:01pm

Exhibit "75"
00213

1  10.    REQUEST FOR PRODUCTION NO. 10: Produce any and all documents relating to any

2  attempt by You to obtain additional loans secured by the Arrowhead Property, including

3  but not limited to any communications, loan applications, credit history reports, or tax

4  returns.

5        a.    OBJECTION: This demand is vague, overly broad, irrelevant, burdensome, and

6              oppressive. This responding party has not been on title of this property since May

7              2009; 1 year and 9 months prior to the date of petition. Subject to, and without

8              waiver of, said objection, this responding party states that she is unable to comply

9              with this document demand because the category of documents requested either

10             does not exist or is not in the possession, custody, or control of this responding

11             party.

12  11.    REQUEST FOR PRODUCTION NO. 11: Produce any and all documents relating to any

13  attempt by You to modify any loans secured by the Arrowhead Property, including but not

14  limited to any communications, loan applications, credit history reports, or tax returns.

15        a.    OBJECTION: This demand is vague, overly broad, irrelevant, burdensome, and

16             oppressive. This responding party has not been on title of this property since May

17             2009; 1 year and 9 months prior to the date of petition. Subject to, and without

18             waiver of, said objection, this responding party states that she is unable to comply

19             with this document demand because the category of documents requested either

20             does not exist or is not in the possession, custody, or control of this responding

21             party.

22  12.    REQUEST FOR PRODUCTION NO. 12:  Produce any and all documents reflecting

23  payments on account of any loan secured by or encumbrance on the Arrowhead Property,

24  including but not limited to payments on account of any VA Loan, refinances, junior loans,

25  or loan modifications.

26        a.    OBJECTION: This demand is compound, vague, overly broad, irrelevant,

27             burdensome, and oppressive. This responding party has not been on title of this

28             property since May 2009; 1 year and 9 months prior to the date of petition. Subject

F:\DOCS\LETICIA ARCINIEGA\DOC DEMAND RESPONSE.wpd        -8-
9/11-7:01pm

**Exhibit "75"**
**00214**

1              to, and without waiver of, said objection, this responding party states that she is

2              unable to comply with this document demand because the category of documents

3              requested either does not exist or is not in the possession, custody, or control of this

4              responding party.

5  13.    REQUEST FOR PRODUCTION NO. 13: Produce any and all documents relating to the

6      purchase of the Verona Property.

7      a.    OBJECTION: This demand is vague, overly broad, irrelevant, burdensome, and

8              oppressive - the purchase of the Verona property occurred over 21 years ago.

9              Subject to, and without waiver of, said objection, this responding party states that

10              she is unable to comply with this document demand because the category of

11              documents requested either does not exist or is not in the possession, custody, or

12              control of this responding party.

13  14.    REQUEST FOR PRODUCTION NO. 14: Produce any and all documents relating to any

14      attempt by You to refinance any loan secured by the Verona Property, including but not

15      limited to any communications, loan applications, credit history reports, or tax returns.

16      a.    OBJECTION: This demand is vague, overly broad (no time period), irrelevant,

17              burdensome, and oppressive. Subject to, and without waiver of, said objection, this

18              responding party states that she already produced these documents to Plaintiff after

19              the mediation. Said documents will be produced again.

20  15.    REQUEST FOR PRODUCTION NO. 15: Produce any and all documents relating to any

21      attempt by You to obtain loans secured by the Verona Property, including but not limited

22      to any communications, loan applications, credit history reports, or tax returns.

23      a.    OBJECTION: This demand is vague, overly broad (no time period), irrelevant,

24              burdensome, and oppressive. Subject to, and without waiver of, said objection, this

25              responding party states that she already produced these documents to Plaintiff after

26              the mediation. Said documents will be produced again.

27  16.    REQUEST FOR PRODUCTION NO. 16: Produce any and all documents relating to any

28      attempt by You to modify any loans secured by the Verona Property, including but not

Exhibit "75"
00215

1  limited to any communications, loan applications, credit history reports, or tax returns.

2      a.    OBJECTION: This demand is vague, overly broad (no time period), irrelevant,

3          burdensome, and oppressive. Subject to, and without waiver of, said objection, this

4          responding party states that she already produced these documents to Plaintiff after

5          the mediation. Said documents will be produced again.

6  17.    REQUEST FOR PRODUCTION NO. 17: Produce any and all documents reflecting

7  payments on account of any loan secured by or encumbrance on the Verona Property,

8  including but not limited to payments on account of any VA Loan, refinances, junior loans,

9  or loan modifications.

10      a.    OBJECTION: This demand is vague, overly broad (no time period), irrelevant,

11          burdensome, and oppressive. Subject to, and without waiver of, said objection, this

12          responding party states that she already produced these documents to Plaintiff after

13          the mediation. Said documents will be produced again.[1]

14  18.    REQUEST FOR PRODUCTION NO. 18: Produce any and all documents relating to Your

15  request that Plaintiff convey his interest in the Verona Property to You.

16      a.    OBJECTION: This demand is vague, overly broad, irrelevant, burdensome, and

17          oppressive. Subject to, and without waiver of, said objection, this responding party

18          states that she is unable to comply with this document demand because the category

19          of documents requested either does not exist or is not in the possession, custody, or

20          control of this responding party.

21  19.    REQUEST FOR PRODUCTION NO. 19: Produce any and all documents relating to any

22  Christian Loan.

23      a.    OBJECTION: This demand is vague, overly broad (no time period), irrelevant,

24          burdensome, and oppressive. Subject to, and without waiver of, said objection, this

25

26

27  [1] See attached reports from bill pay accounts to CitiMortgage for payment of loan, dating 8/05
– 8/12. The Union Bank search engine only allows queries based on the last 18 months; the first time
Defendant paid Citi from Union Bank was in March of 2011. Previously all payments were made from

28  the WFB account.

Exhibit "75"
00216

1        responding party states that said documents will be produced.[2]

2  20.    REQUEST FOR PRODUCTION NO. 20: Produce any and all documents relating to any

3        deed of trust securing any Christian Loan.

4      a.    OBJECTION: This demand is vague, overly broad (no time period), irrelevant,

5            burdensome, and oppressive. Subject to, and without waiver of, said objection, this

6            responding party states that said documents will be produced.[3]

7  21.    REQUEST FOR PRODUCTION NO. 21: Produce any and all documents relating to

8        disposition of any funds You received from David D. Christian, including the Christian

9        Loan, during the period commencing on May 4, 2007, through and including the Petition

10      Date.

11      a.    OBJECTION: This demand is vague, overly broad, irrelevant, burdensome, and

12            oppressive. Plaintiff is not entitled to Debtor's assets from May 4, 2007 through the

13            February 18, 2011 Petition Date. There is no relevance to this May 4, 2007 date to

14            the specific causes of action in this adversary proceeding. The Arrowhead

15            Litigation was commenced on May 2, 2007, and those claims for declaratory relief,

16            breach of oral contract and specific performance were or will be discharged in the

17            Debtor's bankruptcy. That date has no relevance to the other causes of action

18            herein. The 523(a)(2)(A) and (a)(6) causes of action are for the May 4, 2009

19            Settlement Agreement between the parties and David Christian & Dolores

20            Arciniega were not involved in that transaction nor were their bank accounts. The

21            727(a)(2) and (a)(4) causes of action only apply to the February 18, 2011 Petition

22            Date and the 1-year reachback of February 18, 2010.

23      b.    Subject to, and without waiver of, said objection, this responding party states that

24

25      [2]See attached: Disbursements stopped in 2009 because a month later Defendant had her $30k

26  portion of the settlement. The previous September, Plaintiff had offered $100k to settle; that would have paid off the house. $30k wasn't even half of what was owed in May 2009.

27      [3]See attached: Disbursements stopped in 2009 because a month later Defendant had her $30k

28  portion of the settlement. The previous September, Plaintiff had offered $100k to settle; that would have paid off the house. $30k wasn't even half of what was owed in May 2009.

Exhibit "75"
00217

1    she is unable to comply with this document demand because the category of

2    documents requested either does not exist or is not in the possession, custody, or

3    control of this responding party.[4]

4    22.    REQUEST FOR PRODUCTION NO. 22: Produce any and all documents relating to the

5    .    disposition of any funds You received in connection with the Settlement Agreement.

6    a.    OBJECTION: This demand is vague, overly broad, irrelevant, burdensome, and

7    oppressive. Subject to, and without waiver of, said objection, this responding party

8    states that said documents will be produced.[5]

9    23.    REQUEST FOR PRODUCTION NO. 23: Produce any and all documents relating to any

10    transfer to one or more third parties of Property belonging to You with a value of $1,000 or

11    more during the period commencing on May 4, 2009, through and including the Petition

12    Date.

13    a.    OBJECTION: This demand is vague, overly broad, irrelevant, burdensome, and

14    oppressive. Plaintiff is not entitled to Debtor's assets from May 4, 2009 through the

15    February 18, 2011 Petition Date. There is no relevance to this May 4, 2009 date to

16    the specific causes of action in this adversary proceeding. The Arrowhead

17    Litigation was commenced on May 2, 2007, and those claims for declaratory relief,

18    breach of oral contract and specific performance were or will be discharged in the

19    Debtor's bankruptcy. That date has no relevance to the other causes of action

20    herein. The 523(a)(2)(A) and (a)(6) causes of action are for the May 4, 2009

21    Settlement Agreement between the parties and David Christian & Dolores

22    Arciniega were not involved in that transaction nor were their bank accounts. The

23

24        [4]The last funds from David that are part of this element were received in April of 2009. The
following month Debtor received the settlement monies on which she could operate. The account the
25    funds went into was closed many months ago and the Debtor must rely on the bank to provide copies.
She has requested them. See file: LJA WFB & UBOC Bank Statements 2007-2011 for details of all
26    deposits to defendant's personal accounts. These can be matched to disbursements from Christian,
MSRE, Inc. and the defendant's employers.
27
        [5]See file: MSRE, Inc. 2009, the May statement clearly shows the deposit of the $30k to that
28    account on May 18, 2009.

F:\DOCS\LETICIA ARCINIEGA\DOC DEMAND RESPONSE.wpd    -12-
9/11-7:01pm

Exhibit "75"
00218

1      727(a)(2) and (a)(4) causes of action only apply to the February 18, 2011 Petition

2      Date and the 1-year reachback of February 18, 2010.

3      b.    OBJECTION: Subject to, and without waiver of, said objection, this responding

4      party states that said documents will be produced.[6]

5   24.   REQUEST FOR PRODUCTION NO. 24: Produce any and all documents relating to the

6    removal from Your possession of property belonging to You with a value of $1,000 or

7    more during the period commencing on May 4, 2009, through and including the Petition

8    Date.

9      a.    OBJECTION: This demand is vague, overly broad, irrelevant, burdensome, and

10      oppressive. Plaintiff is not entitled to Debtor's assets from May 4, 2009 through the

11      February 18, 2011 Petition Date. There is no relevance to this May 4, 2009 date to

12      the specific causes of action in this adversary proceeding. The Arrowhead

13      Litigation was commenced on May 2, 2007, and those claims for declaratory relief,

14      breach of oral contract and specific performance were or will be discharged in the

15      Debtor's bankruptcy. That date has no relevance to the other causes of action

16      herein. The 523(a)(2)(A) and (a)(6) causes of action are for the May 4, 2009

17      Settlement Agreement between the parties and David Christian & Dolores

18      Arciniega were not involved in that transaction nor were their bank accounts. The

19      727(a)(2) and (a)(4) causes of action only apply to the February 18, 2011 Petition

20      Date and the 1-year reachback of February 18, 2010.

21      b.    Subject to, and without waiver of, said objection, this responding party states that

22      she is unable to comply with this document demand because the category of

23      documents requested either does not exist or is not in the possession, custody, or

24      control of this responding party.

25   25.   REQUEST FOR PRODUCTION NO. 25: Produce any and all documents relating to the

26    concealment of property belonging to You with a value of $1000 or more during the period

27

---

28     [6]See file: MSRE, Inc. 2009, the May statement clearly shows the deposit of the $30k to that account on May 18, 2009.

Exhibit "75"
00219

1    commencing on May 4, 2009, through and including the Petition Date.

2        a.    OBJECTION: This demand is vague, overly broad, irrelevant, burdensome, and

3            oppressive. Plaintiff is not entitled to Debtor's assets from May 4, 2009 through the

4            February 18, 2011 Petition Date. There is no relevance to this May 4, 2009 date to

5            the specific causes of action in this adversary proceeding. The Arrowhead

6            Litigation was commenced on May 2, 2007, and those claims for declaratory relief,

7            breach of oral contract and specific performance were or will be discharged in the

8            Debtor's bankruptcy. That date has no relevance to the other causes of action

9            herein. The 523(a)(2)(A) and (a)(6) causes of action are for the May 4, 2009

10           Settlement Agreement between the parties and David Christian & Dolores

11           Arciniega were not involved in that transaction nor were their bank accounts. The

12           727(a)(2) and (a)(4) causes of action only apply to the February 18, 2011 Petition

13           Date and the 1-year reachback of February 18, 2010.

14       b.    Subject to, and without waiver of, said objection, this responding party states that

15           she is unable to comply with this document demand because the category of

16           documents requested either does not exist or is not in the possession, custody, or

17           control of this responding party.

18   26.  REQUEST FOR PRODUCTION NO. 26: Produce any and all documents relating to any

19       attempt by You to pay off the VA Loan after May 4, 2009.

20       a.    OBJECTION: This demand is vague, overly broad, irrelevant, burdensome, and

21           oppressive. Plaintiff is not entitled to Debtor's assets from May 4, 2009 through the

22           February 18, 2011 Petition Date. There is no relevance to this May 4, 2009 date to

23           the specific causes of action in this adversary proceeding. The Arrowhead

24           Litigation was commenced on May 2, 2007, and those claims for declaratory relief,

25           breach of oral contract and specific performance were or will be discharged in the

26           Debtor's bankruptcy. That date has no relevance to the other causes of action

27           herein. The 523(a)(2)(A) and (a)(6) causes of action are for the May 4, 2009

28           Settlement Agreement between the parties and David Christian & Dolores

Exhibit "75"
00220

1    Arciniega were not involved in that transaction nor were their bank accounts. The

2    727(a)(2) and (a)(4) causes of action only apply to the February 18, 2011 Petition

3    Date and the 1-year reachback of February 18, 2010.

4       b.    Subject to, and without waiver of, said objection, this responding party states that

5          she already produced these documents to Plaintiff after the mediation. Said

6          documents will be produced again.[7]

7    27.    REQUEST FOR PRODUCTION NO. 27:  Produce any and all documents relating to the

8    value of the "Cayucos Property as of the Petition Date.

9       a.    OBJECTION: This demand is vague, overly broad, irrelevant, burdensome, and

10          oppressive. Subject to, and without waiver of, said objection, this responding party

11          states that said documents will be produced.[8]

12    28.    REQUEST FOR PRODUCTION NO. 28: Produce any and all documents relating to the

13    value of Your interest in books, pictures, and collectibles as of the Petition Date.

14       a.    OBJECTION: This demand is vague, overly broad, irrelevant, burdensome, and

15          oppressive. Subject to, and without waiver of, said objection, this responding party

16          states that she is unable to comply with this document demand because the category

17          of documents requested either does not exist or is not in the possession, custody, or

18          control of this responding party.

19    29.    REQUEST FOR PRODUCTION NO. 29: Produce any and all documents relating to the

20    value of Your interest in office equipment, furnishings, and supplies as of the Petition

21    Date.

22       a.    OBJECTION: This demand is vague, overly broad, irrelevant, burdensome, and

23          oppressive. Subject to, and without waiver of, said objection, this responding party

24          states that she will comply with this document demand and produce the requested

25

26

27    [7]This file was formerly called: Ad Ans CoA 1.

28    [8]The second file "Paper Roads Lots 2012 Tx Assessment is a recent doc; the Assessor has
pretty much concurred with the Debtor's valuation findings.

F:\DOCS\LETICIA ARCINIEGA\DOC DEMAND RESPONSE.wpd    -15-
9/11-7:01pm

Exhibit "75"
00221

1          document.[9]

2   30.    REQUEST FOR PRODUCTION NO. 30: Produce any and all documents relating to the

3        value of the Main Street Property as of the Petition Date.

4          a.    OBJECTION: This demand is vague, overly broad, irrelevant, burdensome, and

5                oppressive. Subject to, and without waiver of, said objection, this responding party

6                states that she will comply with this document demand and produce the requested

7                document.[10]

8   31.    REQUEST FOR PRODUCTION NO. 31: Produce any and all documents relating to the

9        value of Your interest in MSRE, Inc. as of the Petition Date.

10        a.    OBJECTION: This demand is vague, overly broad, irrelevant, burdensome, and

11              oppressive. Subject to, and without waiver of, said objection, this responding party

12              states that she will comply with this document demand and produce the requested

13              document.[11]

14   32.    REQUEST FOR PRODUCTION NO. 32: Produce any and all documents relating to rental

15        income from MSRE, Inc. during the period commencing on May 4, 2007, through and

16        including the Petition Date.

17        a.    OBJECTION: This demand is vague, overly broad, irrelevant, burdensome, and

18              oppressive. Subject to, and without waiver of, said objection, this responding party

19              states that she is unable to comply with this document demand because the category

20              of documents requested either does not exist or is not in the possession, custody, or

21              control of this responding party (as it is prohibited under IRS rules: my CPA and I

22

23      [9]Two files, the original FF&E submitted to the Debtor's CPA for booking the purchase of same and the subsequent message from the Debtor's CPA re: the remaining balance, second file, "CPA".

24

25      [10]Req for Prod of Docs #30 and "288 E Main Valuation" are extracts from the Bk docs, supporting the Debtor's valuation of the building at $149k. The third file: "288 E Main St SJCN-Sale LoopNet" is a recent report based on the fact that the building sold for $160k in May of 2012. That's

26      about a 6.5% difference; over a period of one year.

27      [11]Attached at two files: MSRE, Inc Articles of Incorporation, showing the Debtor as agent of service. This doesn't really translate to 'owner' but the Debtor is the sole officer and shareholder of

28      the corporation. The second file is a copy of the Debtor's 2010 taxes.

Exhibit "75"
00222

1    deliberately set up the Note (as reported in my BK filing) because to do otherwise

2    (have the business pay me rent) would be in violation of an IRS 'arms length'

3    limitation; resulting in a transaction involving me, my business and my taxes).

4    33.    REQUEST FOR PRODUCTION NO. 33: Produce any and all documents relating to

5    property held by a third party for Your benefit at any time during the period commencing

6    on May 4, 2007, through and including the Petition Date.

7        a.    OBJECTION: This demand is vague, overly broad, irrelevant, burdensome, and

8            oppressive. Plaintiff is not entitled to Debtor's bank statements relating to financial

9            accounts held by her (or jointly) from May 4, 2007 through the February 18, 2011

10           Petition Date. There is no relevance to this May 4, 2007 date to the specific causes

11           of action in this adversary proceeding. The Arrowhead Litigation was commenced

12           on May 2, 2007, and those claims for declaratory relief, breach of oral contract and

13           specific performance were or will be discharged in the Debtor's bankruptcy. That

14           date has no relevance to the other causes of action herein. The 523(a)(2)(A) and

15           (a)(6) causes of action are for the May 4, 2009 Settlement Agreement between the

16           parties and David Christian & Dolores Arciniega were not involved in that

17           transaction nor were their bank accounts. The 727(a)(2) and (a)(4) causes of action

18           only apply to the February 18, 2011 Petition Date and the 1-year reachback of

19           February 18, 2010.

20       b.    Subject to, and without waiver of, said objection, this responding party states that

21           she is unable to comply with this document demand because the category of

22           documents requested either does not exist or is not in the possession, custody, or

23           control of this responding party.

24    34.    REQUEST FOR PRODUCTION NO. 34: Produce any and all documents relating to any

25    trusts created by You during the period commencing on May 4, 2007, through and

26    including the Petition Date.

27       a.    OBJECTION: This demand is vague, overly broad, irrelevant, burdensome, and

28           oppressive. Plaintiff is not entitled to Debtor's bank statements relating to financial

Exhibit "75"
00223

1    accounts held by her (or jointly) from May 4, 2007 through the February 18, 2011

2    Petition Date. There is no relevance to this May 4, 2007 date to the specific causes

3    of action in this adversary proceeding. The Arrowhead Litigation was commenced

4    on May 2, 2007, and those claims for declaratory relief, breach of oral contract and

5    specific performance were or will be discharged in the Debtor's bankruptcy. That

6    date has no relevance to the other causes of action herein. The 523(a)(2)(A) and

7    (a)(6) causes of action are for the May 4, 2009 Settlement Agreement between the

8    parties and David Christian & Dolores Arciniega were not involved in that

9    transaction nor were their bank accounts. The 727(a)(2) and (a)(4) causes of action

10    only apply to the February 18, 2011 Petition Date and the 1-year reachback of

11    February 18, 2010.

12    b.    Subject to, and without waiver of, said objection, this responding party states that

13    she is unable to comply with this document demand because the category of

14    documents requested either does not exist or is not in the possession, custody, or

15    control of this responding party.

16    35.    REQUEST FOR PRODUCTION NO. 35:  Produce any and all documents relating to any

17    trusts of which You were a beneficiary or in which You had any interest of any nature

18    during the period commencing on May 4, 2007, through and including the Petition Date.

19    a.    OBJECTION: This demand is vague, overly broad, irrelevant, burdensome, and

20    oppressive. Plaintiff is not entitled to Debtor's bank statements relating to financial

21    accounts held by her (or jointly) from May 4, 2007 through the February 18, 2011

22    Petition Date. There is no relevance to this May 4, 2007 date to the specific causes

23    of action in this adversary proceeding. The Arrowhead Litigation was commenced

24    on May 2, 2007, and those claims for declaratory relief, breach of oral contract and

25    specific performance were or will be discharged in the Debtor's bankruptcy. That

26    date has no relevance to the other causes of action herein. The 523(a)(2)(A) and

27    (a)(6) causes of action are for the May 4, 2009 Settlement Agreement between the

28    parties and David Christian & Dolores Arciniega were not involved in that

Exhibit "75"
00224

1         transaction nor were their bank accounts. The 727(a)(2) and (a)(4) causes of action

2         only apply to the February 18, 2011 Petition Date and the 1-year reachback of

3         February 18, 2010.

4     b.      Subject to, and without waiver of, said objection, this responding party states that

5         she is unable to comply with this document demand because the category of

6         documents requested either does not exist or is not in the possession, custody, or

7         control of this responding party.

8

9 DATED:      September 11, 2012      LAW OFFICE OF BARUCH C. COHEN
                                       A Professional Law Corporation

10

11                               By ___ /S/ Baruch C. Cohen_____

12                               Baruch C. Cohen, Esq.
                              *Attorney For Defendant* LETICIA JOY ARCINIEGA

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Exhibit "75"
00225

1

### VERIFICATION:

2    The undersigned has reviewed the foregoing DEFENDANT LETICIA JOY
ARCINIEGA'S VERIFIED RESPONSE TO PLAINTIFF JAMES CLARK'S FIRST SET OF

3    DOCUMENT DEMANDS F.R.C.P. 36 F.R.B.P. 7036 and further declares under penalty of
perjury under the laws of the United States and of the State of California that the foregoing are true

4    and correct, except as to those matters stated on information and belief, which the undersigned is
informed and believes are true and correct.

5

6    September 10, 2012            *Defendant* LETICIA JOY ARCINIEGA

7



8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

F:\DOCS\LETICIA ARCINIEGA\DOC DEMAND RESPONSE.wpd    -20-
9-10-9:08pm

**Exhibit "75"**
**00226**

| In re: LETICIA JOY ARCINIEGA | Chapter 7 No. 6:11-BK-15412-DS |
|---|---|
| JAMES CLARK *against LETICIA JOY ARCINIEGA*. | Adversary # 6:11-ap-01735-DS |

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I. Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

## PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 4929 Wilshire Boulevard, Suite 940, Los Angeles, CA 90010. The document entitled: **DEFENDANT LETICIA JOY ARCINIEGA'S VERIFIED RESPONSE TO PLAINTIFF JAMES CLARK'S FIRST SET OF DOCUMENT DEMANDS F.R.C.P. 34 F.R.B.P. 7034** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

I. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

Baruch C Cohen - bcc4929@gmail.com
Tom Tarter - ttarter@earthlink.net

II. SERVED BY U.S. MAIL OR OVERNIGHT MAIL(indicate method for each person or entity served): On September 11, 2012 I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. *Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.*
☐Service information continued on attached page

Tom Tarter The Andela Consulting Group 16311 Ventura Blvd., Suite 845 Encino, CA 91436 Phone: (818) 380-3102 Fax: (818) 501-5412

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| *Date*   September 11, 2012 | *Signature* |
|---|---|
| *Type Name* **BARUCH C. COHEN** | By ____ /S/ Baruch C. Cohen |

Exhibit "75"
00227

1  Baruch C. Cohen, Esq. (SBN 159455)
   **LAW OFFICE OF BARUCH C. COHEN**
2       A Professional Law Corporation
   4929 Wilshire Boulevard, Suite 940
3  Los Angeles, California 90010
   (323) 937-4501        Fax (323) 937-4503
4  e-mail: BCC4929@gmail.com
   Linkedin Profile: http://www.linkedin.com/in/baruchcohen
5
   *Attorney For Defendant* LETICIA JOY ARCINIEGA
6

7

8                    **UNITED STATES BANKRUPTCY COURT**

9                    **CENTRAL DISTRICT OF CALIFORNIA**

10                        **RIVERSIDE DIVISION**

11

12  In re                              Case No. 6:11-BK-15412-DS
                                       Adversary # 6:11-ap-01735-DS
13  LETICIA JOY ARCINIEGA,             Before the Honorable Deborah J. Salzman
                                       Chapter 7
14         Debtor

15

16

17                                     DEFENDANT LETICIA JOY ARCINIEGA'S
    JAMES CLARK,                       AMENDED VERIFIED RESPONSE TO
18                                     PLAINTIFF'S FIRST SET OF
           Plaintiff                   INTERROGATORIES F.R.C.P. 33 F.R.B.P. 7034
19
    vs.
20
    LETICIA JOY ARCINIEGA,
21
           Defendants
22

23
           PROPOUNDING PARTY:    PLAINTIFF JAMES CLARK
24
           RESPONDING PARTY:     DEFENDANT LETICIA JOY ARCINIEGA
25
           SET NO.:              ONE
26
           TO PLAINTIFF JAMES CLARK AND HIS ATTORNEYS OF RECORD HEREIN:
27
           DEFENDANT LETICIA JOY ARCINIEGA (hereinafter referred to collectively as
28

F:\DOCS\LETICIA ARCINIEGA\SROGGS RESPONSE 4.wpd
10/16-2:49pm

Exhibit "76"
00228

1  "DEFENDANT") hereby responds to the PLAINTIFF'S FIRST SET OF INTERROGATORIES

2  F.R.C.P. 33 F.R.B.P. 7034 (hereinafter referred to as "Discovery Requests") issued by

3  PLAINTIFF JAMES CLARK(hereinafter referred to as "PLAINTIFF").

4  **PRELIMINARY STATEMENT**

5      These responses are made solely for the purpose of this action. Each response is subject to

6  all objections as to competence, relevance, materiality, propriety and admissibility, and any and all

7  other objections and grounds that would require the exclusion of any statement herein, if any

8  interrogatory were asked for or any statement contained herein was made by a witness present and

9  testifying in court, all of which objections and grounds are reserved and may be interposed at the

10  time of trial. This responding party is responding to all Discovery Demands to the extent that

11  information has become known by it. However, this responding party's discovery and

12  investigation in preparation for trial is this matter has not been completed as of the date of these

13  responses to Discovery Demands, and, therefore, this responding party does not propose to state

14  herein anything more than information presently known and discovered by it. This responding

15  party reserves the right to continue discovery and investigation in this matter for facts, witnesses

16  and supporting data that may recall information which, if it had presently within its knowledge,

17  would be included in these responses. Consequently, to the extent that the Discovery Demands

18  herein ask for "all facts" or the name of "all persons" or the identity of "all documents", etc., they

19  are responded to fully insofar as the information is presently available to the responding party.

20  This responding party is not precluded from presenting at trial information discovered following

21  the date of these responses. However, Defendant assume no obligation to voluntarily supplement

22  or amend these responses to reflect witnesses, facts and evidence discovered following the mailing

23  of these responses. Except for explicit facts submitted herein, no admissions of any nature

24  whatsoever are implied or should be inferred. The fact that any Discovery Demand herein has been

25  answered should not be taken as an admission, or acceptance, or that existence or any fact or facts

26  set forth or assumed by such Discovery Demand, or that such answer constitutes admissible

27  evidence.

28      It is assumed by the responding party that the propounding party and all parties to this

F:\DOCS\LETICIA ARCINIEGA\SROGGS RESPONSE 4.wpd    -2-
10/16-2:48pm

Exhibit "76"
00229

1  lawsuit possess and are familiar with all the discovery proceedings in this action. Therefore, when

2  an interrogatory calls for information which is contained in the discovery materials available to all

3  parties, said interrogatory will be answered only by reference to those discovery materials.

4      This introductory statement is incorporated herein by reference to each of the answers as it

5  is stated in full.

6  **GENERAL OBJECTIONS APPLICABLE TO ALL DISCOVERY DEMANDS**

7      Defendant objects to Plaintiff's Discovery Demands and each request contained therein to

8  the extent they seek information that is vague, ambiguous, over broad, inadequately described,

9  burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

10     Defendant objects to Plaintiff's Discovery Demands and each request contained therein to

11  the extent they seek to impose a duty upon Defendant which is greater than imposed by the Federal

12  Rules of Civil Procedure.

13     Defendant objects to Plaintiff's Discovery Demands and each request contained therein to

14  the extent they call for any documents protected from disclosure or discovery by (i) the attorney-

15  client privilege; (ii) the protection of the attorney work product privilege, including but not limited

16  to documents prepared in anticipation of litigation or for trial; and (iii) any other applicable

17  privilege(s). Defendant claims privileges and protection with respect to all information and

18  documents which are protected from disclosure or discovery by such privilege(s) and protection(s).

19     Defendant objects to Plaintiff's Discovery Demands and each request contained therein to

20  the extent they seek production or disclosure of documents containing confidential, sensitive,

21  private and/or proprietary information of Defendant, their family members and others.

22     Defendant objects to Plaintiff's Discovery Demands and each request contained therein to

23  the extent they seek production or disclosure of documents which are not relevant to the subject

24  matter of this lawsuit.

25     Defendant objects to Plaintiff's Discovery Demands and each request contained therein to

26  the extent they seek production or disclosure of documents that Plaintiffs already have in its

27  possession.

28     Defendant made a diligent and good faith effort to locate and produce the documents

F:\DOCS\LETICIA ARCINIEGA\SROGGS RESPONSE 4.wpd     -3-
10/16-2:48pm

Exhibit "76"
00230

1   which are responsive to those requests. Defendant, however, has not completed her investigation.

2   Accordingly, the following written responses are based on the current status of Defendant's

3   investigation and discovery, and the accompanying production of documents consists of those

4   documents within Defendant's custody and control which have been located following diligent

5   search. These written responses and the accompanying documents are provided without prejudice

6   to Defendant's right to offer into evidence additional responsive documents or evidence when such

7   are located or ascertained. More over, these responses should not be construed as, and do not

8   constitute, a waiver of Defendant's right to introduce additional evidence, in any form, later on in

9   this proceeding.

10        These written responses and the accompanying production of documents are subject to all

11   objections including but not limited to, relevance, materiality, and admissibility, that would

12   require exclusion of any statement made herein, or any document produced, as if it were made by a

13   witness present and testifying in court, all of which objections and grounds are reserved and may

14   be imposed at the time of arbitration or trial. The fact that Defendant has responded to all or any

15   part of a request for production is not an admission that the request seeks admissible evidence and

16   is not to be construed as a waiver of any proper grounds of objection that may hereafter be

17   interposed to such request or to the admissibility of any documents produced in response thereto.

18        The foregoing General Objections are incorporated into each specific responses made

19   below by Defendant to Plaintiff's Discovery Demands. Defendant's specific responses are made

20   without waiving and are otherwise without prejudice to these General Objections. Furthermore, as

21   set forth below, certain representations in the specific response below as to Defendant's intention

22   and agreement to produce documents in response to these requests are contingent upon the entry in

23   this action of a stipulated protective order to ensure the confidentiality of such documents.

24   RESPONSE TO SPECIAL INTERROGATORIES

25   1.   SPECIAL INTERROGATORY NO. 1:  Identify any and all individuals with whom You

26        have communicated regarding this litigation.

27        a.   OBJECTION: This demand is vague (ie, which litigation?), overly broad (no time

28             period), burdensome, and oppressive. Subject to, and without waiver of, said

F:\DOCS\LETICIA ARCINIEGA\SROGGS RESPONSE 4.wpd       -4-
10/16-2:48pm

objection, this responding party states that the answer is: I have communicated with

the following individuals:

   i.   Attorneys: Michael deKruif, Lorene Mies, David Hagan, David Lally,
        Baruch C. Cohen

   ii.  Family: David D. Christian, Dolores R. Arciniega, Eliana Arciniega, Bruce
        Ecker, Luis Arciniega, II, Alfredo Arciniega & Christina, Leo Arciniega &
        Christine Martin, Dolores A. Charlton, Waldo & Chloe, deceased

   iii. Friends/Associates/Service Providers: Pat Gibson, Jemea Baker, Janet
        Duggins, deceased, Henry C. Sander, Jr., Patty Mayne

2. SPECIAL INTERROGATORY NO. 2: Identify any and all financial institutions
maintaining accounts in Your name, as an individual or jointly with another individual or
entity.

   a.   OBJECTION: This demand is vague (ie, which litigation?), overly broad (no time
        period), burdensome, and oppressive. Subject to, and without waiver of, said
        objection, this responding party states that the answer is:

        i.   Joint account w/James A. Clark from 1976 until he closed it following the
             first litigation in 2009.

        ii.  One individual checking w/WFB closed in 2009 due to tampering by 3rd
             parties

        iii. One individual checking and one savings w/Wells Fargo Bank, since 1972

        iv.  One individual checking w/Union Bank of California since March 2011.

        v.   Merrill Lynch, IRA and SEPP retirement accounts, (now under UBS
             Financial Services)

        vi.  New York Life Insurance, life policy

        vii. None others.

3. SPECIAL INTERROGATORY NO. 3: Identify any and all persons who are holding or
have at any time since May 4, 2007, held property for Your benefit.

   a.   OBJECTION: This demand is vague (ie, which litigation?), overly broad (no time

F:\DOCS\LETICIA ARCINIEGA\SROGGS RESPONSE 4.wpd          -5-
10/16-2:48pm

1    period), burdensome, and oppressive. Subject to, and without waiver of, said

2    objection, this responding party states that the answer is:

3        i.    MSRE, Inc. received the full sum of $30k resulting from the settlement

4            w/the Plaintiff in 2009, the sum being transferred as an owner contribution

5            to the business.

6        ii.    See page 2 of file: "BK doc 1 of 4.pdf"

7        iii.    See "MSRE, Inc 5-09 Stmt Settlement Dep"

8    4.    SPECIAL INTERROGATORY NO. 4:  Identify any and all property of value greater than

9    $1,000 belonging to You at any time during the period commencing on May 4, 2007,

10    through and including the Petition Date.

11        a.    OBJECTION: This demand is vague (ie, which litigation?), overly broad (no time

12          period), burdensome, and oppressive. Subject to, and without waiver of, said

13          objection, this responding party states that the answer is:

14        i.    After the purchase of the commercial building at 288 E Main Street on

15            January 2, 2007 I did not purchase, acquire, transfer, sell or other wise take

16            ownership of or dispose of a property, goods or assets except at disclosed in

17            my bankruptcy statements.

18        ii.    Values as of date of filing:

19            (1)    Household goods & Furnishings    $2500.00

20            (2)    NYL Whole Life Ins Policy  $7356.01

21            (3)    Merrill Lynch IRA    $101,237.30

22            (4)    ½ Int 2007 Ford Ranger    $3,307.50

23            (5)    1986 Chevy Corvette-Salvaged    $5,700.00

24            (6)    2007 Ford Escape    $10,685.00

25            (7)    Office Furnishings    $1,500.00

26            (8)    Residence    $93,000.00

27            (9)    Paper Roads  $5,252.80

28            (10)    288 E Main St, commercial bldg    $149,400.00

Exhibit "76"
00233

1              (11)    ½ Int 2 vacnt lots-Soboba Heights    $2,062.50

2    5.    SPECIAL INTERROGATORY NO. 5:  Identify any and all encumbrances on the Verona

3    Property.

4        a.    OBJECTION: This demand is vague (ie, which litigation?), overly broad (no time

5              period), burdensome, and oppressive. Subject to, and without waiver of, said

6              objection, this responding party states that the answer is:

7              i.    As of date of filing; no other liens or encumbrances exist.

8                    (1)    CitiMortgage-1st Lienholder  Balance:  $75,707.00

9                    (2)    CitiMortgage-2nd Lienholder Balance:  $96,952.00

10   6.    SPECIAL INTERROGATORY NO. 6:  Identify any and all efforts You have made to pay

11   off the VA Loan secured by the Verona Property.

12       a.    OBJECTION: This demand is vague (ie, which litigation?), overly broad (no time

13             period), burdensome, and oppressive. Subject to, and without waiver of, said

14             objection, this responding party states that the answer is:

15             i.    Previously submitted;

16             ii.    See file: SpecInterrog 6 CoA 1.pdf

17   7.    SPECIAL INTERROGATORY NO. 7: Identify the disposition of all funds or assets You

18   received from David D. Christian during the period from May 4, 2007, through and

19   including the Petition Date.

20       a.    OBJECTION: This demand is vague (ie, which litigation?), overly broad (no time

21             period), burdensome, and oppressive. Subject to, and without waiver of, said

22             objection, this responding party states that the answer is:

23             i.    Previously submitted and can be corroborated with bank statements

24                    showing deposit of such funds in the accounts disclosed above,

25             ii.    See file labeled: "SpecInterrog 7-CoA -3-para 73.pdf"

26   8.    SPECIAL INTERROGATORY NO. 8:  Identify the disposition of the $50,000 You

27   received from Plaintiff in exchange for transfer of title to the Arrowhead Property.

28       a.    OBJECTION: This demand is vague (ie, which litigation?), overly broad (no time

Exhibit "76"
00234

1  period), burdensome, and oppressive. Subject to, and without waiver of, said

2  objection, this responding party states that the answer is:

3      i.    $20k to Milton & Associates, a PLC in payment for services, balance went

4          to MSRE, Inc. I believe the last of it is reported in my BK filing

5          income/expense worksheet as an Owner Contribution to the business in

6          January of 2010;

7      ii.   See page 2 of file: "BK doc 1 of 4.pdf"

8      iii.  See "MSRE, Inc 5-09 Stmt Settlement Dep"

9  9.  SPECIAL INTERROGATORY No. 9:  Identify any and all transfers from You to any

10  third-party individuals or entities of property belonging to You with a value of $1000 or

11  more during the period commencing on May 4, 2007, through and including the Petition

12  Date.

13      a.    OBJECTION: This demand is vague (ie, which litigation?), overly broad (no time

14          period), burdensome, and oppressive. Subject to, and without waiver of, said

15          objection, this responding party states that the answer is:

16      i.    MSRE, Inc. received the full sum of $30k resulting from the settlement

17          w/the Plaintiff on May 18, 2009, the sum being transferred as an owner

18          contribution to the business.

19      ii.   See file labeled: Clark-Arciniega Settlement 2009

20      iii.  See file labeled: MSRE, Inc 5-09 Stmt Settlement Dep

21  10.  SPECIAL INTERROGATORY NO. 10:  Identify any and all real property held in Your

22  name or for Your benefit during the period commencing on May 4, 2007, through and

23  including the Petition Date.

24      a.    OBJECTION: This demand is vague (ie, which litigation?), overly broad (no time

25          period), burdensome, and oppressive. Subject to, and without waiver of, said

26          objection, this responding party states that the answer is:

27      i.    Any and all real property held in my name or for my benefit is fully

28          disclosed in SR No 4 above; listed as #9, 10, 11 & 12.

Exhibit "76"
00235

11.    SPECIAL INTERROGATORY NO. 11:  Identify any and all trusts established in Your

name or for Your benefit during the period commencing on May 4, 2007, through and

including the Petition Date.

    a.    OBJECTION: This demand is vague (ie, which litigation?), overly broad (no time

        period), burdensome, and oppressive. Subject to, and without waiver of, said

        objection, this responding party states that the answer is:

            i.    Merrill Lynch, now UBS Financial Services, IRA account and SEPP

               account (closed), established in 1998.

12.    SPECIAL INTERROGATORY NO. 12:  Identify any and all loans obtained by You during

the period commencing on May 4, 2007, through and including the Petition Date.

    a.    OBJECTION: This demand is vague (ie, which litigation?), overly broad (no time

        period), burdensome, and oppressive. Subject to, and without waiver of, said

        objection, this responding party states that the answer is:

            i.    Loans incurred 5/4/2007- Petition date:

               (1)    WFB Business        $26,351.00

               (2)    WFB Business$17,957.00

               (3)    David D. Christian (continued)        $43,000.00 later settled prior

                    to filing

               (4)    US Bank        $16,057.92

               (5)    Yellow Book (advertising collection-not a loan)        $12, 663.32

               (6)    Don Kent, Riv County Treasurer Delinquent 2010/11 Property taxes

                    $4,559.88

13.    SPECIAL INTERROGATORY NO. 13:  Identify any and all property, tangible or

intangible, with a value of $1000 or more transferred to You during the period

commencing on May 4, 2007, through and including the Petition Date.

    a.    OBJECTION: This demand is vague (ie, which litigation?), overly broad (no time

        period), burdensome, and oppressive. Subject to, and without waiver of, said

        objection, this responding party states that the answer is:

Exhibit "76"
00236

1       i.     WFB Business $26,351.00

2       ii.    WFB Business $17,957.00

3       iii.   David D. Christian (continued)    $43,000.00 later settled prior to filing

4       iv.   US Bank   $16,057.92

5       v.    Yellow Book (advertising collection-not a loan)   $12, 663.32

6  14.  SPECIAL INTERROGATORY NO. 14:  Identify any and all transfers of property between

7     You and David D. Christian during the period commencing on May 4, 2007, through and

8     including the Petition Date.

9      a.   OBJECTION: This demand is vague (ie, which litigation?), overly broad (no time

10        period), burdensome, and oppressive. Subject to, and without waiver of, said

11        objection, this responding party states that the answer is:

12        i.    David D. Christian (continued)    $43,000.00 later settled prior to filing

13        ii.   Me to David-1993 Harley Davidson Motorcycle for ½ Interest in 2005 Jeep

14        iii.  Me to David-1/2 Interest in 2005 Jeep for ½ Interest in 2006 Ford Ranger

15  15.  SPECIAL INTERROGATORY NO. 15:  Identify any and all transfers of property between

16     You and Dolores Arciniega during the period commencing on May 4, 2007, through and

17     including the Petition Date.

18      a.   OBJECTION: This demand is vague (ie, which litigation?), overly broad (no time

19        period), burdensome, and oppressive. Subject to, and without waiver of, said

20        objection, this responding party states that the answer is:

21        i.    There have been no transfers of property between myself and Dolores R.

22           Arciniega.

23

24  DATED:    October 16, 2012     LAW OFFICE OF BARUCH C. COHEN

25                   A Professional Law Corporation

26

27                   By   /S/ Baruch C. Cohen
                        Baruch C. Cohen, Esq.
                        *Attorney For Defendant* LETICIA JOY ARCINIEGA

28

Exhibit "76"
00237

<u>**VERIFICATION**</u>:

      The undersigned has reviewed the foregoing DEFENDANT LETICIA JOY ARCINIEGA'S VERIFIED RESPONSE TO PLAINTIFF'S FIRST SET OF INTERROGATORIES F.R.C.P. 33 F.R.B.P. 7034 and further declares under penalty of perjury under the laws of the United States and of the State of California that the foregoing are true and correct, except as to those matters stated on information and belief, which the undersigned is informed and believes are true and correct.

October 15, 2012                     *Defendant* LETICIA JOY ARCINIEGA

F:\DOCS\LETICIA ARCINIEGA\SROGGS RESPONSE 3.wpd
10/15-1:59pm          -11-

**Exhibit "76"**
00238

| In re: LETICIA JOY ARCINIEGA | Chapter 7 No. 6:11-BK-15412-DS |
| JAMES CLARK *against LETICIA JOY ARCINIEGA.* | Adversary # 6:11-ap-01735-DS |

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I. Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

## PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 4929 Wilshire Boulevard, Suite 940, Los Angeles, CA 90010. The document entitled: DEFENDANT LETICIA JOY ARCINIEGA'S AMENDED VERIFIED RESPONSE TO PLAINTIFF'S FIRST SET OF INTERROGATORIES F.R.C.P. 33 F.R.B.P. 7034 will be served or was served (a) on the judge in chambers in the form and manner required by LBR 5005-2(d); and (b) in the manner indicated below:

I. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

Baruch C Cohen - bcc4929@gmail.com
D Edward Hays, Esq., ehays@marshackhays.com

II. SERVED BY U.S. MAIL OR OVERNIGHT MAIL(indicate method for each person or entity served): On October 16, 2012 I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. *Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.*
☐Service information continued on attached page

D Edward Hays, Esq., George Huang, Esq., Marshack & Hays, 5410 Trabuco Road, # 130, Irvine, CA 92620-5749

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| Date    October 16, 2012 | Signature |
| Type Name **BARUCH C. COHEN** | By    /S/ Baruch C. Cohen |

F:\DOCS\LETICIA ARCINIEGA\SERVICE.POS.wpd
10/16-2:55pm

Exhibit "76"
00239

1  Baruch C. Cohen, Esq. (SBN 159455)
   **LAW OFFICE OF BARUCH C. COHEN**
2      A Professional Law Corporation
   4929 Wilshire Boulevard, Suite 940
3  Los Angeles, California 90010
   (323) 937-4501      Fax (323) 937-4503
4  e-mail: BCC4929@gmail.com
   Linkedin Profile: http://www.linkedin.com/in/baruchcohen
5
   *Attorney For Defendant* LETICIA JOY ARCINIEGA
6

7

8

                    **UNITED STATES BANKRUPTCY COURT**
9
                    **CENTRAL DISTRICT OF CALIFORNIA**
10
                         **RIVERSIDE DIVISION**
11

12  In re                              Case No. 6:11-BK-15412-DS
                                       Adversary # 6:11-ap-01735-DS
13  LETICIA JOY ARCINIEGA,             Before the Honorable Deborah J. Salzman
                                       Chapter 7
14          Debtor

15

16

17                                     DEFENDANT LETICIA JOY ARCINIEGA'S
    JAMES CLARK,                       AMENDED VERIFIED RESPONSE TO
18                                     PLAINTIFF JAMES CLARK'S FIRST SET OF
            Plaintiff                  DOCUMENT DEMANDS F.R.C.P. 34 F.R.B.P.
19                                     7034
    vs.
20
    LETICIA JOY ARCINIEGA,
21
            Defendants
22

23
          PROPOUNDING PARTY:   PLAINTIFF JAMES CLARK
24
          RESPONDING PARTY:    DEFENDANT LETICIA JOY ARCINIEGA
25
          SET NO.:             ONE
26
          TO PLAINTIFF JAMES CLARK AND HIS ATTORNEYS OF RECORD HEREIN:
27
          DEFENDANT LETICIA JOY ARCINIEGA (hereinafter referred to collectively as
28

F:\DOCS\LETICIA ARCINIEGA\DOC DEMAND RESPONSE 3 10-15-2012.pdf.wpd
10/16-2:49pm

Exhibit "77"
00240

1  "DEFENDANT")  hereby responds to the PLAINTIFF'S FIRST SET OF DOCUMENT

2  DEMANDS  (hereinafter referred to as "Discovery Requests") issued by PLAINTIFF JAMES

3  CLARK(hereinafter referred to as "PLAINTIFF").

4  **PRELIMINARY STATEMENT**

5       These responses are made solely for the purpose of this action. Each response is subject to

6  all objections as to competence, relevance, materiality, propriety and admissibility, and any and all

7  other objections and grounds that would require the exclusion of any statement herein, if any

8  interrogatory were asked for or any statement contained herein was made by a witness present and

9  testifying in court, all of which objections and grounds are reserved and may be interposed at the

10  time of trial. This responding party is responding to all Discovery Demands to the extent that

11  information has become known by it. However, this responding party's discovery and

12  investigation in preparation for trial is this matter has not been completed as of the date of these

13  responses to Discovery Demands, and, therefore, this responding party does not propose to state

14  herein anything more than information presently known and discovered by it. This responding

15  party reserves the right to continue discovery and investigation in this matter for facts, witnesses

16  and supporting data that may recall information which, if it had presently within its knowledge,

17  would be included in these responses. Consequently, to the extent that the Discovery Demands

18  herein ask for "all facts" or the name of "all persons" or the identity of "all documents", etc., they

19  are responded to fully insofar as the information is presently available to the responding party.

20  This responding party is not precluded from presenting at trial information discovered following

21  the date of these responses. However, Defendant assume no obligation to voluntarily supplement

22  or amend these responses to reflect witnesses, facts and evidence discovered following the mailing

23  of these responses. Except for explicit facts submitted herein, no admissions of any nature

24  whatsoever are implied or should be inferred. The fact that any Discovery Demand herein has been

25  answered should not be taken as an admission, or acceptance, or that existence or any fact or facts

26  set forth or assumed by such Discovery Demand, or that such answer constitutes admissible

27  evidence.

28       It is assumed by the responding party that the propounding party and all parties to this

F:\DOCS\LETICIA ARCINIEGA\DOC DEMAND RESPONSE 3 10-15-2012.pdf2wpd
10/16-2:49pm

Exhibit "77"
00241

1  lawsuit possess and are familiar with all the discovery proceedings in this action. Therefore, when

2  an interrogatory calls for information which is contained in the discovery materials available to all

3  parties, said interrogatory will be answered only by reference to those discovery materials.

4      This introductory statement is incorporated herein by reference to each of the answers as it

5  is stated in full.

6      **GENERAL OBJECTIONS APPLICABLE TO ALL DISCOVERY DEMANDS**

7      Defendant objects to Plaintiff's Discovery Demands and each request contained therein to

8  the extent they seek information that is vague, ambiguous, over broad, inadequately described,

9  burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

10      Defendant objects to Plaintiff's Discovery Demands and each request contained therein to

11  the extent they seek to impose a duty upon Defendant which is greater than imposed by the Federal

12  Rules of Civil Procedure.

13      Defendant objects to Plaintiff's Discovery Demands and each request contained therein to

14  the extent they call for any documents protected from disclosure or discovery by (i) the attorney-

15  client privilege; (ii) the protection of the attorney work product privilege, including but not limited

16  to documents prepared in anticipation of litigation or for trial; and (iii) any other applicable

17  privilege(s). Defendant claims privileges and protection with respect to all information and

18  documents which are protected from disclosure or discovery by such privilege(s) and protection(s).

19      Defendant objects to Plaintiff's Discovery Demands and each request contained therein to

20  the extent they seek production or disclosure of documents containing confidential, sensitive,

21  private and/or proprietary information of Defendant, their family members and others.

22      Defendant objects to Plaintiff's Discovery Demands and each request contained therein to

23  the extent they seek production or disclosure of documents which are not relevant to the subject

24  matter of this lawsuit.

25      Defendant objects to Plaintiff's Discovery Demands and each request contained therein to

26  the extent they seek production or disclosure of documents that Plaintiffs already have in its

27  possession.

28      Defendant made a diligent and good faith effort to locate and produce the documents

F:\DOCS\LETICIA ARCINIEGA\DOC DEMAND RESPONSE 3 10-15-2012.pdf9xpd
10/16-2:49pm

Exhibit "77"
00242

1  which are responsive to those requests. Defendant, however, has not completed her investigation.

2  Accordingly, the following written responses are based on the current status of Defendant's

3  investigation and discovery, and the accompanying production of documents consists of those

4  documents within Defendant's custody and control which have been located following diligent

5  search. These written responses and the accompanying documents are provided without prejudice

6  to Defendant's right to offer into evidence additional responsive documents or evidence when such

7  are located or ascertained. More over, these responses should not be construed as, and do not

8  constitute, a waiver of Defendant's right to introduce additional evidence, in any form, later on in

9  this proceeding.

10      These written responses and the accompanying production of documents are subject to all

11  objections including but not limited to, relevance, materiality, and admissibility, that would

12  require exclusion of any statement made herein, or any document produced, as if it were made by a

13  witness present and testifying in court, all of which objections and grounds are reserved and may

14  be imposed at the time of arbitration or trial. The fact that Defendant has responded to all or any

15  part of a request for production is not an admission that the request seeks admissible evidence and

16  is not to be construed as a waiver of any proper grounds of objection that may hereafter be

17  interposed to such request or to the admissibility of any documents produced in response thereto.

18      The foregoing General Objections are incorporated into each specific responses made

19  below by Defendant to Plaintiff's Discovery Demands. Defendant's specific responses are made

20  without waiving and are otherwise without prejudice to these General Objections. Furthermore, as

21  set forth below, certain representations in the specific response below as to Defendant's intention

22  and agreement to produce documents in response to these requests are contingent upon the entry in

23  this action of a stipulated protective order to ensure the confidentiality of such documents.

24      **RESPONSE TO DOCUMENT DEMANDS**

25  1.    REQUEST FOR PRODUCTION NO. 1: Produce any and all documents relating to

26      communications between You and David D. Christian regarding this litigation.

27      a.    OBJECTION: This demand is vague (ie, which litigation?), overly broad (no time

28        period), burdensome, and oppressive. Subject to, and without waiver of, said

Exhibit "77"
00243

1      objection, this responding party states that she is unable to comply with this

2      document demand because the category of documents requested either does not

3      exist or is not in the possession, custody, or control of this responding party.

4   2.    REQUEST FOR PRODUCTION NO. 2: Produce any and all documents relating to

5      communications between You and David D. Christian regarding previous litigation

6      between You and Plaintiff, including but not limited to the settlement of any such

7      litigation.

8     a.    OBJECTION: This demand is vague (ie, which Litigation?), overly broad (no time

9        period), burdensome, and oppressive. Subject to, and without waiver of, said

10        objection, this responding party states that she is unable to comply with this

11        document demand because the category of documents requested either does not

12        exist or is not in the possession, custody, or control of this responding party.

13   3.    REQUEST FOR PRODUCTION NO. 3: Produce any and all documents relating to

14      communications between You and Dolores Arciniega regarding this litigation.

15     a.    OBJECTION: This demand is vague (ie, which Litigation?), overly broad (no time

16        period), burdensome, and oppressive. Subject to, and without waiver of, said

17        objection, this responding party states that she is unable to comply with this

18        document demand because the category of documents requested either does not

19        exist or is not in the possession, custody, or control of this responding party.

20   4.    REQUEST FOR PRODUCTION NO. 4: Produce any and all documents relating to

21      communications between You and any other third party regarding this litigation.

22     a.    OBJECTION: This demand is vague (ie, which Litigation?), overly broad (no time

23        period), burdensome, and oppressive. Subject to, and without waiver of, said

24        objection, this responding party states that she is unable to comply with this

25        document demand because the category of documents requested either does not

26        exist or is not in the possession, custody, or control of this responding party.

27   5.    REQUEST FOR PRODUCTION NO. 5: Produce any and all bank records relating to bank

28      accounts held by You, jointly, or by You, as an individual, for the period commencing on

F:\DOCS\LETICIA ARCINIEGA\DOC DEMAND RESPONSE 3 10-15-2012.pd5wpd
10/16-2:49pm

1    May 4, 2007, through and including the Petition Date.

2    a.    OBJECTION: This demand is vague, overly broad, irrelevant, burdensome, and

3    oppressive. Plaintiff is not entitled to Debtor's bank statements relating to financial

4    accounts held by her (or jointly) from May 4, 2007 through the February 18, 2011

5    Petition Date. There is no relevance to this May 4, 2007 date to the specific causes

6    of action in this adversary proceeding. The Arrowhead Litigation was commenced

7    on May 2, 2007, and those claims for declaratory relief, breach of oral contract and

8    specific performance were or will be discharged in the Debtor's bankruptcy. That

9    date has no relevance to the other causes of action herein. The 523(a)(2)(A) and

10    (a)(6) causes of action are for the May 4, 2009 Settlement Agreement between the

11    parties and David Christian & Dolores Arciniega were not involved in that

12    transaction nor were their bank accounts. The 727(a)(2) and (a)(4) causes of action

13    only apply to the February 18, 2011 Petition Date and the 1-year reachback of

14    February 18, 2010.

15    b.    Subject to, and without waiver of, said objection, this responding party states

16    i.    I have provided ALL bank records and tax records for the period

17    1/1/2007-12/31/2011 for both my personal and business accounts as well as

18    all bankruptcy supporting documents. This was done voluntarily without

19    acknowledgement from Plaintiff's representatives. See files labeled:

20    (1)    LJA BkStmt 07-11; and

21    (2)    Bk Docs 1 of 4 through 4 of 4-Bill of Sale; and

22    (3)    Bk 1 of 2 and Bk 2 of 2; in addition to

23    (4)    Req for Prod of Docs #26;

24    (5)    Req for Prod of Docs #27-Paper Roads;

25    (6)    Req for Prod of Docs #29;

26    (7)    Req for Prod of Docs #29-CPA;

27    (8)    UBOC CitiMortgage;

28    (9)    WFB CitiMortgage 2005-2012.

F:\DOCS\LETICIA ARCINIEGA\DOC DEMAND RESPONSE 3 10-15-2012.pdf.wpd
10/16-2:49pm

Exhibit "77"
00245

6.    REQUEST FOR PRODUCTION NO. 6:  Produce any and all documents relating to Your assets during the period commencing on May 4, 2007, through and including the Petition Date.

    a.    OBJECTION: This demand is vague, overly broad, irrelevant, burdensome, and oppressive. Plaintiff is not entitled to Debtor's assets from May 4, 2007 through the February 18, 2011 Petition Date. There is no relevance to this May 4, 2007 date to the specific causes of action in this adversary proceeding. The Arrowhead Litigation was commenced on May 2, 2007, and those claims for declaratory relief, breach of oral contract and specific performance were or will be discharged in the Debtor's bankruptcy. That date has no relevance to the other causes of action herein. The 523(a)(2)(A) and (a)(6) causes of action are for the May 4, 2009 Settlement Agreement between the parties and David Christian & Dolores Arciniega were not involved in that transaction nor were their bank accounts. The 727(a)(2) and (a)(4) causes of action only apply to the February 18, 2011 Petition Date and the 1-year reachback of February 18, 2010.

    b.    Subject to, and without waiver of, said objection, this responding party states

        i.    Household goods & Furnishings    $2500.00

        ii.    NYL Whole Life Ins Policy    $7356.01

        iii.    Merrill Lynch IRA    $101,237.30

        iv.    Merrill Lynch SEPP    $21.49

        v.    ½ Int 2007 Ford Ranger    $3,307.50

        vi.    1986 Chevy Corvette-Salvaged    $5,700.00

        vii.    2007 Ford Escape    $10,685.00

        viii.    Office Furnishings    $1,500.00

        ix.    Residence    $93,000.00

        x.    Paper Roads    $5,252.80

        xi.    288 E Main St, commercial bldg    $149,400.00

        xii.    ½ Int 2 vacnt lots-Soboba Heights    $2,062.50

F:\DOCS\LETICIA ARCINIEGA\DOC DEMAND RESPONSE 3 10-15-2012.pdf7wpd
10/16-2:49pm

Exhibit "77"
00246

1      xiii.    Cash on Hand $40.00

2      xiv.    Savings Account     $1.16

3      xv.    WFB checking balance     $167.78

4      xvi.    Books, Pictures & Collectibles     $150.00

5      xvii.    Wearing Apparel     $700.00

6      xviii.   Fashion Jewelry     $750.00

7      xix.    Total   $383,831.54

8    7.     REQUEST FOR PRODUCTION NO. 7: Produce any and all documents relating to Your

9    current assets.

10      a.     OBJECTION: This demand is vague, overly broad, irrelevant, burdensome, and

11         oppressive. Plaintiff is not entitled to Debtor's current post-petition assets (18

12         months after the February 18, 2011 Petition Date). There is no relevance to the

13         specific causes of action in this adversary proceeding. The 523(a)(2)(A) and (a)(6)

14         causes of action are for the May 4, 2009 Settlement Agreement between the parties

15         and David Christian & Dolores Arciniega were not involved in that transaction nor

16         were their bank accounts. The 727(a)(2) and (a)(4) causes of action only apply to

17         the February 18, 2011 Petition Date and the 1-year reachback of February 18, 2010.

18      b.     Subject to, and without waiver of, said objection, this responding party states

19         i.     See files labeled: WFB9-12 and UBOC 9-12.

20         ii.     As of September 30, 2012

21             (1)     Household goods & Furnishings     $2,250.00

22             (2)     NYL Whole Life Ins Policy   $7,356.01

23             (3)     UBS IRA     106,242.56

24             (4)     ½ Int 2007 Ford Ranger-Per KBB    $2,809.00

25             (5)     1986 Chevy Corvette-Salvaged     $3,000.00

26             (6)     2006 Ford Escape-Per KBB   $5,704.00

27             (7)     Office Furnishings     $750.00

28             (8)     Residence     $93,000.00

Exhibit "77"
00247

  (9)  Paper Roads $5,252.80

  (10)  ½ Int 2 vacnt lots-Soboba Heights  $2,062.50

  (11)  Cash on Hand $65.00

  (12)  WFB Savings Account  $26.16

  (13)  WFB checking balance  $32.99

  (14)  UBOC checking balance  $2,821.90

  (15)  Books, Pictures & Collectibles  $150.00

  (16)  Wearing Apparel  $700.00

  (17)  Fashion Jewelry  $750.00

  (18)  Total $232,972.92

8. REQUEST FOR PRODUCTION NO. 8:  Produce any and all documents relating to the purchase of the property commonly known as 3047 N. Arrowhead Ave., San Bernardino, CA, 92405 (the "Arrowhead Property").

  a.  OBJECTION: This demand is vague, overly broad, irrelevant, burdensome, and oppressive. The purchase of the Arrowhead Property is not the focus of this nondischargeability litigation.

  b.  Subject to, and without waiver of, said objection, this responding party states that she is unable to comply with this document demand because the category of documents requested either does not exist or is not in the possession, custody, or control of this responding party.

9. REQUEST FOR PRODUCTION NO. 9: Produce any and all documents relating to any attempt by You to refinance the Arrowhead Property, including but not limited to any communications, loan applications, credit history reports, or tax returns.

  a.  OBJECTION: This demand is vague, overly broad, irrelevant, burdensome, and oppressive.

  b.  Subject to, and without waiver of, said objection, this responding party states that she is unable to comply with this document demand because the category of documents requested either does not exist or is not in the possession, custody, or

Exhibit "77"
00248

1          control of this responding party.

2    10.    REQUEST FOR PRODUCTION NO. 10: Produce any and all documents relating to any

3        attempt by You to obtain additional loans secured by the Arrowhead Property, including

4        but not limited to any communications, loan applications, credit history reports, or tax

5        returns.

6        a.    OBJECTION: This demand is vague, overly broad, irrelevant, burdensome, and

7            oppressive. This responding party has not been on title of this property since May

8            2009; 1 year and 9 months prior to the date of petition. Subject to, and without

9            waiver of, said objection, this responding party states that she is unable to comply

10            with this document demand because the category of documents requested either

11            does not exist or is not in the possession, custody, or control of this responding

12            party.

13    11.    REQUEST FOR PRODUCTION NO. 11: Produce any and all documents relating to any

14        attempt by You to modify any loans secured by the Arrowhead Property, including but not

15        limited to any communications, loan applications, credit history reports, or tax returns.

16        a.    OBJECTION: This demand is vague, overly broad, irrelevant, burdensome, and

17            oppressive. This responding party has not been on title of this property since May

18            2009; 1 year and 9 months prior to the date of petition. Subject to, and without

19            waiver of, said objection, this responding party states that she is unable to comply

20            with this document demand because the category of documents requested either

21            does not exist or is not in the possession, custody, or control of this responding

22            party.

23    12.    REQUEST FOR PRODUCTION NO. 12:  Produce any and all documents reflecting

24        payments on account of any loan secured by or encumbrance on the Arrowhead Property,

25        including but not limited to payments on account of any VA Loan, refinances, junior loans,

26        or loan modifications.

27        a.    OBJECTION: This demand is compound, vague, overly broad, irrelevant,

28            burdensome, and oppressive. This responding party has not been on title of this

Exhibit "77"
00249

Case 6:11-ap-01735-SY    Doc 106    Filed 02/17/15    Entered 02/17/15 18:34:47    Desc
Main Document      Page 255 of 469


1  property since May 2009; 1 year and 9 months prior to the date of petition. Subject

2  to, and without waiver of, said objection, this responding party states that she is

3  unable to comply with this document demand because the category of documents

4  requested either does not exist or is not in the possession, custody, or control of this

5  responding party.

6  13.  REQUEST FOR PRODUCTION NO. 13: Produce any and all documents relating to the

7  purchase of the Verona Property.

8      a.  OBJECTION: This demand is vague, overly broad, irrelevant, burdensome, and

9          oppressive - the purchase of the Verona property occurred over 21 years ago.

10          Subject to, and without waiver of, said objection, this responding party states that

11          she is unable to comply with this document demand because the category of

12          documents requested either does not exist or is not in the possession, custody, or

13          control of this responding party.

14  14.  REQUEST FOR PRODUCTION NO. 14: Produce any and all documents relating to any

15  attempt by You to refinance any loan secured by the Verona Property, including but not

16  limited to any communications, loan applications, credit history reports, or tax returns.

17      a.  OBJECTION: This demand is vague, overly broad (no time period), irrelevant,

18          burdensome, and oppressive.

19      b.  Subject to, and without waiver of, said objection, this responding party states

20          i.  See attached file beginning on page 2 of 74, file: "SpecInterrog 6, CoA 1"

21          ii.  See attached file "2006 CitiMortgage Re Remove Co Borrower"

22          iii.  Beginning 2006 ending: Feb 25, 2011, all documentation has been provided

23  15.  REQUEST FOR PRODUCTION NO. 15: Produce any and all documents relating to any

24  attempt by You to obtain loans secured by the Verona Property, including but not limited

25  to any communications, loan applications, credit history reports, or tax returns.

26      a.  OBJECTION: This demand is vague, overly broad (no time period), irrelevant,

27          burdensome, and oppressive.

28      b.  Subject to, and without waiver of, said objection, this responding party states

F:\DOCS\LETICIA ARCINIEGA\DOC DEMAND RESPONSE 3 10-15-2012.pdf.wpd
10/16-2:49pm

Exhibit "77"
00250

1              i.      See attached file beginning on page 2 of 74, file: "SpecInterrog 6, CoA 1"

2              ii.     See attached file "2006 CitiMortgage Re Remove Co Borrower"

3              iii.    Beginning 2006 ending: Feb 25, 2011, all documentation has been provided

4   16.   REQUEST FOR PRODUCTION NO. 16: Produce any and all documents relating to any

5          attempt by You to modify any loans secured by the Verona Property, including but not

6          limited to any communications, loan applications, credit history reports, or tax returns.

7          a.    OBJECTION: This demand is vague, overly broad (no time period), irrelevant,

8                burdensome, and oppressive.

9          b.    Subject to, and without waiver of, said objection, this responding party states

10                   i.      See attached file beginning on page 2 of 74, file: "SpecInterrog 6, CoA 1"

11                   ii.     See attached file "2006 CitiMortgage Re Remove Co Borrower"

12                   iii.    Beginning 2006 ending: Feb 25, 2011, all documentation has been

13                           provided.

14  17.   REQUEST FOR PRODUCTION NO. 17: Produce any and all documents reflecting

15          payments on account of any loan secured by or encumbrance on the Verona Property,

16          including but not limited to payments on account of any VA Loan, refinances, junior loans,

17          or loan modifications.

18          a.    OBJECTION: This demand is vague, overly broad (no time period), irrelevant,

19                burdensome, and oppressive.

20          b.    Subject to, and without waiver of, said objection, this responding party states that

21                she already produced these documents to Plaintiff after the mediation. Said

22                documents will be produced again.[1]  See files labeled:

23                    i.      UBOC CitiMortgage;

24                    ii.     WFB CitiMortgage 2005-2012.

25  18.   REQUEST FOR PRODUCTION NO. 18: Produce any and all documents relating to Your

---

[1] See attached reports from bill pay accounts to CitiMortgage for payment of loan, dating 8/05 – 8/12. The Union Bank search engine only allows queries based on the last 18 months; the first time Defendant paid Citi from Union Bank was in March of 2011. Previously all payments were made from the WFB account.

Exhibit "77"
00251

1    request that Plaintiff convey his interest in the Verona Property to You.

2        a.    OBJECTION: This demand is vague, overly broad, irrelevant, burdensome, and

3            oppressive.

4        b.    Subject to, and without waiver of, said objection, this responding party states:

5            i.    See file labeled: Clark-Arciniega Settlement Agmt 2009; I have no other

6                documents.

7    19.    REQUEST FOR PRODUCTION NO. 19: Produce any and all documents relating to any

8        Christian Loan.

9        a.    OBJECTION: This demand is vague, overly broad (no time period), irrelevant,

10            burdensome, and oppressive.

11        b.    Subject to, and without waiver of, said objection, this responding party states:

12            i.    See file labeled: "SpecInterrog 7 CoA 3 para73" these are all of the

13                documents in my possession.[2]

14    20.    REQUEST FOR PRODUCTION NO. 20: Produce any and all documents relating to any

15        deed of trust securing any Christian Loan.

16        a.    OBJECTION: This demand is vague, overly broad (no time period), irrelevant,

17            burdensome, and oppressive.

18        b.    Subject to, and without waiver of, said objection, this responding party states:

19            i.    See file labeled: "SpecInterrog 7 CoA 3 para73" these are all of the

20                documents in my possession.[3]

21    21.    REQUEST FOR PRODUCTION NO. 21: Produce any and all documents relating to

22        disposition of any funds You received from David D. Christian, including the Christian

23        Loan, during the period commencing on May 4, 2007, through and including the Petition

24

25        [2]See attached: Disbursements stopped in 2009 because a month later Defendant had her $30k

26    portion of the settlement. The previous September, Plaintiff had offered $100k to settle; that would have paid off the house. $30k wasn't even half of what was owed in May 2009.

27        [3]See attached: Disbursements stopped in 2009 because a month later Defendant had her $30k

28    portion of the settlement. The previous September, Plaintiff had offered $100k to settle; that would have paid off the house. $30k wasn't even half of what was owed in May 2009.

Exhibit "77"
00252

1     Date.

2     a.     OBJECTION: This demand is vague, overly broad, irrelevant, burdensome, and

3     oppressive. Plaintiff is not entitled to Debtor's assets from May 4, 2007 through the

4     February 18, 2011 Petition Date. There is no relevance to this May 4, 2007 date to

5     the specific causes of action in this adversary proceeding. The Arrowhead

6     Litigation was commenced on May 2, 2007, and those claims for declaratory relief,

7     breach of oral contract and specific performance were or will be discharged in the

8     Debtor's bankruptcy. That date has no relevance to the other causes of action

9     herein. The 523(a)(2)(A) and (a)(6) causes of action are for the May 4, 2009

10     Settlement Agreement between the parties and David Christian & Dolores

11     Arciniega were not involved in that transaction nor were their bank accounts. The

12     727(a)(2) and (a)(4) causes of action only apply to the February 18, 2011 Petition

13     Date and the 1-year reachback of February 18, 2010.

14     b.     Subject to, and without waiver of, said objection, this responding party states

15     i.     See file labeled: LJA BkStmt 07-11 Funds were received and spent as of

16     4/28/09.[4]

17   22.     REQUEST FOR PRODUCTION NO. 22: Produce any and all documents relating to the

18     disposition of any funds You received in connection with the Settlement Agreement.

19     a.     OBJECTION: This demand is vague, overly broad, irrelevant, burdensome, and

20     oppressive.

21     b.     Subject to, and without waiver of, said objection, this responding party states

22     i.     See file labeled: MSRE, Inc. 5-09 Stmt Settlement Dep.[5]

23

---

24     [4]The last funds from David that are part of this element were received in April of 2009. The following month Debtor received the settlement monies on which she could operate. The account the

25   funds went into was closed many months ago and the Debtor must rely on the bank to provide copies. She has requested them. See file: LJA WFB & UBOC Bank Statements 2007-2011 for details of all

26   deposits to defendant's personal accounts. These can be matched to disbursements from Christian, MSRE, Inc. and the defendant's employers.

27

    [5]See file: MSRE, Inc. 2009, the May statement clearly shows the deposit of the $30k to that

28   account on May 18, 2009.

Exhibit "77"
00253

23. REQUEST FOR PRODUCTION NO. 23: Produce any and all documents relating to any transfer to one or more third parties of Property belonging to You with a value of $1,000 or more during the period commencing on May 4, 2009, through and including the Petition Date.

    a. OBJECTION: This demand is vague, overly broad, irrelevant, burdensome, and oppressive. Plaintiff is not entitled to Debtor's assets from May 4, 2009 through the February 18, 2011 Petition Date. There is no relevance to this May 4, 2009 date to the specific causes of action in this adversary proceeding. The Arrowhead Litigation was commenced on May 2, 2007, and those claims for declaratory relief, breach of oral contract and specific performance were or will be discharged in the Debtor's bankruptcy. That date has no relevance to the other causes of action herein. The 523(a)(2)(A) and (a)(6) causes of action are for the May 4, 2009 Settlement Agreement between the parties and David Christian & Dolores Arciniega were not involved in that transaction nor were their bank accounts. The 727(a)(2) and (a)(4) causes of action only apply to the February 18, 2011 Petition Date and the 1-year reachback of February 18, 2010.

    b. OBJECTION: Subject to, and without waiver of, said objection, this responding party states

        i. MSRE, Inc. received the full sum of $30k resulting from the settlement w/the Plaintiff on May 18, 2009, the sum being transferred as an owner contribution to the business.

        ii. See file labeled: MSRE, Inc. 5-09 Stmt Settlement Dep.[6]

24. REQUEST FOR PRODUCTION NO. 24: Produce any and all documents relating to the removal from Your possession of property belonging to You with a value of $1,000 or more during the period commencing on May 4, 2009, through and including the Petition Date.

---

[6]See file: MSRE, Inc. 2009, the May statement clearly shows the deposit of the $30k to that account on May 18, 2009.

F:\DOCS\LETICIA ARCINIEGA\DOC DEMAND RESPONSE 3 10-15-2012.pdf Spd
10/16-2:49pm

Exhibit "77"

00254

1     a.   OBJECTION: This demand is vague, overly broad, irrelevant, burdensome, and

2       oppressive. Plaintiff is not entitled to Debtor's assets from May 4, 2009 through the

3       February 18, 2011 Petition Date. There is no relevance to this May 4, 2009 date to

4       the specific causes of action in this adversary proceeding. The Arrowhead

5       Litigation was commenced on May 2, 2007, and those claims for declaratory relief,

6       breach of oral contract and specific performance were or will be discharged in the

7       Debtor's bankruptcy. That date has no relevance to the other causes of action

8       herein. The 523(a)(2)(A) and (a)(6) causes of action are for the May 4, 2009

9       Settlement Agreement between the parties and David Christian & Dolores

10      Arciniega were not involved in that transaction nor were their bank accounts. The

11      727(a)(2) and (a)(4) causes of action only apply to the February 18, 2011 Petition

12      Date and the 1-year reachback of February 18, 2010.

13    b.   Subject to, and without waiver of, said objection, this responding party states

14      i.   See file labeled: Clark-Arciniega Settlement 2009

15      ii.   See file labeled: MSRE,Inc 5-09 Stmt Settlement Dep.

16 25.   REQUEST FOR PRODUCTION NO. 25: Produce any and all documents relating to the

17    concealment of property belonging to You with a value of $1000 or more during the period

18    commencing on May 4, 2009, through and including the Petition Date.

19    a.   OBJECTION: This demand is vague, overly broad, irrelevant, burdensome, and

20      oppressive. Plaintiff is not entitled to Debtor's assets from May 4, 2009 through the

21      February 18, 2011 Petition Date. There is no relevance to this May 4, 2009 date to

22      the specific causes of action in this adversary proceeding. The Arrowhead

23      Litigation was commenced on May 2, 2007, and those claims for declaratory relief,

24      breach of oral contract and specific performance were or will be discharged in the

25      Debtor's bankruptcy. That date has no relevance to the other causes of action

26      herein. The 523(a)(2)(A) and (a)(6) causes of action are for the May 4, 2009

27      Settlement Agreement between the parties and David Christian & Dolores

28      Arciniega were not involved in that transaction nor were their bank accounts. The

Exhibit "77"
00255

1            727(a)(2) and (a)(4) causes of action only apply to the February 18, 2011 Petition

2            Date and the 1-year reachback of February 18, 2010.

3     b.     Subject to, and without waiver of, said objection, this responding party states that

4            she is unable to comply with this document demand because the category of

5            documents requested either does not exist or is not in the possession, custody, or

6            control of this responding party.

7 26.    REQUEST FOR PRODUCTION NO. 26: Produce any and all documents relating to any

8     attempt by You to pay off the VA Loan after May 4, 2009.

9     a.     OBJECTION: This demand is vague, overly broad, irrelevant, burdensome, and

10            oppressive. Plaintiff is not entitled to Debtor's assets from May 4, 2009 through the

11            February 18, 2011 Petition Date. There is no relevance to this May 4, 2009 date to

12            the specific causes of action in this adversary proceeding. The Arrowhead

13            Litigation was commenced on May 2, 2007, and those claims for declaratory relief,

14            breach of oral contract and specific performance were or will be discharged in the

15            Debtor's bankruptcy. That date has no relevance to the other causes of action

16            herein. The 523(a)(2)(A) and (a)(6) causes of action are for the May 4, 2009

17            Settlement Agreement between the parties and David Christian & Dolores

18            Arciniega were not involved in that transaction nor were their bank accounts. The

19            727(a)(2) and (a)(4) causes of action only apply to the February 18, 2011 Petition

20            Date and the 1-year reachback of February 18, 2010.

21     b.     Subject to, and without waiver of, said objection, this responding party states that

22            she already produced these documents to Plaintiff after the mediation. Said

23            documents will be produced again.

24       i.     See files labeled:

25            (1)     UBOC CitiMortgage;

26            (2)     WFB CitiMortgage 2005-2012

27            (3)     SpecInterrog 6 CoA 1

28

Exhibit "77"
00256

1        (4)     2006 CitiMortgage Re Remove Co borrower.[7]

2   27.   REQUEST FOR PRODUCTION NO. 27: Produce any and all documents relating to the

3         value of the "Cayucos Property as of the Petition Date.

4         a.     OBJECTION: This demand is vague, overly broad, irrelevant, burdensome, and

5                oppressive. Subject to, and without waiver of, said objection, this responding party

6                states

7                i.      See attached file labeled: "Soboba, Cayucos Valuation" and

8                ii.     See "Paper Roads lots 2012 Tx Assess"; showing valuation for tax

9                        purposes, based on previous sales as $5500.[8]

10  28.   REQUEST FOR PRODUCTION NO. 28: Produce any and all documents relating to the

11        value of Your interest in books, pictures, and collectibles as of the Petition Date.

12        a.     OBJECTION: This demand is vague, overly broad, irrelevant, burdensome, and

13               oppressive. Subject to, and without waiver of, said objection, this responding party

14               states that she is unable to comply with this document demand because the category

15               of documents requested either does not exist or is not in the possession, custody, or

16               control of this responding party.

17  29.   REQUEST FOR PRODUCTION NO. 29: Produce any and all documents relating to the

18        value of Your interest in office equipment, furnishings, and supplies as of the Petition

19        Date.

20        a.     OBJECTION: This demand is vague, overly broad, irrelevant, burdensome, and

21               oppressive. Subject to, and without waiver of, said objection, this responding party

22               states

23               i.      See file labeled: "Bill of Sale".

24

25

26   ───────────────

27   [7]This file was formerly called: Ad Ans CoA 1.

28   [8]The second file "Paper Roads Lots 2012 Tx Assessment is a recent doc; the Assessor has
     pretty much concurred with the Debtor's valuation findings.

F:\DOCS\LETICIA ARCINIEGA\DOC DEMAND RESPONSE 3 10-15-2012.pdf 18pd
10/16-2:49pm

Exhibit "77"
00257

1            ii.    In addition to: "Main Street Furniture Release.[9]

2   30.   REQUEST FOR PRODUCTION NO. 30:  Produce any and all documents relating to the

3      value of the Main Street Property as of the Petition Date.

4          a.   OBJECTION: This demand is vague, overly broad, irrelevant, burdensome, and

5             oppressive. Subject to, and without waiver of, said objection, this responding party

6             states

7                i.    See attached file labeled: "Soboba, Cayucos Valuation"

8                ii.    Also, "288 E Main St SJCN LoopNet"

9                iii.   No other documents exist.[10]

10  31.   REQUEST FOR PRODUCTION NO. 31: Produce any and all documents relating to the

11     value of Your interest in MSRE, Inc. as of the Petition Date.

12         a.   OBJECTION: This demand is vague, overly broad, irrelevant, burdensome, and

13            oppressive. Subject to, and without waiver of, said objection, this responding party

14            states

15               i.    Ownership declared in Bankruptcy filing as the Note; interest appears in

16                  each tax return filed since 2007, see LJA taxes 2007-2011.[11]

17  32.   REQUEST FOR PRODUCTION NO. 32: Produce any and all documents relating to rental

18     income from MSRE, Inc. during the period commencing on May 4, 2007, through and

19     including the Petition Date.

20         a.   OBJECTION: This demand is vague, overly broad, irrelevant, burdensome, and

21            oppressive.

22

-------------------------

23  [9]Two files, the original FF&E submitted to the Debtor's CPA for booking the purchase of same and the subsequent message from the Debtor's CPA re: the remaining balance, second file, "CPA".

24

25  [10]Req for Prod of Docs #30 and "288 E Main Valuation" are extracts from the Bk docs, supporting the Debtor's valuation of the building at $149k. The third file: "288 E Main St SJCN-Sale LoopNet" is a recent report based on the fact that the building sold for $160k in May of 2012. That's

26  about a 6.5% difference; over a period of one year.

27  [11]Attached at two files: MSRE, Inc Articles of Incorporation, showing the Debtor as agent of service. This doesn't really translate to 'owner' but the Debtor is the sole officer and shareholder of

28  the corporation. The second file is a copy of the Debtor's 2010 taxes.

Exhibit "77"
00258

1       b.    Subject to, and without waiver of, said objection, this responding party states that

2             she is unable to comply with this document demand because the category of

3             documents requested either does not exist or is not in the possession, custody, or

4             control of this responding party (as it is prohibited under IRS rules: my CPA and I

5             deliberately set up the Note (as reported in my BK filing) because to do otherwise

6             (have the business pay me rent) would be in violation of an IRS 'arms length'

7             limitation; resulting in a transaction involving me, my business and my taxes).

8  33.   REQUEST FOR PRODUCTION NO. 33: Produce any and all documents relating to

9     property held by a third party for Your benefit at any time during the period commencing

10    on May 4, 2007, through and including the Petition Date.

11       a.    OBJECTION: This demand is vague, overly broad, irrelevant, burdensome, and

12            oppressive. Plaintiff is not entitled to Debtor's bank statements relating to financial

13           accounts held by her (or jointly) from May 4, 2007 through the February 18, 2011

14           Petition Date. There is no relevance to this May 4, 2007 date to the specific causes

15           of action in this adversary proceeding. The Arrowhead Litigation was commenced

16           on May 2, 2007, and those claims for declaratory relief, breach of oral contract and

17           specific performance were or will be discharged in the Debtor's bankruptcy. That

18           date has no relevance to the other causes of action herein. The 523(a)(2)(A) and

19           (a)(6) causes of action are for the May 4, 2009 Settlement Agreement between the

20           parties and David Christian & Dolores Arciniega were not involved in that

21           transaction nor were their bank accounts. The 727(a)(2) and (a)(4) causes of action

22           only apply to the February 18, 2011 Petition Date and the 1-year reachback of

23           February 18, 2010.

24       b.    Subject to, and without waiver of, said objection, this responding party states that

25            she is unable to comply with this document demand because the category of

26           documents requested either does not exist or is not in the possession, custody, or

27           control of this responding party.

28  34.   REQUEST FOR PRODUCTION NO. 34: Produce any and all documents relating to any

Exhibit "77"
00259

1    trusts created by You during the period commencing on May 4, 2007, through and

2    including the Petition Date.

3        a.    OBJECTION: This demand is vague, overly broad, irrelevant, burdensome, and

4        oppressive. Plaintiff is not entitled to Debtor's bank statements relating to financial

5        accounts held by her (or jointly) from May 4, 2007 through the February 18, 2011

6        Petition Date. There is no relevance to this May 4, 2007 date to the specific causes

7        of action in this adversary proceeding. The Arrowhead Litigation was commenced

8        on May 2, 2007, and those claims for declaratory relief, breach of oral contract and

9        specific performance were or will be discharged in the Debtor's bankruptcy. That

10       date has no relevance to the other causes of action herein. The 523(a)(2)(A) and

11       (a)(6) causes of action are for the May 4, 2009 Settlement Agreement between the

12       parties and David Christian & Dolores Arciniega were not involved in that

13       transaction nor were their bank accounts. The 727(a)(2) and (a)(4) causes of action

14       only apply to the February 18, 2011 Petition Date and the 1-year reachback of

15       February 18, 2010.

16       b.    Subject to, and without waiver of, said objection, this responding party states that

17       she is unable to comply with this document demand because the category of

18       documents requested either does not exist or is not in the possession, custody, or

19       control of this responding party.

20   35.    REQUEST FOR PRODUCTION NO. 35:  Produce any and all documents relating to any

21   trusts of which You were a beneficiary or in which You had any interest of any nature

22   during the period commencing on May 4, 2007, through and including the Petition Date.

23       a.    OBJECTION: This demand is vague, overly broad, irrelevant, burdensome, and

24       oppressive. Plaintiff is not entitled to Debtor's bank statements relating to financial

25       accounts held by her (or jointly) from May 4, 2007 through the February 18, 2011

26       Petition Date. There is no relevance to this May 4, 2007 date to the specific causes

27       of action in this adversary proceeding. The Arrowhead Litigation was commenced

28       on May 2, 2007, and those claims for declaratory relief, breach of oral contract and

Exhibit "77"
00260

1  specific performance were or will be discharged in the Debtor's bankruptcy. That

2  date has no relevance to the other causes of action herein. The 523(a)(2)(A) and

3  (a)(6) causes of action are for the May 4, 2009 Settlement Agreement between the

4  parties and David Christian & Dolores Arciniega were not involved in that

5  transaction nor were their bank accounts. The 727(a)(2) and (a)(4) causes of action

6  only apply to the February 18, 2011 Petition Date and the 1-year reachback of

7  February 18, 2010.

8      b.   Subject to, and without waiver of, said objection, this responding party states that

9  she is unable to comply with this document demand because the category of

10  documents requested either does not exist or is not in the possession, custody, or

11  control of this responding party.

12

13  DATED:    October 16, 2012    LAW OFFICE OF BARUCH C. COHEN
    A Professional Law Corporation

14

15      By   /S/ Baruch C. Cohen
    Baruch C. Cohen, Esq.

16      *Attorney For Defendant* LETICIA JOY ARCINIEGA

17

18

19

20

21

22

23

24

25

26

27

28

F:\DOCS\LETICIA ARCINIEGA\DOC DEMAND RESPONSE 3 10-15-2012.pdf.wpd
10/16-2:49pm

Exhibit "77"
00261

1

**VERIFICATION:**

2
    The undersigned has reviewed the foregoing DEFENDANT LETICIA JOY
ARCINIEGA'S VERIFIED RESPONSE TO PLAINTIFF JAMES CLARK'S FIRST SET OF

3
DOCUMENT DEMANDS F.R.C.P. 36 F.R.B.P. 7036 and further declares under penalty of
perjury under the laws of the United States and of the State of California that the foregoing are true

4
and correct, except as to those matters stated on information and belief, which the undersigned is
informed and believes are true and correct.

5

6
October 15, 2012                    *Defendant* LETICIA JOY ARCINIEGA

7

8


9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

E:\DOCS\LETICIA ARCINIEGA\DOC DEMAND RESPONSE 3 10-15-2012.p28.wpd
10-15-3:27pm

Exhibit "77"
00262

| In re: LETICIA JOY ARCINIEGA | Chapter 7 No. 6:11-BK-15412-DS |
|---|---|
| JAMES CLARK *against LETICIA JOY ARCINIEGA.* | Adversary # 6:11-ap-01735-DS |

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I. Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

## PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 4929 Wilshire Boulevard, Suite 940, Los Angeles, CA 90010. The document entitled: DEFENDANT LETICIA JOY ARCINIEGA'S AMENDED VERIFIED RESPONSE TO PLAINTIFF JAMES CLARK'S FIRST SET OF DOCUMENT DEMANDS F.R.C.P. 34 F.R.B.P. 7034 will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

I. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

Baruch C Cohen - bcc4929@gmail.com
D Edward Hays, Esq., ehays@marshackhays.com

II. SERVED BY U.S. MAIL OR OVERNIGHT MAIL(indicate method for each person or entity served): On October 16, 2012 I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. *Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.*
☐Service information continued on attached page

D Edward Hays, Esq., George Huang, Esq., Marshack & Hays, 5410 Trabuco Road, # 130, Irvine, CA 92620-5749

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| *Date* October 16, 2012 | *Signature* |
|---|---|
| *Type Name* **BARUCH C. COHEN** | By    /S/ Baruch C. Cohen |

F:\DOCS\LETICIA ARCINIEGA\SERVICE.POS.wpd
10/16-2:54pm

Exhibit "77"
00263

Secured Tax Bill

Page 1 of 3 

| 2010/11 SECURED TAX BILL | FOR FISCAL YEAR | DATE BILLED | TAX-RATE AREA | ASSESSMENT NO. |
|---|---|---|---|---|
| | 2010/11 | 10/22/2010 | 063-020 | 064,071,035 |

FOR CITIES,COUNTY, SCHOOLS,OTHER TAXING AGENCIES
IN SAN LUIS OBISPO COUNTY

| CORTAC # | BILL NUMBER |
|---|---|
| | 2010/11 064,071,035 53 |

**FRANK L. FREITAS**
County Tax Collector
Room D-290
County Government Center
San Luis Obispo, CA 93408

PROPERTY DESCRIPTION: MORRO RK VW SUB 2 BL 10 PTN LTS 5 TO 9

ASSESSED OWNER AS OF 01/01/2010

ARCINIEGA LETICIA J

| PROPERTY VALUE ALLOCATION | ASSESSED VALUE |
|---|---|
| LAND | 8,000 |
| IMPROVEMENTS | |
| PERSONAL PROPERTY | |
| FIXTURES / EQUIPMENT | |

The total values listed above less the exemptions listed
below equal the net property value.

| EXEMPTION | AMOUNT |
|---|---|

| TAXING AGENCY | RATE/$100 | AMOUNT |
|---|---|---|
| PROP 13 TAX RATE | 1.00000 | 80.04 |
| STATE WATER PROJ | .00290 | 0.22 |
| CAYUCOS ELEM-2004A&B | .02614 | 2.08 |
| CAYUCOS ELEM-2006A | .01790 | 1.42 |
| COAST UNIF BND 1998A | .00586 | 0.46 |
| AV TAX SUBTOTAL | 1.05280 | 84.22 |

The Tax Collector is not responsible for payments
made on wrong assessments. Be sure this bill is for
property on which you are obligated to pay taxes.
**SEE INSTRUCTIONS FOR IMPORTANT
TAXPAYER INFORMATION**

Keep This Portion For Your Records
Special Assessment Contact Information

We accept as negotiable
instruments only checks and

money orders drawn in U.S.
dollars on U.S. banks.

| NET PROPERTY | FIRST INSTALLMENT | SECOND INSTALLMENT | TOTAL |
|---|---|---|---|
| 8,000 | 42.11 | 42.11 | 84.22 |
| VALUE | DUE DATE: 11/01/2010 DELINQUENT: 12/10/2010 | DUE DATE: 02/01/2011 DELINQUENT: 04/11/2011 | TAX DUE |

ADDITIONAL PENALTIES ADDED AFTER JUNE 30TH

- - - - - - - - - - - - - - - - - - ✂ - - - - - - - - - - - - - - - - - - - - - - -

| FOR FISCAL YEAR | DATE BILLED | TAX-RATE AREA | ASSESSMENT NO. | BILL NUMBER (PLEASE INCLUDE ON CHECK) |
|---|---|---|---|---|
| 2010/11 | 10/22/2010 | 063-020 | 064,071,035 | 2010/11 064,071,035 3 |

ASSESSED OWNER AS OF 01/01/2010

ARCINIEGA LETICIA J

**AFTER:** April 11, 2011 to June 30, 2011

DELINQUENT
SECOND INSTALLMENT **PAID**
WHICH INCLUDES THE TAX, A 10% PENALTY AND COST

ADDITIONAL PENALTIES ADDED AFTER JUNE 30TH
MAILED TO: 064,071,035
ARCINIEGA LETICIA J

| PAY THIS AMOUNT - ON OR BEFORE: | 04/11/2011 |
|---|---|
| AMOUNT DUE | **PAID** |

THIS SECOND INSTALLMENT CANNOT BE PAID BEFORE
THE FIRST INSTALLMENT.

HOME
BANKING
PLEASE
ENTER BILL
NUMBER IN
ACCOUNT
NUMBER
FIELD

** INSTALLMENT PAID 12/10/2010 **   INSTALLMENT PAYMENT STUB **2**

Return this stub with payment

MAKE CHECK PAYABLE TO: San Luis Obispo County Tax Collector or "SLOCTC"
(Please Write Bill Number on Check)

**Exhibit "78"**
00264

Secured Tax Bill                                                           Page 2 of 3

- - - - - - - - - - - - - - - - - - - - - - - - - - - - ✂ - - - - - - - - - - - - - - - - - - - - - - - -

| FOR FISCAL YEAR | DATE BILLED | TAX-RATE AREA | ASSESSMENT NO. | BILL NUMBER (PLEASE INCLUDE ON CHECK) |
|---|---|---|---|---|
| 2010/11 | 10/22/2010 | 063-020 | 064,071,035 | 2010/11 064,071,035 5 |

ASSESSED OWNER AS OF  01/01/2010

ARCINIEGA LETICIA J

AFTER:   December 10, 2010 to June 30, 2011

DELINQUENT
FIRST INSTALLMENT        **PAID**

WHICH INCLUDES THE TAX AND A 10% PENALTY

ADDITIONAL PENALTIES ADDED AFTER JUNE 30TH
MAILED TO:                              064,071,035

ARCINIEGA LETICIA J.

Return this stub with payment

| PAY THIS AMOUNT - ON OR BEFORE: | 12/10/2010 |
|---|---|
| AMOUNT DUE | **PAID** |
| TO PAY TOTAL AMOUNT DUE RETURN BOTH STUBS WITH $84.22  BY  12/10/2010 | |

HOME BANKING PLEASE ENTER BILL NUMBER IN ACCOUNT NUMBER FIELD

** INSTALLMENT PAID 12/10/2010 **       INSTALLMENT PAYMENT STUB **1**

MAKE CHECK PAYABLE TO:      San Luis Obispo County Tax Collector or "SLOCTC"
(Please Write Bill Number on Check)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - ✂ - - - - - - - - - - - - - - - - - - - - - - - -

## IMPORTANT INFORMATION and CONTACT NUMBERS

**TAX COLLECTOR**  (805) 781-5831
1055 Monterey Street, Room D-290, County Government Center, San Luis Obispo, CA  93408
Email:  ttc@co.slo.ca.us
Website:  www.slocounty.ca.gov/tax   24 HOUR INFORMATION

**PAYMENT OPTIONS:  ONLINE** - Electronic and credit card payments are accepted on the Tax Collector's
website at www.slocounty.ca.gov/tax; **HOME BANKING** - Enter Bill Number in the Account Number field; **BY
MAIL** - Payment should be made by check, cashier's check, or money order. Do not mail cash.  The Tax
Collector disclaims any responsibility for cash sent by mail; **BY PHONE** -Credit Cards only; **IN PERSON** - Cash,
checks, and credit cards at the above address. Credit card payment fee information is available at
www.slocounty.ca.gov/tax. To avoid penalties, the first installment must be paid no later than December 10 and
the second installment must be paid no later than April 10. If December 10 or April 10 falls on a Saturday,
Sunday, or legal holiday, the time of delinquency extends to 5:00 p.m. on the next business day. A 10% penalty
is added to the first installment after December 10, and a 10% penalty and $10.00 delinquency cost are added to
the second installment after April 10.   *IMPORTANT: The second installment cannot be paid before the first
installment is paid.*

**RETURNED PAYMENTS:**  If payment is returned by the bank for any reason, that payment will be removed, a
returned payment fee will be added, and delinquent penalties will accrue as required by law.

**PRIOR TAXES UNPAID:** If this appears on the face of the bill, there are delinquent taxes which could jeopardize
the property. When taxes become delinquent, penalties, costs, and fees are added as required by law. Prior
years' taxes are not included in this tax bill. For payment information, contact the Redemption Division of the Tax
Collector's Office at (805) 781-5836.

**RESPONSIBILITY OF TAXPAYER:**  The taxpayer is responsible to see that the taxes are paid.  **Failure to
receive a tax bill does not relieve the taxpayer of the responsibility to pay the taxes when they become
due and payable, and does not provide a basis for removing penalties.**  Examine the bill carefully before
paying.  Be certain it covers your property.  If you have other property not included in this bill, be sure to obtain
additional bills for each assessment.

**COUNTY ASSESSOR**  San Luis Obispo (805) 781-5643 and Atascadero (805) 461-6143
1055 Monterey Street, Room D-360, County Government Center, San Luis Obispo CA 93408
Email:  assessor@co.slo.ca.us
Website:  www.slocounty.ca.gov/assessor

12

**Exhibit "78"**
**00265**

Secured Tax Bill                                                                    Page 3 of 3

**ASSESSMENT LIEN DATE:** The fiscal year is for the period of July 1 through June 30. Taxes for the current fiscal year are levied on both real and personal property as it existed at 12:01 a.m. on January 1 of the preceding fiscal year.

**ASSESSED VALUE:** If the taxpayer disagrees with the assessed value, the taxpayer has the right to an informal review by contacting the County Assessor's Office. If an informal agreement cannot be reached, the taxpayer has the right to file an Application for Changed Assessment with the County Assessment Appeals Board. Applications must be filed with the County Clerk, 1055 Monterey Street, Room D-120, County Government Center, San Luis Obispo, CA 93408, from July 2 through September 15, or for 60 days following the mailing of any notice of assessment, outside the regular period. Additional information regarding the Assessment Appeals and forms may be obtained at: www.slocounty.ca.gov/clerk

**10% PENALTY:** An asterisk (*) next to the property value indicates the assessed valuation **INCLUDES A 10% PENALTY** pursuant to Revenue & Taxation Code Section 463.

**ADDRESS CHANGES:** Tax bills are mailed to the **latest address** on the Assessor's roll. To change the mailing address, please go to www.slocounty.ca.gov/tax.

**HOMEOWNERS' EXEMPTION REQUIREMENTS:** If you filed a claim for the Homeowners' Property Tax Exemption, you declared under penalty of perjury that you are the owner of this property and that it is your principal place of residence. You are required by law to terminate this claim if either or both of the following events occurred prior to 12:01 a.m., January 1: (1) Ownership of the property transfers to another party, (2) Your principal place of residence changes to another location. If you are not eligible for this exemption you must notify the Assessor in writing on or before December 10, or you will be subject to payment in the amount of taxes the exemption represents, plus applicable penalties and interest. If you move to another home, you must file a new exemption claim for that property. The exemption cannot be transferred. To request a new Homeowners' Exemption Claim form or if you have questions contact the County Assessor.

**AUDITOR-CONTROLLER** (805) 781-5048
1055 Monterey Street, Room D-220, County Government Center, San Luis Obispo, CA 93408
Email: auditor@co.slo.ca.us
Website: http://www.slocounty.ca.gov/ac

**TAX BILL CALCULATIONS::** The Tax Collector does not determine the amount of tax you pay. The tax bill is calculated by multiplying the value of your property by the tax rate, plus any special assessments. Tax rates are established by the County Board of Supervisors.

**DISTRIBUTION OF TAXES:** Additional information regarding the distribution of property taxes may be obtained at www.slocounty.ca.gov/ac/Property_Tax_Information

Special Assessment Contact Information

**STATE-SPONSORED PROGRAMS** For information see the Tax Collector's website at:
www.slocounty.ca.gov/tax/proptaxinfo

**Property Tax Assistance for Senior Citizens, Blind, or Disabled Persons**
The state budget does not include funding for the Gonsalves-Deukmejian-Petris Senior Citizens Property Tax Assistance Law. Therefore, the Franchise Tax Board (FTB) will **not** issue Homeowner and Renter Assistance (HRA) Program instruction booklets and will not accept HRA claims. For the most current information on the HRA program, go to www.ftb.ca.gov and search for **HRA** .

**Property Tax Postponement for Senior Citizens, Blind, or Disabled Persons**
Chapter 4, Statutes of 2009, suspended the Senior Citizens' Property Tax Deferral Program effective February 20, 2009. As a result of the program suspension, the State Controller no longer may accept applications for property tax postponement. For the most current information on the Property Tax Postponement program please visit the Controller's website at www.sco.ca.gov (public services) or at 800-952-5661.

13

**Exhibit "78"**
00266

1              UNITED STATES BANKRUPTCY COURT

2       CENTRAL DISTRICT OF CALIFORNIA - RIVERSIDE DIVISION

3

4

5   In re                    ) Case No. 6:11-bk-15412-DS
                             )
6   LETICIA JOY ARCINIEGA,   ) Chapter 7
                             )
7             Debtor,        ) Adv. No. 6:11-ap-01735-DS
    _____)
8                            )
    JAMES CLARK,             )
9                            )
              Plaintiff,     )
10        vs.                )
                             )
11  LETICIA JOY ARCINIEGA,   )
                             )
12            Defendant.     )
    _____)
13

14

15    DEPOSITION OF :   LETICIA JOY ARCINIEGA
      TAKEN BY      :   CHAD V. HAES, ESQUIRE
16    Commencing    :   9:08 a.m.
      Location      :   870 Roosevelt Avenue
17                      Irvine, California
      Day, Date     :   Wednesday, January 30, 2013
18    Reported by   :   CORIN M. MULRENIN, C.S.R. NO. 9496
      Pursuant to   :   Notice
19    Original to   :   BARUCH C. COHEN, ESQUIRE

20

21

22  Pages 1 - 196

23  Job No. 130573

24

25

Exhibit "A"      Page: 1
00267

```
 1                    APPEARANCES OF COUNSEL

 2                          PRESENT

 3

 4   FOR THE PLAINTIFF:    MARSHACK HAYS
                          870 Roosevelt Avenue
 5                        Irvine, California 92620
                          949.333.7777
 6                        BY:  CHAD V. HAES, ESQUIRE
                                  -and-
 7                            SARAH C. BOONE, ESQUIRE

 8

 9   FOR THE DEFENDANT:    LAW OFFICES OF BARUCH C. COHEN
                          4929 Wilshire Boulevard
10                        Suite 940
                          Los Angeles, California 90010
11                        323.937.4501
                          BY:  BARUCH C. COHEN, ESQUIRE
12

13

14   ALSO PRESENT:        JAMES CLARK

15

16

17

18

19

20

21

22

23

24

25
```

**Exhibit "A"**   Page: 2
**00268**

1                          I-N-D-E-X

2  WITNESS:                                              PAGE

3        LETICIA JOY ARCINIEGA

4              Examination by Mr. Haes ...............  8
               Examination by Ms. Booth ............... 64
5        Further Examination by Mr. Haes ........ 66
               Further Examination by Ms. Booth .......185

6

7

8                          EXHIBITS

9  PLAINTIFF'S                                    MARKED FOR
   EXHIBIT NO.            DESCRIPTION          IDENTIFICATION
10
        1        Agreement of Compromise,          55
11               Settlement, and Mutual
                 and General Release
12
        2        Copy of checks payable            57
13               to Milton and DeKruif
                 and Leticia Arciniega
14
        3        Wells Fargo Portfolio             66
15               Management Account from
                 from 12/9/06 to 1/9/07
16
        4        Deed of Trust for 890             68
17               Verona Avenue, San Jacinto,
                 CA 92583-0000
18
        5        Account statements from          69
19               The Bank of Hemet

20      6        Recap of loan activity           89
                 from David D. Christian
21               to Leticia J. Arciniega

22      7        Official Records from            98
                 Riverside County
23               Assessor-County
                 Clerk-Recorder
24

25

**Exhibit "A"**
**00269**

```
 1                    I-N-D-E-X - Continued

 2                         EXHIBITS

 3   PLAINTIFF'S                                    MARKED FOR
     EXHIBIT NO.               DESCRIPTION        IDENTIFICATION
 4
        8          Promissory Note dated              93
 5                 4/24/09

 6      9          Promissory Installment             94
                   Note dated 12/18/06
 7
       10          Statement of Financial            105
 8                 Affairs regarding
                   Leticia Joy Arciniega
 9                 entered 2/18/11

10     11          Defendant Leticia Joy             111
                   Arciniega's Amended
11                 Verified Response to
                   Plaintiff's First Set
12                 of Interrogatories
                   F.R.C.P. 33 F.R.B.P. 7034
13
       12          Client Action Plan dated         119
14                 12/11/08 fro Springboard

15     13          Letter dated 1/22/09             124
                   to James Clark from
16                 CitiMortgage Loss
                   Mitigation
17
       14          Letter dated 2/12 to             128
18                 James A. Clark and
                   Leticia J. Arciniega
19                 from Adela McAllister

20     15          Letter dated 4/13/09 to          134
                   James A. Clark and
21                 Leticia J. Arciniega
                   from CitiMortgage
22
       16          Letter dated 4/20/09 to          136
23                 James A. Clark and
                   Leticia J. Arciniega
24                 from CitiMortgage

25
```

California Deposition Reporters

**Exhibit "A"**
**00270**

Page: 4

```
 1                     I-N-D-E-X - Continued

 2                   EXHIBITS   (Continued)

 3    PLAINTIFF'S                               MARKED FOR
      EXHIBIT NO.          DESCRIPTION        IDENTIFICATION
 4
         17        Letter dated 5/2/09 to          138
 5                 CitiMortgage from
                   Leticia J. Arciniega
 6
         18        Wells Fargo Advantage           143
 7                 Checking account statement
                   dated 8/11/09 through
 8                 9/9/09 for Leticia Joy
                   Arciniega
 9
         19        Wells Fargo PMA Package         144
10                 account statement dated
                   12/9/08 through 1/9/09
11                 for Leticia Joy Arciniega

12       20        UnionBank Statement of         146
                   Accounts dated 2/25/01
13                 through 3/04/11 for
                   Leticia J. Arciniega
14
         21        The Bank of Hemet account      147
15                 statement dated 1/31/11
                   for MSRE, Inc.
16
         22        The Bank of Hemet account      148
17                 statement dated 1/31/11
                   for MSRE, Inc.
18
         23        The Bank of Hemet account      149
19                 statement dated 1/31/11
                   for MSRE, Inc.
20
         24        The Bank of Hemet account      150
21                 statement dated 1/31/11
                   for MSRE, Inc.
22
         25        The Bank of Hemet account      151
23                 statement dated 1/31/11
                   for MSRE, Inc.
24

25
```

| 1 | | I-N-D-E-X - Continued | |
|---|---|---|---|
| 2 | | EXHIBITS   (Continued) | |

| | PLAINTIFF'S | | MARKED FOR |
|---|---|---|---|
| 3 | EXHIBIT NO. | DESCRIPTION | IDENTIFICATION |
| 4 | | | |
| 5 | 26 | The Bank of Hemet account<br>statement dated 8/31/10<br>for MSRE, Inc. | 153 |
| 6 | | | |
| 7 | 27 | The Bank of Hemet account<br>statement dated 1/31/11<br>for MSRE, Inc. | 153 |
| 8 | | | |
| 9 | 28 | The Bank of Hemet account<br>statement dated 1/31/11<br>for MSRE, Inc. | 154 |
| 10 | | | |
| | 29 | Schedule A - Real Property | 158 |
| 11 | | | |
| 12 | 30 | Chapter 7 Individual<br>Debtor's Statement of<br>Intention | 159 |
| 13 | | | |
| 14 | 31 | Schedule I - Current Income<br>of Individual Debtor(s) | 163 |
| 15 | 32 | Chapter 7 Statement of<br>Current Monthly Income and | 164 |
| 16 | | Means-Test Calculation | |
| 17 | 33 | Schedule B - Personal<br>Property | 166 |
| 18 | | | |
| 19 | 34 | Schedule C - Property<br>Claimed as Exempt | 172 |
| 20 | 35 | 2010/11 Secured Tax Bill | 178 |

| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

1                        I-N-D-E-X - Continued

2

3

4                    INFORMATION REQUESTED

5                          (None)

6

7

8                    QUESTIONS NOT ANSWERED

9                          (None)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1       IRVINE, CALIFORNIA, WEDNESDAY, JANUARY 30, 2013

2               9:08 A.M.

3               -o0o-

4

5           LETICIA JOY ARCINIEGA,

6     the deponent herein, after having been first

7     duly sworn, was deposed and testified as follows:

8

9              EXAMINATION

10  BY MR. HAES:

11    Q   Would you please give your full name for the

12  record.

13    A   Leticia Joy Arciniega.

14    Q   Okay.  Well, good morning.  My name is Chad

15  Haes.  This is Sarah Boone.  We are the attorneys

16  representing Mr. Clark, the Plaintiff in the adversary

17  proceeding against you.  I will be asking you questions

18  during this deposition, and I would like to start off by

19  getting a few instructions out of the way.

20      If you need to take a break, please let me know,

21  and we can take a break at any time so long as I don't

22  have a question pending.  We will also take a lunch

23  break.

24      When I ask a question, please wait until I have

25  completed the question before you answer.  In order for

1   the court reporter to hear everything that we say and so

2   we have a clear record, we can't interrupt each other,

3   and you can't talk over me.

4          We will need a verbal answer to each question.

5   Please don't shake your head or nod in response to a

6   question and avoid responses like "uh-huh" or "huh-uh."

7   Just a clear "yes" or "no" is what we need.

8          Please don't guess in response to a question.

9   If you can estimate or approximate, please do.  If you

10  don't know the answer, you can and should say you don't

11  know the answer.

12         That being said, I'm entitled to your best

13  estimates.  If you are unclear about the difference

14  between a guess and an estimate, please tell me, and I

15  will explain.

16         For example, if I ask you how much a gallon of

17  milk costs in Southern California, you might have a good

18  idea based on your experience and knowledge that a gallon

19  of milk costs $3.50.  That is an estimate.  If I ask you

20  how much a gallon of milk costs in Paris, if you have

21  never been there, you will have no idea and might pull a

22  number from the air and say it would cost five Euros.

23  That's a guess.

24         The other lawyers here, Sarah included, are

25  allowed to ask you questions if they so choose.  I'll ask

```
 1    them to wait until I'm done before they ask you

 2    questions.

 3           The court reporter is taking everything down and

 4    will prepare a written record of everything that is said

 5    which is something we call a transcript.  If you wish,

 6    after we are done, you will be able to review the

 7    transcript to check if it's accurate and make any

 8    corrections before signing it.

 9           Do you understand everything so far?

10     A    I do.

11     Q    Okay.  Do you have any questions so far?

12     A    I do not.

13     Q    Do all of these instructions make complete sense

14    to you?

15     A    They do.

16     Q    It's really important that you understand the

17    questions that I ask you and give accurate answers.  If

18    there is anything that you don't understand or anything

19    that you don't know or aren't sure of, please let us

20    know.

21           Okay?

22     A    Yes.

23     Q    Okay.  Is there anything on your mind which

24    would prevent you from answering any of my questions

25    fully and truthfully today?
```

1    A    No.

2    Q    Have you consumed alcohol in the last eight

3 hours?

4    A    No.

5    Q    Are you on any medications or other drugs which

6 would prevent you from answering my questions fully and

7 truthfully today?

8    A    No.

9    Q    Okay.  Is Leticia Joy Arciniega your full name?

10    A    It is.

11    Q    Do you have any nicknames?

12    A    Yes.

13    Q    What is that?

14    A    Tish.

15    Q    Is that your only nickname?

16    A    My family calls me Joy.

17    Q    Spell Tish.

18    A    T-i-s-h.

19    Q    Very well.  What is your date of birth?

20    A    November 19, 1953.

21    Q    And where were you born?

22    A    San Bernardino, California.

23    Q    Where do you currently reside?

24    A    890 Verona Avenue, San Jacinto, California,

25 92853.

```
 1        Q    Are you currently married or single?

 2        A    I'm unmarried.

 3        Q    Do you currently reside with anybody?

 4        A    I do.

 5        Q    What is that person's name?

 6        A    David Dodd Christian.

 7        Q    Do you reside with anybody else?

 8        A    I do not.

 9        Q    What is your relationship with David Christian?

10        A    Domestic partner.

11        Q    How long have you resided with David Christian?

12        A    Since 1995.

13        Q    What is the highest level of education that you

14   have obtained?

15        A    I have a non-transferable bachelor's degree that

16   I earned in Mexico.

17        Q    Okay.  What is the major for that degree?

18        A    Biology, premed.

19        Q    Do you have any other degrees?

20        A    I do not.

21        Q    Did you graduate from high school?

22        A    I did.

23        Q    In what year?

24        A    '71.

25        Q    Is that 1971?
```

1    A    It is.

2    Q    Do you have any certificates or licenses?

3    A    I do.

4    Q    Okay.  What are those?

5    A    I have a realtor's license, California

6    Association of Realtors license.

7    Q    What is your real estate license number?

8    A    01803573.

9    Q    Do you have any other certificates or licenses?

10   A    No.

11   Q    Okay.  Briefly describe your employment history.

12   A    I started as a teller in a part-time position

13   for a bank in 1972, and I wound up being senior

14   vice-president of information technology in 1997.

15   Q    Are you currently employed?

16   A    I am not.  I'm self-employed.

17   Q    Do you own any businesses?

18   A    I do.

19   Q    What form of business is it?

20   A    I have a realty office.

21   Q    Is it a sole proprietorship?

22   A    "S" corp.

23   Q    Do you own any other corporations?

24   A    I do not.

25   Q    What is the name of the corporation that you are

1    the owner of?

2       A    MSRE, Inc.

3       Q    Have you ever owned any other corporations?

4       A    I have not.

5       Q    When you say that you are self-employed, please

6    explain exactly what you do.

7       A    A couple of things.  I do compliance consulting

8    for financial institutions, and I own the realty

9    business.

10      Q    What type of consulting is compliance

11   consulting?

12      A    As you are aware, financial institutions,

13   whether they are banks, savings institutions, or

14   commercial banks, all function under regulatory guidance.

15   Oftentimes, they go astray of guidance either through

16   lack of understanding or resources to implement the

17   guidance appropriately.  At those times they run afoul of

18   the regulators, the examiners, so they will call me in to

19   bring them back in line with their compliance

20   requirements.

21      Q    Do these compliance requirements relate to

22   loans?

23      A    It relates to the entire enterprise from teller

24   function and operations, I.T., audit processes, board

25   guidelines.  Yes, it includes loans.

1    Q    Would you say that you are experienced with the

2  loan process through your job?

3    A    I'm experienced from the pipeline process.  Job

4  related, no.  I'm concerned with the guidelines that

5  outline the processes.

6    Q    Okay.  Is the consulting you do through MSRE?

7    A    No.

8    Q    Okay.  What type of business is MSRE?

9    A    MSRE, Inc. is a corporation that holds Main

10  Street Realty as a dba.  That is its only involvement.

11    Q    When was MSRE, Inc. incorporated?

12    A    Originally, 2006.

13    Q    Okay.  When did you become self-employed?

14    A    1997.  October 7th.

15    Q    How much money did you make in 1997?

16    A    In 1997, I was a payroll employee, and I think I

17  made less than 75,000.

18    Q    How about in 1998?

19    A    In 1998, I think I made 110.

20    Q    '99?

21    A    I don't remember.

22    Q    2000?

23    A    I don't remember.

24    Q    Approximately?  An estimate?

25    A    I couldn't.  I would have to sit and think about

1  it.  I can't remember.  In '99, I know that I did really

2  well.  I think I might have made like 160 for '99 maybe.

3  2000, I didn't work much that year.  2001, I didn't work

4  much that year.  2002, I sold some real estate.  That is

5  not what you are asking me, but that is what my source of

6  income was.  2003 and '04, I couldn't tell you.  2004,

7  '5, and '6, I started doing consulting work again.

8      Q    Do you know how much money you made in 2002?

9      A    I don't.  I don't remember.

10     Q    Not even an estimate?

11     A    I couldn't tell you.  I would have to look at my

12  tax returns.

13     MR. COHEN:  We will interpose objections based on

14  relevance to income that was generated or earned going

15  back to far as 2002.

16  BY MR. HAES:

17     Q    Do you know how much money you made in 2003?

18     A    I don't.

19     MR. COHEN:  Same objection.  Relevance.

20  BY MR. HAES:

21     Q    Do you know how much money you made in 2004?

22     MR. COHEN:  Same objection.  Relevance.

23     THE WITNESS:  I don't.

24  BY MR. HAES:

25     Q    Estimate?  Not even an estimate in 2004?

```
 1       A     No.

 2       Q     Do you know how much money you made in 2005?

 3       MR. COHEN:  Same objection.  Relevance.

 4   BY MR. HAES:

 5       Q     You may answer the question.

 6       A     I don't remember.

 7       Q     Not even an estimate?

 8       A     No.

 9       MR. COHEN:  Objection.  Relevance.

10   BY MR. HAES:

11       Q     How about 2006?

12       MR. COHEN:  Objection.  Relevance.

13   BY MR. HAES:

14       Q     You may answer the question.

15       A     I don't remember.

16       Q     Not even an estimate of your income in 2006?

17       A     No.

18       Q     I'm entitled to your best estimate.

19       A     My income varies widely from year to year

20   depending on what I'm doing.  In 2006, I honestly don't

21   remember.  It could have been anywhere from 20,000 and

22   120,000.

23       Q     Okay.  How about your income for 2007?

24       A     I don't remember.

25       Q     Okay.  Can you give me an estimate for your
```

 1    income for 2007?

 2        A    No.

 3        Q    What was your income for 2008?

 4        A    Less than 30,000.  Less than 20,000.  It's a

 5    guess.  It's in my tax filings.

 6        Q    What were your typical monthly living expenses

 7    in 2008?

 8        A    $2,700 a month.

 9        Q    What did these typical living expenses include?

10    What types of expenses?

11        A    House payment, car payment, health insurance,

12    gas, water, lights, telephone, cable, internet.

13        Q    What were your typical business expenses in

14    2008?

15        A    When you refer to business expenses, please

16    define business expenses.

17        Q    Expenses related either to self-employment or

18    MSRE, Inc.

19        A    So you are asking me for personal or corporate?

20        Q    We will start with personal.

21        A    Personal, business expenses, telephone,

22    internet, mileage, meals, occasional supplies that I

23    purchased.

24        Q    Okay.  Other than your typical living -- well,

25    let's go back.

Exhibit "A"     Page: 18
00284

1      How about your typical business expenses for

2   2008 for the corporation for MSRE, Inc.?

3      A      Please repeat that.

4      Q      What were your typical business expenses for

5   MSRE, Inc. in 2008?

6      MR. COHEN:  Objection.  Relevance.

7   BY MR. HAES:

8      Q      You may answer.

9      MR. COHEN:  Unless I tell you not to answer, you

10  answer.

11     THE WITNESS:  Okay.  Mortgage.  In 2008?

12  BY MR. HAES:

13     Q      That's correct.  For MSRE, Inc. in 2008.

14     A      Mortgage, utilities, insurance, subscriptions,

15  licenses, advertising and payroll.

16     Q      How much did those amount to approximately?

17     A      15,000 a month, approximately.

18     Q      For your personal business, your

19  self-employment, how much did that amount to

20  approximately per month in 2008?

21     A      Expenses?

22     Q      Expenses.

23     A      I didn't do consulting work in 2008.

24     Q      Okay.

25     A      If I did, it was very minimal.

1    Q    So there were some expenses related to

2  consulting work in 2008 that you can think of?

3    A    That I can think of.

4    Q    Other than your typical living expenses and

5  typical business expenses in 2008, are there any

6  extraordinary expenses out of the ordinary for 2008 that

7  you can think of?

8    A    Lawyer fees.

9    MR. COHEN:  Objection.  Relevance.

10  BY MR. HAES:

11    Q    What was the amount of those lawyer fees

12  approximately?

13    A    I don't remember.

14    MR. COHEN:  Objection.  Relevance.

15        You need to wait a second and let me interpose

16  an objection.

17    THE WITNESS:  Okay.

18  BY MR. HAES:

19    Q    Can you think of any extraordinary fees you had

20  aside from typical business expenses and personal

21  expenses in 2007?

22    MR. COHEN:  Objection.  Relevance.

23    THE WITNESS:  Does that mean I can or can't?

24    MR. COHEN:  You can answer.  I need to make an

25  objection, and unless I instruct you not to answer, you

 1  are to answer.

 2      THE WITNESS:  Oh, got it.  Please repeat the

 3  question.

 4  BY MR. HAES:

 5      Q    Aside from typical living and business-related

 6  expenses in 2007, can you think of any extraordinary

 7  expenses you incurred that year?

 8      MR. COHEN:  Objection.  Relevance.

 9      THE WITNESS:  I can't recall.

10  BY MR. HAES:

11      Q    I'm entitled to your best estimate.

12      A    That's my best estimate.  I don't remember.

13      Q    You don't remember at all 2007?

14      MR. COHEN:  Asked and answered.

15  BY MR. HAES:

16      Q    How about 2006, are there any extraordinary

17  expenses you can think of for 2006?

18      MR. COHEN:  Objection.  Relevance.

19      THE WITNESS:  No.  I don't recall.

20  BY MR. HAES:

21      Q    Not even an estimate?

22      A    If I can't recall an incident, I couldn't

23  estimate it.

24      Q    What were your typical living expenses in 2009,

25  monthly living expenses?

1        A       $2,700 a month.

2        Q       Generally, what did that consist of?  Expenses

3    for what?

4        A       Mortgage, car payment, auto insurance,

5    utilities, health insurance.

6        Q       And what was your income in 2009?

7        A       I don't remember.  I would need to see my taxes.

8        Q       So you can't even give me an estimate for 2009?

9        MR. COHEN:  Objection.  Asked and answered.  She said

10   she wants to see her tax returns before she provides an

11   answer.

12       THE WITNESS:  If we are looking for accuracy, then I

13   should be able to look at the documents that I recorded.

14   BY MR. HAES:

15       Q       Well, I'm entitled to your best estimate.

16       MR. COHEN:  I'll object on the basis of asked and

17   answered.

18   BY MR. HAES:

19       Q       Do you have an estimate for 2009 of typical

20   living expenses?

21       A       I gave you typical living expenses, $2,700 a

22   month.  You asked me income.  I don't have an estimate

23   for income.

24       Q       What was your income in 2010?

25       A       Miserable.  Under 20,000.

1    Q    Okay.  And I apologize.  Going back to 2009 for

2  a second, what were your typical business expenses for

3  2009?

4    A    It would have been the same that I had stated

5  earlier with the difference that in 2009 I no longer had

6  a paid broker.  I went to a rent-a-broker.

7    Q    Okay.  Did that decrease your business expenses?

8    A    It did from 15,000 a month to about 12.

9    Q    What were your typical business expenses for

10  2010 monthly?

11    A    Mortgage and I had two lines of credit,

12  utilities, payroll, so it was running about 10 to 12,000

13  a month.

14    Q    What were your typical living expenses for 2010?

15    A    $2,700 a month.

16    Q    What did that consist of?

17    A    House payment, car payment, car insurance,

18  health insurance, utilities.

19    Q    Can you think of any extraordinary business or

20  living expenses in 2009 aside from your typical living

21  expenses?

22    MR. COHEN:  Objection.  Relevance.

23    THE WITNESS:  Lawyer fees.

24  BY MR. HAES:

25    Q    Do you know approximately how much those fees

1    were?

2        MR. COHEN:  Same objections.

3        THE WITNESS:  At least 20,000.

4    BY MR. HAES:

5        Q    Can you think of any extraordinary expenses for

6    2010 other than typical living and business expenses?

7        A    I cannot.

8        Q    What was your income for 2011?

9        A    I think it reads 14,400.

10       Q    What are your typical living expenses or what

11   were they for 2011?

12       A    2,700 a month.

13       Q    What did that consist of generally?

14       A    House payment, car payment, health insurance,

15   car insurance, utilities.

16       Q    What were your typical business expenses for

17   2011?

18       A    I would say close to 6,000 a month or somewhere

19   between six and seven.

20       Q    In 2006, did MSRE broker any property

21   transactions?

22       A    No.

23       MR. COHEN:  Objection.  Relevance.

24   BY MR. HAES:

25       Q    In 2007, did MSRE broker any property

Exhibit "A"     Page: 24
00290

1    transactions?

2        MR. COHEN:  Objection.  Relevance.

3        THE WITNESS:  Yes.

4    BY MR. HAES:

5        Q    What pieces of property were sold in 2007?

6        MR. COHEN:  Same objection.

7        THE WITNESS:  I don't recall.

8    BY MR. HAES:

9        Q    Do you have any idea?  Do you recall what those

10   properties sold for, if any?

11       A    No.

12       Q    Did MSRE broker any property transactions in

13   2008?

14       MR. COHEN:  Same objection.  Relevance.

15       THE WITNESS:  Yes.

16   BY MR. HAES:

17       Q    All right.  And what properties were sold in

18   2008?

19       A    I don't recall.

20       MR. COHEN:  Objection.  Relevance.

21   BY MR. HAES:

22       Q    Did MSRE broker any property transactions in

23   2009?

24       A    Yes.

25       MR. COHEN:  Objection.  Relevance.

1    BY MR. HAES:

2        Q    What properties were sold in 2009?

3        A    I don't recall.

4        Q    Did MSRE broker any property transactions in

5    2010?

6        MR. COHEN:  Objection.  Relevance.

7        THE WITNESS:  Yes.

8    BY MR. HAES:

9        Q    What properties were sold in 2010?

10       A    I don't recall.

11       Q    Did MSRE broker any property transactions in

12   2011?

13       MR. COHEN:  Objection.  Relevance.

14       THE WITNESS:  Yes.

15   BY MR. HAES:

16       Q    What properties were sold in 2011?

17       A    I don't recall.

18       Q    All right.  For any transaction that is

19   brokered by MSRE, what does MSRE get from that

20   transaction?

21       MR. COHEN:  Objection.  Relevance.

22       THE WITNESS:  It depends on what side the broker is

23   involved with or whether it's both sides.  It also

24   depends on the split with the agent that brought the

25   contract to the table.

1    BY MR. HAES:

2        Q     Generally, does MSRE get commissions or a

3    portion of whatever property sale is for every sale that

4    is brokered by MSRE?

5        A     Yes.

6        Q     What range are those percentages?

7        A     Can we break that down?  If you are talking

8    gross commission that is paid to the broker, if you

9    understand how real estate commissions are broken down,

10   the broker is paid in full for their split of the

11   transaction.  The agent is given their compensation for

12   bringing the transaction to the table.

13         Depending on the split with the agent, there are

14   times when the corporation makes less than $300 after

15   paying expenses to the listing broker that exercises the

16   broker license, the agent that brought the transaction to

17   the table.

18         For example, if you sell $100,000 with a six

19   percent commission and you are listing the house but

20   another agent from another office brings you the buyer,

21   there is three percent to each offer being paid.  I get a

22   whopping $3,000 gross from that.

23         If the agent that brought it to me is a 90

24   percent split agent, I take 10 percent off the top.  I

25   get 100 bucks, and I pay my rent-a-broker $400 per

1  transaction.  Technically, I'm in the hole, but he and I

2  have an arrangement where we only split anything that is

3  going to be less than $400.  My agent would be getting 90

4  percent of the deal.

5      Q   Is there a specific range of percent from each

6  deal that MSRE, Inc. typically gets when it brokers a

7  real estate transaction?

8      MR. COHEN:  Objection.  Relevance.

9      THE WITNESS:  No.

10  BY MR. HAES:

11      Q   Moneywise, in terms of dollar amount, what is

12  the range that MSRE, Inc. could bring in for each

13  transaction that it brokers?

14      MR. COHEN:  Objection.  Relevance.

15      THE WITNESS:  It's anywhere between $150 to maybe

16  2,500.

17  BY MR. HAES:

18      Q   Are you aware of any extraordinary expenses

19  aside from your typical business expenses and typical

20  living expenses for 2011?

21      A   Yes.

22      Q   What are those?

23      A   Lawyer expenses.

24      Q   Approximately, how much were your lawyer

25  expenses in 2011?

1        MR. COHEN:  Objection.  Relevance.

2        THE WITNESS:  I would say somewhere in the vicinity

3    of 15 to 20,000.

4    BY MR. HAES:

5        Q    Typically, how many transactions does MSRE, Inc.

6    broker per year?

7        A    What type of transactions are you asking about?

8        Q    Real estate sales of property or property sales.

9        A    Through 2011, about 10 to 12 a year.

10       Q    Since the inception of -- since MSRE was

11   incorporated through 2011, between 10 to 12 per year?

12       A    Average.

13       Q    Okay.  Does MSRE, Inc. generate income in any

14   other manner?

15       A    Yes.

16       Q    How else does MSRE, Inc. generate income?

17       A    Property management.

18       Q    How many properties does MSRE, Inc. manage?

19       A    Between 70 to 90 homes.

20       Q    Currently?

21       A    Currently.

22       Q    On average on a monthly basis, how much income

23   is produced pursuant to property management services

24   provided by MSRE, Inc.?

25       A    About 6,000 a month.

1    Q    Would that include 2006?

2    MR. COHEN:  Objection.  Relevance.

3    THE WITNESS:  No.

4  BY MR. HAES:

5    Q    How much would MSRE, Inc. be generating in

6  income from property management services in 2006?

7    A    Zero.

8    MR. COHEN:  Objection.  Relevance.

9  BY MR. HAES:

10   Q    Approximately, how much was MSRE, Inc.

11  generating in property management services in 2007?

12   MR. COHEN:  Objection.  Relevance.

13   THE WITNESS:  Maybe 2,000 a month.

14  BY MR. HAES:

15   Q    How about 2008?

16   MR. COHEN:  Objection.  Relevance.

17   THE WITNESS:  Probably about five to six.

18   MR. COHEN:  Five to six what?

19   THE WITNESS:  Thousand.

20  BY MR. HAES:

21   Q    2009?

22   MR. COHEN:  Objection.  Relevance.

23   THE WITNESS:  Six to seven.

24  BY MR. HAES:

25   Q    Six to 7,000 per month?

1       A       Yes.

2       Q       2010?

3       MR. COHEN:   Objection.   Relevance.

4       THE WITNESS:   Six to 7,000 per month.

5   BY MR. HAES:

6       Q       And 2011?

7       A       Six to 7,000 per month.

8       Q       Have you ever received redevelopment funds from

9   the city of San Jacinto?

10      A       I did.

11      Q       In what year?

12      A       I believe it was 2009.

13      Q       Is that the only year you've ever received

14  redevelopment funds from the City of San Jacinto?

15      A       It is.

16      Q       How many times in that year did you receive

17  redevelopment funds?

18      A       Once.

19      Q       What was the amount?

20      A       $2,500.

21      Q       Have you ever received redevelopment funds from

22  any other city?

23      A       No.

24      Q       Prior to your work for MSRE, Inc. and prior to

25  being self-employed, what did you do for a living?

1    A    I was an employee of financial institutions.

2    Q    Okay.  Prior to MSRE, Inc. and being

3 self-employed, which financial institutions did you work

4 for?

5    A    Hemet Federal.

6    Q    What was your job title there?

7    A    Senior vice-president, information technology.

8    Q    What were your job duties as senior

9 vice-president of information technology?

10    A    I oversaw the technology for the institution.

11    Q    Define technology.  Did that have anything to do

12 with marketing?  Was that mostly in house?  Monitoring

13 E-mails?  What did you do in terms of monitoring

14 technology?

15    A    I ensured that the organization had adequate

16 resources that were supporting the infrastructure

17 necessary to conduct business.  That entailed both

18 outsourcing technology, and we had an in-house processor

19 as well my job was to ensure that we had both budgetary

20 resources available as well as the technology resources

21 and the soft resources in the way of humans that knew how

22 to maintain and support the users and technologies and

23 the processes dependent on hardware and software.

24    Q    What was your compensation at the time that you

25 left Hemet Federal?

Exhibit "A"       Page: 32
00298

1        MR. COHEN:  Objection.  Relevance.

2        THE WITNESS:  As I stated earlier, less than 75,000.

3    BY MR. HAES:

4        Q    Prior to your work at Hemet Federal, where did

5    you work?

6        A    Redlands Federal.

7        Q    What was your job title there?

8        A    It was a funny title.  Something like liability

9    product development officer.

10       Q    When did you start at Redlands Federal?

11       A    September of 1985.

12       Q    And when did you leave Redlands Federal?

13       A    The end of March 1989.

14       Q    Is that when you began at Hemet Federal?

15       A    Yes.

16       Q    When did you leave Hemet Federal?

17       A    October 7, 1997.

18       Q    Why did you leave Hemet Federal?

19       MR. COHEN:  Objection.  Relevance.

20       THE WITNESS:  It was voluntary.

21    BY MR. HAES:

22       Q    For what reason?

23       A    Politics.

24       Q    You were unhappy there?

25       A    The company had converted from a mutual to a

1   stock organization.  Our CEO had basically moved out of

2   the picture and promoted someone who didn't have a

3   functional grey cell in his head to run the operation.

4   There were a number of us that left.  Six months later

5   the corporation sold to an outside investment group and

6   the company no longer exists.  It was time.

7       Q    Why did you leave Redlands Federal?

8       MR. COHEN:  Objection.  Relevance.

9       THE WITNESS:  Because of an offer from Hemet Federal.

10  I never looked for a job.

11  BY MR. HAES:

12      Q    What were your job duties at Redlands Federal?

13      A    It was a marvelous job.  It was like being a mad

14  scientist.  They opened the entire company to me and said

15  to find out what it costs us to offer a product and tell

16  us how we can make a profit doing that.

17           I conducted an in-depth time management analysis

18  whereby I fed a formula of FTE costs, the overhead costs,

19  and was able to calculate what it would cost the

20  institution to open a savings account and at what rate

21  and what balance it would earn a profit for the bank,

22  taking into consideration reserves, overnight funds, just

23  everything.  It was fascinating.

24      Q    Were those your job duties for your entire time

25  at Redlands Federal?

1      A     Pretty much, with the exception of managing an

2   acquisition.

3      Q     What did you manage?

4      A     The acquisition.  We bought eight branches, and

5   I managed it.

6      Q     So you managed the acquisition of eight

7   additional branches?

8      A     Correct.

9      Q     Very well.  What was your compensation at the

10  time you left --

11     MR. COHEN:  Objection.  Relevance.

12  BY MR. HAES:

13     Q     -- Redlands Federal?

14     MR. COHEN:  Sorry.  I didn't mean to interrupt you.

15  I thought you finished your question.  Objection.

16  Relevance.

17     MR. HAES:  No problem.

18     THE WITNESS:  About 48,000 a year.

19  BY MR. HAES:

20     Q     Prior to your work at Redlands Federal, where

21  did you work?

22     MR. COHEN:  Objection.  Relevance.

23     THE WITNESS:  Pacific Savings Bank.

24  BY MR. HAES:

25     Q     When did you start at Pacific Savings Bank?

1          A     Well, that is a long story.  Actually, I started

2     there when it was Santa Fe Federal.  It merged twice, and

3     it converted charters twice.  It wound up being Pacific

4     Savings Bank.  I start in 1977, it must have been.

5          Q     What was your job title there?

6          A     I started as a temporary part-time teller in the

7     pool.

8          Q     Did you move up from there?

9          A     Yes.

10         Q     What was your job title after part-time teller?

11         A     After part-time teller, I was a savings

12    counselor, and then I was a trainer, a teller trainer.

13    Then I was in administration support, and then I wrote my

14    own job description as a resource specialist.  That was

15    the title I held when I left.

16         Q     Well, let's take one at a time.

17               You said after teller you were a savings

18    manager?

19         A     Savings counselor.

20         Q     What were your job duties as a savings

21    counselor?

22         A     I opened accounts for people.

23         Q     After savings counselor, what were your promoted

24    to?

25         A     Teller trainer.

1    Q    What were your job duties as a teller trainer?

2    A    I trained tellers.

3    Q    Basically, tellers' duties include what types of

4    services?

5    A    Handling transactions, monetary transactions for

6    customers.

7    Q    Where did you go from teller trainer?  Were you

8    promoted from there?

9    A    Yeah.  I moved into a function as a back office

10   administrative support person.

11   Q    What were your job duties as an administrative

12   support person?

13   A    Writing policy and procedure.

14   Q    What type of policy and procedure?

15   A    Deposit or what is referred to in the business

16   as retail operations, policies and procedures.

17   Q    Did any of that involve policies and procedures

18   as it related to customers?

19   A    Yes.

20   Q    Did it involve policies and procedures as it

21   related to loans?

22   A    No.

23   Q    So when you started there, it was Pacific

24   Federal?

25   A    No.  It was Santa Fe Federal.

1    Q    Prior to Santa Fe Federal, where did you work?

2    A    The Bank of California.

3    Q    What was your job title there?

4    A    Teller, drive-up.

5    Q    Other than being self-employed and owning MSRE,

6  Inc., do you have currently any other sources of income?

7    A    No.

8    Q    Beginning in 2006, other than MSRE, Inc. and

9  consulting, do you have or did you have any other sources

10  of income?

11    MR. COHEN:  Objection.  Relevance.

12    THE WITNESS:  No.

13  BY MR. HAES:

14    Q    2007, any other sources of income?

15    MR. COHEN:  Objection.  Relevance.

16    THE WITNESS:  No.

17  BY MR. HAES:

18    Q    2008, any other sources of income?

19    MR. COHEN:  Objection.  Relevance.

20    THE WITNESS:  No.

21  BY MR. HAES:

22    Q    2009, any other sources of income?

23    A    No.

24    Q    2010, any other sources of income?

25    A    No.

**Exhibit "A"**   Page: 38
**00304**

1       Q     2011, any other sources of income?

2       A     No.

3       Q     Do you have any investments, annuities or

4    retirement accounts?

5       A     I have an IRA.

6       Q     How much money is in your IRA?

7       A     A little under 100,000.

8       Q     Under 100,000?

9       A     Yes.

10      Q     About how much under 100,000?

11      A     Maybe 3,000 under 100,000.

12      Q     So approximately $97,000?

13      A     Approximately, $97,000.

14      Q     Do you have a 401K?

15      A     No.

16      Q     Have you ever had a 401K?

17      A     Yes.

18      Q     Did you cash out your 401K?

19      A     I did.

20      Q     In what year?

21      A     1990.

22      Q     How much did you receive from the cash-out?

23      MR. COHEN:  Objection.  Relevance.

24      THE WITNESS:  Approximately $3,500.  I used it as a

25   down payment to purchase the house in San Jacinto.

1    BY MR. HAES:

2        Q    Do you have any other investments or annuities

3    or retirement accounts?

4        A    No.

5        Q    Other than the accounts you've already

6    mentioned, have you ever had any other investments or

7    retirement accounts?

8        A    I had a SEP.

9        Q    Did you cash out the SEP?

10       A    I did.

11       Q    When did you cash out the SEP?

12       A    I think I took the last distribution during the

13   early part of 2010.  I think it was 2010.  It might have

14   been 2009.

15       Q    Let me go back for a second.  Please define SEP.

16       A    It's a self-employed pension plan.

17       Q    All of the cash-out of the SEP, did they all

18   occur in 2010?

19       A    Either 2009 or 2010.  They were all within about

20   a one-year period, but I think they started in '09 and

21   ended in '10.

22       Q    How much did you receive as a result of cashing

23   out your SEP?

24       A    45,000.

25       Q    Have you ever had any other investment or

1    retirement accounts?

2        A    No.

3        Q    What is the address for MSRE, Inc.?

4        A    890 Verona Avenue, San Jacinto, California

5    92583.

6        Q    How long has MSRE, Inc. been located at that

7    address?

8        A    Since inception.

9        Q    Is that where MSRE, Inc. conducts its business?

10       A    No.

11       Q    Where does MSRE, Inc. conduct its business now?

12       A    2537, Unit B, San Jacinto Avenue, San Jacinto,

13   California 92583.

14       Q    Do you own that property?

15       A    I do not.

16       Q    Prior to that location, where did MSRE, Inc.

17   conduct its business?

18       A    288 East Main Street, San Jacinto, California

19   92583.

20       Q    Do you own that property?

21       A    No.

22       Q    Did you ever own that property?

23       A    I did.

24       Q    What was the disposition of that property?

25       A    It was foreclosed upon.

1    Q    For how long did you own that property?

2    A    From January 2nd, 2007 until February 28th,

3    2011.

4    MR. COHEN:  What address are you referring to right

5    now?  You mentioned three addresses.  I just want to make

6    sure I'm following which address this line of questioning

7    is.

8    MR. HAES:  Would you repeat the last address back to

9    us, please.

10           (The record was read by the reporter

11           as follows:

12           "A    288 East Main Street, San Jacinto,

13           California 92583.")

14    MR. HAES:  That is the address I'm referring to.

15    MR. COHEN:   Thank you.

16   BY MR. HAES:

17    Q    During the entire time that you owned that

18   property, 288 Main Street in San Jacinto, was MSRE

19   conducting its business out of that property?

20    A    Yes.

21    Q    Were you receiving rent from MSRE, Inc.?

22    A    No.  It's illegal by IRS terms.

23    Q    Were you receiving any type of compensation from

24   MSRE, Inc. for the use of that property?

25    A    No.

1     Q     Did you own any other property where MSRE, Inc.

2  conducted its business?

3     A     No.

4     Q     Have you ever filed for bankruptcy?

5     A     Yes.

6     Q     How many times?

7     A     Twice.

8     Q     What year was your first filing?

9     A     I think it was in 1988.

10    Q     When did you receive your discharge?

11    A     I believe it was the early part of 1989.

12    Q     What year was your second filing?

13    A     2011.

14    Q     When did you receive your discharge?

15    A     I have not.

16    Q     When did you marry James Clark?

17    A     February 29, 1976.

18    Q     How long did the marriage last?

19    A     Until July of 2000.

20    Q     Did you own any property prior to your marriage

21  to James?

22    A     No.

23    Q     No personal property of any significant value?

24    A     No.

25    Q     Was there any property that you acquired during

1   the marriage with James Clark?

2        A    Yes.

3        Q    What property was acquired during the marriage?

4        A    We acquired a lot purchased through a tax sale

5   that my parents gave us as a wedding gift in East

6   Highlands.

7        Q    Do you know the address of that lot?

8        A    It was unimproved property.  It's underneath the

9   freeway now.

10       Q    What was the disposition of that lot?  Do you

11  still own that lot?

12       A    No.

13       Q    What was the disposition of that lot?

14       A    It was taken by condemnation proceedings by

15  Caltrans for the freeway.  They paid us for it.

16       Q    How much did they pay you?

17       A    Over 40,000.

18       Q    Who did that money go to?

19       A    We had liens on the property, so it went to the

20  lienholders.

21       Q    Okay.  What other property did you acquire

22  during the course of the marriage?

23       A    We had a property in Fontana that we purchased

24  through a tax sale.

25       Q    What is the address of that property?

```
 1       A    I don't know.

 2       Q    When was that property acquired?

 3       A    I don't remember.

 4       Q    Approximately?

 5       A    I would say somewhere in the mid eighties.

 6       Q    What was the purchase price for that property?

 7       A    3,500, I think, or 2,500 or something.

 8       Q    Do you still own that property?

 9       A    No.

10       Q    What was the disposition of that property?

11       A    We sold it.

12       Q    "We" meaning --

13       A    Clark and I.

14       Q    How much was it sold for?

15       A    I don't remember.

16       Q    Not even an estimate?

17       A    No.  I don't remember.

18       Q    Any other property acquired during the marriage?

19       A    A house at 3047 North Arrowhead Avenue in

20   San Bernardino.

21       Q    What was the purchase price?

22       A    41,500.

23       Q    When was that property acquired?

24       A    1978, '79.  '78.

25       Q    Do you still have any interest in that property?
```

1       A      No.

2       Q      What was the disposition of that property?

3       A      Mr. Clark sued me and so we settled and he has

4    it.

5       Q      Any other property acquired during the marriage?

6       A      The house I have on Verona in San Jacinto.

7       Q      When was that property acquired?

8       A      1991.

9       Q      What was the purchase price for that property?

10      A      110.

11      Q      Do you still own that property?

12      A      I do.

13      Q      Any other property acquired during the course of

14   the marriage?

15      A      A timeshare.  A timeshare, approximately 1989.

16      Q      Where is that property located?

17      A      I don't remember where it was located.  We never

18   used it.  We did a reversion of trust because there were

19   too many complications with the ownership of it.  The

20   monies were refunded in full.

21      Q      What county or state?

22      A      Orange County.  You would need to refer to

23   Mr. Clark.  I don't recall the details on that.  He was

24   the principal involved in purchasing it.

25      Q      Do you know what the purchase price was?

Exhibit "A"     Page: 46
00312

1      A      I don't remember.

2      Q      Do you have any ownership interest in that

3    property currently?

4      A      No.

5      Q      Do you know what the disposition of that

6    property was?

7      A      As I stated, we executed a reversion of trust.

8    We gave it back.

9      Q      Okay.  Any other properties that were acquired

10   during the course of the marriage?

11     A      I don't recall any.

12     Q      What pieces of real property do you currently

13   own?

14     A      I own the house on Verona, and I own half

15   interest in a vacant lot described as Soboba Heights.  I

16   own a total of 4,000 square feet or less in the County of

17   San Luis Obispo referred to as Paper Roads.

18     Q      When was the Soboba Heights property acquired?

19     A      I'm sorry?

20     Q      Spell Soboba.

21     A      Soboba, S-o-b-o-b-a.

22     Q      When was that property acquired?

23     A      I think that was about 10 years ago.

24     Q      What was the purchase price?

25     A      I think it was $7,000.

1       Q       Who is the co-owner of that property?

2       A       David Dodd Christian.

3       Q       What is the current value of that property?

4       A       About $7,500.

5       Q       What do you base that on?

6       A       There is an enormous concrete pond on it.  It

7  was a former tank site.  The water district moved the

8  water tank off of the site because seismically it was

9  found to be unsound.  The whole hillside is unsound.  In

10  order to mitigate the earthquake risk, it is

11  substantially more than the property would be worth.

12      Q       When did you acquire the Paper Roads property?

13      A       When Mr. Clark signed them over to me --

14  actually, I forgot to mention to you that during the

15  course of the marriage, we purchased those lots, and that

16  would have been way back in the late seventies maybe.

17      Q       What was the purchase price?

18      A       10,000.

19      Q       Are you the sole owner of that property

20  currently?

21      A       I am now, yes.

22      Q       What is the value of that property?

23      A       According to market studies, under $10,000.

24      Q       Where have you seen these market studies?

25      A       I've done an analysis based on the MLS data

1    available to me as a realtor.

2        Q    Based on comparables?

3        A    Correct, and also through title documents.   In

4    addition to that, because of the economic recession in

5    terms of real estate values in California, a great number

6    of the counties -- and you will have seen this yourself

7    in property in your own tax billings -- that most of the

8    counties do a recalculation of tax bills during the last

9    two to three years and certainly in the year of 2011

10   where they took the valuations that were coming in on

11   purchases and used them to recast tax values.  The County

12   of San Luis Obispo did that and sent me a notice saying

13   they re-valuated the assessed values.

14       Q    Do you currently own any other real properties?

15       A    No.

16       Q    Are you familiar with the property acquired by

17   you and Jim in Morro Bay?

18       A    That is the Paper Roads.

19       Q    Okay.  Do you also refer to that property as the

20   Cayucos property?

21       A    Yes.

22       Q    With respect to the Verona property, how is

23   title taken to that property?

24       A    James A. Clark and Leticia J. Arciniega, husband

25   and wife.  I don't recall exactly, but I'm assuming that

```
 1    is what it was.

 2          Q    And the property was purchased in 2000?

 3          A    No.

 4          Q    When was the property purchased?

 5          A    1991.

 6          Q    Were you and James still legally married at that

 7    time?

 8          A    Yes.

 9          Q    Were you separated at that time?

10          A    No.   That was right before we became separated.

11          Q    Were you discussing separation at that time?

12          A    I don't believe so.

13          Q    What was the down payment for the Verona

14    property?

15          A    $3,500.

16          Q    What was the source of the down payment?

17          A    My 401K.

18          Q    How was the home financed?

19          A    We took a mortgage.

20          Q    What type of mortgage was it?

21          A    Fixed rate, 30-year.

22          Q    Was it a V.A. loan?

23          A    Yes.

24          Q    Was the home ever refinanced?

25          A    Oh, yes.
```

1      Q     How many times?

2      A     At least two other times, maybe three.

3      Q     What years was the home refinanced?

4      A     I don't recall the exact years for the initial

5    refinancing.  All I know is there was an event in 2004

6    and some months preceding which is the current mortgage

7    that exists on the loan and then some months preceding

8    that that there had been another refinance because the

9    rates came down pretty dramatically.

10            We refinanced it, and then the rates continued

11   to drop contrary to normal interest cycles.  The first

12   time we refinanced, it was in February, and it was

13   through Wells Fargo.  Then when the rates continued to

14   drop, we looked into refinancing it again because we were

15   going to be able to recapture within a sort period of

16   time the cost of the refinancing.

17      Q     You are saying the first time you refinanced was

18   in February of 2004?

19      A     I am not saying that.  I'm saying that the last

20   time we refinanced was in 2004, but there had been a

21   previous incident of that earlier in 2004.  I don't

22   recall the number or the dates of the times that we

23   refinanced it between 2000 and 2004, but I believe there

24   were other incidents, at least one.

25      Q     Do you remember what year the first refinance

1    was?

2         A     I don't.

3         Q     Do you know how many refinances there were on

4    the property?

5         A     I don't.

6         Q     Do you know when the last refinance was?

7         A     Yes.

8         Q     When was that?

9         A     2004.

10        Q     What was the purpose for the refinance?

11        A     To lower the rate.

12        Q     What was the purpose for the other refinances?

13        A     To lower the rate.

14        Q     How many loans are currently secured by the

15   Verona property?

16        A     Two.

17        Q     Have any of those loans been paid off?

18        A     No.

19        Q     Is the first lien on the Verona property still

20   the V.A. loan?

21        A     Yes.

22        Q     Have any of the loans on the Verona property

23   been modified?

24        A     Yes.

25        Q     Which loans?

1    A    The first.

2    Q    How many times has the first loan been modified?

3    A    Once.

4    Q    When did that modification occur?

5    A    I think 2009.

6    Q    Is Jim Clark still on the V.A. loan?

7    A    Yes.  Do you have water?

8    MR. HAES:  Do I have your permission to take a break?

9    MR. COHEN:  Yes.

10   MR. HAES:  We both agree we need a break.

11        Can we go off record?

12   MR. COHEN:  Very well.

13        (Recess)

14   MR. HAES:  We are back on the record.

15        Let the record reflect we just came back from a

16   short break.

17   BY MR. HAES:

18   Q    I was asking about the V.A. loan on the Verona

19   property.

20        There is still a V.A. loan on the Verona

21   property, correct?

22   A    Yes.

23   Q    Okay.  James is still on that loan, correct?

24   A    Yes.

25   Q    Is James on title to the Verona property?

```
 1      A      No.

 2      Q      Why is he not on title to the Verona property?

 3      A      He quitclaimed it to me.

 4      Q      Why did he quitclaim the Verona report to you?

 5      A      He chose to.

 6      Q      Did you ask him to quitclaim the Verona property

 7   to you?

 8      A      Yes.

 9      Q      When did you ask him to quitclaim the Verona

10   property to you?

11      A      In 2006.

12      Q      Why did you ask him to quitclaim the Verona

13   property to you?

14      A      He had remarried.

15      Q      Did you feel like you were entitled to have the

16   Verona property quitclaimed to you?

17      A      Yes.

18      Q      For what reason?

19      A      I had bought it with my 401K, and I had made

20   every mortgage payment on it.  I had paid all utilities,

21   maintenance, and repairs necessary.  I resided in it full

22   time from the day it was purchased.

23      Q      Did Jim contribute to the mortgage payments on

24   the Verona property?

25      A      No.
```

1    Q    Did Jim make any contribution toward the Verona

2  property?

3    A    No.

4    Q    Never?

5    A    No.

6    Q    Aside from the properties already mentioned, do

7  you own any other real property in Mexico or any other

8  country at all?

9    A    No.

10    Q    Just to clarify, you mentioned earlier that you

11  and David Christian were domestic partners?

12    A    Yes.

13    Q    Are you registered domestic partners?

14    A    No.

15    Q    Let me show you a document.  Please identify

16  this document.  I apologize.

17    MR. HAES:  Will you please mark this document as

18  Exhibit 1.  Thank you.

19         (Plaintiff's Exhibit 1 was marked

20      for identification, the original of which

21      is attached hereto.)

22  BY MR. HAES:

23    Q    Leticia, would you please identify this

24  document.

25    A    This is the settlement agreement regarding the

1    house on Arrowhead that we entered into in May of 2009.

2        Q    Would you please read aloud the caption or title

3    of the document.

4        A    "Agreement of Compromise, Settlement, and Mutual

5             and General Release."

6        Q    Would you please turn to page 6 of 6 the

7    document.  I apologize.  It's page 5 of 5 of the

8    document.

9        MR. COHEN:  You don't mean 5 of 5.

10       MR. HAES:  It's 5 of 6.  I didn't mean 5 of 5.  It's

11   5 of 6.

12   BY MR. HAES:

13       Q    Is that your signature at the bottom of the

14   page?

15       A    Yes.

16       Q    Would you please flip back to the first page of

17   the document.  Please read paragraph II-A at the bottom

18   of the page.  Please read it aloud.

19       A    "A.  Plaintiff will pay Settling Defendant the

20            principal sum of $50,000.  The settlement draft

21            will be made payable to defendant and her

22            counsel of record.  This Payment is due on

23            Wednesday, May 13, 2009, so long as all parties

24            have executed the settlement agreement and

25            defendant has provided plaintiff with a properly

1              signed and notarized quitclaim deed granting

2              her entire interest in the Subject Property to

3              plaintiff.  Plaintiff is required to pay

4              defendant $1,000 for each day that he is late in

5              delivering the settlement funds to defendant, so

6              long as all the conditions set forth above are

7              met."

8      Q    Thank you.  Did James pay you the $50,000 on or

9  before May 13, 2009?

10     A    He made payment to my attorney, yes, my counsel

11  of record.

12     Q    Let me show you another document.

13     MR. COHEN:  Are we done with number 1?

14     MR. HAES:  We may refer back to it.

15     MR. COHEN:  I'll put it here.

16     MR. HAES:  Okay.

17     MR. HAES:  Can we have this marked as Exhibit 2.

18  Thank you.

19              (Plaintiff's Exhibit 2 was marked

20       for identification, the original of which

21       is attached hereto.)

22  BY MR. HAES:

23     Q    Do you recognize the images on this document?

24     A    I don't.

25     Q    Please describe the images on the document.

1     A    It's a cashier's check or camera check issued by

2  Washington Mutual in the amount of $50,000 to Milton and

3  DeKruif and Leticia Arciniega dated April 30th, 2009.

4     Q    What is Milton and DeKruif?

5     A    My attorney at the time.

6     Q    Do you acknowledge receipt of $50,000 from James

7  to you?

8     A    I acknowledge receipt.  I've never seen this

9  item.

10    Q    Did Jim fulfill his portion of the agreement as

11  described in Exhibit A?

12    MR. COHEN:  Objection.  Calls for a legal conclusion.

13  BY MR. HAES:

14    Q    Did James pay you $50,000 as a result of the

15  settlement agreement?

16    A    Yes.

17    Q    Did Jim have any other obligations under the

18  settlement agreement?

19    MR. COHEN:  Objection.  Calls for a legal conclusion.

20  BY MR. HAES:

21    Q    Let's refer back to Exhibit 1.  You may answer

22  the question.

23        Did Jim have any other obligations under the

24  settlement agreement?

25    MR. COHEN:  Objection.  The document speaks for

```
 1    itself, not only under agreements, but under release and

 2    requests for dismissals.

 3         THE WITNESS:  I'm so sorry.

 4         MR. COHEN:  Please turn it off.

 5         THE WITNESS:  I am going to.

 6    BY MR. HAES:

 7         Q    Leticia, would you please turn to page 2 of

 8    Exhibit 1, the settlement agreement.

 9              Would you please read paragraph "B" near the top

10    of page 2 out loud?

11         A    "No later than May 13, 2010, defendant will take

12              all necessary measures to pay off the existing

13              V.A. loan and remove plaintiff's name from the

14              loan on her property located at 890 Verona

15              Avenue, Hemet, California.  Defendant will not

16              attempt to assume the V.A. loan.  Defendant

17              agrees to pay plaintiff liquidated damages at

18              the rate of $1,000 per day for every day that

19              she is late complying with this provision.

20              Plaintiff will execute all necessary documents

21              so as to enable defendant to effectuate the

22              removal of plaintiff's name from the loan on her

23              property on 890 Verona, Hemet, California."

24         Q    Thank you.  Does paragraph "B" say that you

25    would make your best efforts or that you would take all
```

1   necessary measures?

2      MR. COHEN:  Objection.  The document speaks for

3   itself, Counsel.

4   BY MR. HAES:

5      Q    You may answer the question.

6      A    It says to take all necessary measures to pay

7   off the existing V.A. loan.

8      Q    Are there any limitations to that?

9      MR. COHEN:  Objection.  Calls for a legal conclusion.

10  Calls for an opinion.  Calls for speculation.

11  BY MR. HAES:

12     Q    You may answer.

13     A    It states "Plaintiff will execute all necessary

14  documents so as to enable defendant to effectuate the

15  removal of plaintiff's name."

16     Q    Would you consider that a limitation to taking

17  all necessary measures to paying off the loan and

18  removing Plaintiff's name?

19     A    Yes.

20     Q    Does the agreement say anywhere that you are not

21  required to surrender the property or use settlement or

22  retirement funds to comply with the provisions stated in

23  paragraph "B"?

24     MR. COHEN:  Objection.  Calls for total speculation

25  and conjecture.  The document is what it is.  You are

 1  asking this witness to speculate about what it doesn't

 2  say.

 3      MR. HAES:  I'm asking the witness whether the

 4  document says that.

 5      MR. COHEN:  Well, then give her the time to read the

 6  six pages then.

 7  BY MR. HAES:

 8      Q    You can have your time.

 9      A    I understood that the intent of the document was

10  to bring to my attention that I needed to remove the

11  Plaintiff's name from the mortgage.  I did not read the

12  document to say that I should commit financial suicide or

13  put myself on the street as a result of any such action.

14      Q    We all agree the document says take all

15  necessary measures?

16      A    I don't interpret it the way perhaps you are.  I

17  do not and I refuse to put myself on the street and ruin

18  myself financially in order to satisfy an unspecified

19  requirement in this document.

20      Q    What requirement is unspecified?

21      A    Necessary measures would seem to invoke what is

22  real, practical, and prudent on my behalf and not

23  necessarily to put myself in a position of financial risk

24  and ruin.  Necessary measures are strategies and steps

25  taken to effectuate the removal of his name from the

1    mortgage, not to withdraw the mortgage or the house from

2    my ownership.  There is a difference.

3        Q    Did Jim ever fail to execute any documents that

4    would pay off the loan and remove his name from the loan?

5        A    There was no opportunity to pay off the loan

6    from the time this document was written to today's date.

7    Other than somebody throwing cash at it, the loan cannot

8    be refinanced.

9        MR. COHEN:  You need to answer the question.

10        THE WITNESS:  No.

11    BY MR. HAES:

12        Q    Did you agree to take all necessary measures to

13    pay off the loan, correct?

14        A    I did.

15        MR. COHEN:  The question is did you agree.

16        MR. HAES:  I think she answered the question.

17        MR. COHEN:  I think she did.

18    BY MR. HAES:

19        Q    In the same paragraph, in paragraph "B," you

20    agree that you will not attempt to assume the V.A. loan,

21    correct?

22        A    Correct.

23        Q    Did you ever attempt to assume the V.A. loan?

24        A    Before this document was written, yes.

25        Q    How about after the document was written?

Exhibit "A"     Page: 62
00328

1    A    I inquired of the opportunity to do so if we

2   could fulfill the obligation that the Plaintiff placed on

3   me to eliminate his eligibility being involved.

4    Q    Also, in the same paragraph, you agree to pay

5   James liquidated damages at a rate of $1,000 a day for

6   every day you are late in taking all necessary measures

7   to pay off the loan and remove his name, correct?

8    MR. COHEN:  Objection.  Mischaracterizes what the

9   agreement says.

10  BY MR. HAES:

11   Q    You may answer the question.

12   MR. COHEN:  Actually, it's mischaracterizing it.  If

13  you are going to cite from the liquidated damages

14  provision, it has to be cited accurately.  Otherwise, I

15  will object and instruct this witness not to answer.  It

16  mischaracterizes the question.

17  BY MR. HAES:

18   Q    Did you agree to pay liquidated damages to James

19  Clark in the event the loan was not paid off in full and

20  his name removed from the loan?

21   A    Please specify more clearly because one thing is

22  to pay off the loan and the other thing is to remove his

23  name.

24   Q    Well, paragraph "B" includes both paying off the

25  loan and removal of his name, correct?

1      A    I can't help it if it is ambiguous.  One thing

2   is removing the name, and the other thing is paying off

3   the loan.

4      MR. COHEN:  What counsel what is getting to, I guess,

5   is the confusion is the term necessary measures applies

6   to both elements, removing Plaintiff's name from the loan

7   and to pay off the existing V.A. loan or is it only to

8   the first.  Hence, the question contains a confusing

9   statement.

10     MS. BOONE:  We are not going to resolve what counsel

11  alleges and the deponent alleges to be an ambiguity in a

12  settlement document today.  We are just trying to get

13  Leticia's best testimony.  Let's back up and try this

14  line of questioning again in a different way.

15         Counsel, if you will allow me to rephrase?

16     MR. COHEN:  Sure.

17

18                    EXAMINATION

19  BY MS. BOONE:

20     Q    Ms. Arciniega, would you kindly read to us the

21  sentence beginning on the fourth line of  paragraph "B"

22  starting with "Defendant agrees."

23     A     "Defendant agrees to pay plaintiff liquidated

24          damages at the rate of $1,000 per day for every

25          day she is late complying with this provision."

1    MR. COHEN:  Counsel, which provision does this refer

2    to?

3    MS. BOONE:  At this point that is not a question that

4    is pending.

5    MR. COHEN:  Okay.

6    BY MS. BOONE:

7    Q    Ms. Arciniega, did you pay off the existing

8    V.A. loan?

9    A    I took all necessary measures within my scope to

10   try to pay off the loan.

11   Q    That wasn't the question.  I'm sorry.

12   Did you pay off the existing V.A. loan?

13   A    I did not.

14   Q    Did you remove Plaintiff's name from the loan on

15   your property located at 890 Verona Avenue, Hemet,

16   California?

17   A    I did not.

18   Q    And have you paid Plaintiff, which in this case

19   refers to Mr. Clark, damages of $1,000 a day for every

20   day that you were late complying with this provision?

21   And before I draw the objection, have you paid

22   $1,000 a day for every day that you were late in paying

23   off the existing V.A. loan?

24   A    I have not.

25   Q    Have you paid Plaintiff, Mr. Clark, $1,000 a day

```
 1    for every day that you were late removing Mr. Clark's

 2    name from the loan on the Verona property?

 3        A    I have not.

 4        MS. BOONE:  Thank you.

 5

 6                    FURTHER EXAMINATION

 7    BY MR. HAES:

 8        Q    In paragraph "C" of the agreement -- well, why

 9    don't I have you read paragraph "C" of the agreement on

10    page 2 of 6.

11        A    "Subject to defendant fulfilling the obligations

12             set forth above in paragraph II-B, plaintiff

13             hereby waives any and all interests he may have

14             in the property located at 890 Verona Avenue,

15             Hemet, California."

16             For the record, it's not Hemet.  It's

17    San Jacinto.

18        Q    Thank you.  Let me show you another document.

19        MR. HAES:  Can we have this marked as Exhibit 3.

20    Thank you.

21             (Plaintiff's Exhibit 3 was marked

22          for identification, the original of which

23          is attached hereto.)

24    BY MR. HAES:

25        Q    Do you recognize this document?
```

1      A     Yes.

2      Q     Was this a document produced by you to us?

3      A     Yes.

4      Q     Please describe this document.

5      A     It's a statement from December 6, 2006 or

6    December 9, 2006 to January 9, 2007 of my Wells Fargo PMA

7    account.

8      Q     What account number is it?

9      MS. BOONE:   I'm going to intercept and just say that

10   we will ask you to identify the last six digits of the

11   account number.

12     THE WITNESS:   Okay.   The last six digits?

13   BY MR. HAES:

14     Q     Yes.

15     A     364304.

16     Q     May I direct your attention to page 10 of 10 of

17   the document?   If you would please look down near the

18   bottom of the document to the section entitled

19   "Subtractions."

20          What is listed under subtractions?

21     A     $88,000.

22     Q     Well, was the $88,000 a withdrawal or a deposit?

23     A     It's a withdrawal.

24     Q     How does it describe the withdrawal?   Would you

25   please read it?

**Exhibit "A"**   Page: 67
                                                                  **00333**

```
 1      A     "Withdrawal made in branch."

 2      Q     On what date?

 3      A     12/21.

 4      Q     12/21 of what year?

 5      A     2007 -- no.  12/21/2006.

 6      Q     Did you withdraw those funds?

 7      A     I did.

 8      Q     I would like to show you another document.

 9      MR. HAES:  Can you mark this Exhibit 4.  Thank you.

10            (Plaintiff's Exhibit 4 was marked

11       for identification, the original of which

12        is attached hereto.)

13  BY MR. HAES:

14      Q     Do you recognize this document?

15      A     I do.

16      Q     Please describe this document.

17      A     It's a deed of trust securing a second mortgage

18  on the house on Verona.

19      Q     Are you the trustor on the deed of trust?

20      A     I am.

21      Q     Is the information -- well, the deed of trust

22  indicates a loan.

23            In what amount was the loan?

24      A     100,000.

25      Q     Did you receive the $100,000 on account of this
```

```
 1   deed of trust?

 2       A    I did.

 3       Q    Thank you.  When and how did you receive those

 4   funds on account of that loan, the $100,000?

 5       A    I received a check in the mail.

 6       Q    When?

 7       A    In 2007.

 8       Q    Do you recall when in 2007?

 9       A    Sometime in the month of March.

10       MR. HAES:  I have another document here.  Would you

11   please mark this as Exhibit 5.  Thank you.

12              (Plaintiff's Exhibit 5 was marked

13         for identification, the original of which

14         is attached hereto.)

15   BY MR. HAES:

16       Q    As you can see, this document is quite

17   voluminous.

18            Do you recognize at least the cover page, the

19   front page of this document?

20       A    I do.

21       Q    Please describe the front page of this document.

22       A    The front page of this document is page number 1

23   one of The Bank of Hemet statement on the MSRE, Inc.

24   account ending in 289401.

25       Q    I'm going to, for sake of brevity, flip through
```

1   pages here and try to direct you to the relevant pages of

2   this document.

3       A    Okay.

4       Q    I'm going to quickly ask you questions related

5   to copies of certain checks that appear on each page.

6       MR. COHEN:  What do you mean by quickly ask her?

7       MR. HAES:  Well, I'm going to reference checks, and

8   I'm going to ask her whether or not she recognizes the

9   checks and whether or not those checks were payable to

10  her and whether she received those funds.

11      MS. BOONE:  To the extent you want a minute to flip

12  through the document and through the exhibit, go ahead

13  and take the time to do so.

14      MR. HAES:  Actually, I think that's a great idea.

15  BY MR. HAES:

16      Q    I would like to know your opinion as to whether

17  or not these are documents produced by you to us.

18      MR. COHEN:  I'll object to the question and this

19  document on the basis of we can't determine what you

20  collated and what you produced from all the documents

21  that we produced to form this one document.

22          From the Bates stamping at the bottom, it looks

23  like it starts off at 475 and then it jumps to 1,029.  I

24  would object to this witness authenticating this entire

25  document as a whole because I don't know how you collated

1   it.  I would prefer you ask her specific questions about

2   specific items.

3       MS. BOONE:  Absolutely.  We are not asking her to

4   verify the authenticity of this exhibit as a whole right

5   now.  I simply am asking Ms. Arciniega to be able to flip

6   through it for her comfort.  There will be specific

7   questions about specific pages in this document rather

8   than questioning as a whole.

9       MR. COHEN:  Okay.

10      MS. BOONE:  Thank you.

11  BY MR. HAES:

12      Q    Let us know when you are prepared.

13      A    I am good.

14      Q    Okay.  Please turn to the third page in.  The

15  full number appears at the corner.  It says 477.  Some of

16  the numbers may be cut off.

17          Do you see on the top left-hand corner check

18  number 1227?

19      A    I do.

20      Q    The check is made out to you in the amount of

21  $300.

22          Do you recognize this check?

23      A    I do.

24      Q    Were those funds received and cashed?

25      A    Those funds were received but not cashed.

1    Q    Were those funds received by you?

2    A    Yes.

3    Q    Do you recognize check number 1228 in the amount

4  of $2,700 made out to you on December 2nd, 2010?

5    A    I do.

6    Q    Were those funds received by you?

7    A    They were.

8    Q    Do you recognize check number 1229 made out to

9  you in the amount of $500 on December 21st, 2010?

10   A    I do.

11   Q    Were these funds received by you?

12   A    They were.

13   Q    Okay.  Let's flip a few more pages.  If you have

14  it on the bottom right-hand corner of your page, it's

15  1031.

16        Do you recognize the check in the top left-hand

17  corner, check number --

18     MR. COHEN:  Hold on.  Which page?

19     MR. HAES:  1031.  Are you there?

20     MR. COHEN:  Yes.  I'm here.

21  BY MR. HAES:

22   Q    Do you recognize the check in the top left-hand

23  corner made out to you in the amount of $2,700?

24   A    I do.

25   Q    It's check number 1230, correct?

```
 1      A    Yes.

 2      Q    Did you receive those funds?

 3      A    I did.

 4      Q    Right next to that top right-hand corner, do you

 5   recognize the check in the top right-hand corner, check

 6   number 1231, made out to you in the amount of $200?

 7      A    I do.

 8      Q    Did you receive those funds?

 9      A    I did.

10      Q    Do you recognize check number 1232 made out to

11   you in the amount of $50?

12      A    I do.

13      Q    Did you receive those funds?

14      A    I did.

15      Q    Do you recognize check number 1233 made out to

16   you in the amount of $25?

17      A    I do.

18      Q    Did you receive those funds?

19      A    I did.

20      Q    Did you recognize check number 1234 made out to

21   you in the amount of $300?

22      A    I do.

23      Q    Did you receive those funds?

24      A    I did.

25      Q    So we are going one, two, three flips, and we
```

1    should be at 1034 if it shows up on your page.

2           Do you recognize in the top right-hand corner,

3    check number 1236, made out to you in the amount of $400?

4        A    I do.

5        Q    Did you receive those funds?

6        A    I did.

7        Q    Do you recognize check number 1238 just below

8    that made out to you in the amount of $200?

9        A    No.  It's not made out to me.

10       Q    Oh, it's not.  Oh.  Hard to read.

11          Do you recognize check number 1239 made out to

12   you in the amount of $2,700 on the bottom of the page?

13       A    I do.

14       Q    Did you receive those funds?

15       A    I did.

16       Q    One, two, three flips, and you should be at

17   1037.

18          Do you recognize check number 1240 made out to

19   you in the amount of $200?

20       A    I do.

21       Q    Did you receive those funds?

22       A    I did.

23       Q    One, two, three flips, and you should be at

24   1040.

25          Do you recognize check number 1241 in the amount

1   of $2,700 made out to you?

2        A    I do.

3        Q    Did you receive those funds?

4        A    I did.

5        Q    Do you recognize check number 1242 made out to

6   you in the amount of $200?

7        A    I do.

8        Q    Did you receive those funds?

9        A    I did.

10       Q    One, two, three, flips, and you should be at

11   1043.

12            Do you recognize check number 1245 made out to

13   you in the amount of $2,700?

14       A    I do.

15       Q    Did you receive those funds?

16       A    I did.

17       Q    Do you recognize check number 1246 made out to

18   you in the amount of $300?

19       A    I do.

20       Q    Did you receive those funds?

21       A    I did.

22       Q    One, two, three flips, and you should be at

23   1046, bottom right-hand corner of the page.

24            Do you recognize check number 1248 made out to

25   you in the amount of $2,700?

Exhibit "A"   Page: 75
00341

1      A     I do.

2      Q     Did you receive those funds?

3      A     I did.

4      Q     Opposite corner, do you recognize check number

5   1251 made out to you in the amount of $2,700?

6      A     I do.

7      Q     Did you receive those funds?

8      A     I did.

9      Q     One, two, three flips, and you should be at

10  1049.

11          Do you recognize check number 1252 made out to

12  you in the amount of $300?

13     A     I do.

14     Q     Did you receive those funds?

15     A     I did.

16     Q     Do you recognize check number 1253 made out to

17  you in the amount of $300?

18     A     I do.

19     Q     Did you receive those funds?

20     A     I did.

21     Q     Okay.  One, two, three flips, and you should be

22  at 1052.

23     MR. COHEN:  This is going to be a long day.

24  BY MR. HAES:

25     Q     Do you recognize check number 1254 made out to

1    you in the amount of $2,700?

2        A    I do.

3        Q    Did you receive those funds?

4        A    I did.

5        Q    One, two, three flips, and you should be at

6    1050.

7            Do you recognize number 1257 made out to you in

8    the amount of $100?

9        A    I do.

10       Q    Did you receive those funds?

11       A    Yes.

12       Q    Did you recognize check number 1258 made out to

13   you in the amount of $100?

14       A    I do.

15       Q    Did you receive those funds?

16       A    I did.

17       Q    One, two flips, and you should be at 1057.

18           Do you recognize check number 1259 made out to

19   you in the amount of $200?

20       A    I do.

21       Q    Did you receive those funds?

22       A    I did.

23       Q    Do you recognize check number 1262 made out to

24   you in the amount of $2,000?

25       A    I do.

1     Q    Did you receive those funds?

2     A    I did.

3     Q    Okay.  One, two, three, four, five flips, and

4  you should be at 1062.

5          Do you recognize check number 1267 made out to

6  you in the amount of $1,250?

7     A    I do.

8     Q    Did you receive those funds?

9     A    I did.

10    Q    Bottom of the page, do you recognize check

11 number 1268 made out to you in the amount of $1,450?

12    A    I do.

13    Q    Did you receive those funds?

14    A    I did.

15    Q    Okay.  One, two, three flips, and you should be

16 at 1065, if you can read it.

17         Do you recognize --

18    MR. COHEN:  Give me one second, please.

19    MR. HAES:  Sure.  1065.

20    MR. COHEN:  Give me one second, please.

21    MR. HAES:  Sure.

22 BY MR. HAES:

23    Q    Are you at 1065, Ms. Arciniega?

24    A    Yes.

25    Q    Do you recognize check 1203 made out to you in

```
 1   the amount of $2,700?

 2       A    I do.

 3       Q    Did you receive those funds?

 4       A    I did.

 5       Q    Okay.  One, two, three flips, and you should be

 6   at 1068.

 7            Do you recognize check number 1204 made out to

 8   you in the amount of $2,700?

 9       A    I do.

10       Q    Did you receive those funds?

11       A    I did.

12       Q    Okay.  One, two, three flips, and you should be

13   at 1071.

14            Do you recognize check number 1205 made out to

15   you in the amount of $2,700?

16       A    I do.

17       Q    Did you receive those funds?

18       A    I did.

19       Q    Two checks down, do you recognize check number

20   1208 made out to you in the amount of $700?

21       A    I do.

22       Q    Did you receive those funds?

23       A    I did.

24       Q    Last check, do you recognize check number 1209

25   in the amount of $1,000 made out to you?
```

```
 1        A    I do.

 2        Q    Did you receive those funds?

 3        A    I did.

 4        Q    Okay.  One, two, three flips, and you should be

 5   at 1074.

 6             Do you recognize check number 1210 in the amount

 7   of $3,500 made out to you?

 8        A    I do.

 9        Q    Did you receive those funds?

10        A    I did.

11        Q    Okay.  One, two, three flips, and you should be

12   at 1077.

13             Do you recognize check number 1211 made out to

14   you in the amount of $2,700?

15        A    I do.

16        Q    Did you receive those funds?

17        A    I did.

18        Q    One, two, three, four, five flips, and you

19   should be at 1082.

20             Do you recognize check number 1213 made out to

21   you in the amount of $2,000?

22        A    I do.

23        Q    Did you receive those funds?

24        A    I did.

25        Q    One, two, three, four, five, six, seven, eight,
```

1  nine, 10, 11, 12, 13, 14, 15 flips, and you should be at

2  1097.

3         Do you recognize check number 1225 made out to

4  you in the amount of $1,500?

5     A    I do.

6     Q    Did you receive those funds?

7     A    I did.

8     Q    Did you recognize check number 1226 made out to

9  you in the amount of $300?

10    A    I do.

11    Q    Did you receive those funds?

12    A    I did.

13    Q    Okay.  One, two, three, four flips, and you

14  should be at page 1101.

15        Do you recognize check number 1075 at the top

16  right-hand corner of the page made out to you in the

17  amount of $750?

18    A    I do.

19    Q    Did you receive those funds?

20    A    I did.

21    Q    In the row below that on the left, do you

22  recognize check number 1076 made out to you in the amount

23  of $800?

24    A    I do.

25    Q    Did you receive those funds?

1      A     I did.

2      Q     Okay.   One, two, three flips, and you should be

3   at page 1104, left-hand side of the page, second check

4   down.

5            Do you recognize check number 1098 made out to

6   you in the amount of $100?

7      A     Yes.

8      Q     Did you receive those funds?

9      A     Yes.

10     Q     Okay.   Moving on, one page over, you are at

11   1105.

12           The last three checks on the page, do you

13   recognize check number 1119 made out to you in the amount

14   of $1,550?

15     A     Yes.

16     Q     Did you receive those funds?

17     A     I did.

18     Q     Next to that, do you recognize check number 1120

19   made out to you in the amount of $250?

20     A     I do.

21     Q     Did you receive those funds?

22     A     I did.

23     Q     The last check on the page, do you recognize

24   check number 1121 made out to you in the amount of $500?

25     A     I do.

1      Q    Did you receive those funds?

2      A    I did.

3      Q    Okay.  Moving on, one, two, three, four, five

4  flips, and you should be at 1110.

5           The top left-hand corner, do you recognize check

6  number 1139 made out to you in the amount of $500?

7      A    I do.

8      Q    Did you receive those funds?

9      A    I did.

10     Q    Do you recognize check number 1140 made out to

11  you in the amount of $200?

12     A    I do.

13     Q    Did you receive those funds?

14     A    I did.

15     Q    Okay.  Moving on, one, two, three flips, and you

16  should be at 1113.

17          The top right-hand corner of that page, do you

18  recognize check number 1154 made out to you in the amount

19  of $500?

20     A    I do.

21     Q    Did you receive those funds?

22     A    I did.

23     Q    Moving on, one flip over, page 1114.

24          Do you recognize check number 1174 made out to

25  you in the amount of $700.

1        A      I do.

2        Q      Did you receive those funds?

3        A      I did.

4        Q      Do you recognize check number 1175 made out to

5    you in the amount of $200?

6        A      I do.

7        Q      Did you receive those funds?

8        A      I did.

9        Q      Okay.  Moving on, one, two, three flips, and you

10   should be at 1117.

11            The top right-hand corner of that page, do you

12   recognize check number 1176 made out to you in the amount

13   of $2,700?

14       A      I do.

15       Q      Did you receive those funds?

16       A      I did.

17       Q      Do you recognize the check below that check,

18   number 1179, made out to you in the amount of $600?

19       A      I do.

20       Q      Did you receive those funds?

21       A      Yes, I did.

22       Q      Okay.  Moving on, one, two, three, four flips,

23   and you should be at 1121.

24            Do you recognize check number 1181 in the top

25   right-hand corner made out to you in the amount of

1    $5,000?

2        A    Top right-hand corner?

3        Q    Top left-hand corner.  I apologize.

4        A    I see it.  Yes.  I recognize it.

5        Q    Did you receive those funds?

6        A    I did.

7        Q    Just below that, do you recognize check number

8    1183 made out to you in the amount of $2,000?

9        A    I recognize it.

10       Q    Did you receive those funds?

11       A    I did.

12       Q    Okay.  Moving on, one, two, three, four, five

13   flips, and you should be at 1126.

14            Last two checks on the page first, do you

15   recognize check number 1192 made out to you in the amount

16   of $2,700?

17       A    I do.

18       Q    Did you receive those funds?

19       A    I did.

20       Q    Just below that, check number 1193 made out to

21   you in the amount of $2,063.84, do you recognize that

22   check?

23       A    I do.

24       Q    Did you receive those funds?

25       A    I did.

1      Q     Moving on, one, two, three flips, and you should

2   be at 1129, second check down.

3            Do you recognize check number 1195 made out to

4   you in the amount of $2,000?

5      A     I do.

6      Q     Did you receive those funds?

7      A     I did.

8      Q     Next check down, do you recognize check number

9   1196 made out to you in the amount of $100?

10     A     I do.

11     Q     Did you receive those funds?

12     A     I did.

13     Q     Next check down, do you recognize check number

14  1197 made out to you in the amount of $2,063.84?

15     A     I do.

16     Q     Did you receive those funds?

17     A     I did.

18     Q     Moving on, one, two, three, four, five, six,

19  seven, eight, nine, 10, 11 flips, and you should be at

20  page 1140.

21           Top left-hand corner of the page, do you

22  recognize check number 1012 made out to you in the amount

23  of $2,000?

24     A     What number?

25     Q     1012.

1       A     For what amount?

2       Q     $2,600.

3       A     I recognize it.

4       Q     Did you receive those funds?

5       A     I did.

6       Q     Bottom right-hand corner of the page, do you

7    recognize check number 1017 made out to you in the amount

8    of $2,060?

9       A     I do.

10      Q     Did you receive those funds?

11      A     I did.

12      Q     Moving on, one, two flips, and you should be at

13   page 1142, top left-hand corner of the page.

14            Do you recognize check number 1018 made out to

15   you in the amount of $1,775?

16      A     I do.

17      Q     Did you receive those funds?

18      A     I did.

19      Q     Moving on, one, two flips, and you should be at

20   page 1144, top left-hand corner.

21            Do you recognize check number 1020 made out to

22   you in the amount of $1,880?

23      A     I do.

24      Q     Did you receive those funds?

25      A     I did.

1      Q      Moving on, one, two flips, and you should be at

2   page 1146.

3            In the middle row, left-hand side, do you

4   recognize check number 1025 made out to you in the amount

5   of $2,170?

6      A      I do.

7      Q      Did you receive those funds?

8      A      I did.

9      Q      Right next to that, do you recognize check

10  number 1026 made out to you in the amount of $2,390?

11     A      I do.

12     Q      Did you receive those funds?

13     A      I did.

14     Q      Right below that, do you recognize check number

15  1028 made out to you in the amount of $900?

16     A      I do.

17     Q      Did you receive those funds?

18     A      I did.

19     Q      Okay.  Moving on, two flips, and you should be

20  at page number 1148, top right-hand corner.

21           Do you recognize check number 1030 made out to

22  you in the amount of $1,000?

23     A      I do.

24     Q      Did you receive those funds?

25     A      I did.

1    Q    Bottom check, do you recognize check number 1031

2  made out to you in the amount of $4,370?

3    A    I do.

4    Q    Did you receive those funds?

5    A    I did.

6    Q    Moving on, one, two, three, four, five, six,

7  seven, last check, page 1155.

8         Do you recognize check number zero made out to

9  you in the amount of $3,500?

10   A    I do.

11   Q    Did you receive those funds?

12   A    I did.

13   Q    Okay.  Thank you.

14  MR. HAES:  What time is it?

15  MS. BOONE:  It is 11:04 according to my computer.

16  MR. HAES:  Okay.  Good.

17  BY MR. HAES:

18   Q    I'm going to show you another document.

19  MR. HAES:  Can you please mark this as Exhibit 6.

20  Thank you.

21         (Plaintiff's Exhibit 6 was marked

22      for identification, the original of which

23      is attached hereto.)

24  BY MR. HAES:

25   Q    Do you recognize this document?

1      A     I do.

2      Q     Was this document produced by you?

3      A     It was.

4      Q     Please describe this document.

5      A     This is a recap of loan activity from

6  David D. Christian to Leticia J. Arciniega.  It shows the

7  date, amount, and check numbers that Mr. Christian wrote

8  to me as loans.

9      Q     Okay.  Prior to 2006, approximately how much

10 money was lent to you by David Christian?

11     A     I would need a calculator to add that up, but it

12 would be line number 16 on up to line number 1.  There

13 were previous amounts that don't appear here, but they

14 were paid back.

15     Q     Okay.  What was the purpose of the loans prior

16 to 2006?

17     A     The purpose of the loans prior to 2006 was to

18 help me with my living expenses.

19     Q     All right.  And would you read entries 1

20 through 15.  Just quickly read off date, check number,

21 and amount for each payment or for each check David wrote

22 out to you from the first entry through the fifteenth

23 entry.

24     MR. COHEN:  Counsel, isn't there a more effective use

25 of our time than having her read 15 entries on a

1   register?

2   BY MR. HAES:

3       Q    Do you have a calculator with you?

4       A    I don't.

5       Q    Okay.

6       MS. BOONE:  You can certainly use the calculator on

7   my phone if you need a calculator.

8       MR. HAES:  I would rather just go grab one.

9           Do we have a standard one?

10      MS. BOONE:  I will go get one.

11      MR. HAES:  Thank you.

12      MS. BOONE:  I will be right back.  Excuse me.

13          (Pause in proceedings)

14      MR. HAES:  Thank you, Sarah.

15      MS. BOONE:  You are welcome.

16  BY MR. HAES:

17      Q    Would you do me a favor and please add entries

18  1 through 15.

19      MR. COHEN:  No.  I'm objecting.  The debtor is not

20  here to do your calculations.

21      MR. HAES:  Okay.  Very well.  I will.

22  BY MR. HAES:

23      Q    Would you agree that between 2000 and 2006, you

24  were loaned approximately $40,000 by David Christian?

25      A    No.  It's more than that.

1      Q     Approximately?

2      A     No.  It's more than that.

3      MR. COHEN:  The question is, do you agree?  "Yes" or

4   "no."

5      THE WITNESS:  I don't agree.

6   BY MR. HAES:

7      Q     Okay.  Approximately, how much do you believe

8   you were loaned between June of 2000 and, let's say, the

9   beginning of 2006 or at the end of 2006 by David

10  Christian?

11     A     It's more like 70 or 80,000.

12     Q     Are all of the checks or payments from David

13  Christian to you as a loan reflected on this document?

14     MR. COHEN:  Objection.  Asked and answered.  The

15  Debtor already testified that certain transactions were

16  not included because they were paid back already.

17  BY MR. HAES:

18     Q     Are all of the payments made to you as a loan by

19  David Christian reflected in any promissory note in favor

20  of David Christian on this statement?

21     A     Please repeat that question.

22     Q     Any payment that David Christian made to you as

23  a loan that he holds a promissory note for, will those

24  payments all be reflected on this document?

25     A     David holds no promissory note.

1    Q    Okay.  I would like to share another document.

2    MR. HAES:  I would like to mark this as Exhibit 8.

3  Thank you.

4    MR. COHEN:  Are you coming back to number 6?

5    MR. HAES:  Yes.  We will also come back to number 7

6  as well.

7         (Plaintiff's Exhibit 8 was marked

8      for identification, the original of which

9      is attached hereto.)

10  BY MR. HAES:

11    Q    This here is Exhibit 8.

12    A    Okay.

13    Q    Please describe this document.

14    A    This is a promissory note signed by me dated

15  April 24th, 2009 wherein it's a note.  It's a promissory

16  note in David's favor.  The balance is 120,000.

17    Q    Have you made any payments to David Christian on

18  account of this promissory note?

19    A    I have not.

20    Q    Is David Christian still the holder of this

21  promissory note in his favor?

22    A    No.

23    Q    Why not?

24    A    He accepted to be placed as a beneficiary on my

25  retirement account and life insurance policy in lieu of

1    having a note.

2        Q    All right.  I would like to show you another

3    document.

4        MR. HAES:  Would you please mark this as Exhibit 9.

5    Thank you.

6            (Plaintiff's Exhibit 9 was marked

7          for identification, the original of which

8          is attached hereto.)

9    BY MR. HAES:

10       Q    Please describe this document.

11       A    This is a promissory note dated December 18,

12   2006 for a principal amount of 80,000 signed by me in

13   favor of David Christian.

14       Q    Have you made any payments to David Christian on

15   behalf of this promissory note?

16       A    No.

17       Q    Why not?

18       A    It's included in Exhibit 7 or 8.  I lost track

19   of the numbers.  It's number 8.

20       Q    Is David Christian the current holder of this

21   promissory note in his favor?

22       A    He has no promissory note.

23       Q    Okay.

24       MR. COHEN:  That's a "yes" or a "no."

25       THE WITNESS:  No.

1    BY MR. HAES:

2        Q     Why not?

3        A     Excuse me?

4        Q     Why isn't he a current holder of this promissory

5    note in his favor?

6        A     I answered that previously.  He accepted being a

7    beneficiary on my retirement account and life insurance

8    policy.

9        Q     So that is applicable to this note as well?

10       A     There is only one --

11       MR. COHEN:  It's a "yes" or a "no."

12       THE WITNESS:  Yes.

13   BY MR. HAES:

14       Q     I would like to get back to Exhibit Number 6,

15   please.  Please direct your attention to line item

16   number 16.

17            Would you please read that entire line item out

18   loud.

19       A     "Missing items.  Prior to 2006.  $21,250."

20       Q     What do you mean by "missing items"?

21       A     Well, I was apparently able to identify amounts

22   that David had provided me with prior to 2006, but we

23   were unable to find the canceled checks.

24       Q     Okay.  So there are no checks to corroborate

25   that portion of the loan in the amount of $21,250?

1        MR. COHEN:  Objection.  Mischaracterizes what the

2    witness just said.  She said she wasn't able to locate

3    those checks.  Your question is "There are no checks."

4    It is mischaracterizing her testimony.

5    BY MR. HAES:

6        Q     Do any documents exist anywhere to corroborate

7    the portion of the loan listed in item number 16 in the

8    amount of $21,250?

9        A     Please repeat that.

10       Q     Are there any documents anywhere that would

11   corroborate the portion of the loan listed in line item

12   number 16 in the amount of $21,250?

13       MR. COHEN:  Objection.  Calls for speculation as to

14   what is out there.

15   BY MR. HAES:

16       Q     Please answer the question.

17       A     Bank histories.  If I received the money, it

18   went through my account.

19       Q     Okay.

20       A     I don't know how far back.  I don't know if

21   banks would retain the history on the items that far

22   back, but it would clearly show the canceled checks that

23   were deposited to my accounts.

24       Q     Okay.  Do you have access to those bank

25   histories?

1     A     I don't.

2     Q     These bank histories are related to your

3  accounts, correct?

4     A     Correct.

5     Q     Why do you not have access to these bank

6  histories?

7     A     I would have to go to the bank to request them.

8     Q     So you do have access to the bank histories?

9     A     I have to access the bank and request them.

10  Whether they are available, as I said to start with, I

11  don't know how far they keep them.

12     Q     Okay.  Is there a chance that the amounts were

13  reserved in cash or given to you in cash and that is why

14  there are no checks?

15     A     No.

16     Q     I would like to ask that you please obtain

17  those bank statements to reflect the missing $21,250.

18  I would like to make a formal request for those

19  statements.

20     MR. COHEN:  Your request is noted.  I'll also note

21  this information was made available to this Plaintiff,

22  and the Plaintiff could have conducted discovery to have

23  obtained this information from the bank just as equally

24  as this witness could have done so.

25     MR. HAES:  Duly noted.

1    BY MR. HAES:

2       Q    Were the notes in favor of David Christian

3    canceled?

4       MR. COHEN:  Objection.  Calls for a legal conclusion.

5    BY MR. HAES:

6       Q    How would you characterize the -- well, answer

7    the question, please.

8            Were the notes canceled?

9       A    They were substituted.

10      Q    Define substituted.

11      A    He is satisfied that his investment has been

12   secured.

13      Q    I would like to share another document with you.

14      MR. HAES:  Can you mark this as Exhibit 7, please.

15   Thank you.

16           (Plaintiff's Exhibit 7 was marked

17        for identification, the original of which

18        is attached hereto.)

19      MR. HAES:  For the record, I would also like to

20   formally request written proof of the satisfaction on the

21   notes.

22      MR. COHEN:  Your request is duly noted.

23   BY MR. HAES:

24      Q    Do you recognize the document listed as

25   Exhibit 7?

1    A    I do.

2    Q    Was this document produced by you?

3    A    It was.

4    Q    Please describe this document.

5    A    This is proof that David is satisfied with the

6    substitution, what you just asked for us to produce --

7    MR. COHEN:  Describe the document.

8    THE WITNESS:  It is a reconveyance filed by David, in

9    effect, a release on a $120,000 lien that had been filed

10   against the property at 890 Verona.  He recorded it on

11   May 19th, 2009.

12   BY MR. HAES:

13   Q    What prompted David Christian to record the deed

14   of trust on the Verona property?

15   MS. BOONE:  I'm sorry.  Before you go forward, I'm

16   going to ask that the deponent describe the document

17   again because this document is not a reconveyance.

18   THE WITNESS:  This document is not a reconveyance.

19   This is a copy of a recordation of reconveyance.

20   MR. COHEN:  I would like a minute with my client so

21   that your questions are properly answered.

22   MS. BOONE:  Thank you.

23   MR. COHEN:  Give me a minute to step outside.

24   MS. BOONE:  I don't think we have a question pending,

25   so we'll go off the record.

1       MR. COHEN:  It will just be a minute.  Okay.  Thank

2  you.

3       MS. BOONE:  Thank you.

4            (Recess)

5       MR. HAES:  Okay.  We are back on the record.

6            Let the record reflect we just came back from a

7  short break.

8  BY MR. HAES:

9       Q    We were on the document listed as Exhibit

10  Number 7 which is -- well, you were describing the

11  document.

12            What is that document?

13      A    This document is a copy of an online inquiry for

14  documents that were recorded under the name of Leticia

15  Arciniega or David Christian.  The time period is May of

16  2011.

17      Q    Was the document produced by you to us?

18      A    Yes.

19      Q    Would you please read the entry described as

20  document number 2009-0215647 with the black "X" next to

21  it.  Would you read that entry.

22      A    "Document Type:  Trust Deed.  Arciniega, Leticia

23            Joy.  Christian, David D.  Document Number:

24            2009-0215647.  Number of Pages:  1.  Recording

25            Date:  2009-04-30.  Cost to Buy:  $7.  Add $1.00

 1              for Certified Copy.  Buy Now."

 2       Q    This is a record apparently, according to you,

 3  an online record from Riverside Assessor-County

 4  Clerk-Recorder; is that correct?

 5       A    Yes.

 6       Q    What does that entry reflect, the one you just

 7  read off?  In your opinion, what does that reflect?

 8       MR. COHEN:  Objection.  Calls for a legal conclusion.

 9       THE WITNESS:  It reflects the recording of the trust

10  deed in favor of David Christian on April 30th of 2009.

11  BY MR. HAES:

12       Q    What prompted David Christian to record a deed

13  of trust on the Verona property on that date?

14       MR. COHEN:  Objection.  Calls for speculation.

15       THE WITNESS:  You would have to ask David.

16  BY MR. HAES:

17       Q    Did you discuss with David Christian the

18  recordation of a deed of trust on that date?

19       A    What did I discuss with David?  Repeat the

20  question.

21       Q    At any time prior to the recordation of that

22  deed of trust, did you discuss with David Christian that

23  he would be recording a deed of trust on that date?

24       A    No.

25       Q    Generally, did you discuss with him that he

1   would be recording a deed of trust on the Verona property

2   generally?

3       A    No.

4       Q    Did you ever have any discussion with David

5   Christian regarding the recordation of a deed of trust on

6   the Verona property?

7       A    No.

8       Q    Were you aware that David Christian recorded a

9   deed of trust on the Verona property shortly after the

10  recordation of the deed of trust?

11      A    Yes.

12      Q    How were you made aware of that fact?

13      A    David made me aware of it.

14      Q    So you did discuss the recordation of the deed

15  of trust with David Christian?

16      MR. COHEN:  Objection.  Mischaracterizes the

17  witness's testimony.  The earlier question was

18  discussions prior to the recordation.

19      MR. HAES:  I believe I asked if she ever discussed

20  with David the recordation.

21      MR. COHEN:  Just ask the question.

22  BY MR. HAES:

23      Q    Did you ever discuss the recordation of the deed

24  of trust with David Christian?

25      A    Yes.

1    Q    And what did David Christian share with you or

2  tell you with respect to the recordation of the deed of

3  trust?

4       MR. COHEN:  Objection.  Hearsay.

5       THE WITNESS:  He told me he had it recorded.

6  BY MR. HAES:

7       Q    Did he say why?

8       MR. COHEN:  Objection.  Hearsay.

9       THE WITNESS:  No.

10  BY MR. HAES:

11       Q    Did you ask him why?

12       A    No.

13       MR. COHEN:  Objection.  Hearsay.

14  BY MR. HAES:

15       Q    Do you know why?

16       MR. COHEN:  Objection.  Calls for speculation.

17       THE WITNESS:  He was concerned.

18  BY MR. HAES:

19       Q    What was he concerned about?

20       A    I was being sued by the Plaintiff, and David had

21  a substantial investment in me and did what he did.

22       Q    Which was?

23       A    Record the deed of trust.

24       Q    Shortly after he recorded the deed of trust,

25  there is another entry on this exhibit, Exhibit Number 7,

1    entitled "Reconveyance."

2         Do you see that entry on the document?

3    A    I do.

4    Q    In your opinion, what does that entry reflect?

5    MR. COHEN:  Objection.  Calls for a legal conclusion.

6    THE WITNESS:  It is an entry on the Riverside County

7    Assessor-County Clerk-Recorder's website of a document

8    that was recorded, document number 2009-0251898 of a

9    reconveyance by David Christian.

10   BY MR. HAES:

11   Q    Did David Christian ever discuss with you the

12   reconveyance?

13   A    Yes.

14   Q    Did he explain to you why he recorded the

15   reconveyance?

16   A    No.

17   Q    Did you ask him why he recorded the

18   reconveyance?

19   A    No.

20   Q    Did you ever have a conversation with David

21   Christian as to why he recorded the reconveyance?

22   A    No.

23   Q    Do you know why David Christian recorded the

24   reconveyance?

25   A    Yes.

1      Q     Why did he record the reconveyance?

2      A     I put him on as a beneficiary on my retirement

3   account and my life insurance policy.

4      Q     At that point, at the point in which you put him

5   on as a beneficiary, were you still being sued by the

6   Plaintiff?

7      A     Yes.

8      Q     On what date did you put or did you add David

9   Christian as a beneficiary on the account?

10     A     I don't know.

11     Q     Approximately?

12     A     I don't know.

13     Q     I would like to show you another document.

14     MR. HAES:  Can you mark this as Exhibit Number 10,

15   please.  Thank you.

16            (Plaintiff's Exhibit 10 was marked

17      for identification, the original of which

18      is attached hereto.)

19     THE WITNESS:  Thank you.

20   BY MR. HAES:

21     Q     You are welcome.

22     MR. COHEN:  You just acceded to my request.

23     MS. BOONE:  While we are on the subject, you had said

24   you wanted a copy during lunch.

25            Do you want me to print it for you now?

**Exhibit "A"**   Page: 105
**00371**

1    MR. COHEN:  Well, if you can.

2    MS. BOONE:  I'll try and have it delivered to the

3  conference room.  Unfortunately, I am unable to print the

4  docket to reflect that there were no amendments, but you

5  can look at my computer if you want to see the document.

6    MR. COHEN:  Do you plan on showing the Debtor her

7  schedules as well?

8    MR. HAES:  Yes.

9    MR. COHEN:  All right.  Are you going to show it to

10  her before lunch?

11    MR. HAES:  I believe we are going to try to cover as

12  much as we can, and I think we will get there.

13    MR. COHEN:  Then I will have it.

14    MS. BOONE:  Let me know if you need something else.

15    MR. COHEN:  Just the docket to make sure there are no

16  amendments.

17      Do you happen to have the web page?

18    MR. HAES:  I won't be able to print it, but I can

19  just show it to you.

20    MR. COHEN:  Can I come around?  Is that okay?

21    MS. BOONE:  Yes.

22      Can we go off the record for a moment while we

23  do that?

24    MR. COHEN:  Sure.

25    MS. BOONE:  We will go off the record.  Thank you.

1          (Discussion off the record)

2      MR. HAES:  We are back on the record.  Let the record

3  reflect we just came back from a short break.

4  BY MR. HAES:

5      Q    Please read the title of the document I just

6  gave you.

7      A    "Statement of Financial Affairs.  United States

8           Bankruptcy Court.  Central District of

9           California."

10     Q    That's fine.  Who prepared this document for

11  you?

12     A    Lorene Mies.

13     Q    Page 8 of this document purports to be signed

14  electronically by you.

15          Do you recall reviewing this document?

16     MR. COHEN:  Objection as to time.

17  BY MR. HAES:

18     Q    Do you recall ever reviewing this document?

19     A    I referred the material that was submitted.

20  This document, no.

21     MR. COHEN:  "Yes" or "no."

22     THE WITNESS:  This document, no.

23  BY MR. HAES:

24     Q    Did you review your petition and schedules prior

25  to them being filed with the bankruptcy court?

1     A     Yes.

2     Q     But not this one?  You don't recall this one in

3   particular?

4     A     Excuse me?

5     Q     But you don't recall whether or not you reviewed

6   this document in particular?

7     A     I don't.

8     Q     Okay.  Please turn to page 4 of the document.

9   I'll direct your attention to question number 10 entitled

10  "Other transfers."

11    A     Uh-huh.

12    Q     Do you recognize the first transfer of cash

13  described in question number 10 dated 2010?  Do you

14  recognize that transfer?

15    A     No.

16    Q     Please describe the first transfer listed in

17  question number 10.

18    A     "Self-Employment Pension Plan Distribution:

19          $45,578.34.  Merrill Lynch.  P.O. Box 2150,

20          Lakewood,  New Jersey.  08701.  Debtor used .

21          these funds for living expenses."

22    Q     Okay.  Do you remember receiving that

23  distribution from Merrill Lynch in 2010?

24    A     No.

25    Q     Did you receive that distribution from Merrill

1     Lynch in 2010?

2        A     No.

3        Q     Did you ever receive a distribution from Merrill

4     Lynch in the amount of $45,578.34?

5        A     May I talk to you for a minute?

6        MR. COHEN:   There is a pending question right now.

7        THE WITNESS:   Okay.

8        MR. COHEN:   The practice is if there is a pending

9     question, you don't take a break.

10            Do you understand the question?

11        THE WITNESS:   I do.

12        MR. COHEN:   Okay.

13    BY MR. HAES:

14        Q     Please answer the question.

15        MR. COHEN:   Then you have to answer the question.

16        THE WITNESS:   I did not receive a distribution for

17    $45,578.34 from Merrill Lynch in 2010.

18    BY MR. HAES:

19        Q     No.  The question was ever.

20        A     I did not ever receive a distribution of

21    $45,578.34 from Merrill Lynch in 2010.

22        Q     Did you receive a distribution from Merrill

23    Lynch in 2010 at all?

24        A     Yes.

25        Q     Please describe the distribution or

1    distributions you received from Merrill Lynch in 2010.

2        A    I received several distributions from Merrill

3    Lynch in 2010 totaling approximately $45,000.

4        Q    Okay.  Do you recognize the distribution listed

5    in question number 10 as having been received in 2009?

6        A    Yes.

7        Q    Would you please read the description of that

8    distribution?

9        A    "Self-Employment Pension Plan Distribution.

10            $15,000.  Merrill Lynch.  P.O. Box 2150,

11            Lakewood, New Jersey 08701.  Debtor used these

12            funds for living expenses."

13        Q    Did you receive that distribution as described

14    in 2009?

15        A    Yes.

16        Q    Okay.  Do you recognize the third transfer

17    listed in question number 10?

18        A    Yes.

19        Q    Please describe that transfer.

20        A    "Interspousal Transfer/Change of Title of

21            House."  This wasn't the settlement amount I

22            received.  "3047 North Arrowhead Avenue,

23            San Bernardino, California 29405.  Debtor

24            received $30,000 in exchange for the Transfer.

25            Debtor used these funds for living expenses."

1    Q    Did you receive that transfer as described in

2    question number 10?

3    A    Yes.

4    Q    Okay.  So to be clear, in 2010, you acknowledge

5    receiving a total of approximately $45,000 in the form of

6    a pension plan distribution from Merrill Lynch, correct?

7    A    Correct.

8    Q    In 2009, you acknowledge receiving approximately

9    $15,000 in the form of a pension plan distribution from

10   Merrill Lynch, correct?

11   A    Correct.

12   Q    In 2009, in April of 2009, you acknowledge

13   receiving an interspousal transfer/change of title of

14   house and receiving cash in the amount of $30,000 in

15   exchange for the transfer; is that correct?

16   A    Correct.

17   Q    I would like to show you another document.

18   MR. HAES:  Could you please mark this as Exhibit 11.

19   Thank you.

20        (Plaintiff's Exhibit 11 was marked

21     for identification, the original of which

22     is attached hereto.)

23   BY MR. HAES:

24   Q    Do you recognize this document?

25   A    I do.

1    Q    Please describe this document.  Why don't you

2  just please read off the caption of the document.

3    A    "Defendant Leticia Joy Arciniega's Amended

4         Verified Response to Plaintiff's First Set of

5         Interrogatories F.R.C.P. 33 F.R.B.P. 7034."

6    Q    Who prepared this document?

7    A    My counsel.

8    Q    Did you review this document after it was

9  prepared?

10   A    Yes.

11   Q    Please turn to page 6 of the document.  I'll

12 direct your attention to your response to special

13 interrogatory number 4.

14        Would you please read that special

15 interrogatory.

16   A    "Identify any and all property of greater value

17        than $1,000 belonging to You at any time during

18        the period commencing on May 4, 2007, through

19        and including the petition date."

20   Q    Under sub header "ii," where it states "Values

21 as of the date of filing," please read the second item

22 listed.

23   A    "New York Life Whole Life Insurance Policy."

24   Q    In what amount?

25   A    $7,356.01.

1      Q      Are you still the holder of the New York Life

2    Whole Life Insurance Policy listed in item number 2?

3      A      I am.

4      Q      What is the current value of that policy?

5      A      I don't know.

6      Q      Approximately?

7      A      I don't know.  I'm sorry.  I don't know.

8      Q      Not even an estimate?

9      A      The face value is 50,000.

10     Q      Okay.

11     A      That's if I die.

12     Q      So you have no idea on the cash surrender?

13     A      I'm sorry.  No, I don't.

14     Q      Please read the third item listed right below

15   the insurance policy.

16     A      Merrill Lynch IRA, $101,237.30."

17     Q      That is $101,237.30?

18     A      It is.

19     Q      Okay.  Do you still have that Merrill Lynch IRA?

20     A      I do.

21     Q      What is the current balance of the IRA?

22     A      Approximately, 97,000.

23     Q      Okay.  Please turn to page 9 of the document.

24   I'll direct your attention to your response to special

25   interrogatory number 12.

1          Would you please read that special

2     interrogatory.

3     A     "Identify any and all loans obtained by You

4           during the period commencing on May 4, 2007,

5           through and including the petition date."

6     Q     Okay.  Under sub header number "i," where it

7     states "Loans incurred May 4th, 2007 through petition

8     date," please read the first item listed.

9     A     "WFB Business, $26,351."

10    Q     When did you take out that loan?

11    A     It was the latter part of, I think, 2007.

12    Q     Is the loan in your name?

13    A     I don't remember.  I believe it was in my name.

14    Q     Is there anybody else's name the loan would be

15    in?

16    A     No.

17    Q     So are you confident the loan was in your name?

18    A     Either mine or the corporation.  Most likely

19    mine.

20    Q     Do you acknowledge receipt of this loan or the

21    funds related to that loan?

22    A     I do.

23    Q     Are there any documents anywhere to corroborate

24    this loan?

25    A     Yes.

1      Q     I would ask that you please provide us with

2  those documents.

3      MR. COHEN:  Your request is noted.

4  BY MR. HAES:

5      Q     Please read the second item listed.

6      A     "WFB Business, $17,957."

7      Q     Is that another loan?

8      A     It is.

9      Q     When did you take out that loan?

10     A     In the same time period as the first one.

11     Q     What was that time period?

12     A     The latter part of 2007.

13     Q     Is that loan in your name?

14     A     Yes.

15     Q     Do you acknowledge receipt of the funds

16  associated with that loan?

17     A     I do.

18     Q     Are there any documents anywhere to corroborate

19  this loan?

20     A     Yes.

21     Q     I would like to formally request you produce

22  those documents.

23     MR. COHEN:  The request is noted.

24  BY MR. HAES:

25     Q     Please read the third item listed.

1    A    "David D. Christian (continued) $43,000 later

2         settled prior to filing."

3    Q    Do you acknowledge receipt of that loan in the

4    amount of $43,000 from David Christian to you?

5    A    Yes.

6    Q    When did you receive those funds?

7    A    In the time period prior to filing -- during the

8    time period described, May 4th, through and including the

9    petition date.

10   Q    Please be more specific.

11   MR. COHEN:  Objection.  The question only asks for a

12   time period from May 4th, 2007 until the petition date.

13   It does not ask for specific dates.

14   MS. BOONE:  To try to help clarify this issue, the

15   question is being asked in the course of the deposition

16   on what dates were those funds received.  The question is

17   not whether the response to the interrogatory is

18   responsive to the interrogatory or not.  The question is,

19   can you now tell us when did you receive those funds.

20   THE WITNESS:  May I have the schedule?

21   MR. COHEN:  Which schedule?

22   THE WITNESS:  It's 7 or 8, something.

23   MS. BOONE:  You are referring to Exhibit 6?

24   THE WITNESS:  Exhibit 6.  I'm referring to Exhibit 6,

25   and I'm referring to items 17 through 27.

1    BY MR. HAES:

2        Q    What is that date period?

3        A    May 2nd, 2008 through April 28, 2009.

4        Q    Thank you.

5        A    Uh-huh.

6        Q    Right beside the $43,000 sum under item

7    number 3, it says "Later settled prior to filing."

8             What does that mean?

9        A    That means that I put David on my life insurance

10   policy and my IRA as a beneficiary.

11       Q    Is it your contention that you no longer owe

12   these funds to David Christian?

13       A    No.

14       Q    Have you made any payments on this loan to David

15   Christian?

16       A    No.

17       Q    Read the fourth item listed.

18       A    "U.S. Bank, $16,057.92."

19       Q    Is that another loan?

20       A    Yes.

21       Q    Do you acknowledge receipt of the funds

22   associated with this loan?

23       A    Yes.

24       Q    When did you take out that loan?

25       A    1993.

1      Q      1993?

2      A      Yes.

3      Q      Are you saying that loan is erroneously listed

4    in this response to that special interrogatory?

5      MR. COHEN:  Well, I'll object to that question on the

6    basis that it asks for a legal conclusion.

7      THE WITNESS:  It's a credit card.

8      MR. COHEN:  To the extent counsel asked the question

9    as of May 4th, 2007, if this transaction truly occurred

10   in 1993, it should not have been included in this

11   response.

12     THE WITNESS:  The card was issued in '93, and I

13   incurred and paid on the card throughout the life of the

14   card.  As of the date of filing, that was the balance on

15   it.  I could not recreate what amounts I had advanced or

16   paid.

17     MR. COHEN:  But the question was a loan that was

18   obtained by you during this period, and you did not

19   obtain this loan during this period?

20     THE WITNESS:  Correct.

21     MR. COHEN:  Therefore, counsel's question was, was

22   this inaccurate, and the answer is?

23     THE WITNESS:  No.

24   BY MR. HAES:

25     Q      So you meant to list this, and you purposely

Exhibit "A"   Page: 118
00384

 1   listed it as a response to special interrogatory

 2   number 12?

 3       A    Erroneously, but yes.

 4       MR. HAES:  Okay.  I'm moving on to a document I

 5   would like to have marked as Exhibit Number 12.  Thank

 6   you.

 7            (Plaintiff's Exhibit 12 was marked

 8         for identification, the original of which

 9         is attached hereto.)

10   BY MR. HAES:

11       Q    Do you recognize this document?

12       A    I do.

13       Q    Please read the caption of this document, the

14   title, top center.

15       A    "Client Action Plan."

16       Q    What is the date listed on this document?

17       A    December 11, 2008.

18       Q    Please read the full name of the company who

19   sent you this document in the top left-hand corner.

20       A    Springboard.

21       Q    Below that?

22       A    "Non Profit Consumer Credit Management."

23       Q    Please turn to page 2 of the document.  I would

24   like for you to please read all of the text that appears

25   below the header entitled "Housing Action Plan" about

1    halfway down the page.  Please read it out loud.

2        A    "Reviewed income and listed housing and

3             transportation expenses.  Client has a deficit

4             of $3,820 after listing expenses.  Based on

5             financials compiled, reviewed and verified,

6             present Monthly Net Income is insufficient to

7             maintain mortgage."

8        Q    Keep going.

9        A    "Essential living expenses and transportation

10            costs.  Client's living expenses are 207.10

11            percent of the net monthly income.  The national

12            average is 35 to 45 percent.  Client's

13            transportation expenses are 93.20 percent of the

14            net monthly income.  National average is 15 to

15            25 percent.  I recommended client to maintain

16            and implement a monthly household budget keeping

17            the mortgage the top priority.  Eliminate all

18            nonessental spending from client's budget like

19            cable, internet and cell phones, for these are

20            luxuries you can do without until the mortgage

21            issue is resolved.  Consider selling assets

22            (unused car, motorcycle, jewelry).  I also

23            recommended reducing food budget from $400 to

24            $275.  I recommended for client to seek

25            full-time and/or part-time employment, also

1     possibly rent out a room."

2  Q  Keep going.

3  A  "To contact the lender to begin the loss

4     mitigation process.  To continue to keep housing

5     as a financial priority.  Increase income.

6     Budget improvement needed prior to loan

7     resolution.  Listing home/selling recommended.

8     To attend the necessary training that will allow

9     them to manage their finances with a greater

10    amount of skill.  Decrease expenses."

11  Q  Do you know why this document was sent to you?

12  MR. COHEN:  Objection.  Relevance.  Lacks foundation.

13 Hearsay.  Calls for speculation.

14 BY MR. HAES:

15  Q  Do you know why this document was sent to you?

16  MR. COHEN:  Repeat my objections.

17 BY MR. HAES:

18  Q  You can answer.

19  A  I called them.  I called them.  I called my

20 lender initially, CitiMortgage, to determine --

21  MR. COHEN:  The question is "yes" or "no."

22    Do you know why it was sent to you?

23  THE WITNESS:  Yeah, I do.  Uh-huh.

24 BY MR. HAES:

25  Q  Why was this document sent to you?

1      A     Because I contacted my lender.

2      Q     Did you receive this document on or about the

3   date listed on the document?

4      A     I did.

5      Q     Why did you contact your lender at that point in

6   time?

7      A     I wanted to find out what my options were in

8   terms of having the house refinanced in my name.

9      Q     And this was a response you received to your

10   request to refinance?

11      A     Yes.

12      Q     Did you speak with a Springboard advisor?

13      A     I did.

14      Q     When was that conversation?

15      A     Approximately, December of 2008.

16      Q     Did you take any notes related to that

17   conversation?

18      A     Probably.

19      Q     I would like to formally request that you

20   produce those notes.

21      MR. COHEN:  Your request is noted.

22   BY MR. HAES:

23      Q     Actually, I apologize.  Please go back to the

24   document we had out before.  It's Exhibit 12.

25            What real property was this document in

1    reference to?

2        MR. COHEN:  Objection.  Lacks foundation.

3    BY MR. HAES:

4        Q    Answer the question.

5        A    Verona.

6        Q    You mentioned that this document was sent to you

7    in response to a telephone call you placed to your

8    lender, correct?

9        A    Yes.

10       Q    All right.  What were you calling your lender

11   about?

12       MR. COHEN:  Objection.  Hearsay.

13       THE WITNESS:  Refinancing Verona in my name.

14   BY MR. HAES:

15       Q    So you wanted to discuss the potential refinance

16   of the Verona property?

17       A    Yes.

18       Q    And you believe that this was sent to you in

19   response to that request?

20       MR. COHEN:  Objection.  Asked and answered.

21       THE WITNESS:  Yes.

22   BY MR. HAES:

23       Q    Did you follow any of the recommendations listed

24   in the housing action plan?

25       MR. COHEN:  Objection.  Lacks foundation.

```
 1    BY MR. HAES:

 2        Q    I'm referring to the housing action plan on

 3    page 2 that you read off just a couple minutes ago onto

 4    the record.

 5        MR. COHEN:  Objection.  Compound question.

 6        THE WITNESS:  No.  It's a code violation in my town

 7    to rent --

 8        MR. COHEN:  The question calls for a "yes" or a "no."

 9        THE WITNESS:  No.  No.  No.

10    BY MR. HAES:

11        Q    Why not?

12        A    They are not practical.

13        Q    I would like to show you another document.

14        MR. HAES:  Would you please mark this as Exhibit 13.

15    Thank you.

16            (Plaintiff's Exhibit 13 was marked

17         for identification, the original of which

18         is attached hereto.)

19    BY MR. HAES:

20        Q    Do you recognize this document?

21        A    I do.

22        Q    What is the date listed on this document?

23        A    January 22nd, 2009.

24        Q    What is the address listed on this document?

25        A    890 Verona Avenue, San Jacinto, California
```

```
 1    92583.

 2         Q    To whom was the document addressed?

 3         A    James Clark.

 4         Q    Anybody else?

 5         A    Well, at the top it's addressed to both of us.

 6         Q    Okay.

 7         A    Their computer system has a limitation and can

 8    only handle one name.

 9         Q    So the document was addressed to both you and

10    James Clark?

11         A    Correct.

12         Q    Please read the full name of the company who

13    sent this document to you, the top left-hand corner.

14         A    Citi.

15         Q    Is Citi a lienholder on the Verona property?

16         A    Yes.

17         Q    What position lien do they hold?

18         A    First.

19         Q    Please read the first paragraph of the document

20    out loud.

21         A    "Thank you for submitting your request for

22              assistance on the above-referenced loan which

23              was received on January 22, 2009.  Your file has

24              now been forwarded to a loss mitigation

25              specialist for review."
```

**Exhibit "A"**   Page: 125
                                              **00391**

1      Q     Now please read the fourth paragraph of the

2    letter.

3      A     "Please be aware that we are unable to suspend

4            collection or foreclosure activity until such a

5            time that a Workable Solution has been approved

6            or completed, depending on the type of solution

7            offered."

8      Q     Did you reach out to Citi prior to them sending

9    this document to you?  Did you call Citi?

10     A     Yes.

11     Q     Did you speak with a loss mitigation specialist?

12     A     Possibly.

13     Q     Is that a "yes"?

14   MR. COHEN:  "Possibly" is not a "yes," Counsel.

15   THE WITNESS:  No, it's not a "yes."

16   BY MR. HAES:

17     Q     Do you remember having a conversation with a

18   representative of Citi regarding this document in

19   particular?

20     A     Yes.

21     Q     Do you remember if that person was a loss

22   mitigation specialist?

23     A     No.

24     Q     Had a workable solution -- well, how would you

25   interpret workable solution as referred to in this

1    document?

2        MR. COHEN:  Objection.  Calls for speculation.  Calls

3    for an opinion.  The document lacks foundation.  These

4    words are not the Debtor's words.

5        MS. BOONE:  The question was how would she interpret

6    or understand.  I think that's fair.

7        THE WITNESS:  A workable solution is generically used

8    to identify anything that the borrower will agree to and

9    the lender will concede to when a loan is in trouble.  A

10   loan being in trouble doesn't necessarily mean it's in

11   default or even behind.  It just means that there is an

12   anticipated hardship.

13           Consequently, workable could be anything from

14   the bank slashing the principle on the loan to extending

15   the loan term, reducing the interest rate applicable, any

16   number of concessions either permanent or temporary.

17           The rule of thumb is that the mortgage payment

18   should not exceed 31 percent of the borrower's income.

19   Subsequent to this document, there have been substantial

20   changes.

21       MR. COHEN:  Wait.  Wait.  Stop.

22       THE WITNESS:  Thank you.

23   BY MR. HAES:

24       Q    In your opinion, did you complete the review

25   process described in paragraph 2?

1      MR. COHEN:  Objection.  Lacks foundation.  Relevance.

2      THE WITNESS:  I completed the review process, yes.

3  BY MR. HAES:

4      Q    Have you read paragraph 2?

5      A    I did.

6      Q    What did the review process consist of in your

7  opinion?

8      A    The review process consisted of me providing

9  full financials and tax reports, income and expense.

10      Q    Were you aware of the possibility of foreclosure

11  at the time you read this document?

12      A    No.

13      Q    Was a workable solution ever approved or

14  completed?

15      A    Yes.

16      Q    What were the terms of the workable solution?

17      A    I don't remember the exact terms, but the

18  payment went from $1,031 per month to $715.

19      Q    Would you characterize that as a loan

20  modification?

21      A    It is a loan modification.

22      Q    I would like to show you another document.

23      MR. HAES:  Would you please mark this as Exhibit 14.

24  Thank you.

25          (Plaintiff's Exhibit 14 was marked

```
 1        for identification, the original of which

 2        is attached hereto.)

 3   BY MR. HAES:

 4        Q    Do you recognize this document?

 5        A    I do.

 6        Q    To whom is this document addressed on the top

 7   left-hand corner?

 8        A    To James A. Clark and Leticia J. Arciniega.

 9        Q    What is the address listed on this document?

10        A    890 Verona Avenue, San Jacinto, California

11   92583.

12        Q    Did you ever show this document to Mr. Clark?

13        A    No.

14        Q    Please read the full name of the company that

15   sent this document to you.

16        A    Citi.

17        Q    Do you acknowledge receipt of this document?

18        A    I do.

19        Q    Please read the first paragraph of this

20   document.

21        A    "Dear Mortgagor:  CitiMortgage (CMI) has

22             reviewed your request for a forbearance plan.

23             The enclosed contract sets forth the terms under

24             which CMI will accept a schedule of payments

25             during the time of plan."
```

Exhibit "A"

1      Q     When did you receive this document?

2      A     Somewhere around February 12th, whatever the

3  year was, 2009.

4      Q     There is a fax receipt line at the top of the

5  document.

6      A     Yes, there is.  2/26.

7      Q     This document was sent to you in reference to

8  which property?

9      A     Verona.

10      Q     Please turn to page 2 of the document.

11      A     Okay.

12      Q     Please read the caption or title at the top

13  center of the document.

14      A     "Stipulated Special Forbearance Plan Agreement."

15      Q     What is the date listed on the stipulated

16  special forbearance plan agreement?

17      A     Third day of February, 2009.

18      Q     Under the header entitled "Recitals," please

19  read aloud recital "B."

20      A     "The Borrower has failed and omitted to make

21            regular monthly payments in accordance with the

22            terms of the Note and Deed of Trust/Mortgage.

23            Therefore, the loan is in default, and CMI has

24            exercised its rights to institute collections

25            (and/or foreclosure, if applicable)."

 1      Q      You were aware of the possibility of foreclosure

 2    at the time you read this document, correct?

 3      A      No.

 4      Q      Notwithstanding the plain language of the

 5    document?

 6      A      Notwithstanding the plain language of the

 7    document.  I need to editorialize.

 8      MR. COHEN:  Restrain yourself, please.

 9    BY MR. HAES:

10      Q      Now, please read recital "C."

11      A      "The Borrower has requested that CMI enter into

12             this agreement to place its collections (and/or

13             foreclosure on hold, if applicable).  CMI wishes

14             to assist Borrower, but does not wish to

15             discontinue collections (and/or foreclosure, if

16             applicable) until the loan is brought current."

17      MR. COHEN:  By the way, the witness wants to

18    elaborate on her answer.  I guess it's up to you if you

19    want her to.

20      MR. HAES:  No.

21      MR. COHEN:  You don't want her to.  Okay.

22    BY MR. HAES:

23      Q      Please turn to page 3 of the document.  Please

24    read provision number 9 of the document.

25      A      "CMI will not discontinue the pending collection

1          (and/or foreclosure, if applicable), until

2          Borrower's account is current."

3          It's canned language.  They are obligated under

4     federal law to state these items whether or not they

5     apply to the loan in specific.

6     Q     Is it your contention that your loan was not in

7     jeopardy at the time you entered into the forbearance

8     agreement?

9     A     Go back to the Springboard document.  It says

10    the loan is current.

11    MS. BOONE:  Correction.  Just to be clear, I believe

12    that that document says that Ms. Arciniega says that the

13    loan is current.

14    THE WITNESS:  It was always current.

15    MR. COHEN:  That is your answer.

16    MS. BOONE:  Anyway, that document speaks for

17    itself.

18    MR. COHEN:  Well, she answered your question.  It's

19    current.

20    THE WITNESS:  The loan document speaks for itself.

21    The loan history speaks for itself.  The loan was never

22    delinquent, never in foreclosure, never in default.  The

23    computer for the systems at that point in time could not

24    allow a modification to occur concurrently with a current

25    loan.  They had to market --

 1   BY MR. HAES:

 2       Q    There is no question pending right now.

 3       A    Thank you.

 4       Q    The forbearance agreement attached hereto, would

 5   you just turn to the last page of the document, please.

 6            Is that your signature on the last page of the

 7   document?

 8       A    It is.

 9       Q    On what date did you sign this document?

10       A    February 25th, 2009.

11       Q    I would like to show you another document.

12       MR. COHEN:  I would like to break for lunch in the

13   near future.  It's 12:30.

14       MR. HAES:  Do you want to do it now?  Well, let's do

15   it now.

16            What time is it?

17       MR. COHEN:  It's 12:20.

18       MR. HAES:  Let's do it now.

19       MR. COHEN:  It's been a long stretch.

20       MR. HAES:  Yes, it has.  Do you agree we go off the

21   record for lunch?

22       MR. COHEN:  Yes, I do.

23                        (LUNCH RECESS)

24

25

```
 1        IRVINE, CALIFORNIA, WEDNESDAY, JANUARY 30, 2013

 2                    (AFTERNOON SESSION)

 3

 4

 5        MR. HAES:  Okay.  We are back on the record.

 6             Let the record reflect that we just back from a

 7   lunch break.  I was about to pass out another document.

 8        MR. COHEN:  I thought you were about to pass out.

 9        MR. HAES:  We are moving on to a document and if you

10   could tag this as Exhibit 15, please.  Thank you.

11                 (Plaintiff's Exhibit 15 was marked

12           for identification, the original of which

13            is attached hereto.)

14   BY MR. HAES:

15        Q    Do you recognize this document?

16        A    I do.

17        Q    Okay.  What is the date listed on this document?

18        A    April 13th, 2009.

19        Q    What is the address listed on the document?

20        A    890 Verona Avenue, San Jacinto, California

21   92583.

22        Q    Who is the document addressed to?

23        A    James A. Clark and Leticia J. Arciniega.

24        Q    Did you ever show this document to James?

25        A    No.
```

1    Q    Please read the full name of the company who

2    sent this document to you.

3    A    CitiMortgage.

4    Q    Okay.  And did you receive this document at or

5    around April 13th, 2009?

6    A    I would imagine so.

7    Q    Please read the first sentence of the first

8    paragraph of the document.

9    A    "In response to your recent inquiry regarding

10         assistance with your mortgage, enclosed is a

11         financial information form for you to complete

12         and return to us for review."

13   Q    If you would, please read the third paragraph

14   starting with "If we are unable."

15   A    "If we are unable to find a solution to help you

16         keep your home or you do not wish to keep your

17         home, we have additional alternatives to

18         foreclosure that may include monetary assistance

19         to satisfy other lienholders or help pay moving

20         costs."

21   Q    Go on.

22   A    "Pre-Foreclosure Sale.  We can allow you to sell

23         your home for its market value to a qualified

24         purchaser and pay us the sale proceeds to

25         satisfy the debt, even if the proceeds are less

1           than the total owed.  Deed-in-Lieu of

2           foreclosure.  If you are unable to sell your

3           home after a specified period of time, we may be

4           able to accept the property itself as settlement

5           of the account."

6           You realize either course of action would have

7      shot the hell out of his credit.

8      MS. BOONE:  That was not the question.

9      THE WITNESS:  My contribution --

10      MR. COHEN:  She said it anyway.

11      MR. HAES:  Okay.  I have another document.  Would you

12      please label this document number 16, Exhibit Number 16.

13      Thank you.

14           (Plaintiff's Exhibit 16 was marked

15        for identification, the original of which

16        is attached hereto.)

17      BY MR. HAES:

18      Q    Do you recognize that document?

19      A    I do.

20      Q    What is the date listed on that document?

21      A    April 20th, 2009.

22      Q    What is the address listed on the document?

23      A    890 Verona Avenue, San Jacinto, California

24      92853.

25      Q    Who is the document addressed to?

```
 1        A     James A. Clark and Leticia J. Arciniega.

 2        Q     Did you share this document with James?

 3        A     No.

 4        Q     Please read the full name of the company that

 5   sent you the document.

 6        A     CitiMortgage.

 7        Q     What real property was this document sent to you

 8   in reference to?

 9        A     890 Verona.

10        Q     Okay.  Please read the first paragraph of the

11   document.

12        A     "We are concerned because your mortgage account

13              is still delinquent."

14        Q     Keep going.

15        A     Oh, you said the first sentence.

16        Q     I believe I said first paragraph.  Did I say

17   first sentence?  First paragraph, please.

18        A     "Our agreement was that we would receive this

19              payment no later than 4/20/09.  However, your

20              account is still due for a total amount of

21              $2,182.38, including zero in late charges, $30

22              in delinquencies, and zero in other fees."

23        MR. HAES:  Okay.  I have another document here.

24              Would you please mark this Exhibit Number 17.

25   Thank you.
```

1              (Plaintiff's Exhibit 17 was marked

2          for identification, the original of which

3          is attached hereto.)

4      THE WITNESS:  There is a second page to this.

5  BY MR. HAES:

6      Q    This is all that we have.  I wasn't going to ask

7  you about the second page anyway.

8      A    Okay.

9      MR. COHEN:  Then wait one second, please.

10     MR. HAES:  Sure.

11     MR. COHEN:  I'll object to this document on the basis

12  that it lacks foundation.

13     MR. HAES:  Okay.

14  BY MR. HAES:

15     Q    Do you recognize this document?

16     A    I do.

17     Q    Did you draft this document?

18     A    I did.

19     Q    What is the date listed on the document?

20     A    May 2nd, 2009.

21     Q    Please read the first, second, and third

22  paragraphs.  The third paragraph is just a single

23  sentence.

24     A    "I have been in communication with various

25          representatives of CitiMortgage for several

```
 1              months.  Since January I have been in a

 2              'forbearance' program.  This program was

 3              initially described to me as having no

 4              consequence to my credit scores and I understood

 5              that the unpaid portion of the payment would be

 6              added to the mortgage balance.

 7                   After I made the first modified payment, I

 8              learned differently:  my credit report reflected

 9              the loan as delinquent before the end of the

10              first 30 days.  I called CitiMortgage and was

11              informed that due to my 'forbearance' status, I

12              was, in fact, delinquent.  As a consequence, one

13              of my credit card providers has closed my

14              account, causing a negative result to my credit

15              scores.  The documents I received from Citi

16              after we began the partial payment program

17              indicate I must make up the arrears at the end

18              of the three-month period or face foreclosure,

19              short sale or deed in lieu of foreclosure.

20                   I have lived in my house for 18 years.  I

21              do not want to lose it, but I need help."

22        Q    At this point you were aware of the possibility

23   of foreclosure at the time you wrote this letter,

24   correct?

25        A    No.
```

1        Q     That's what the document says?

2        MR. COHEN:  Objection.  Argumentative.

3              Is there a question pending?

4        MR. HAES:  No.  No, there is not.

5        MR. COHEN:  Chad --

6        MR. HAES:  Let the record reflect that both counsel

7    have requested a short break off the record.

8              (Recess)

9        MR. HAES:  Let the record reflect that we are back on

10   the record after a short break.

11             Where was I?

12   BY MR. HAES:

13       Q     Would you please reread for me the last sentence

14   of the second paragraph.

15       A     "The documents I received from Citi after we

16             began the partial payment program indicate I

17             must make up the arrears at the end of the

18             three-month period or face foreclosure, short

19             sale or deed in lieu of foreclosure."

20       Q     At the time you drafted this, were you aware

21   that if you failed to make up the arrears, that you would

22   face foreclosure, short sale, deed in lieu of

23   foreclosure?

24       A     Correct.

25       Q     Were you aware at the time you wrote this letter

1    that you were delinquent on your loan?

2       A    No.

3       Q    Were you aware at the time you wrote this letter

4    that CitiMortgage considered you delinquent on your loan?

5       A    No.

6       Q    Would you reread the second sentence of the

7    second paragraph, please.

8       A    "The documents I received from Citi after we

9            began the partial payment indicate I must make

10           up the arrears at the end of the three-month

11           period or face foreclosure, short sale, deed in

12           lieu of foreclosure."

13      MS. BOONE:   That is the final sentence of the

14   paragraph.

15      THE WITNESS:   I'm sorry.   Which sentence?

16      MR. HAES:   The second sentence of the second

17   paragraph.

18      THE WITNESS:   "I called CitiMortgage and was

19           informed that due to my 'forbearance' status, I

20           was, in fact, delinquent."

21   BY MR. HAES:

22      Q    So it's your assertion that you were not aware

23   that CitiMortgage considered you delinquent despite that

24   language?

25      A    Hang with me.   I was aware that I was not

1    delinquent regardless of their correspondence.  The

2    correspondence was in error.  It's canned correspondence

3    based on erroneous programs.

4         MS. BOONE:  That is not actually responsive to the

5    question.

6              Could you read back the last question?

7         MR. COHEN:  I think it is responsive.  You can reask

8    it.

9    BY MR. HAES:

10        Q    The question was, are you saying that --

11        MR. HAES:  Could you reread my question, please.

12             (The record was read by the reporter

13             as follows:

14             "Q    So it's your assertion that you were not

15             aware that CitiMortgage considered you

16             delinquent despite that language?")

17        MR. COHEN:  Do you understand the question?

18        THE WITNESS:  Yeah.  I'm aware that CitiMortgage did

19   not consider me delinquent despite the correspondence I

20   received.

21   BY MR. HAES:

22        Q    I'm sorry.  I'm not referring to the

23   correspondence.  I'm referring to the specific language

24   of the letter that you drafted.

25             Despite the sentence that says "and was informed

1  that due to my 'forbearance' status, I was, in fact,

2  delinquent," despite that language, it's your contention

3  that CitiMortgage did not consider you delinquent?

4      A    Correct.

5      MR. HAES:  Got it.  Okay.  I have another document

6  here.  Would you please mark this Exhibit Number 18.

7  Thank you.

8              (Plaintiff's Exhibit 18 was marked

9        for identification, the original of which

10       is attached hereto.)

11  BY MR. HAES:

12     Q    Do you recognize this document?

13     A    I do.

14     Q    Please describe the document including the

15  account number and the name of the bank where the account

16  is held.

17     A    This is a Wells Fargo checking account.

18     Q    I'm sorry to interrupt you.  Just go with the

19  last four digits of the account number.

20     A    Okay.  Wells Fargo checking account statement

21  dated August 11 through September 9, 2009 for account

22  ending in 7601.

23     Q    Okay.  When was this account opened?

24     A    I think this was opened in 1989.

25     Q    Is the account still open?

1    A    No.

2    Q    When was the account closed?

3    A    I believe it's about the time period for this

4  statement.

5    Q    September of 2009?

6    A    I think so.  I don't recall the exact dates.

7    Q    Okay.  Why was the account closed?

8    A    Somebody tampered with my I.D. and tried to get

9  into the account online.  I believed it was somebody who

10  knew me enough to know my social security, address, and

11  my pertinent data, so I closed it.

12    Q    At the time it was closed, how much money was in

13  the account?

14    A    According to this, it was $10.99 in the

15  negative.

16    MR. HAES:  Okay.  I have another document here.

17  Would you mark this exhibit number 19.  Thank you.

18           (Plaintiff's Exhibit 19 was marked

19       for identification, the original of which

20       is attached hereto.)

21  BY MR. HAES:

22    Q    Do you recognize this document?

23    A    I do.

24    Q    Please describe the document including the

25  account number, the last four digits of the account

1    number, and the name of the bank where the account is

2    held.

3        A    This is a Wells Fargo bank account statement

4    dated December 9, 2008 through January 9, 2009, account

5    number ending in 5304.

6        Q    Okay.  When was this account opened?

7        A    I think around 2000.  I don't remember.

8        Q    Is the account still open?

9        A    I don't believe so.  Maybe.

10       Q    Do you want to think about it?

11       A    That's my answer.  I don't remember.  I know I

12   have a Wells Fargo account that I haven't used in the

13   last two and a half years.  It's open, but I don't

14   remember the account number.

15       Q    Do you have any PMA accounts open at Wells

16   Fargo?

17       A    No.

18       Q    Okay.  Why did you open the account?

19       A    The business relationship I had with them, the

20   mortgage balance was 500-some odd dollars, and it

21   entitled to me to privileges and benefits and offered me

22   a package of services.  I took them up on it.  You have

23   to maintain a certain balance to qualify, and I didn't

24   have that after a while.

25       MR. HAES:  I have another document here.  Would you

1    please mark this as Exhibit Number 20.  Thank you.

2            (Plaintiff's Exhibit 20 was marked

3         for identification, the original of which

4         is attached hereto.)

5    BY MR. HAES:

6        Q    Do you recognize this document?

7        A    I do.

8        Q    Please describe the document including the

9    account number or the last four digits of the account

10   number and the name of the bank where the bank account is

11   held.

12       A    This is a Union Bank checking account statement.

13   The date is February 25th, 2011 through March 4th, 2011.

14            What was the other thing?  I'm sorry.

15       MR. COHEN:  Last four digits.

16       THE WITNESS:  Last four digits of the account number

17   are 6286.

18   BY MR. HAES:

19       Q    When was this account opened?

20       A    The end of February 2011.

21       Q    Why was this account opened?

22       A    I had a checking account at Wells Fargo, and I

23   had a mortgage loan at Wells Fargo, commercial mortgage.

24   I had two lines of credit.  The business office for Wells

25   Fargo advised me to close my Wells Fargo account because

1  Wells Fargo would, in fact, seize my assets and use them

2  to be applied against whatever monies I owed to them.  I

3  didn't close the account.  I had it down to a few dollars

4  and started doing business through Union Bank.

5      Q    Is the account still open?

6      A    It is.

7      Q    How much money is currently in the account?

8      A    Approximately $6,000.

9  MR. HAES:  Okay.  I have another document here.

10      Would you please mark this as Exhibit Number 21.

11  Thank you.

12          (Plaintiff's Exhibit 21 was marked

13       for identification, the original of which

14       is attached hereto.)

15  BY MR. HAES:

16      Q    Do you recognize this document?

17      A    I do.

18      Q    Please describe the document including the last

19  four digits of the account number and the name of the

20  bank where the account is held.

21      A    This is a Bank of Hemet commercial checking

22  account statement for the period of 12/31/10 to

23  January 31st, 2011.  The holder of the account is MSRE,

24  Inc.  Last four digits of the account number is 1901.

25      Q    When was this account opened?

**Exhibit "A"**  Page: 147
**00413**

1      A     In January of 2007.

2      Q     Is this account still open?

3      A     It is.

4      Q     Okay.  How much money is currently in the

5   account?

6      A     I think it's $76,000.

7      Q     Where did the $76,000 come from?

8      A     Our tenant security deposits for the homes we

9   rent.  As the titled states, this is a security deposit

10  trust account.

11     MR. HAES:  Would please mark this as Exhibit

12  Number 22.  Thank you.

13            (Plaintiff's Exhibit 22 was marked

14       for identification, the original of which

15       is attached hereto.)

16  BY MR. HAES:

17     Q     Do you recognize this document?

18     A     I do.

19     Q     Please describe the document including the last

20  four digits of the account number and the name of the

21  bank where the account is held.

22     A     This is a Bank of Hemet commercial account to

23  MSRE, Inc. for 12/31/10 through 1/31/11.  The last four

24  of the account number are 3201.

25     Q     When was the account opened?

1       A     January 2007.

2       Q     Why was the account opened?

3       A     It manages the commissions that are paid to the

4    office on transactions, sales transactions.

5       Q     Is this account still open?

6       A     It is.

7       Q     How much is currently in the account?

8       A     I believe it's $240.

9       MR. HAES:  Okay.  Please mark this Exhibit Number 23.

10   Thank you.

11            (Plaintiff's Exhibit 23 was marked

12        for identification, the original of which

13        is attached hereto.)

14   BY MR. HAES:

15      Q     Do you recognize this document?

16      A     I do.

17      Q     Please describe the document including the last

18   four digits of the account number and the name of the

19   bank where the account is held.

20      A     This is the Bank of Hemet commercial checking

21   account statement issued to MSRE, Inc. for 12/31/10

22   through 1/31/11.  The last four digits 1601.

23      Q     When was the account opened?

24      A     January 2007.

25      Q     Why was the account opened?

1        A     To handle escrow trust funds for any escrow

2    transactions we might manage.

3        Q     Is the account still open?

4        A     No.

5        Q     When was the account closed?

6        A     I think 2009.

7        Q     This is a statement for 2011?

8        A     It had to be after 2011.  We haven't used it in

9    years.

10        Q     Why was the account closed?

11        A     We stopped doing escrows.  There was no business

12    for escrows.

13        Q     At the time the account was closed, how much

14    money was in the account?

15        A     What is in there?  $107.20.

16       MR. HAES:  Would you mark this Exhibit Number 24,

17    please.  Thank you.

18              (Plaintiff's Exhibit 24 was marked

19         for identification, the original of which

20         is attached hereto.)

21    BY MR. HAES:

22        Q     Do you recognize this document?

23        A     I do.

24        Q     Please describe the document including the last

25    four digits of the account number and the number of the

1    bank where the account is held.

2        A    This is a Bank of Hemet commercial checking

3    account statement issued to MSRE, Inc. for the period of

4    12/31/10 through January 31st, 2011.  The last four are

5    2401.

6        Q    When was the account opened?

7        A    January 2007.

8        Q    Why was the account opened?

9        A    It's a general fund for the business.

10       Q    Is the account still open?

11       A    It is.

12       Q    How much money is currently in the account?

13       A    $2,453.

14       MR. HAES:  I have another document.

15           Would you please mark this as Exhibit Number 25.

16   Thank you.

17               (Plaintiff's Exhibit 25 was marked

18        for identification, the original of which

19        is attached hereto.)

20       THE WITNESS:  Thank you.

21   BY MR. HAES:

22       Q    You are welcome.

23           Do you recognize this document?

24       A    I do.

25       Q    Please describe the document including the last

1  four digits of the account number and the name of the

2  bank where the account is held.

3      A    This says Bank of Hemet, 12/31/10 through

4  1/31/11.  The last four digits are 4001.

5      Q    When was the account opened?

6      A    January 2007.

7      Q    Why was the account opened?

8      A    It was to handle related expenses to property

9  management.

10     Q    Is the account still open?

11     A    It is not.

12     Q    When was the account closed?

13     A    Sometime in 2012.

14     Q    Why was the account closed?

15     A    We didn't use it.

16     Q    At the time it was closed, how much money was in

17 the account?

18     A    What is on the balance?  $1,106.36.

19     Q    What did you do with the money when the account

20 was closed?

21     A    We put it into the rent trust account.

22     Q    Do you know which account number is the rent

23 trust account?

24     A    No.  But you are coming up on it.  You haven't

25 come to it yet.

1        MR. HAES:  Okay.  Could you mark this as Exhibit

2   Number 26.  Thank you.

3            (Plaintiff's Exhibit 26 was marked

4         for identification, the original of which

5         is attached hereto.)

6        THE WITNESS:  Same account.

7   BY MR. HAES:

8        Q    It is actually.

9        A    It's the same account.  It's a duplicate.

10       MR. HAES:  You can leave it as 26, but I have no

11   questions regarding that.

12            Would please mark this as Exhibit Number 27.

13   Thank you.

14            (Plaintiff's Exhibit 27 was marked

15         for identification, the original of which

16         is attached hereto.)

17       THE WITNESS:  We did this already, I thought.

18   BY MR. HAES:

19       Q    Do you have the last four digits in your record

20   ending there 9401?  We haven't done this one yet.

21   Actually, no.

22       MR. COHEN:  While you are looking, give me 30

23   seconds.

24       MS. REPORTER:  Off the record?

25       MS. BOONE:  No.  We will stay on the record.  Thank

1    you.

2        MR. HAES:  Okay.  We are still on the record.

3    BY MR. HAES:

4        Q    I don't believe we've done Exhibit Number 27

5    yet.

6            Would you please describe this document

7    including the last four digits of the account number and

8    the name of the bank where the account is held.

9        A    This is a Bank of Hemet commercial account

10   statement issued to MSRE, Inc. for the period 12/31/10

11   through 1/31/11.  The last four digits are 9401.

12       Q    When was this account opened?

13       A    January 2007.

14       Q    Why was this account opened?

15       A    This is the corporate account that pays bills

16   for the corporation.

17       Q    Is the account still open?

18       A    It is.

19       Q    How much is in the account?

20       A    It's less than $500.

21       MR. HAES:  Okay.  Would you please mark this as

22   Exhibit Number 28.  Thank you.

23            (Plaintiff's Exhibit 28 was marked

24        for identification, the original of which

25        is attached hereto.)

1    BY MR. HAES:

2        Q    Do you recognize this document?

3        A    I do.

4        Q    Please describe the document including the last

5    four digits of the account number and the name of the

6    bank where the account is held.

7        A    This is a Bank of Hemet commercial checking

8    account statement for the period of 12/31/10 to 1/31/11

9    provided to MSRE, Inc.  The last four are 3501.

10       Q    When was the account opened?

11       A    January of 2007.

12       Q    Why was the account opened?

13       A    To collect the rent monies, the gross rent

14   monies paid by tenants.  It's a trust account.

15       Q    Is the account still open?

16       A    It is.

17       Q    How much money is in the account?

18       A    Earlier this week, it was 56,000.

19       Q    Actually, would you please go back to Exhibit

20   Number 10.

21       MR. COHEN:  Which one is 10?

22       MR. HAES:  The statement of financial affairs.

23       MR. COHEN:  Wait a minute.  I took it with me.  That

24   is why.

25       THE WITNESS:  Thank you.

1     MR. HAES:  It looks like this.

2     MR. COHEN:  Yes.

3     THE WITNESS:  Uh-huh.

4     MR. COHEN:  I just took her copy with me.

5   BY MR. HAES:

6     Q   Okay.  Please turn to page 4 of the document.  I

7  will direct your attention to question number 10 entitled

8  "Other transfers."

9       Regarding the third transfer listed in question

10  number 10, please read your answer as to how the funds

11  received pursuant to that transfer were spent way down at

12  the bottom far right-hand side.

13       Well, first of all, read a description of the

14  transfer.

15     A   "Interspousal Transfer/Change of Title of House

16          3047 North Arrowhead Avenue, San Bernardino,

17          California 92405.  Debtor received $30,000 in

18          exchange for the Transfer.  Debtor used this

19          funds for living expenses."

20     Q   Generally, what was that transfer for, the

21  $30,000?

22     A   That was the settlement agreement.

23     Q   From whom did you receive that money?

24     A   From Clark.

25     Q   When did you receive that money?

1      A      In May of 2009.

2      Q      According to this, once again, how were the

3   funds spent?

4      A      I put them into MSRE.

5      Q      Well, no.  I'm asking what it says here on the

6   statement of financial affairs.

7      A      Please restate your question.

8      Q      How were the funds spent according to your

9   statement under oath on the statement of financial

10  affairs?

11     A      I drew on them for living expenses.

12     Q      Now, if you would go back to Exhibit Number 11

13  which is this one.

14     MR. COHEN:  Give me a second.

15     MR. HAES:  Yes.

16  BY MR. HAES:

17     Q      May I direct your attention to your response to

18  special interrogatory number 3.  Actually, go to page

19  number 6.

20          Under sub header "i" near the top of the page,

21  would you read sub header "i"?

22     A      "MSRE, Inc. received the full sum of $30,000

23             resulting from the settlement with the Plaintiff

24             in 2009, the sum being transferred as an owner

25             contribution to the business."

1      Q    Okay.  Thank you.  I have another document here

2    I would like to show you.

3      MR. HAES:  Would you please label this Exhibit

4    Number 29.  Thank you.

5           (Plaintiff's Exhibit 29 was marked

6        for identification, the original of which

7        is attached hereto.)

8      THE WITNESS:  Thank you.

9    BY MR. HAES:

10     Q    You are welcome.  Would you read the title of

11   this document near the top in the center in bold, dark

12   print?

13     A    "Schedule A - Real Property."

14     Q    Who prepared this document?

15     A    Lorene Mies.

16     Q    Do you recall reviewing this document?

17     A    Yes.

18     Q    Okay.  Please read the description of the first

19   real property listed up at the top right and left-hand

20   corner.

21     MR. COHEN:  I'm going to object to the document on

22   the basis it lacks foundation.

23     THE WITNESS:  "Single family home.  Primary

24   Residence.  8990 Verona Avenue, San Jacinto, California

25   92853."

```
 1   BY MR. HAES:

 2      Q    Okay.  Do you acknowledge that this document was

 3   filed along with your petition and schedules when you

 4   filed your bankruptcy?

 5      A    I do.  For the record, the address is 890

 6   Verona.

 7      Q    Very well.  Thank you.

 8           Would you please read the paragraph below the

 9   description of the property.

10      A    "Value based on Zillow.com dated 2/15/2011.

11           Debtor trying to modify second mortgage.  If

12           unable to do, Debtor will surrender property."

13      Q    Okay.  Thank you.  I have another document.

14      MR. HAES:  Would you please mark this as document

15   number 30.  Thank you.

16              (Plaintiff's Exhibit 30 was marked

17         for identification, the original of which

18          is attached hereto.)

19   BY MR. HAES:

20      Q    Will you please read the title of this document,

21   not the United States Bankruptcy Court, but just below

22   that center, bold print.

23      A    "Chapter 7 Individual Debtor's Statement of

24   Intention."

25      Q    Do you recall reviewing this document?
```

 1      MR. COHEN:   Objection.   Lacks foundation.

 2  BY MR. HAES:

 3      Q    Did you ever review this document?

 4      A    I don't know if it was this, but I submitted the

 5  data for it.

 6      Q    Okay.   Do you acknowledge that this document was

 7  filed with your petition and schedules when you filed for

 8  bankruptcy?

 9      A    I acknowledge that it was filed with my

10  petition.

11      Q    Who prepared this document?

12      A    Lorene Mies.

13      Q    Please read the description of the real property

14  in the box on the right in the middle of the page.

15      A    "Single Family Home.   Primary Residence.   8990

16  Verona Avenue, San Jacinto, California 92583."

17      Q    Now, read the paragraph below that.

18      A    "Value based on Zillow.com dated 2/15/2011.

19           Debtor is trying to modify second mortgage.   If

20           unable to do, Debtor will surrender property."

21      MR. HAES:   I need a short break.

22           Would you agree to a short break?

23      MR. COHEN:   Sure.

24           (Recess)

25      MR. HAES:   Let's go back on the record.

1              Let the record reflect we have just gotten back

2      from another quick break.

3      BY MR. HAES:

4          Q     We were on document number 30.  Previous to that

5      document number 29, you read off a paragraph.

6              Do you have document number 30 in front of you?

7          MR. COHEN:  Yes.

8          MR. HAES:  It's just to get back on the same line of

9      questioning.

10     BY MR. HAES:

11         Q     Regarding the Verona property on the first page,

12     you read off the property description.  Actually, it's

13     listed incorrectly here, but that is with respect or

14     supposed to be with respect to your residence, correct?

15         A     Correct.

16         Q     And please, one more time for the record, just

17     read the paragraph just below the property description.

18         A     "Value based on Zillow.com dated 2/15/2011.

19             Debtor trying to modify second mortgage.  If

20             unable to do, Debtor will surrender property."

21         Q     Have you surrendered the property?

22         A     No.

23         Q     You know, I just wanted some clarification.

24             On the earlier question I asked regarding

25     Exhibits 10 and 11, do you recall that question?  Do you

1    want me to repeat the question?

2        A     Please repeat it.

3        Q     Basically, Exhibit Number 10, you acknowledged

4    that it stated that the funds received from Jim, the

5    settlement funds, in Exhibit Number 10 which was your

6    statement of financial affairs, that in Exhibit

7    Number 10, it stated that the funds were used for living

8    expenses.

9            Then you acknowledged that in Exhibit Number 11,

10   which was your amended verified response to first set of

11   interrogatories, it stated that the funds were -- well,

12   I'll pull up the exact language -- transferred as an

13   owner contribution to the business.  Then today you

14   stated that you drew down on the funds.

15           Just for the record, because we have three kinds

16   of differing responses, which one is it?  Which is the

17   correct answer?

18       A     There is only one response.  I transferred the

19   funds to the business as an owner contribution, and I

20   drew on them as a shareholder for living expenses.

21       Q     Okay.

22       A     The $2,700 checks we walked through earlier.

23       Q     Let's see.  I have another document to show you.

24       MR. HAES:  Would you please mark this as Exhibit

25   Number 31.  Thank you.

```
 1              (Plaintiff's Exhibit 31 was marked

 2          for identification, the original of which

 3          is attached hereto.)

 4        THE WITNESS:  Thank you.

 5   BY MR. HAES:

 6        Q    You're welcome.

 7        MR. COHEN:  Objection.  Lacks foundation.

 8   BY MR. HAES:

 9        Q    Do you recognize this document?

10        A    No.  Not in this form.

11        Q    Do you remember what you listed as your income

12   on your petition?

13        A    Not off the top of my head, no.

14        Q    Will you please read what it states as your

15   other monthly income on question number 13 or line

16   number 13 on the document I just presented you with.

17        MR. COHEN:  Objection.  Lacks foundation.

18        THE WITNESS:  Net monthly draw is $1,429.16.

19   BY MR. HAES:

20        Q    Would you please read the title of the document

21   near the top center in bold print.

22        A    "Schedule I - Current Income of Individual

23   Debtor."

24        Q    Okay.  Even above that on the very top left-hand

25   corner, there is a case number there.
```

1        Would you read that case number out loud.

2    A    6:11-bk-15412-DS.

3    Q    Okay.  What does it say after the case number?

4    Just keeping going across.

5    A    "Doc 1.  Filed 218 02/18/11.  Entered 02/18/11.

6         16:41:01.  Desc."

7    Q    Did you provide the information that appears as

8    your other monthly income in the amount of $1,429.16 to

9    your attorney?

10   A    I did.

11   Q    Okay.  Do you recall reviewing this document?

12   A    The drafts.  Not this document.

13   Q    How did you arrive at this total for your

14   monthly income?

15   A    It's what I drew from the business.  It's what I

16   drew from all sources.  This was the average of draws.

17   Q    The average for how long?

18   A    The year for the period I was required to

19   disclose, which I think was 15 months, something like

20   that.

21   Q    Okay.  I'll show you another document.

22   MR. HAES:  Would you please mark this Exhibit 32.

23   Thank you.

24        (Plaintiff's Exhibit 32 was marked

25     for identification, the original of which

1        is attached hereto.)

2   BY MR. HAES:

3        Q    Could you please read the caption of this

4   document.

5        A    "Chapter 7 - Statement of Current Monthly Income

6   and Means-Test Calculation."

7        MR. COHEN:  I will object on this on the basis it

8   lacks foundation.

9   BY MR. HAES:

10       Q    Okay.  Do you recognize this document?

11       A    Not in this format.

12       Q    Up on the top left-hand corner, there is a case

13  number.

14            Could you read that case number out loud.

15       A    "Case 6:11-bk-15412-DS.  Doc 1.  Filed 02/18/11.

16            Entered 02/18/11.  16:41:01 Desc."

17       Q    Can you turn to page 2 of the document, please.

18            Read off the amount of money listed as gross

19  receipts in box 4, little (a).

20       A    $1,429.17.

21       Q    And in the column right beside that?

22       A    $1,429.17.

23       Q    Thank you.  And next page, top of page 3, under

24  "Total Current Monthly Income," what is the amount listed

25  all the way over to the right?

1        A     $1,429.17.

2        Q     Okay.  How did you arrive at that total?

3        MR. COHEN:  Objection.  This document is not derived

4    by the Debtor's filling out the form.  This is a

5    computer-generated form done by an attorney.

6        MR. HAES:  Okay.

7        MR. COHEN:  This is attorney calculations.  This is

8    not the Debtor's calculations.

9        MS. BOONE:  Your objection is noted, Counsel.

10       MR. HAES:  Very well.

11   BY MR. HAES:

12       Q     Okay.  I'll show you another document.

13       MR. HAES:  Would you please mark this as Exhibit

14   Number 33.  Thank you.

15              (Plaintiff's Exhibit 33 was marked

16         for identification, the original of which

17         is attached hereto.)

18   BY MR. HAES:

19       Q     Do you recognize this document?

20       MR. COHEN:  I'll object on the basis it lacks

21   foundation.

22       THE WITNESS:  I've seen it before.

23   BY MR. HAES:

24       Q     Okay.  Would you please read the caption or

25   title of the document.

1     A     "Schedule B - Personal Property."

2     Q     And would you please also go up to the top

3   left-hand corner and read all the way across, case

4   number, and the other information following that.

5     A     "Case 6:11-bk-15412-DS.  Doc 1.  Filed 02/18/11.

6           Entered 02/18/11.  16:41:01.  Desc."

7     Q     Who prepared this document?

8     A     Lorene Mies.

9     Q     Have you ever viewed this document?

10    A     Yes.

11    Q     Did you provide the information on this document

12  to your attorney?

13    A     I did.

14    Q     Please direct your attention to item number 5 on

15  the first page.

16    A     Okay.

17    Q     "Books, Pictures, and Collectibles."

18    A     Okay.

19    Q     Do you still own a signed, first edition book

20  collection?

21    A     No.

22    Q     What happened to that book collection?

23    A     Yard sale.

24    Q     So the book collection was sold?

25    A     Right.

1      Q    Are there any documents to corroborate the sale

2    or corroborate the sale of the books?

3      A    No.

4      Q    Okay.  How much did you sell the book collection

5    for?

6      A    $150.

7      Q    Okay.  Do you still own a collection of Lladro

8    porcelain statues?

9      A    I have a Nativity scene.

10     MR. COHEN:  The question is "yes" a or "no."

11     THE WITNESS:  Yes.

12   BY MR. HAES:

13     Q    Aside from the Nativity scene that you are still

14   in possession of, did you ever own any other Lladro

15   porcelain collectible statues?

16     A    While I was married to Mr. Clark.

17     Q    Okay.  Aside from the Nativity scene that you

18   still own, what were the other porcelain statues --

19     MR. COHEN:  Objection.  Mischaracterizes the

20   witness's testimony as to whether she owns it.

21   BY MR. HAES:

22     Q    Aside from the Nativity scene that is still

23   currently in your possession, what other Lladro porcelain

24   collectibles did you own at any point in time?

25     A    We had several pieces.  I don't remember the

1    number of them.  We had some Norman Rockwell Lladro.

2        Q    When you say some Norman Rockwell, how many did

3    you have?

4        A    Five or seven.  I don't remember how many.

5        Q    What else?

6        A    There were individual pieces.  The Girl with the

7    Ducks.  I don't remember what they all were.  It's

8    painful to recall most things.  He kept them all except

9    for the Nativity scene and sold them on eBay is what I

10   was told.

11       Q    You are still in possession of the Nativity

12   scene, correct?

13       A    I am.

14       Q    Would you consider yourself the owner of the

15   Nativity scene?

16       A    I would.

17       Q    Okay.  What would you say is the value of that?

18       A    The head broke off on one of the shepherds.  I

19   have no idea what it is worth at this point.

20       Q    Other than the one shepherd with the head broken

21   off, is every other member of the Nativity scene still

22   intact?

23       A    They are.

24       Q    How many pieces are there in total including the

25   one with the broken off head?

1        MR. COHEN:  You mean how many pieces in the Nativity

2    scene?

3    BY MR. HAES:

4        Q    How many porcelain statues included in the

5    Nativity scene in total?

6        A    Maybe eight.

7        Q    One of those eight has a head broken off head?

8        A    Baltazar.

9        MR. COHEN:  Which one?

10       THE WITNESS:  Baltazar.

11   BY MR. HAES:

12       Q    Okay.  How exactly did you go about determining

13   a value for your books, pictures and collectibles?

14       A    What I would pay for them if I came across them

15   and wanted to purchase them.

16       Q    Now, you already mentioned that you sold the

17   book collection for $150 which apparently -- strike that

18            When did you sell the book collection?

19       A    Before 2002.  It was before -- it was in August

20   of 2000.  We had a flood in the house, and the house was

21   severely damaged.  I had to dismantle the bookcases and

22   everything in the den.

23       Q    Okay.  In your evaluation of $150 for books,

24   pictures and collectibles, were the remaining pieces of

25   the Lladro collection included in that estimate?

1        A     I don't think I went through and evaluated item

2    by item in the house.   I was just trying to get a general

3    accumulation of numbers.

4        Q     Okay.   Moving further down, schedule "B," you

5    assign a value of $750 to furs and jewelry.

6              Do you see that?

7        A     I do.

8        Q     Do you still own a custom gold and diamond ring

9    made for you by James, a heart-shaped diamond?

10       A     I do.

11       Q     What would you say is the value of that ring?

12       A     I haven't got a clue.   It was a gift.

13       Q     Okay.

14       A     He can have it back if he likes.

15       Q     Was the ring or an estimate of the value of the

16   ring included in the $750 for furs and jewelry that you

17   listed on your schedule "B"?

18       A     Yes.   I wasn't eliminating any pieces.

19       Q     How did you go about determining the value of

20   that ring?

21       A     What I would have paid for it.

22       Q     Did you make any affirmative attempt to

23   determine the value of the ring before filing your

24   petition and schedules?

25       MR. COHEN:   Objection.   Assumes facts not in evidence

1   and also assumes the Debtor has this obligation as you

2   just described.

3        THE WITNESS:  I'm not a jeweler, so I have no idea

4   what the real value of it is.  It was a gift.  I've

5   looked at jewelry here and there and now and then and

6   something that size, whether a stone of that size and of

7   that clarity.  I didn't exclude any pieces when I came up

8   with that number.

9   BY MR. HAES:

10       Q    Did you make an affirmative attempt?

11       A    I made an effort to be reasonable about my

12   assessment.

13       Q    What effort did you make?

14       A    To come up with a value that I thought was fair

15   and reasonable.

16       Q    You came up with a value yourself?

17       A    Yes.

18       Q    Okay.  I will show you another document.

19       MR. HAES:  Could you please mark this as Exhibit

20   Number 34.  Thank you.

21            (Plaintiff's Exhibit 34 was marked

22        for identification, the original of which

23        is attached hereto.)

24       MR. COHEN:  I'll object on the basis that it lacks

25   foundation.  This, too, is a document generated by

1    attorneys, not by the Debtor.

2    BY MR. HAES:

3        Q    Can you please read the caption of the document,

4    the title?

5        A    "Schedule C - Property Claimed as Exempt."

6        Q    Could you please go up to the top left-hand

7    corner and read the information across the top including

8    case number and the rest of it.

9        A    "Case 6:11-bk-15412-DS.  Doc 1.  Filed 02/18/11.

10            Entered 02/18/11.  16:41:01.  Desc."

11       Q    Who prepared this document?

12       A    Lorene Mies.

13       MR. COHEN:  Objection.  Well, withdrawn.

14   BY MR. HAES:

15       Q    Do you recall reviewing this document?

16       A    Not in this format.

17       Q    Are you aware that this document is included in

18   your schedules and statements that are filed and signed

19   under penalty of perjury?

20       A    I am.

21       MR. COHEN:  Objection.  Counsel, this document is not

22   signed under penalty of perjury.  This is the lawyer's

23   application of exemption statutes.

24       MR. HAES:  I believe that --

25       MR. COHEN:  This is lawyer's application of exemption

 1   statutes.  This is predicated and pulled from information

 2   in other schedules.

 3        MS. BOONE:  Well, Counsel, that depends on how the

 4   petition is prepared.  Nevertheless, the petition is

 5   prepared under penalty of perjury.

 6        MR. COHEN:  You are correct.

 7        MS. BOONE:  I think we are all on the same page.

 8   Let's just keep going.

 9        MR. COHEN:  We are not.

10        MS. BOONE:  In what respect?

11        MR. COHEN:  Questions to the Debtor about applied

12   exemptions, she is not competent to testify about

13   statutory application of exemptions.

14        MS. BOONE:  The question isn't pending about the

15   statutory application of exemptions.  If one is asked,

16   you can object on that basis.

17        MR. COHEN:  I'm objecting on this document being

18   presented to the client and to ask her any information

19   about anything in this document.  If you want to go to

20   the source of origin, in other words, if there was

21   something in schedule "A" or in schedule "B," you can ask

22   the Debtor questions about that.  In this document I will

23   object.

24        MS. BOONE:  Your objection is noted, and we will ask

25   our questions.  Thank you, Counsel.

1   BY MR. HAES:

2       Q    On the top left-hand corner of the document,

3   would you please read the property description listed

4   there, the very first real property listed on this

5   document?

6       A    "Parcel with five unbuildable lots.

7            Description:  Morro Park.  View.  Subdivision 2.

8            Block 10.  Point LTS, five to nine.  Zero Paper

9            Roads, Cayucos.  Debtor retaining property."

10      Q    Very well.  If you shift all the way over to the

11  right, the far right-hand side of the page, do you see

12  the current value of the property without deducting

13  exemption?

14      A    I do.

15      Q    What is that dollar amount?

16      MR. COHEN:  I will still object on the basis that

17  this is a document that calls for information from other

18  schedules.

19      MR. HAES:  Understood.  You said that three times.

20      MR. COHEN:  I'll say it a fourth time.

21      MR. HAES:  Okay.

22      MR. COHEN:  Okay.

23      MR. HAES:  Understood.

24      MR. COHEN:  Therefore, I object to this line of

25  questioning.  It lacks foundation.  This Debtor is not

1  competent to testify to information that is contained in

2  schedule "C."  If you want to go to schedule "A" which is

3  the source, you are welcome to.

4      MR. HAES:  Your objection is duly noted for the

5  fourth time.

6  BY MR. HAES:

7      Q    What is the total dollar amount listed there?

8      A    $5,252.80.

9      Q    Did you provide that value to your attorney who

10  prepared these documents?

11     A    I did.

12     MR. COHEN:  Objection as to the form of question.

13  You said as to these documents.  I object to that

14  question.

15  BY MR. HAES:

16     Q    Did you provide --

17     MR. COHEN:  Let me finish.  This Debtor did not

18  provide any information to support schedule "C."

19  BY MR. HAES:

20     Q    Did you provide information to your attorney to

21  indicate that the property that you just read off was

22  valued at $5,252.80?

23     MR. COHEN:  I'll object.  If you want to show the

24  Debtor schedule "A" which is the basis of her real

25  property evaluation, you are welcome to, but you are

1    asking an incorrect question which is loaded with

2    landmines and problems.  I urge you to go to the source

3    of this schedule and present the Debtor with a

4    schedule "A" to avoid these objections.

5        MR. HAES:  Duly noted.

6    BY MR. HAES:

7        Q    Did you provide your attorney who filed your

8    petition for you an estimate of the value of the property

9    that you read off?

10       A    I did.

11       Q    What was that value that you provided your

12   attorney with?

13       A    I would have to see the schedule I drafted.

14       Q    Okay.  $5,252.80 sound like the value of that

15   property?

16       A    It does.

17       Q    Does $5,252.80 sound like the value of the

18   property located in Morro Bay, the Cayucos property that

19   you just read off the property description for?

20            Does that sound like the value of the property

21   that you gave to your attorney at the time that you filed

22   your petition?

23       A    Yes.

24       Q    Okay.  I've got the last document.

25       A    Great.

1        MR. HAES:  Would you please mark this as Exhibit

2   Number 35.  Thank you.

3              (Plaintiff's Exhibit 35 was marked

4        for identification, the original of which

5        is attached hereto.)

6   BY MR. HAES:

7        Q    Would you please --

8        MR. COHEN:  Give me a second, please.

9              (Attorney/client discussion)

10       MS. BOONE:  Let the record reflect, please, that

11  Defendant's counsel was conferring with his client

12  privately.

13             (Attorney/client discussion)

14       THE WITNESS:  Uh-huh.

15       MR. COHEN:  Okay.

16  BY MR. HAES:

17       Q    Would you please read the title of the document

18  I just handed you which is located in the top left-hand

19  corner of the document?

20       A    "Secured Tax Bill."

21       Q    Please include the date and read the title over

22  again.

23       A    "2010/11 Secured Tax Bill."

24       Q    Okay.  Please direct your attention to the

25  property description a couple of rows below the document

1    title.

2          Would you please read the property description.

3      MR. COHEN:  I'll object to this document on the basis

4    that it lacks foundation.

5      MR. HAES:  Very well.

6      THE WITNESS:  "Morro Rock.  View.  Subdivision 2.  BL

7      10 PTN Lots 5 to 9."

8    BY MR. HAES:

9      Q    Just below the property description, please read

10   the assessed owner as of January 1st, 2010.

11     A    "Arciniega, Leticia J."

12     Q    Is this the same property that we just discussed

13   that was in schedule "C"?

14     A    Yes.

15     Q    Please read the net property value towards the

16   middle of the page.  It's the assessed value that is

17   underlined.

18     A    8,000.

19     Q    Would you agree that this is the assessed value

20   for tax purposes as of 2010 and 2011?

21     MR. COHEN:  Objection.  Calls for speculation.  The

22   Debtor is not competent to testify about net value or tax

23   value.

24     THE WITNESS:  It's the assessed tax value.  It's not

25   the market value.

1    BY MR. HAES:

2        Q    Is it your understanding that based on this

3    document, the assessed value is $8,000?

4        MR. COHEN:  Objection.  She has no opinion as to the

5    tax value.  She is not competent to testify as to what

6    the tax value is.

7        MS. BOONE:  Counsel, the question was not regarding

8    tax value.  She may have an opinion.  Let's get the

9    testimony.

10       MR. COHEN:  I'll object on the basis that she is not

11   competent to testify about the tax value of property.

12       MS. BOONE:  Again, tax value was not the question.

13       MR. COHEN:  I believe it was.  Let's read back the

14   question.

15   BY MR. HAES:

16       Q    Is it your understanding based on what this

17   document says that according to this document, the

18   assessed value of the property is $8,000?

19       MR. COHEN:  Objection.  Lacks foundation.  Calls for

20   an opinion.  Calls for speculation.

21       THE WITNESS:  It states 8,000.

22   BY MR. HAES:

23       Q    Okay.  You stated earlier that in response to

24   one of my questions, that you had never owned any other

25   corporation aside from MSRE.

```
 1              Have you ever owned any other business aside

 2    from MSRE?

 3       A    As a separate dba?

 4       Q    Just as a business owner, sole proprietor.

 5       A    Yes.

 6       Q    Okay.  What business was that?

 7       A    I did immigration document consulting for a

 8    while.

 9       Q    Okay.  What was the name of that company?  Was

10    it a corporation?

11       A    No.

12       Q    Okay.

13       A    It was just a dba.

14       Q    And what was the dba called?  What was the name?

15       A    Servicios de Imigracion Amistad.

16    MR. HAES:  You got that?

17    MR. COHEN:  Can you spell it?

18    THE WITNESS:  S-e-r-v-i-c-i-o-s, d-e,

19    I-m-i-g-r-a-c-i-o-n, A-m-i-s-t-a-d.

20    BY MR. HAES:

21       Q    What year did you start that business?

22       A    I think it was 2001.

23       Q    Okay.  And for how long did the business last?

24    When did you end it?

25       A    Until 2006 and then I transferred it to somebody
```

```
 1   else.

 2        Q    Okay.  Was the business sold?

 3        A    Technically, yes.

 4        Q    How much was it sold for?

 5        A    Zero.  A dollar.

 6        Q    Why would you sell it for a dollar?

 7        A    There is no book.

 8        Q    So there was no book of business associated with

 9   it?

10        A    No.

11        Q    Why would someone want it?

12        A    The name, the phone number, the advertising that

13   was out there, the equipment, furniture, fixtures,

14   whatever, used desk, used P.C.

15        Q    While you were running the business, what was

16   the approximate income generated per month from that

17   business?

18        A    Gross?

19        Q    Gross, yeah.

20        A    $350.

21        Q    Okay.  And that is from the inception until

22   transfer?

23        A    Correct.

24        Q    Okay.  Did you ever own any other business?

25        A    Not that I can recall.
```

1    Q    Okay.  I apologize.  I'm just going back to a

2    couple of documents.  This won't take very much longer.

3         Would you please go back to Exhibit Number 3.

4    In case you need to spot it, it looks something like

5    this.  On page 10 of this exhibit, we discussed earlier a

6    withdrawal in the amount of $88,000.

7         Do you see that withdrawal?

8    A    Yes.

9    Q    Would you please, again, for the record state

10   what date it was withdrawn.

11   A    According to the statement, it was 12/21 of

12   2007.

13   Q    Okay.  What was the money spent on?

14   A    To buy the building, a down payment.

15   Q    Which building?

16   A    288 East Main Street.  It's part of what I lost.

17   Real cash.

18   Q    Okay.  Could you take a look at document

19   number 4 once more, please.

20   A    Okay.

21   Q    We talked about this earlier.  It's the deed

22   associated with the $1,000 loan that you received.

23        Do you agree with that?

24   A    I do.

25   Q    What was the money spent on?

1     A     The $15,000 a month that it was costing me to

2   run the office before it started producing and even after

3   it didn't produce.

4     Q     So the entirety of this loan was used for MSRE,

5   Inc.; is that right?

6     A     Me and MSRE, Inc.

7     Q     Okay.  Would you please take another look at

8   document number 17.  It's the letter you drafted to Citi.

9           You see down at the bottom of the page the

10  numbers 1 and 2?

11    A     Uh-huh.

12    Q     Well, not the paragraph right above that, but

13  the paragraph above where it says "James," the second

14  sentence of that paragraph starts with "At the beginning

15  of 2007."

16          Do you see that?

17    A     I do.

18    Q     Would you please read that sentence.

19    A     "At the beginning of 2007, I saw what appeared

20          to be an opportunity for investment in real

21          estate and took a second mortgage on the house."

22    Q     Okay.  Keep going.

23    A     "Again, I have made the payments for this

24          mortgage completely on my own."

25    Q     Keep going.

1    A    "Ironically, I made no such investment.  (Since

2         the forbearance on the first became effective, I

3         received no statement for this second mortgage;

4         no one will talk to me about it.  As I am told,

5         'We're not doing anything with them)."

6    Q    With respect to the funds received, what were

7    those funds used for?

8    A    As I stated during the earlier question, I used

9    them to support myself and the business since it did not

10   produce what I expected it to produce.

11   MR. HAES:  Okay.  We are literally on the verge of

12   being done, but we need to take one tiny break before we

13   wrap it up.

14        Can I get your consent for that?

15   MR. COHEN:  Sure.

16   MR. HAES:  We both agree to a very short break.

17   Thank you.

18   MS. BOONE:  Let's go back on the record.

19

20                    FURTHER EXAMINATION

21   BY MS. BOONE:

22   Q    I am going to ask a short series of questions,

23   and then I think we may be ready to wrap up our end of

24   this for the day.

25        I am going to ask you to refer back to some

1  documents we looked at before.  I'll tell you the numbers

2  of all of the documents, and we will just pull them all

3  out so they will be easier to see.

4          We will be looking at document number 1 and then

5  documents 12 through 17.  That is 12, 13, 14, 15, 16, 17.

6     MR. COHEN:  Let's just do it one at a time.

7     MS. BOONE:  Yes.  That's fine.

8  BY MS. BOONE:

9     Q    Let's start with document 12.

10    MR. COHEN:  Give me a second.

11    MS. BOONE:  Okay.

12 BY MS. BOONE:

13    Q    Ms. Arciniega, do I understand you to have

14 testified that shortly before receiving this client

15 action plan which is dated December 11, 2008, that you

16 had a conversation with a representative of Springboard?

17    A    Yes.

18    MR. COHEN:  Objection.  Asked and answered.

19    THE WITNESS:  Yes.

20 BY MS. BOONE:

21    Q    And the purpose of the conversation was to

22 modify the payments with respect to the Verona house?

23    A    No.  The purpose was to see if I could refinance

24 the house on my own.

25    Q    Okay.  And then let's look at document 13 which

1  is a Citi letter dated January 22nd, 2009.

2       Between the time of the Springboard conversation

3  and the date of this letter, did you request assistance

4  on this loan from Citi?

5       A    I don't recall specifically.

6       Q    Prior to the date of the January 22nd, 2009

7  letter, did you request assistance on the Verona loan?

8       A    I don't recall specifically.  This letter might

9  have been an offshoot of the conversation with

10  Springboard.  I would not have called Springboard first.

11  I would have called CitiMortgage first.  They would have

12  referred me to Springboard.  Whether this letter resulted

13  from my initial contact with Citi or my subsequent

14  conversation with Springboard, I don't recall.

15       Q    Okay.  But to clarify my second question,

16  sometime prior to January 22nd, 2009, you submitted a

17  request to Citi for assistance on the Verona loan,

18  correct?

19       A    This is a canned letter.  I talked to

20  CitiMortgage in December of 2008.  I had spoken to them

21  previously about refinancing the loan on my own.  At this

22  point in time, the lenders were beginning to see more

23  people having hardship issues, and they started

24  streamlining the process.  They were required to refer

25  you to Springboard.  That is how the Springboard letter

1    was generated.

2         Q    Okay.

3         A    Again, I don't recall the circumstances that

4    gave rise to this letter of this date.

5         Q    But setting aside specific circumstances, is it

6    fair to say that prior to January 22nd, 2009, that you

7    contacted Citi requesting assistance on the loan?

8         A    Requesting an evaluation to see if I could

9    refinance the loan on my own.

10        Q    Okay.  Thank you for that clarification.

11             Looking to document 14, this is a document that

12   there was some confusion about the date because the date

13   on the front is obscured, but there is a fax date at the

14   top of February 26, 2009, and I believe the signature

15   which you reviewed on the back page says February 25th,

16   2009.

17             Just to be clear about what time frame we

18   are talking about, it looks like sometime between

19   February 12, 2009 and February 25th, 2009 you would have

20   received this document, correct?

21        A    Correct.

22        Q    Can you please read for me the first sentence of

23   this document?

24        MR. COHEN:   Which document?

25        MS. BOONE:   Document 14.

1        MR. COHEN:  There is a cover letter and a follow-up.

2        MS. BOONE:  The first sentence of document 14 would

3    be the first sentence of the cover letter.

4        THE WITNESS:  CitiMortgage has reviewed your

5        forbearance plan."

6    BY MS. BOONE:

7        Q    That is fine.  That is the first sentence.

8    Thank you.

9        A    Uh-huh.

10       Q    Prior to February 12, 2009, did you contact

11   CitiMortgage regarding a forbearance plan?

12       A    No.  I contacted them regarding refinancing the

13   house on my own.  When we went through the financials on

14   my own, we determined I could not refinance the house on

15   my own, but I probably qualified for modification and

16   they offered it.

17       Q    So the first sentence of this letter --

18       A    It is canned letter.

19       Q    Canned letter which you maintain is not accurate

20   because you requested a refinance which was not possible

21   and they parlayed that into a forbearance?

22       A    Yes.

23       Q    Thank you for that clarification.  Can we look

24   at document 15, please

25            Document 15 is dated April 13, 2009 in the upper

1    left corner.  Again, this first sentence references a

2    recent inquiry regarding assistance with your mortgage.

3         What inquiry regarding assistance with your

4    mortgage does that reference?

5    A    The same one I responded to in the previous

6    questions.

7    Q    Thank you.  Document 16, I believe this may be a

8    document which gave rise to some heated discussion

9    earlier about the word delinquent, but this document is

10   dated April 20th, 2009.

11        The first sentence says, "We are concerned

12   because your mortgage account is still delinquent."

13        Do I understand your testimony correctly that

14   you maintain that as of April 20th, 2009 the account was

15   not delinquent?

16   A    The account was never delinquent.

17   Q    And is this communication, however the bank has

18   characterized the delinquency of the account, was this

19   communication also with respect to your efforts to

20   refinance the property?

21   A    It's a consequence of my efforts to refinance

22   the property.

23   Q    Okay.  Thank you.  I actually don't think we

24   need to refer to document 17.  Now I will go to

25   document 1.  I will ask you to turn to page 2 of 6 on

1   document 1.  Actually, let's turn to page 6 of 6 first.

2          Can you read for me the dates that appear --

3   that's not your signature.  Never mind.  It's page 5

4   of 6.  I did the same thing Chad did.

5          Can you read for me the date that appears next

6   to your signature on page 5 of 6?

7      A    May 11th, 2009.

8      Q    Okay.  And now turning to page 2 of 6, the first

9   sentence reads:

10              "No later than May 13, 2010, Defendant

11              will take all necessarily measures to pay off

12              the existing V.A. loan and removing Plaintiff's

13              name from the loan on her property located at

14              8890 Verona Avenue, Hemet, California."

15          I believe you did clarify that is actually

16   San Jacinto, California, and not Hemet, California.

17          Can you tell me, prior to May 11, 2009, whether

18   you signed the document containing paragraph "B," did you

19   inform Mr. Clark of the efforts referenced in the

20   documents to refinance the loan on the Verona property?

21      A    I have had no communication with Mr. Clark from

22   June of 2006.  He refuses any contact on my part.

23      Q    Just to be clear, would that be a no, you did

24   not inform him of these efforts?

25      A    No, I did not inform him.

1    Q    I think we were speaking over again.  I'm going

2  to ask the question and ask you wait until I finish.

3         To be clear, did you inform Mr. Clark of your

4  efforts to refinance the loan?

5    A    No.

6    Q    Thank you.

7    MS. BOONE:  That covers it for me.

8         Chad, do you have anything else?

9    MR. HAES:  No, I don't think so.  No, I do not.

10   MS. BOONE:  Baruch, did you have questions you wanted

11  to ask?

12   MR. COHEN:  The only question I have is, do I get my

13  response to document demands today?

14   MR. HAES:  I need to run upstairs.

15   MR. COHEN:  Okay.

16   MR. HAES:  And we will make sure.

17   MS. BOONE:  Why don't we go off the record and make

18  sure we are done.  Baruch and I can talk about the

19  stipulation about dealing with the transcript.

20        We will go off the record.

21        (Recess)

22   MS. BOONE:  We will go back on the record.

23        During the short break from which we are now

24  returning, counsel and I discussed the stipulation for

25  the handling of the transcript of today's deposition.

1          I will just recite what we agreed to and then

2     ask counsel to state if that also reflects his

3     understanding.

4          We will ask that the transcript be delivered to

5     Ms. Arciniega for her review through her counsel, meaning

6     that the transcript will be delivered to Mr. Cohen's

7     office at the address that he has provided to the

8     reporter.

9          Ms. Arciniega will have two weeks to review,

10    provide her comments, make any changes.

11         I should clarify that if you do want to make

12    changes to the transcript of your deposition and it's the

13    clarification of a spelling or where there has been

14    something that you think has been mistranscribed, then we

15    will, of course, look for your corrections.  To the

16    extent you are changing your answer and your answer on

17    the record is a "yes" and you want to change it to a

18    "no," that will be something that we reserve the right to

19    bring to the attention of the Court.

20         Your review is essentially for cleanup rather

21    than changes.  We will be able to see any changes that

22    you propose.

23         Counsel has stated that Ms. Arciniega needs two

24    weeks to review the transcript at which point it will be

25    returned.

1          Counsel and I have stipulated that the court

2    reporter will be relieved of her duties pursuant to

3    California Code of Civil Procedure Section 2025 and any

4    applicable federal provisions.

5          We have agreed that Marshack & Hays, which is

6    this law firm, will take possession of and maintain

7    originals of the transcripts.

8          We will provide access to counsel or parties to

9    the transcript upon request and reasonable notice and in

10   compliance with all applicable laws and statutes.

11          Counsel, does that reflect your understanding?

12      MR. COHEN:  Yes.

13      MS. BOONE:  Is there anything else we should put on

14   the record at this time?

15      MR. COHEN:  No.

16      MS. BOONE:  I will thank the court reporter for her

17   services today and thank everybody for coming.

18          (Deposition concluded at 3:50 p.m.)

19          (Whereupon it was stipulated by and

20        between counsel that the provisions of

21        2025(q)(1) and 2025(s)(1) were waived.)

22

23

24

25

PENALTY OF PERJURY CERTIFICATE

 

 

 

    I hereby declare I am the deponent in the within
matter, that I have read the foregoing transcript and
know the contents thereof; that I declare that the same
is true of my knowledge, except as to the matters which
are therein stated upon my information or belief, and as
to those matters, I believe them to be true.

    I declare being aware of the penalties of perjury;
that the foregoing answers are true and correct.

 

 

    Executed on the _____ day of_____
20_____, at _____, California.

 

 

 

 

                          _____

                           LETICIA JOY ARCINIEGA

1                    REPORTER'S CERTIFICATE

2     STATE OF CALIFORNIA,  )
                             )    ss.
3     COUNTY OF LOS ANGELES )

4              I, CORIN M. MULRENIN, CSR NO. 9496, Certified

5     Shorthand Reporter for the State of California, do hereby

6     certify;

7              That the deponent named in the foregoing

8     deposition, prior to being examined, was by me first duly

9     sworn to testify to the truth, the whole truth and

10    nothing but the truth;

11             That said deposition was taken before me at

12    the time and place therein stated and was thereafter

13    transcribed into print under my direction and

14    supervision, and I hereby certify the foregoing

15    deposition is a full, true, and correct transcript of my

16    shorthand notes so taken.

17             I further certify that I am not of counsel nor

18    attorney for either of the parties hereto or in any way

19    interested in the event of this case and that I am not

20    related to either of the parties hereto.

21             WITNESS my hand this 7th day of February 2013.

22

23

24             _Corin M Mulrenin_

25

                                                            196

1

2                    CERTIFIED COPY CERTIFICATE

3

4          I, CORIN M. MULRENIN, Certified Shorthand

5    Reporter, No. 9496, hereby certify that the attached

6    deposition is a correct and certified copy of the

7    deposition of the deponent named in the foregoing

8    deposition, taken before me at the time and place therein

9    stated.

10

11         I declare under penalty of perjury that the

12   foregoing is true and correct.

13

14

15         Executed at Covina, California, this 7th day of

16   February 2013.

17

18

19

20

21

22

23

24

25

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
870 Roosevelt Avenue, Irvine, CA 92620

A true and correct copy of the foregoing document entitled (*specify*): **PLAINTIFF JAMES CLARK'S COMPENDIUM OF TRIAL EXHIBITS** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) **February 17, 2015**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **CHAPTER 7 TRUSTEE,** Karl T Anderson (TR) edansie@hotmail.com, kanderson@ecf.epiqsystems.com
- **ATTORNEYS FOR PLAINTIFF,** Sarah C Boone sboone@marshackhays.com, ecfmarshackhays@gmail.com
- **INTERESTED PARTY DOLORES ARCINIEGA,** Alan W Forsley awf@fl-lawyers.net, awf@fkllawfirm.com,addy@fl-lawyers.net,lc@fl-lawyers.net,awf@fl-lawyers.net
- **ATTORNEYS FOR PLAINTIFF,** Chad V Haes chaes@marshackhays.com, ecfmarshackhays@gmail.com
- **ATTORNEYS FOR PLAINTIFF,** D Edward Hays ehays@marshackhays.com, ecfmarshackhays@gmail.com
- **UNITED STATES TRUSTEE (RS)** ustpregion16.rs.ecf@usdoj.gov

☐  Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) _____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐  Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) **February 17, 2015**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

Via Personal Delivery – February 18, 2015
PRESIDING JUDGE'S COPY
Bankruptcy Judge Scott H. Yun
United States Bankruptcy Court - Central District of California
3420 Twelfth Street, Suite 345 / Courtroom 302
Riverside, CA 92501-3819

**DEFENDANT, IN PRO PER – VIA EMAIL**
Leticia Joy Arciniega
890 Verona Ave
San Jacinto, CA 92583
Telephone: (951) 654-1095; email: larcinie@verizon.net

☐  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| February 17, 2015 | Chanel Mendoza | */s/ Chanel Mendoza* |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.